## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CRYOCOR, INC. and )
AMS RESEARCH CORPORATION, )
)
       Plaintiffs, )    C.A. No. 08-31-GMS
)
   v. )
) **JURY TRIAL DEMANDED**
CRYOCATH TECHNOLOGIES, INC., )
)
      Defendant. )

## PLAINTIFFS' OPENING BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS COUNTS III, IV, AND XI OF DEFENDANT'S COUNTERCLAIMS, OR, IN THE ALTERNATIVE, TO BIFURCATE AND STAY THE SAME

OF COUNSEL:

Leland G. Hansen
Wil Rao
Andrew W. Bateman
MCANDREWS, HELD & MALLOY, LTD.
500 West Madison Street, 34th Floor
Chicago, Illinois 60661
Tel: (312) 775-8000
*Attorneys For AMS Research Corp.*

Howard N. Wisnia
James P. Conley
BAKER & MCKENZIE
12544 High Bluff Drive, Third Floor
San Diego, California 92130-3051
Tel: (858) 523-6200
*Attorneys For CryoCor, Inc.*

Dated: March 11, 2008
854235 / 32647

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
1313 N. Market Street
Hercules Plaza, 6th Floor
Wilmington, DE 19801
Tel: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys For Plaintiffs CryoCor, Inc. and
AMS Research Corporation*

**TABLE OF CONTENTS**

I.      INTRODUCTION .................................................................................................. 1

II.     NATURE AND STAGE OF PROCEEDINGS ................................................... 2

III.    SUMMARY OF ARGUMENT ............................................................................ 3

IV.     STATEMENT OF FACTS ................................................................................... 6

        A.      Count III – Alleged Violation of Sherman Act Section 2 ....................... 6

        B.      Count III – Alleged Patent Misuse ......................................................... 8

        C.      Count IV – Alleged Sham Litigation ...................................................... 9

        D.      Count XI – Alleged Delaware Unfair Competition ................................ 9

V.      ARGUMENT ........................................................................................................ 9

        A.      Legal Standard For A Motion To Dismiss ............................................ 10

        B.      Defendant CryoCath Failed To State A Sherman Act Claim Under
                Section 2 ................................................................................................. 11

                1.      Defendant CryoCath Failed To Plead Sufficiently An Exception To
                        Plaintiffs' *Noerr-Pennington* Immunity ..................................... 11

                        a.      Defendant CryoCath Failed To Sufficiently Plead That
                                Plaintiffs' Suit Is Objectively Baseless .......................... 13

                        b.      Defendant CryoCath Failed To Sufficiently Plead That
                                Plaintiffs' Suit Is Subjectively Motivated By Improper
                                Purposes ........................................................................... 15

                2.      Defendant CryoCath Failed To Plead A Legally Cognizable
                        Antitrust Injury ............................................................................. 16

                3.      Defendant CryoCath Failed To Plead Factual Allegations
                        Supporting A Monopolization Claim Under Section 2 Of The
                        Sherman Act .................................................................................. 18

                        a.      Defendant CryoCath Was Required To Establish Monopoly
                                Power In A Relevant Market In A Meaningful Economic
                                Sense ................................................................................ 18

                        b.      Defendant CryoCath Failed To Plead Facts To Support A
                                Finding That Plaintiff CryoCor Has Monopoly Power In A
                                Relevant Market ............................................................... 20

             c.      Defendant CryoCath Failed To Plead Facts To Support Finding That Plaintiff CryoCor Has Engaged In Any Anticompetitive Conduct ................................................................ 21

      4.      Defendant CryoCath Failed To Properly Plead Necessary Elements Of Its Attempted Monopolization Antitrust Claim .................................... 23

             a.      Defendant CryoCath Failed To Plead Predatory Or Anticompetitive Conduct To Accomplish Monopolization .......... 23

             b.      Defendant CryoCath Failed To Properly Plead Specific Intent To Control Prices Or Destroy Competition ......................... 24

             c.      Defendant CryoCath Failed To Properly Plead A Dangerous Probability Of Success In Achieving Monopoly Power ............................................................................................ 24

  C.      Defendant CryoCath's Defective Antitrust Claims Should Be Dismissed To Avoid Incurring Significant Discovery Costs .................................................. 25

  D.      Patent Misuse Is Not An Affirmative Counterclaim And Defendant Failed To State A Patent Misuse Claim For Which Relief Can Be Granted .................. 26

      1.      Patent Misuse Is Not A Counterclaim But Instead A Defense ................ 26

      2.      Defendant Failed To State A Claim For Patent Misuse By Not Pleading An Exception To Plaintiffs' Immunity Under 35 U.S.C. § 271(d)(3) .............................................................................................. 26

  E.      Defendant CryoCath's Delaware Unfair Competition Counterclaim Is Barred By The *Noerr-Pennington* Doctrine ......................................................... 28

  F.      In the Alternative, Defendant CryoCath's Antitrust and Unfair Competition Counterclaims Should Be Bifurcated and Stayed ........................... 29

VI.      CONCLUSION .................................................................................................. 32

# TABLE OF AUTHORITIES

**Cases**

*Advo, Inc. v. Philadelphia Newspapers,*
  51 F.3d 1191 (3d Cir. 1995) .................................................................. 24

*Akzona v. E.I. du Pont de Nemours & Co.,*
  607 F. Supp. 227 (D. Del. 1984) ...................................................... 29, 30

*American Hoist & Derrick Co. v. Sowa & Sons, Inc.,*
  725 F.2d 1350 (Fed. Cir. 1984) ............................................................ 17

*Atlantic Exposition Servs., Inc. v. SMG,* No. 06-4848,
  2008 U.S. App. LEXIS 1832 (3d Cir. Jan. 28, 2008) .............................. 16

*B. Braun Med., Inc. v. Abbott Labs.,*
  124 F.3d 1419 (Fed. Cir. 1997) ............................................................ 26

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. __, 127 S. Ct. 1955  (2007) ...........................................*passim*

*Bristol-Myers Squibb Co. v. IVAX Corp.,*
  77 F. Supp. 2d 606 (D.N.J. 2000)......................................................... 28

*Brown Shoe Co. v. United States,*
  370 U.S. 294 (1962) ............................................................................ 19

*Brownsville Golden Age Nursing Home, Inc. v. Wells,*
  839 F.2d 155 (3d Cir. 1988) ................................................................ 28

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
  429 U.S. 477 (1977) ................................................................... 4, 16, 17

*C.R. Bard, Inc. v. M3 Systems, Inc.,*
  157 F.3d 1340 (Fed. Cir. 1998) .....................................................*passim*

*Capital Imaging v. Mohawk Valley Med. Assoc.,*
  996 F.2d 537 (2d Cir. 1993) ................................................................ 24

*Carroll Touch v. Electro Mech. Sys., Inc.,*
  15 F.3d 1573 (Fed. Cir. 1993) ............................................................. 29

*Cheminor Drugs, Ltd. v. Ethyl Corp.,*
  168 F.3d 119 (3d Cir. 1999) ........................................................... 6, 28

*Chip-Mender, Inc. v. The Sherwin-Williams Co.,*
  No. C 05-3465 PJH, 2006 U.S. Dist. LEXIS 2176 (N.D. Cal. Jan. 3, 2006) ........................... 17

*City of Columbia v. Omni Outdoor Advertising, Inc.,*
  499 U.S. 365 (1991) ................................................................................ 15

*City of Pittsburgh v. West Penn Power Co.,*
  147 F.3d 256 (3d Cir. 1998) ............................................................... 4, 16

*Conley v. Gibson,*
  355 U.S. 41 (1957) ........................................................................... 13, 14

*Crane & Shovel Sales Corp. v. Bucyrus-Erie Co.,*
  854 F.2d 802 (6th Cir. 1988) ............................................................... 5, 16

*Crossroads Cogeneration Corp. v. Orange & Rockland Utilities, Inc.,*
  159 F.3d 129 (3d Cir. 1998) ..................................................................... 4

*D.P. Enters. Inc. v. Bucks County Cmty. Coll.,*
  725 F.2d 943 (3d Cir. 1984) ................................................................... 10

*Dentsply Int'l v. New Tech. Co.,*
  C.A. No. 96-272-MMS, 1996 U.S. Dist. LEXIS 19846 (D. Del. Dec. 19, 1996)..................... 30

*Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.,*
  365 U.S. 127 (1961) ..................................................................... 1, 3, 12

*Evancho v. Fisher,*
  423 F.3d 347 (3d Cir. 2005) ................................................................. 5, 10

*FilmTec Corp. v. Hydranautics,*
  67 F.3d 931 (Fed. Cir. 1995) ................................................................. 9, 12

*Fresh Made, Inc. v. Lifeway Foods, Inc.,*
  No. Civ. 01-4254, 2002 U.S. Dist. LEXIS 15098 (E.D. Pa. Aug. 9, 2002) ........................ 21

*George Haug Co. v. Rolls Royce Motor Cars,*
  148 F.3d 136 (2d Cir. 1998) ................................................................... 24

*Gianna Enters. v. Miss World (Jersey) Ltd.,*
  551 F. Supp. 1348 (S.D.N.Y. 1982) ............................................................ 21

*Glaverbel Societe Anonyme v. Northlake Marketing & Supply, Inc.,*
  45 F.3d 1550 (Fed. Cir. 1995) ......................................................... 11, 17, 27

*Harrison Aire, Inc. v. Aerostar Int'l, Inc.,*
  423 F.3d 374 (3d Cir. 2005) *cert. denied*, 547 U.S. 1020 (2006) ........................ 18, 19

*Heerwagen v. Clear Channel Commc'ns,*
  435 F.3d 219 (2d Cir. 2006) ................................................................... 19

*Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.,*
   343 F. Supp.2d 272 (D. Del. 2004), *aff'd,* 488 F.3d 982 (Fed. Cir. 2007) ........................ 28, 29

*Hydranautics v. FilmTec Corp.,*
   70 F.3d 533 (9th Cir. 1995) ................................................................................. 30

*Illinois Tool Works, Inc. v. Independent Ink, Inc.,*
   547 U.S. 28 (2006) ........................................................................................... 21

*In re Innotron Diagnostics,*
   800 F.2d 1077 (Fed. Cir. 1986) ........................................................................... 29

*Intergraph Corp. v. Intel Corp.,*
   195 F.3d 1346 (Fed. Cir. 1999) ........................................................................... 20

*Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*
   884 F.2d 504 (9th Cir. 1989) ............................................................................... 17

*MedImmune, Inc. v. Genentech, Inc.,*
   427 F.3d 958 (Fed. Cir. 2005), *rev'd and rem'd on other grounds,* 127 S. Ct. 764 (2007) ...... 17

*Morse v. Lower Merion Sch. Dist.,*
   132 F.3d 902 (3d Cir. 1997) ............................................................................... 10

*Nobelpharma AB v. Implant Innovations, Inc.,*
   141 F.3d 1059 (Fed. Cir. 1998) (en banc) .............................................................. 28

*North Jersey Secretarial Sch., Inc. v. McKiernan,*
   713 F. Supp. 577 (S.D.N.Y. 1989) ....................................................................... 20

*Parker v. Learn the Skills Corp.,*
   C.A. No. 06-229-SLR, 2008 U.S. Dist. LEXIS 1811 (D. Del. Jan. 10, 2008) .................... 22, 24

*Pastore v. The Bell Tel. Co. of Penn.,*
   24 F.3d 508 (3d Cir. 1994) ............................................................................. 19, 24

*Pharmacia, AB v. Hybritech, Inc.,*
   4 U.S.P.Q. 975 (S.D. Cal. 1986) .......................................................................... 30

*Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,*
   508 U.S. 49 (1993) ..................................................................................... *passim*

*Q-Pharma, Inc. v. Andrew Jergens Co.,*
   360 F.3d 1295 (Fed. Cir. 2004) ................................................................ 3, 12, 15, 27

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.,*
   124 F.3d 430 (3d Cir. 1997) ......................................................................... *passim*

*Schor v. Abbott Labs.*,
  457 F.3d. 608 (7th Cir. 2006) ................................................................. 23

*Schuylkill Energy Resources v. Pennsylvania Power & Light Co.*,
  113 F.3d 405 (3d Cir. 1997) ................................................................. 18

*Sentinel Trust Co. v. Universal Bonding Ins. Co.*,
  316 F.3d 213 (3d Cir. 2003) ................................................................. 10

*Spectrum Sports, Inc. v. McQuillan*,
  506 U.S. 447 (1993) ................................................................. 20, 23

*Times-Picayune Publ'g Co. v. United States*,
  345 U.S. 594 (1953) ................................................................. 24

*United States v. Grinnell Corp.*,
  384 U.S. 563 (1966) ................................................................. 18

*United States v. Philadelphia Nat'l Bank*,
  374 U.S. 321 (1963) ................................................................. 19

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004) ................................................................. 18

*Virginia Panel Corp. v. MAC Panel Co.*,
  133 F.3d 860 (Fed. Cir. 1997) ................................................................. 26

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*,
  382 U.S. 172 (1965) ................................................................. 12, 19

*Windsurfing Int'l v. AMF, Inc.*,
  782 F.2d 995 (Fed. Cir. 1986) ................................................................. 26

**Statutes**

15 U.S.C. § 2 ................................................................. 11

35 U.S.C. § 271 ................................................................. *passim*

**Rules**

FED. R. CIV. P. 8(a)(2) ................................................................. 1, 5

FED. R. CIV. P. 12(b)(6) ................................................................. *passim*

FED. R. CIV. P. 26 ................................................................. 3

Fed. R. Civ. P. 42 ................................................................. 29, 31

## I.    INTRODUCTION

In this patent infringement case, Plaintiffs CryoCor, Inc. ("CryoCor") and AMS Research Corp. ("AMS Research") (collectively "Plaintiffs") assert that Defendant CryoCath Technologies, Inc. ("CryoCath" or "Defendant") is infringing claims of three patents. Defendant CryoCath has pled three facially defective counterclaims, namely: Count III (Patent Misuse and Sherman Act Section 2); Count IV (Sham Litigation); and Count XI (Delaware Unfair Competition). All of these counts fail to state a claim upon which relief can be granted, and should be dismissed before expensive discovery begins. FED. R. CIV. P. 12(b)(6).

In effect, Defendant CryoCath contends that Plaintiffs have committed antitrust and unfair competition violations and patent misuse by commencing this litigation to stop the ongoing patent infringement by CryoCath. The right to exclude others is the fundamental right of a patent owner. Exercising that right is not an antitrust violation, and does not constitute unfair competition or patent misuse.

More specifically, Counts III, IV, and XI should be dismissed for several reasons. First, Defendant CryoCath failed to plead allegations sufficient to overcome the immunity from liability enjoyed by Plaintiffs for enforcing presumptively valid patent rights. *See, e.g., Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); 35 U.S.C. § 271(d)(3) (2003). Second, Defendant failed to plead an antitrust injury. Third, Defendant did not plead "enough facts to state a claim to relief that is plausible on its face" and pled no more than "labels and conclusions, and a formulaic recitation of the elements." *Bell Atlantic Corp. v. Twombly*, 550 U.S. __, 127 S. Ct. 1955, 1964–66, 1970, 1974 (2007). *See also* FED. R. CIV. P. 8(a)(2). Dismissal of these conclusory allegations is particularly warranted at this stage of litigation, as such antitrust claims can give rise to expensive, wide-ranging discovery. *Twombly*, 550 U.S. __, 127 S. Ct. at 1966–67 ("[P]roceeding to antitrust discovery can be expensive."). In addition,

patent misuse is a defense, not a counterclaim. Moreover, Defendant failed to plead an exception to Plaintiffs' immunity under the Patent Statute (35 U.S.C. § 271(d)(3)) to the defense of patent misuse.

Accordingly, pursuant to FED. R. CIV. P. 12(b)(6), Counts III, IV, and XI of Defendant's counterclaims should be dismissed for failure to state a claim upon which relief can be granted. In the alternative, should the Court choose not to dismiss the counts, Plaintiffs request that the Court bifurcate and Stay Counts III, IV, and XI and any discovery associated them, until after final resolution of Plaintiffs' patent infringement claims.

## II.    NATURE AND STAGE OF PROCEEDINGS

This is a patent infringement action. Plaintiffs CryoCor and AMS Research allege that Defendant CryoCath infringes U.S. Pat. Nos. 6,572,610 ("610 Patent"), 6,471,694 ("694 Patent"), and RE 40,049 ("RE 049 Patent") (collectively "Asserted Patents") under 35 U.S.C. § 271. The Asserted Patents relate to the treatment of cardiac arrhythmias. (D.I. 1, January 15, 2008 Complaint; D.I. 9, February 26, 2008 Amended Complaint.)

Defendant has answered and counterclaimed. (D.I. 7, February 4, 2008 Answer and Counterclaims; D.I. 10, February 26, 2008 Answer to Amended Complaint and Amended Counterclaims.) Defendant alleges that Plaintiff CryoCor infringes U.S. Pat. No. 5,147,355 under 35 U.S.C. § 271, and asserts a number of other counterclaims. (*Id.*)

Plaintiffs' Reply to Defendant's Answer to Amended Complaint and Amended Counterclaims ("Counterclaims") is being filed concurrently with this motion. This motion requests, pursuant to FED. R. CIV. P. 12(b)(6), that Defendant's antitrust related counterclaims be dismissed for failure to state a claim upon which relief can be granted.

No FED. R. CIV. P. 26(f) conference has been held. Discovery has yet to begin. This motion is ripe for resolution to avoid unnecessary and expensive antitrust-related discovery.[1] In the alternative, should the Court choose to not dismiss the counts, Plaintiffs request that the Court bifurcate and Stay the Counts and any discovery associated them until after final resolution of Plaintiffs' patent infringement claims.

## III.    SUMMARY OF ARGUMENT

Counts III, IV, and XI of Defendant's Counterclaims should be dismissed for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Pursuant to D. Del. LR 7.1.3(c)(1)(D), Plaintiffs state that the legal propositions on which they rely are:

**1. Count III (Sherman Act Section 2) should be dismissed under Rule 12(b)(6) because Defendant has failed to pierce Plaintiffs' presumptive antitrust immunity under the *Noerr-Pennington* doctrine.** Plaintiffs have antitrust immunity for enforcing presumptively valid patent rights. *See, e.g., Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) ("*Noerr Pennington*"). Under the *Noerr-Pennington* doctrine, a patent owner has immunity from the type of antitrust violation asserted in Count III, unless the accused infringer establishes: (a) that the patent at issue was obtained through knowing and willful fraud, or (b) the lawsuit is a sham. *See, e.g., Q-Pharma, Inc. v. Andrew Jergens Co.*, 360 F.3d 1295, 1304–05 (Fed. Cir. 2004). Defendant has not pled fraud. And its conclusory sham litigation allegations fail to state a claim upon which relief can be granted. Moreover, the core of Defendant's antitrust counterclaims is its theory that it does not infringe the 694 and RE 049

---

[1] In addition, on February 28, 2008, Plaintiffs filed a complaint with the United States International Trade Commission to preclude Defendant's infringement of these same patents. (Ex. A hereto, ITC Complaint (without Exhibits).) Late in 2007, Defendant filed a patent infringement action in this Court asserting that Plaintiff CryoCor infringes six of Defendant's patents. C.A. No. 07-631-GMS.

Patents. But regardless of the merits of Defendant's theory, it does not provide the basis for seeking relief under the Sherman Act.

**2. Count III (Sherman Act) does not allege all of the requirements for a claim of an antitrust violation.** Count III (Sherman Act) should be dismissed because Defendant failed to include sufficient factual allegations that, if proven, could establish the elements required to prove those claims. For example, Defendant failed to plead a legally cognizable antitrust injury. *See, e.g., Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488–89 (1977); *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 264 (3d Cir. 1998). Defendant also failed to properly identify a particular "relevant market." *See, e.g., Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997). Pleadings defining the relevant market must include economic indicia of reasonable interchangeability, which Defendant also failed to allege:

> Where the [counterclaim] plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted.

*Id.* Further, Defendant did not allege a dangerous probability of Plaintiffs' gaining monopoly power without winning the suit. Defendant also failed to allege that Plaintiffs possess a market share. *See Crossroads Cogeneration Corp. v. Orange & Rockland Utilities, Inc.*, 159 F.3d 129, 141 (3d Cir. 1998).

**3. Count III (Sherman Act) and Count IV (Sham Litigation) should be dismissed under Rule 12(b)(6) for failing to sufficiently plead those claims.** Defendant failed to plead in Counts III (Sherman Act) and IV (Sham Litigation) "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. __, 127 S. Ct. at 1964–66, 1970, 1974. Defendant's Counterclaims do not provide fair notice of the grounds upon which Defendant's antitrust related

counterclaims rest. *See, e.g.,* FED. R. CIV. P. 8(a)(2); *Twombly*, 550 U.S. __, 127 S. Ct. at 1964–65. Instead, Counts III and IV are premised solely on conclusory allegations and the recitation of boilerplate language, which cannot withstand a Rule 12(b)(6) motion to dismiss. *See. e.g., id.; Crane & Shovel Sales Corp. v. Bucyrus-Erie Co.*, 854 F.2d 802, 805 (6th Cir. 1988) ("The essential elements of a private antitrust claim must be alleged in more than vague and conclusory terms to prevent dismissal of the [counterclaim] complaint on a [counterclaim] defendant's 12(b)(6) motion.").

**4. Count III (Patent Misuse) should be dismissed under Rule 12(b)(6) because patent misuse is not an affirmative counterclaim and Defendant failed to plead sufficiently an exception to Plaintiff's immunity under 35 U.S.C. § 271(d)(3).** Contrary to Defendant's assertion, patent misuse is a defense to a charge of infringement, not an affirmative counterclaim. Further, under 35 U.S.C. § 271(d)(3), patent owners have immunity from the type of patent misuse alleged in Count III, i.e., from claims of patent misuse that are predicated on the enforcement of Plaintiffs' patent rights. 35 U.S.C. § 271(d)(3) (2003). In fact, in the patent enforcement context, "[t]he law recognizes a presumption that the assertion of a duly granted patent is made in good faith; this presumption is overcome only by affirmative evidence of bad faith." *C.R. Bard, Inc. v. M3 Systems, Inc.*, 157 F.3d 1340, 1369 (Fed. Cir. 1998) (citation omitted). And the Court need not give weight to Defendant's bald assertions or legal conclusions in deciding to dismiss Count III (Patent Misuse) under Rule 12(b)(6). *See Evancho v. Fisher*, 423 F.3d 347, 351 (3d Cir. 2005).

**5. Count XI (Delaware Unfair Competition) should be dismissed under Rule 12(b)(6) because Defendant failed to pierce Plaintiffs' presumptive antitrust immunity under the *Noerr-Pennington* doctrine.** Defendant's claim of unfair competition is premised on

Plaintiffs seeking to enforce their patent rights by filing this lawsuit. However, because Defendant CryoCath's pleadings are insufficient to support a sham litigation counterclaim, *Noerr-Pennington* immunity precludes liability under Delaware unfair competition law. *See, e.g., Cheminor Drugs, Ltd. v. Ethyl Corp.,* 168 F.3d 119, 128–29 (3d Cir. 1999).

**6. Alternatively, the Court should bifurcate and stay Counts III, IV and IX (and discovery associated therewith) as they are based on the false premise that Plaintiffs' action is a sham.** Favorable resolution of Plaintiffs' patent infringement claims should moot all of the counts. The interests of expedition and economy are best served by resolving the patent infringement claims first. Any remaining antitrust and unfair competition claims could then be resolved to the extent they are not mooted by the infringement determinations.

## IV.    STATEMENT OF FACTS

Defendant has pled three facially defective counterclaims, namely: Count III (Patent Misuse and Violation of the Sherman Act 2); Count IV (Sham Litigation); and Count XI (Delaware Unfair Competition). (D.I. 10, ¶¶ 36–66, 85–88.)

### A.    Count III – Alleged Violation of Sherman Act Section 2

Despite Defendant having outsold Plaintiff CryoCor $11.7 *million* to $46,000 in the third quarter of 2007, and consistently throughout other periods, Defendant alleges that Plaintiff CryoCor has a monopoly or near monopoly and has, by virtue of instituting this patent-infringement action, violated Section 2 of the Sherman Act. (*Id.* at ¶ 61.)[2]

Count III uses some of the formulaic language found in antitrust allegations without the sufficient factual allegations that must be present to maintain an antitrust claim. For example,

---

[2]    Third Quarter Report, CryoCath Technologies, Inc., at 2, *available at* http://www.cryocath.com/en/3.investors/pdf/2007.q3.report.pdf (Ex. B hereto); http://www.cryocath.com/ en/7.news/7.0.news.asp?id=635 (Ex. C); Form 10-Q, CryoCor, Inc. at 4 (For the quarterly period ended September 30, 2007), *available at* http://www.secinfo.com/d14D5a.u7Hg8.htm (Ex. D hereto).

Defendant pled that "Counterdefendants' illegal predatory conduct has created a dangerous probability of success in monopolizing this market or related sub-markets," (*id.* at ¶ 56), without any supporting factual allegations for this bald assertion in terms of (a) how Plaintiffs' assertion of its patent rights based on its claim interpretation and infringement theory constitutes "illegal predatory conduct"; or (b) how Plaintiffs' filing of this lawsuit "has created a dangerous probability of success in monopolizing" the relevant market or submarket.  Instead, Defendant merely alleges that its own literal non-infringement positions, based on its own claim constructions, were known by Plaintiffs from unspecified materials. (*Id.* at ¶¶ 41–45, 49–53.)

Count III also inexplicably fails to allege a proper definition of the "relevant market." Rather, Defendant merely alleges that "relevant markets" exist:

> 37.    Counterdefendant CryoCor competes with CryoCath in *the relevant markets* that exist in the United States for cryosurgical products to treat heart disorders.

(*Id.* at ¶ 37 (emphasis added).)  After referring to these "markets," the subsequent paragraphs in Count III ambiguously refer to "that market," "this market" or "the relevant market."  For example, Defendant alleges:

> 39.    By this lawsuit, counterdefendants seek to exclude CryoCath from *that market.*

> 56.    Counterdefendants' illegal predatory conduct has created a dangerous probability of success in monopolizing *this market* or related sub-markets and has damaged and continues to damage CryoCath and consumers.

> 60.    Unless counterdefendants are enjoined from continuing its anticompetitive conduct, CryoCath as well as other competitors in *the relevant market* and consumers of these cryosurgical devices, will suffer irreparable harm for which there is no adequate remedy at law.

(*Id.* at ¶¶ 39, 56, 60 (emphasis added).)  But, Defendant CryoCath never provides any definition or scope for the "relevant market."

Count III also alleges that Plaintiff CryoCor's allegedly illegal conduct is not necessarily the result of CryoCor's conduct in the "relevant market," but rather, CryoCor's conduct in

undefined "related sub-markets." (*Id.* at ¶ 56.) And again, no definition of the "related sub-markets" is provided.

Count III also alleges that Plaintiff CryoCor has a monopoly on unspecified "certain uses" of cryosurgical products to treat heart disorder.

> 38.    On information and belief, counterdefendant CryoCor has a monopoly on *certain uses* within the United States of cryosurgical products to treat heart disorders.

(*Id.* at ¶ 38 (emphasis added).)

Count III also fails to provide any factual allegation regarding the interchangeability of products or cross-elasticity of demand relating to the products that supposedly are included in the alleged relevant market(s).

Count III also fails to provide any facts supporting its allegation of "a dangerous probability of success":

> 56.    Counterdefendants' illegal predatory conduct has created a dangerous probability of success in monopolizing this market or related sub-markets and has damaged and continues to damage CryoCath and consumers.

(*Id.* at ¶ 56.) As pled by Defendant CryoCath, the "dangerous probability of success" seems to be the likelihood that this Court will find that Defendant is infringing Plaintiffs' valid patent rights. Enforcing valid patent rights is not an antitrust violation.

### B.    Count III – Alleged Patent Misuse

Count III of Defendant's Counterclaims also includes a charge of patent misuse based on Plaintiffs' bringing this action to enforce the 694 and RE 049 Patents (but not the 610 Patent). Defendant bases this contention on: (1) its asserted theory of literal non-infringement for both the 694 and RE 049 Patents; (2) its allegation that Plaintiff CryoCor knows of these non-infringement theories from, "for example," *unidentified* "publicly-available information"; and (3) Plaintiffs' conduct allegedly has "anticompetitive effects."  (*Id.* at ¶¶ 40–47, 48–55, 59.)

Defendant has not pled a basis for piercing Plaintiffs' statutory immunity under 35 U.S.C. § 271(d)(3). Defendant also asserts that at least one Plaintiff lacks standing, which it alleges further demonstrates Plaintiffs extended the scope of their patent rights. (*Id.* at ¶¶ 46, 54.)

### C.    Count IV – Alleged Sham Litigation

Count IV contains no new factual allegations. Instead, Count IV merely incorporates previously recited allegations and concludes without any apparent basis that Plaintiffs' assertion of the 694 and RE 049 Patents constitutes sham litigation, and that Defendant has been, and will be, damaged by the alleged sham litigation. (*Id.* at ¶¶ 63–66.) Count IV suffers from the same incompleteness as outlined in Count III.

### D.    Count XI – Alleged Delaware Unfair Competition

Count XI incorporates all of the preceding allegations in the Counterclaim, and adds the bald and conclusory allegations that (1) Plaintiffs' "actions constitute unfair methods of competition"; (2) these actions have and will continue to damage Defendant at least its costs of suit to defend against the claim and additional damages; and (3) Plaintiffs' "actions constitute common law unfair competition." (*Id.* at ¶¶ 85–88.) Count XI also suffers from the same incompleteness as outlined in Count III.

## V.    ARGUMENT

Defendant's antitrust, patent misuse, sham litigation, and unfair competition counterclaims (Counts III, IV, and XI) have no legitimate basis in law or fact, and should be dismissed for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6); *see also FilmTec Corp. v. Hydranautics*, 67 F.3d 931, 936 (Fed. Cir. 1995) ("If a defendant in its answer to the complaint in a patent infringement suit includes a counterclaim for antitrust violation, that pleading runs the risk of being without substantial basis in law or fact.")

### A.    Legal Standard For A Motion To Dismiss

"A Rule 12(b)(6) motion should be granted 'if it appears to a certainty that no relief could be granted under any set of facts which could be proved.'" *Evancho v. Fisher*, 423 F.3d 347, 351 (3d Cir. 2005) (quoting *D.P. Enters. Inc. v. Bucks County Cmty. Coll.*, 725 F.2d 943, 944 (3d Cir. 1984)). "When considering a Rule 12(b)(6) motion, [the court is] required to accept as true all allegations in the [counterclaim] and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff." *Evancho*, 423 F.3d at 350. In deciding motions to dismiss pursuant to Rule 12(b)(6), courts consider the allegations in the complaint, as well as "exhibits such as public records and other indisputably authentic documents underlying the plaintiff's claims." *Sentinel Trust Co. v. Universal Bonding Ins. Co.*, 316 F.3d 213, 216 (3d Cir. 2003).

However, conclusory allegations are not sufficient to satisfy the required pleading threshold. The "court need not credit either 'bald assertions' or 'legal conclusions' in a complaint when deciding a motion to dismiss." *Evancho*, 423 F.3d at 351; *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. __, 127 S. Ct. at 1965 (citations omitted) (second brackets in original). The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* (addressing dismissal of antitrust claim). In other words, the pleading must include "enough facts to state a claim to relief that is plausible on its face," and to cross from "the factually neutral" to "the factually suggestive." *Id.* at 550 U.S. __, 127 S. Ct. at 1966 n.5, 1974.

**B.     Defendant CryoCath Failed To State A Sherman Act Claim Under Section 2**

Pursuant to FED. R. CIV. P. 12(b)(6), Count III (Sherman Act Section 2) should be

dismissed for a number of reasons.  Section 2 of the Sherman Act provides that:

> Every person who shall monopolize, or attempt to monopolize, or combine or
> conspire with any other person or persons, to monopolize any part of the trade or
> commerce among the several States, or with foreign nations, shall be deemed
> guilty of a felony, and, on conviction thereof, shall be punished by fine not
> exceeding $ 100,000,000 if a corporation, or, if any other person, $ 1,000,000, or
> by imprisonment not exceeding 10 years, or by both said punishments, in the
> discretion of the court.

15 U.S.C. § 2.[3]

Count III is improperly pled for a number of reasons.  First, Defendant failed to plead

sufficiently an exception to Plaintiffs' *Noerr-Pennington* immunity.  Second, Defendant failed to

assert a legally cognizable antitrust injury.  Third, Count III fails to plead necessary requirements

for a Sherman Act Section 2 violation.    Fourth, Count III is insufficiently premised on

conclusory allegations that are devoid of fact.    As the Supreme Court has stated, "a

[counterclaimant] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief'

requires more than labels and conclusions, and a formulaic recitation of the elements of a cause

of action will not do[.]"  *Twombly*, 550 U.S. __, 127 S. Ct. at 1964–65 (citations omitted)

(second brackets in original).

**1.     Defendant CryoCath Failed To Plead Sufficiently An
Exception To Plaintiffs' *Noerr-Pennington* Immunity**

"The bringing of a lawsuit to enforce legal rights does not of itself constitute violation of

the antitrust laws or patent misuse . . . ."  *See, e.g., Glaverbel Societe Anonyme v. Northlake*

*Marketing & Supply, Inc.*, 45 F.3d 1550, 1558 (Fed. Cir. 1995).  The *Noerr-Pennington* doctrine

---

[3] Although Defendant made a conclusory reference to Sherman Act Section 1, it made no
allegations of a violation of Section 1.  (D.I. 10, ¶ 1.)  Because no allegations have been made,
no further discussion of Section 1 will be made here.  To the extent Defendant tries to contend
that such a claim had been made, any such contention should be rejected because its
Counterclaims are devoid of any allegations to support a Section 1 claim.

provides that a patentee is immune to antitrust liability for the anti-competitive effects of enforcing its patent rights, unless the accused infringer can establish that (a) the patent at issue was obtained through knowing and willful fraud,[4] or (b) the lawsuit is a sham. *See, e.g., Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *Q-Pharma, Inc.*, 360 F.3d at 1304–05. Overcoming this immunity is especially difficult in the patent enforcement context because "the law recognizes a presumption that the assertion of a duly granted patent is made in good faith; this presumption is overcome only by affirmative evidence of bad faith." *C.R. Bard, Inc. v. M3 Systems, Inc.*, 157 F.3d 1340, 1369 (Fed. Cir. 1998).

Count IV of Defendant's Counterclaim alleges, albeit in a conclusory fashion, that its sham litigation claim is based on Plaintiffs seeking to enforce their rights under the 694 and RE 049 Patents despite Plaintiffs' purported knowledge of Defendant's literal non-infringement defenses from unspecified publicly-available information. (D.I. 10, ¶¶ 40-45, 49-53, 64, 65.) The sham litigation exception to the immunity provided by the *Noerr-Pennington* doctrine requires that Defendant allege that this litigation is (1) objectively baseless and (2) subjectively motivated by improper purposes. *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 57–60 (1993) (hereinafter "*PRE*").[5] As discussed below, Defendant's counterclaim (Count IV) fails to sufficiently plead both of these requirements.

---

[4] Defendants have not pled the "fraud" exception to *Noerr-Pennington* immunity, and therefore, Defendant cannot pierce the immunity on this basis. *See Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172 (1965).

[5] The Supreme Court emphasized in *PRE* that *Noerr-Pennington* immunizes the pursuit of a lawsuit unless it is utterly frivolous: "sham litigation must constitute the pursuit of claims so baseless that no reasonable litigant could realistically expect to secure favorable relief." PRE, 508 U.S. at 62. "If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception must fail." *FilmTec*, 67 F.3d at 937 (citing *PRE*, 508 U.S. at 60).

**a.    Defendant CryoCath Failed To Sufficiently Plead That Plaintiffs' Suit Is Objectively Baseless**

"If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception must fail." *PRE*, 508 U.S. at 60. In the patent enforcement context, "the law recognizes a presumption that the assertion of a duly granted patent is made in good faith; this presumption is overcome only by affirmative evidence of bad faith." *C.R. Bard*, 157 F.3d at 1369.

Here, Defendant has alleged: (1) a facially defective sham litigation claim in Count IV that has no reference to any legitimate facts and (2) that it does not literally infringe the 694 and RE 049 Patents. (D.I. 10, ¶¶ 41–42, 48–49.) Notably, Defendant fails to allege any facts showing how its product actually works, or to allege that under no set of circumstances can infringement under the doctrine of equivalents exist. And Defendant CryoCath's literal infringement theory is but the theory of an accused infringer on the other side of a litigation.

A patentee, who brings a good faith patent infringement claim, is not subject to antitrust liability, because the accused infringer pleads an untested, speculative noninfringement theory. In short, pleading a superficial noninfringement theory is not sufficient to state a claim for relief. *See, e.g., Twombly,* 550 U.S. ___, 127 S. Ct. 1964–65 ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a [counterclaim] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (citations omitted) (second brackets in original)).[6]

---

[6] Notably, the United States Supreme Court rejected the language previously used by the Court in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), providing that "[i]n appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed

The Federal Circuit addressed this issue in *C.R. Bard.* 157 F.3d at 1369. In *C.R. Bard*, the accused infringer, M3 Systems, alleged that "Bard knew its patents were not infringed when it brought suit[.]" *Id.* M3 System relied on "alleged" evidence to support its claim with respect to one of the two patents-in-suit, the '056 patent:

> M3 Systems states that Bard knew its patents were not infringed when it brought suit, citing the testimony of a Bard engineer that he did not think the original M3 needle infringed the '056 patent and that other Bard employees had told him that M3 changed its needle design to one that did not infringe. The engineer also testified that he did not know whether those who told him M3's needles did not infringe had ever read the '056 patent, or whether they were familiar with the concept of infringement under the doctrine of equivalents.

*Id.* The Federal Circuit held such evidence did not establish a sham litigation claim to pierce the

*Noerr-Pennington* immunity:

> This does not constitute substantial evidence that this litigation was objectively meritless and brought in bad faith. The judgment of antitrust violation can not be upheld on sham litigation grounds.

*Id.*

In the present case, Defendant's allegations are even less supported than the allegations of M3 Systems. Instead, Defendant merely asserts its own literal non-infringement theories, based on its own claim constructions, and alleges these theories were known by Plaintiffs from unspecified publicly-available materials. (D.I. 10, ¶¶ 41–45, 49–53.) But similar to *C.R. Bard*, such an assertion "does not constitute substantial evidence that this litigation was objectively meritless." *See C.R. Bard*, 157 F.3d at 1369.

Because Defendant failed to plead any facts in support of the "objective baseless" element necessary to prove the sham litigation exception to Plaintiffs' antitrust immunity under

---

for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *See Twombly*, 550 U.S. __, 127 S. Ct. at 1964, 1974 (holding that the *Conley* "no set of facts" language "has earned its retirement" and "is best forgotten.").

the *Noerr-Pennington* doctrine, this alone justifies dismissal of Counts III (Sherman Act Section 2) and IV (Sham Litigation) for failure to state a claim upon which relief can be granted.

>    **b.    Defendant CryoCath Failed To Sufficiently Plead That Plaintiffs' Suit Is Subjectively Motivated By Improper Purposes**

Only if the litigation is shown to be objectively meritless may a Court proceed to examine the litigant's subjective motivation to ascertain if the litigation merely masks illegal behavior. *PRE*, 508 U.S. at 60. Under the second part of the definition of sham, the Court focuses on whether a baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor, through the use of the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon. *Id.* at 60–61.

Here, Defendant alleges vague, and factually unsupported generalities, such as "anticompetitive effects," and that defending this lawsuit will result in "costs in disrupted business and lost opportunities to pursue legitimate competition." (D.I. 10, ¶ 59.) But Defendant's pleading does not constitute alleging subjective motivation. In fact, Defendant does not allege that Plaintiff is attempting to illegitimately interfere with any of Defendant's business relationships. Moreover, Defendant never contends that Plaintiffs knew Defendant's theories to be correct or did not expect to prevail at the time it filed this lawsuit. *See Q-Pharma, Inc.*, 360 F.3d at 1305 (infringement suit was not objectively baseless where a reasonable patent owner could have expected to prevail on its claim of alleged infringement); *C.R. Bard*, 157 F.3d at 1368–69 ("sham litigation requires more than a failed legal theory"). Defendant's pleadings simply fail to support a finding that Plaintiffs somehow are subjectively using this litigation as "an anticompetitive weapon" through "the 'use [of] the governmental *process*—as opposed to the *outcome* of that process[.]'" *PRE*, 508 U.S. at 60–61 (quoting *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 380 (1991)). Moreover, Defendant's sham litigation

claims contain *no* allegations of any "abuse of process" or "bad faith" as required by the case law. *See C.R. Bard.* 157 F.3d at 1368–69.

For at least these reasons, Defendant failed to sufficiently plead an exception to Plaintiffs' antitrust immunity under the *Noerr-Pennington* doctrine. Accordingly, this Court should dismiss Defendant's antitrust counterclaims, namely Count III (Sherman Act Section 2) and Count IV (Sham Litigation) for failure to state a claim upon which relief can be granted.

### 2.    Defendant CryoCath Failed To Plead A Legally Cognizable Antitrust Injury

Defendant CryoCath lacks standing to assert its antitrust counterclaims because—at a minimum—it has not alleged facts that could support finding that it has suffered any "antitrust injury," i.e., the type of injury for which antitrust laws are intended to provide redress. *See, e.g., Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488–89 (1977); *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 264 (3d Cir. 1998); *Atlantic Exposition Servs., Inc. v. SMG*, No. 06-4848, 2008 U.S. App. LEXIS 1832, at *5 (3d Cir. Jan. 28, 2008) ("A showing of an antitrust injury is necessary . . . to establish standing . . . ." (internal quotations omitted)). Moreover, the antitrust laws were not enacted to protect competitors, but rather, competition. *Brunswick*, 429 U.S. at 488.

Defendant failed to plead sufficiently how any entity other than it, or any specific market, has, or will be, injured by Plaintiffs' lawsuit against Defendant. Instead, Defendant merely asserts a bald and conclusory allegation that competitors will suffer irreparable harm if Plaintiffs are not enjoined from its alleged anticompetitive conduct. (D.I. 10, ¶ 60.) But, "[t]he essential elements of a private antitrust claim must be alleged in more than vague and conclusory terms to prevent dismissal of the [counterclaim] complaint on a [counterclaim] defendant's 12(b)(6) motion." *Crane & Shovel*, 854 F.2d at 805. And the right of a patent holder to exclude others

16

from practicing its invention is not considered a monopoly in the antitrust sense of the word. *See, e.g., MedImmune, Inc. v. Genentech, Inc.*, 427 F.3d 958, 966 (Fed. Cir. 2005), *rev'd and rem'd on other grounds*, 127 S. Ct. 764 (2007); *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1367 (Fed. Cir. 1984).

The injury Defendant does plead, namely trial and discovery costs, costs in disruption to its business, and its lost business opportunities, are purely individual economic injuries to itself. (D.I. 10, ¶ 59.) But such claims "ha[ve] no effect on competition in the relevant market," and are insufficient to state a claim under the Sherman Act. *Chip-Mender, Inc. v. The Sherwin-Williams Co.*, No. C 05-3465 PJH, 2006 U.S. Dist. LEXIS 2176, at *14–15 (N.D. Cal. Jan. 3, 2006) (citing *Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 508 (9th Cir. 1989) (although proof of plaintiffs' allegations of market exclusion and resulting loss of income would establish harm to their business interests, such proof would not show injury to competition in the market as a whole)). *See also Brunswick*, 429 U.S. at 488 (the antitrust laws were not enacted to protect competitors, but rather, competition.).

Additionally, Defendant's failure to sufficiently plead that the enforcement of the 694 and RE 049 Patents was objectively baseless, as discussed above, precludes these alleged individual injuries from being construed as antitrust injuries. *See, e.g., Chip-Mender*, 2006 U.S. Dist. LEXIS 2176, at *13–16. Moreover, having to incur litigation costs, by itself, does not constitute violation of the Sherman Act:

> [Defendant] Northlake also states that it is being sued by Glaverbel in other countries for violation of Glaverbel's foreign patents on the same technology, and that the cost is "crippling." Parties who engage in international business may indeed encounter litigation in foreign courts; such actions, and their cost and consequences, do not of themselves constitute violation of the Sherman Act.

*Glaverbel Societe*, 45 F.3d at 1559.

Therefore, because Defendant failed to plead an antitrust injury, Plaintiffs respectfully request that Count III (Sherman Violation) be dismissed for failure to state a claim upon which relief can be granted.

### 3. Defendant CryoCath Failed To Plead Factual Allegations Supporting A Monopolization Claim Under Section 2 Of The Sherman Act

Defendant's Sherman Act Section 2 counterclaim of monopolization is unsupported by any sufficient factual allegations and should be dismissed. Two elements must be proven to demonstrate the offense of monopolization under Section 2 of the Sherman Act: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident." *Schuylkill Energy Resources v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 412–13 (3d Cir. 1997) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)). The second element has generally been construed to mean some type of "anticompetitive [or exclusionary] conduct." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407, 414 (2004) (emphasis removed). But Defendant's pleading supports neither of these required elements with factual allegations. Instead, Defendant nakedly asserts that "[o]n information and belief, counterdefendant CryoCor has a monopoly on certain uses within the United States of cryosurgical products to treat heart disorders." (D.I. 10, ¶ 38.)

### a. Defendant CryoCath Was Required To Establish Monopoly Power In A Relevant Market In A Meaningful Economic Sense

The first element, "monopoly power" has been defined as "the power to control prices or exclude competition." *See, e.g., Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 380 (3d Cir. 2005) (internal quotations omitted), *cert. denied*, 547 U.S. 1020 (2006). In order to

determine whether an entity possesses monopoly power, the relevant market within which such power is held must be defined. "Without a definition of that market, there is no way to measure [a defendant's] ability to lessen or destroy competition." *Walker Process*, 382 U.S. at 177. "[A] plaintiff claiming monopolization is obligated to establish the relevant market because the power to control prices or exclude competition only makes sense with reference to a particular market." *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 229 (2d Cir. 2006). Once the market has been defined, "[p]laintiffs relying on market share as a proxy for monopoly power must plead and produce evidence of . . . the alleged monopolist's dominant share of that market, and of high barriers to entry." *Harrison Aire*, 423 F.3d at 381. *See also Pastore v. The Bell Tel. Co. of Penn.*, 24 F.3d 508, 512 (3d Cir. 1994) ("The plaintiffs have the burden of defining the market.").

There are both geographic and product components to a relevant market. *See, e.g., Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962). The geographic market is "the area of effective competition . . . in which the seller operates, and to which the purchaser can practicably turn for supplies[.]" *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 359 (1963) (internal quotations omitted) (emphasis removed). The product market is "'determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.'" *Queen City*, 124 F.3d at 436 (quoting *Brown Shoe*, 370 U.S. at 325). The Third Circuit requires that allegations of a relevant product market address the economic indicia of reasonable interchangeability:

> Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted.

19

*Queen City,* 124 F.3d at 436.

Defendant was required—but failed—to plead sufficient facts to support its definition of a relevant market in a meaningful economic sense, and include sufficient factual analysis. *See Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 459 (1993); *Intergraph Corp. v. Intel Corp.,* 195 F.3d 1346, 1355 (Fed. Cir. 1999).

> **b.    Defendant CryoCath Failed To Plead Facts To Support A Finding That Plaintiff CryoCor Has Monopoly Power In A Relevant Market**

Defendant failed to properly define either component of a relevant antitrust market. Moreover, Defendant failed to offer any definition of the "relevant markets" when it chose to allege that "the relevant markets [] exist." (D.I. 10, ¶ 37.) To the extent that its pleadings can be viewed as offering any definition, the best candidates for alternative definitions of "relevant markets" appear to be: (1) "the relevant markets that exist in the United States for cryosurgical products to treat heart disorders" (*id.* at ¶ 37); (2) "**certain uses** within the United States for cryosurgical products to treat heart disorders" (*id.* at ¶ 38; emphasis added)[7]; and (3) related "sub-markets" (*id.* at ¶ 56.)

Defendant failed to include a single allegation regarding the cross-elasticity of demand/supply or interchangeability of use for "cryosurgical products to treat heart disorders," competing producers of these products, the estimated share in any of these product markets held by Plaintiff CryoCor, the presence or absence of entry barriers, or the "area of effective competition" for any of these products. Defendant failed to justify the basis for its alleged relevant market, though it is required to do so. *See, e.g., North Jersey Secretarial Sch., Inc. v.*

---

[7] This allegation demonstrates Defendant's difficulty in alleging that Plaintiff CryoCor has a monopoly in the relevant market. All Defendant can allege is that Plaintiff CryoCor has a monopoly on "certain uses" of cryosurgical products for treating heart disorders, which also means Plaintiff CryoCor does not have a monopoly on other certain uses.

*McKiernan*, 713 F. Supp. 577, 583 (S.D.N.Y. 1989) (granting motion to dismiss on ground that plaintiff "fails to explain the basis" for the market alleged in the complaint).[8]    And a counterclaim "alleging a submarket is not excused from grounding its allegations with facts regarding reasonable interchangeability and cross-elasticity of demand." *Fresh Made, Inc. v. Lifeway Foods, Inc.*, No. Civ. 01-4254, 2002 U.S. Dist. LEXIS 15098, at *20 n.12 (E.D. Pa. Aug. 9, 2002).

Defendant cannot contend that a patent, by itself, confers monopoly power either. *Illinois Tool Works, Inc. v. Independent Ink, Inc.*, 547 U.S. 28, 45 (2006) ("[A] patent does not necessarily confer market power upon the patentee."). Further, bald assertions of "monopoly . . . within the United States" based upon "information and belief" are not sufficient to survive a Rule 12(b)(6) motion. *Queen City*, 124 F.3d at 436–37.

In view of the case law on this point, it is beyond dispute that Defendant failed to allege a properly defined relevant antitrust market and failed to offer any facts to support its conclusory allegation that Plaintiff CryoCor has a "monopoly."

> **c.    Defendant CryoCath Failed To Plead Facts To Support Finding That Plaintiff CryoCor Has Engaged In Any Anticompetitive Conduct**

Defendant also failed to allege facts that could satisfy the second element of its Sherman Act monopolization claim—anticompetitive conduct. *See, e.g.*, *Trinko*, 540 U.S. at 407 ("To safeguard the incentive to innovate, the possession of monopoly power will not be found

---

[8] *See also, Fresh Made, Inc. v. Lifeway Foods, Inc.*, No. Civ. 01-4254, 2002 U.S. Dist. LEXIS 15098, at *19 (E.D. Pa. Aug. 9, 2002) ("The amended complaint contains no allegations relating to the price of and/or the demand for kefir and other specialty Russian dairy products relative to products in the larger dairy market as a whole. . . . It is also unclear from the allegations what relationship kefir has to other specialty Russian dairy products or why they are appropriately in the same product market."); *Gianna Enters. v. Miss World (Jersey) Ltd.*, 551 F. Supp. 1348, 1354 (S.D.N.Y. 1982) (rejecting a market definition limited to international beauty pageants where plaintiff "made no attempt to explain" why the product market should be so limited).

21

unlawful unless it is accompanied by an element of anticompetitive *conduct*." (emphasis in original)).    Whether Plaintiffs' alleged conduct could properly be characterized as anticompetitive is <u>not</u> determined by simply examining its effect on Defendant, as "[c]onduct that merely harms competitors . . . , while not harming the competitive process itself, is not anticompetitive." *Parker v. Learn the Skills Corp.*, C.A. No. 06-229-SLR, 2008 U.S. Dist. LEXIS 1811, at *26 (D. Del. Jan. 10, 2008).

Defendant alleges that Plaintiff CryoCor's "illegal predatory conduct . . . has damaged and continues to damage CryoCath and consumers," (D.I. 10, ¶ 56), and appears to allege that the institution of this patent-infringement action constitutes the alleged "illegal predatory conduct."[9] (*See e.g.*, *id* at ¶¶ 39–56).    This naked allegation of "anticompetitive litigation" is based solely on Defendant's contention that it, in actuality, does not infringe the patents in suit. That is not sufficient to satisfy the anticompetitive conduct element of a Section 2 monopolization claim.

Primarily, this patent-infringement suit is immunized from antitrust challenge under the *Noerr-Pennington* doctrine, as discussed above.    Nevertheless, even if this lawsuit is not protected under *Noerr-Pennington*, Defendant still has not alleged facts that could support a finding that the institution of this litigation has harmed competition.    There are no allegations that Defendant has stopped selling its products in the marketplace or how any of its voluminous sales has been affected by the filing of this lawsuit.    There are no allegations regarding how the institution of this patent-infringement action has enabled Plaintiff CryoCor to charge artificially

---

[9]    Rather strangely, Defendant includes allegations that "[a]t least one counterdefendant lacks standing" to assert the patents at issue in support of its antitrust counterclaims. (D.I. 10, ¶¶ 46, 54.)  Putting aside the merits of these allegations, it is unclear how they support a Sherman Act claim.  It would be entirely incorrect to convert every—or even any—instance where standing is found lacking into an antitrust violation.  These allegations add nothing to Defendant's antitrust counterclaims and are not addressed further.

high prices to consumers or to make anticompetitive reductions of output within the relevant market. *See, e.g.*, *Schor v. Abbott Labs.*, 457 F.3d. 608, 612 (7th Cir. 2006) (noting that "if a manufacturer cannot make itself better off by injuring consumers through lower output and higher prices, there is no role for antitrust law to play"). Defendant's factual allegations are insufficient to support the anticompetitive conduct element of a monopolization claim.

### 4. Defendant CryoCath Failed To Properly Plead Necessary Elements Of Its Attempted Monopolization Antitrust Claim

A Section 2 Sherman Act attempted monopolization claim requires that the Defendant allege: (1) predatory or anticompetitive conduct with; (2) specific intent to control prices or destroy competition; and (3) a dangerous probability of success in achieving monopoly power. *Queen City*, 124 F.3d at 432 (citing *Spectrum Sports*, 506 U.S. at 456). Defendant's attempted monopolization claim suffers from the same deficiencies as its monopolization claim (e.g., the failure to allege facts supporting either a proper definition of a relevant market or harm to competition). As discussed below, Defendant's attempted monopolization claim fails for multiple reasons, and should be dismissed under Rule 12(b)(6).

### a. Defendant CryoCath Failed To Plead Predatory Or Anticompetitive Conduct To Accomplish Monopolization

The anticompetitive conduct element under Section 2 is the same whether the allegations relate to an attempted or actual monopolization claim. Again, Defendant relies upon the institution of this patent infringement action to satisfy the "anticompetitive conduct" element. This reliance is misplaced, as it provides no more support for its attempted monopolization claim than it does for its monopolization claim.

Defendant CryoCath must demonstrate "that the challenged action has had an actual adverse effect on competition as a whole in the relevant market; to prove it has been harmed as

an individual competitor will not suffice." *George Haug Co. v. Rolls Royce Motor Cars*, 148 F.3d 136, 139 (2d Cir. 1998) (quoting *Capital Imaging v. Mohawk Valley Med. Assoc.*, 996 F.2d 537, 543 (2d Cir. 1993)). *See also Parker*, 2008 U.S. Dist. LEXIS 1811, at \*26. Without properly defining a relevant product market and showing some competitive injury being imposed upon that market by Plaintiff CryoCor, Defendant cannot satisfy the anticompetitive conduct element of an attempted monopolization claim.

> **b.    Defendant CryoCath Failed To Properly Plead Specific Intent To Control Prices Or Destroy Competition**

Defendant has not alleged facts to support a finding that Plaintiff CryoCor has a "specific intent to destroy competition or build monopoly." *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 626 (1953). Specific intent to monopolize may be inferred from anticompetitive conduct. *See, e.g., Advo, Inc. v. Philadelphia Newspapers*, 51 F.3d 1191, 1199 (3d Cir. 1995). This element cannot be satisfied by Defendant's reference to the instigation of this case as the alleged anticompetitive conduct engaged in by Plaintiff CryoCor when it is Plaintiff CryoCor's right to vindicate and protect its patent rights in court. Defendant's reliance on the bringing of this suit is insufficient to move its bald allegations of "specific intent" to monopolize from "the factually neutral" to "the factually suggestive." *Twombly*, 127 S. Ct. at 1966 n.5, 1970, 1974.

> **c.    Defendant CryoCath Failed To Properly Plead A Dangerous Probability Of Success In Achieving Monopoly Power**

Defendant's attempted monopolization counterclaim does not include factual allegations to support a finding that Plaintiff CryoCor has a dangerous probability of achieving a monopoly in any relevant market. The most common way that this element is satisfied is by examining the antitrust defendant's share of the relevant market. *See, e.g., Pastore*, 24 F.3d at 513 (noting that the "most significant" factor is "the defendants' share of the relevant market."). Putting aside Defendant's utter failure to define properly a relevant antitrust market, there is not one single

allegation included in Defendant's counterclaims regarding Plaintiff CryoCor's share of any alleged relevant market. As noted previously, Defendant does allege that "on information and belief" CryoCor "has a monopoly . . . ." (D.I. 10 at ¶ 38.) But no support is offered for this contention—no allegations reference revenue derived or units sold by Plaintiff CryoCor as a percentage of the total amount derived or sold by all competitors in the supposed "relevant market"—and Defendant will not be able to offer one since it significantly outsells Plaintiff CryoCor's cryosurgical products for treating heart diseases.

Coupling this with Defendant's failure to properly define a relevant market, Defendant's attempted monopolization counterclaim cannot be sustained. Failing to allege facts that could support finding even one of the required elements, Defendant's attempted monopolization claim should be dismissed.

### C.    Defendant CryoCath's Defective Antitrust Claims Should Be Dismissed To Avoid Incurring Significant Discovery Costs

Dismissal of Defendants defective antitrust allegations is particularly warranted at this stage of litigation, as such antitrust claims can give rise to expensive, wide-ranging discovery. *Twombly*, 550 U.S. __, 127 S. Ct. at 1966–67 ("[P]roceeding to antitrust discovery can be expensive."). Moreover, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Id*. at 1966 (internal citations omitted). Accordingly, for at least these reasons, Plaintiffs respectfully submit that, under Rule 12(b)(6), Count III (Sherman Act Section 2) of Defendant's Counterclaims should be dismissed for failure to state a claim upon which relief can be granted.

**D.    Patent Misuse Is Not An Affirmative Counterclaim And Defendant Failed To State A Patent Misuse Claim For Which Relief Can Be Granted**

**1.    Patent Misuse Is Not A Counterclaim But Instead A Defense**

In alleging "patent misuse" in a Count III, Defendant demonstrates its lack of understanding about the limits of the "patent misuse" doctrine. "Patent misuse is an affirmative defense to an accusation of patent infringement, the successful assertion of which 'requires that the alleged infringer show that the patentee has impermissibly broadened the "physical or temporal scope" of the patent grant with anticompetitive effect.'" *Virginia Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 868 (Fed. Cir. 1997) (quoting *Windsurfing Int'l v. AMF, Inc.*, 782 F.2d 995, 1001 (Fed. Cir. 1986)). "[M]onetary damages may not be awarded [for] patent misuse, because patent misuse simply renders the patent unenforceable.  In other words, the defense of patent misuse may not be converted to an affirmative claim for damages . . . ." *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1428 (Fed. Cir. 1997) (internal quotations omitted).  In this case, rather than being asserted as an affirmative defense, Defendant seeks to convert the defense of patent misuse to an affirmative counterclaim.  There is no legal basis to do so.  Accordingly, Defendant's patent misuse "counterclaim" should be dismissed.

**2.    Defendant Failed To State A Claim For Patent Misuse By Not Pleading An Exception To Plaintiffs' Immunity Under 35 U.S.C. § 271(d)(3)**

Count III of Defendant's Counterclaims also includes an allegation of patent misuse premised on Plaintiff filing this suit to enforce the 694 and RE 049 Patents (but not the 610 Patent).  This allegation is based on Defendant's conclusory assertions that it has theories of literal non-infringement, that Plaintiffs knew of these theories from, "for example," unidentified "publicly-available information," and that Plaintiffs' conduct has "anticompetitive effects." (*D.I. 10* at ¶¶ 40–47, 48–55, 59.)

Under 35 U.S.C. § 271(d)(3), patent owners are immune from claims of patent misuse that, like Count III, are predicated on the enforcement of its patent rights:

> No patent owner otherwise entitled to relief for infringement or contributory infringement of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having done one or more of the following:
>
>      . . .
>
> (3) sought to enforce his patent rights against infringement or contributory infringement, . . .

35 U.S.C. § 271(d)(3). Therefore, the bringing of a lawsuit to enforce patent rights does not of itself constitute patent misuse. *See also, e.g., Glaverbel Societe*, 45 F.3d at 1558. Instead, "there must be bad faith and improper purpose in bringing the suit, in implementation of an illegal restraint of trade." *Id.*

Defendant failed to plead sufficiently the requisite bad faith for its patent misuse allegation. In particular, as discussed above, Defendant failed to sufficiently plead that Plaintiffs' assertion of the 694 and RE 049 Patents was objectively baseless. Defendant merely asserts that, like most accused infringers, it has literal non-infringement theories, which it alleges were known by Plaintiff CryoCor from, "for example" unspecified "publicly-available information." (D.I. 10 at ¶¶ 41–44, 49–52.) Notably, Defendant makes no assertion that these theories apply to Plaintiffs' allegations that Defendant has infringed the Asserted Patents under the doctrine of equivalents, or provide any facts of how its product works to support its theories. And again, Defendant does not allege that Plaintiffs accepted Defendant's theories as being correct or did not expect to prevail when it initiated this lawsuit. *See Q-Pharma, Inc.*, 360 F.3d at 1305 (infringement suit was not objectively baseless where a reasonable patent owner could have expected to prevail on its claim of alleged infringement); *C.R. Bard*, 157 F.3d at 1368-69

("[S]ham litigation requires more than a failed legal theory."). Count III (Patent Misuse) should be dismissed under Rule 12(b)(6).

### E.    Defendant CryoCath's Delaware Unfair Competition Counterclaim Is Barred By The *Noerr-Pennington* Doctrine

"Because the principles of *PRE* are based on a First Amendment right of petition, those principles also apply to [defendant's] state law theories." *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.,* 343 F. Supp.2d 272, 324 (D. Del. 2004), *aff'd,* 488 F.3d 982 (Fed. Cir. 2007). This rule of law is well rooted in the case law.

In *Cheminor Drugs, Ltd. v. Ethyl Corp.,* the Third Circuit affirmed the grant of summary judgment holding that *Noerr-Pennington* immunity insulated the defendant against state law claims for unfair competition, malicious prosecution, tortuous interference with contract, and tortuous interference with prospective economic advantage. 168 F.3d 119, 128 (3d Cir. 1999). The Third Circuit stated: "We are persuaded that the same First Amendment principles on which *Noerr-Pennington* immunity is based apply to the New Jersey tort claims." *Id.* (citing *Brownsville Golden Age Nursing Home, Inc. v. Wells,* 839 F.2d 155, 159–60 (3d Cir. 1988) (holding that *Noerr-Pennington* immunity precludes tort liability under Pennsylvania law) (other citations omitted)). *See also Bristol-Myers Squibb Co. v. IVAX Corp.,* 77 F. Supp. 2d 606, 616 (D.N.J. 2000) (granting motion to dismiss state law unfair competition claim), *vac'd in part and rem'd on other grounds,* 246 F.3d 1368 (Fed. Cir. 2001). In *Carroll Touch v. Electro Mech. Sys., Inc.,* the Federal Circuit affirmed the district court's application of *Noerr-Pennington* immunity in granting summary judgment against claims of state unfair competition and abuse of process under Illinois law. 15 F.3d 1573, 1581–83 (Fed. Cir. 1993), *overruled on other grounds, Nobelpharma AB v. Implant Innovations, Inc.,* 141 F.3d 1059, 1068 (Fed. Cir. 1998) (en banc).

In *Honeywell v. Universal Avionics*, Universal asserted "commercial counterclaims" which included tortuous interference and unfair competition claims under Delaware law along with the Sherman Act claims. 343 F. Supp.2d at 322–23. Having ruled that there is not sufficient evidence to support Universal's sham litigation assertions, this District Court denied all of Universal "commercial counterclaims," including the Delaware unfair competition counterclaim and the federal antitrust counterclaims, on the *Noerr-Pennington* immunity grounds. *Id.* at 326.

As discussed above, Defendant CryoCath's pleadings are insufficient to support a sham litigation counterclaim. Count XI of CryoCath's Delaware unfair competition counterclaim, which consist of only four paragraphs, alleges no facts other than to incorporate its previously recited allegations. Accordingly, CryoCath's Delaware unfair competition counterclaim (Count XI) is barred in view of the *Noerr-Pennington* immunity afforded to Plaintiffs' assertion of their rightful patent rights in this case, just as CryoCath's antitrust claims are barred in view of the *Noerr-Pennington* immunity.

### F.    In the Alternative, Defendant CryoCath's Antitrust and Unfair Competition Counterclaims Should Be Bifurcated and Stayed

Defendant CryoCath's antitrust and unfair competition counterclaims should be dismissed for failure to state a claim for relief. However, if the Court is inclined to allow Defendant to maintain its antitrust and unfair competition claims, Plaintiffs request under FED. R. CIV. P. 42(b) that the Court bifurcate and stay discovery on those counterclaims pending resolution of the trial on the patent issues in this case.

District courts have frequently exercised their discretion in bifurcating and staying antitrust counterclaims in patent cases. *In re Innotron Diagnostics*, 800 F.2d 1077, 1085 (Fed. Cir. 1986); *Akzona v. E.I. du Pont de Nemours & Co.*, 607 F. Supp. 227, 234-36 (D. Del. 1984)

("if [the patentee] prevails on the issue of patent validity, [plaintiff's] antitrust claim based on fraud on the United States Patent Office would have to be dismissed."); *see also Hydranautics v. FilmTec Corp.*, 70 F.3d 533, 536 (9th Cir. 1995) ("If the plaintiff wins the patent infringement suit, then the antitrust counterclaim may ordinarily be disposed of expeditiously on motion, instead of by a time consuming and expensive trial."); *Pharmacia, AB v. Hybritech, Inc.*, 4 U.S.P.Q. 975, 976 (S.D. Cal. 1986) (bifurcating and staying antitrust counterclaims to avoid "protracted discovery inherent in trial of the antitrust issues" and to allow parties to get to patent trial more quickly).

In this case, bifurcating and staying discovery on Defendant CryoCath's antitrust and unfair competition counterclaims will promote judicial economy. Because Defendant's antitrust and unfair competition counterclaims are premised entirely on its non-infringement position, the resolution of the patent issues will either dispose of entirely or result in considerable simplification of issues related to these counterclaims. *See PRE,* 508 U.S. at 60 n.5 (a "winning lawsuit is by definition a reasonable effort at petitioning for redress and therefore not a sham"); *Innotron*, 800 F.2d at 1085; *Akzona*, 607 F. Supp. at 234, 236 ("bifurcation [of invalidity and fraud on PTO claims] is likely to result in considerable simplification of the issues at the second trial based on the results of the first trial"). Further, Defendant's antitrust and unfair competition counterclaims involve many non-patent issues and evidence completely unrelated to the patent issues in the case – *e.g.*, non-accused products, the composition of the relevant market, and the economic issues relating to cross-elasticity of demand and dangerous probability of success – which are not necessary to resolve the patent claims. *See Dentsply Int'l v. New Tech. Co.,* C.A. No. 96-272-MMS, 1996 U.S. Dist. LEXIS 19846, *17-18 (D. Del. Dec. 19, 1996) (bifurcation appropriate where there are few overlapping issues). Where, as here, a defendant has proffered

vague, conclusory allegations in support of its counterclaims, bifurcation and stay of those claims are particularly appropriate which can "avoid the potentially enormous expense of discovery" related to antitrust claims. *Twombly*, 550 U.S. _, 127 S. Ct. at 1967.

Consequently, if the Court is inclined to allow Defendant to maintain its antitrust and unfair competition claims, Plaintiffs request under FED. R. CIV. P. 42(b) that this Court bifurcate and stay discovery of Counts III, IV and XI of Defendant CryoCath's Amended Counterclaims pending resolution of the trial on the patent issues in this case. The interests of expedition and economy are best served by resolving the patent infringement claims first. Any remaining antitrust and unfair competition claims could then be resolved to the extent they are not mooted by the infringement determinations.

## VI.    CONCLUSION

For all of the foregoing reasons, Plaintiffs' respectfully request that Count III (Patent Misuse and Violation of Sherman Act), Count IV (Sham Litigation), and Count XI (Delaware Unfair Competition) of Defendant's Counterclaims be dismissed under Rule 12(b)(6) for failing to state a claim upon which relief can be granted.


OF COUNSEL:

Leland G. Hansen
Wil Rao
Andrew W. Bateman
MCANDREWS, HELD & MALLOY, LTD.
500 West Madison Street, 34th Floor
Chicago, Illinois 60661
Tel: (312) 775-8000
*Attorneys For AMS Research Corp.*

Howard N. Wisnia
James P. Conley
BAKER & MCKENZIE
12544 High Bluff Drive, Third Floor
San Diego, California 92130-3051
Tel: (858) 523-6200
*Attorneys For CryoCor, Inc.*

Dated:  March 11, 2008
854235 / 32647

POTTER ANDERSON & CORROON LLP

By:  */s/ David E. Moore*
    Richard L. Horwitz (#2246)
    David E. Moore (#3983)
    1313 N. Market Street
    Hercules Plaza, 6th Floor
    Wilmington, DE 19801
    Tel:  (302) 984-6000
    rhorwitz@potteranderson.com
    dmoore@potteranderson.com

*Attorneys For Plaintiffs CryoCor, Inc. and*
*AMS Research Corporation*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on March 11, 2008, the attached document was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

John G. Day
Lauren E. Maguire
Ashby & Geddes
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801

By: /s/ David E. Moore
Richard L. Horwitz
David E. Moore
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, Delaware 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

847926 / 32647

# EXHIBIT A

**UNITED STATES INTERNATIONAL TRADE COMMISSION**
**Washington, D.C. 20436**

| | |
|---|---|
| IN THE MATTER OF<br><br>**CERTAIN CATHETERS, CONSOLES AND OTHER APPARATUS FOR CRYOSURGERY, AND COMPONENTS THEREOF** | Inv. No. 337-TA- |

**COMPLAINT UNDER SECTION 337 OF**
**THE TARIFF ACT OF 1930, AS AMENDED**

<u>**Complainants**</u>

**CryoCor, Inc.**
9717 Pacific Heights Boulevard
San Diego, California 92121
(858) 909-2200
(858) 909-2300 - Facsimile

**AMS Research Corporation**
10700 Bren Road West
Minnetonka, Minnesota 55343
(952) 930-6300
(952) 930-6373 - Facsimile

<u>**Counsel for Complainants**</u>

Leland G. Hansen
Wil L. Rao
**MᴄAɴᴅʀᴇᴡs, Hᴇʟᴅ & Mᴀʟʟᴏʏ, Lᴛᴅ.**
500 West Madison Street
Chicago, Illinois 60661
(312) 775-8000
(312) 775-8100 - Facsimile
*Email: lhansen@mcandrews-ip.com*
*Email: wrao@mcandrews-ip.com*
Attorneys for AMS Research Corp.

Kevin O'Brien
Kevin Sullivan
**Bᴀᴋᴇʀ & McKᴇɴᴢɪᴇ LLP**
815 Connecticut Avenue, NW
Washington, DC 20006-4078
(202) 452-7000
(202) 452-7074 - facsimile
*Email: kevin.m.o'brien@bakernet.com*

<u>**Proposed Respondent**</u>

**CryoCath Technologies, Inc.**
16771 Chemin Ste-Marie
Kirkland, Quebec, H9H 5H3, Canada
(877) 694-1212
(514) 694-6279 - Facsimile

Howard N. Wisnia
James P. Conley
**BAKER & MCKENZIE LLP**
12544 High Bluff Drive, Third Floor
San Diego, California 92130-3051
(858) 523-6200
(858) 259-8290 - facsimile
*Email: howard.n.wisnia@bakernet.com*

**Attorneys for CryoCor, Inc.**

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................... 1

II.     THE PARTIES............................................................................................................... 2

        A.      Complainants CryoCor and AMS Research ........................................................ 2

        B.      Respondent CryoCath ......................................................................................... 4

III.    THE PRODUCTS AT ISSUE ....................................................................................... 4

        A.      Complainant CryoCor's System and Components Thereof................................... 4

        B.      Respondent CryoCath's Products and Components Thereof................................. 7

IV.     THE ASSERTED PATENTS ........................................................................................ 8

        A.      Identification, Ownership, and Enforcement Rights of the Asserted Patents........ 8

        B.      The 694 Patent ................................................................................................... 10

        C.      The 610 Patent ................................................................................................... 12

        D.      The RE 049 Patent ............................................................................................. 13

        E.      Foreign Counterparts of the Respective Asserted Patents ................................... 15

V.      UNFAIR ACTS – CRYOCATH IS INFRINGING THE ASSERTED PATENTS ......... 15

VI.     IMPORTATION AND SALE ...................................................................................... 18

VII.    LICENSES................................................................................................................... 21

VIII.   DOMESTIC INDUSTRY ............................................................................................ 22

IX.     RELATED LITIGATION ............................................................................................ 24

X.      REQUESTED RELIEF................................................................................................. 25

## EXHIBITS

| | |
|---|---|
| Exhibit 1 | U.S. Patent No. 6,572,610 (certified) ("610 Patent") |
| Exhibit 2 | U.S. Patent Reissue No. RE 40,049 (certified) ("RE 049 Patent") |
| Exhibit 3 | U.S. Patent No. 6,471,694 (certified) ("694 Patent") |
| Exhibit 4 | CryoCor, Inc.'s Third Quarter 2007 10-Q |
| Exhibit 5 | American Medical Systems Holdings, Inc.'s 2006 Annual Report |
| Exhibit 6 | American Medical Systems Holdings, Inc.'s Third Quarter 2003 10-Q |
| *Confidential* Exhibit 7 | Confidential 08/31/2000 License Agreement between Cryogen, Inc. and CryoCor, Inc. ("08/31/2000 License Agreement") (submitted separately and concurrently as Appendix A pursuant to Commission Rules 201.6(b) and 210.5(d)) |
| Exhibit 8 | Assignments for the 694 Patent, 610 Patent and RE 049 Patent (issued originally as U.S. Patent No. 6,237,355) from American Medical Systems Gynecology, Inc. to AMS Research Corporation (certified) |
| Exhibit 9 | CryoCath Technologies, Inc.'s Third Quarter 2007 Report |
| Exhibit 10 | CryoCor Inc.'s Summary of Safety and Effectiveness to the U.S. Food and Drug Administration, P050024 – CryoCor Cryoablation System ("CryoCor's Summary of Safety and Effectiveness") |
| Exhibit 11 | 01/30/2008 Webpage printout from CryoCor Inc.'s website at http://www.cryocor.com/Corpprofile/Procedure.Htm and http://www.cryocor.com/Clinical/Atrial_Flutter.Htm |
| Exhibit 12 | CryoCath Technologies, Inc.'s Summary of Safety and Effectiveness to the U.S. Food and Drug Administration, P020045 – CryoCath Freezor Cardiac Cryoablation Catheter and CTT.2 CryoConsole System ("CryoCath's Summary of Safety and Effectiveness") |
| Exhibit 13 | CryoCath Technologies, Inc.'s "The Freezor Family" Product Illustration (with U.S. Flag) |
| Exhibit 14 | 01/30/2008 Webpage printout from CryoCath Technologies, Inc.'s website at www.Cryocath.Com/En/4.Products/40.1.4.Ep.Usa.Console.Asp |

| | |
|---|---|
| Exhibit 15 | Assignments for the 694 Patent, 610 Patent and RE 049 Patent (issued originally as U.S. Patent No. 6,237,355) from the respective inventor(s) to Cryogen, Inc. (certified) |
| Exhibit 16 | Assignments for the 694 Patent, 610 Patent and RE 049 Patent (issued originally as U.S. Patent No. 6,237,355) from Cryogen, Inc. to American Medical Systems Gynecology, Inc. (certified) |
| Exhibit 17 | Public, redacted 06/28/2007 Development and License Agreement among CryoCor, Inc., Boston Scientific Corporation and Boston Scientific Scimed, Inc. ("06/28/2007 License Agreement") (submitted separately and concurrently as Appendix B) |
| Exhibit 18 | A list of each foreign patent, each foreign patent application (not already issued as a patent) and each foreign patent application that has been designated corresponding to the 694 Patent, with an indication of the prosecution status of each such patent application |
| Exhibit 19 | A list of each foreign patent, each foreign patent application (not already issued as a patent) and each foreign patent application that has been designated corresponding to the 610 Patent, with an indication of the prosecution status of each such patent application |
| Exhibit 20 | A list of each foreign patent, each foreign patent application (not already issued as a patent) and each foreign patent application that has been designated corresponding to the RE 049 Patent (issued originally as U.S. Patent No. 6,237,355), with an indication of the prosecution status of each such patent application |
| Exhibit 21 | 12/06/2007 Webpage printout from the U.S. Food and Drug Administration website for 7F Freezor Cardiac Cryoablation Catheter and CCT.2 CryoConsole System – P-20045 at http://www.Fda.Gov/Cdrh/PDF2/P020045.Html |
| Exhibit 22 | 01/31/2008 Webpage printout of CryoCath Technologies, Inc.'s website "Product U.S.A., Electrophysiology, Ordering Information [in the USA]" at http://www.Cryocath.Com/En/4.Products/40.1.5.ep.USA.ordering.info.asp |
| Exhibit 23 | 01/31/2008 Website printout of "Akron Children's Hospital Replay of Pediatric Cardiac Cryoablation" Procedure at http://www.Or-Live.Com/akronchildrens/1562/ |
| Exhibit 24 | 01/31/2008 Website printout of "Virtual Hands-On: CryoCath Technologies Cryoablation" at http://www.hrsonline.Org/Education/Selfstudy/VHO/Cryocath_Technologies_Cryoablation.cfm |

Exhibit 25       Claim charts for infringement of the 694 Patent by CryoCath Technologies, Inc. with supporting Exhibits A through J

Exhibit 26       Claim charts for infringement of the 610 Patent by CryoCath Technologies, Inc. with supporting Exhibits A through E

Exhibit 27       Claim charts for infringement of the RE 049 Patent by CryoCath Technologies, Inc. with supporting Exhibits A through K

Exhibit 28       CryoCath Technologies, Inc.'s Operator's Manual Freezor™ Cardiac Cryoablation Catheter (7F) and CCT.2 CryoConsole

Exhibit 29       CryoCath Technologies, Inc.'s notes for videos located in Electrophysiology Knowledge Center

*Confidential* Exhibit 30       Confidential Declaration of Gregory J. Tibbitts

Exhibit 31       1/31/2008 Webpage printout from the U.S. Food and Drug Administration website, CryoCath Technologies, Inc.'s 510k Premarket Notification Database Summary

Exhibit 32       CryoCath Technologies, Inc.'s 2007 Progress Report

Exhibit 33       Claim charts for the 694 Patent and products of CryoCor, Inc. with Exhibits A through G

Exhibit 34       Claim charts for the 610 Patent and products of CryoCor, Inc. with Exhibits A through G

Exhibit 35       Claim charts for the RE 049 Patent and products of CryoCor, Inc. with Exhibits A through G

Exhibit 36       08/01/2007 U.S. Department of Health and Human Services letter to CryoCor, Inc., P050024 – CryoCor Cryoablation System

Exhibit 37       02/21/2008 Docket Report, *CryoCor Inc. et al. v. CryoCath Technologies, Inc.*, Case No. 08-031-GMS (D. Del.)

Exhibit 38       02/21/2008 Docket Report, *CryoCath Technologies, Inc. v. CryoCor, Inc.*, Case No. 07-631-GMS (D. Del.)

*Physical* Exhibit 39       Imported catheter of CryoCath Technologies, Inc.

Physical Exhibit 40       Domestic catheter of CryoCor, Inc.

Exhibit 41                          02/27/08 Webpage printout of Cryocath Technologies Inc.'s
                                    website of how to "Contact a Medical Advisor" at
                                    http://www.cryocath.com/en/2.patients/2.8medical.advisor.asp

**APPENDICES**
**(Separately and concurrently submitted with the complaint)**

| | |
|---|---|
| Appendix A | Confidential Exhibit 7, 8/31/2000 License Agreement between Cryogen, Inc. and CryoCor, Inc. in triplicate ("8/31/2000 License Agreement") |
| Appendix B | Public, redacted 06/28/2007 Development and License Agreement among CryoCor, Inc., Boston Scientific Corporation and Boston Scientific Scimed, Inc. in triplicate ("06/28/2007 License Agreement") |
| Appendix C | Prosecution History for the 694 Patent (certified not available yet) ("694 Prosecution History") with three additional copies |
| Appendix D | Four copies of each patent and technical reference mentioned in the 694 Prosecution History |
| Appendix E | Certified Prosecution History for the 610 Patent ("610 Prosecution History") with three additional copies |
| Appendix F | Four copies of each patent and technical reference mentioned in the 610 Prosecution History |
| Appendix G | Certified Prosecution History for the RE 049 Patent ("RE 049 Patent Prosecution History") with three additional copies |
| Appendix H | Four copies of each patent and technical reference mentioned in the RE 049 Patent Prosecution History |

## I.    INTRODUCTION

1.1.    CryoCor, Inc. ("CryoCor") and AMS Research Corporation ("AMS Research") (collectively "Complainants") respectfully request that the U.S. International Trade Commission ("the ITC") commence an investigation pursuant to Section 337 of the Tariff Act of 1930, as amended.  See 19 U.S.C. § 1337 ("Section 337").  Complainants request that the ITC remedy the unlawful importation into the United States, the sale for importation, or the sale within the United States after importation by the owner, importer, or consignee, of certain catheters, consoles, and other apparatus for cryosurgery, and components thereof, that infringe one or more of Complainants' patents.

1.2.    On information and belief, the proposed respondent, CryoCath Technologies, Inc. ("CryoCath"), is a company headquartered in Canada that has engaged in unfair acts in violation of Section 337 through the unlicensed importation, sale for importation, or sale after importation into the United States of certain catheters, consoles, and other apparatus for cryosurgery, which include at least CryoCath's cryoconsoles and CryoCath's cryoablation catheters such as Freezor, Freezor Xtra, and Freezor MAX catheters (collectively the "CryoCath Products").

1.3.    CryoCath's CryoCath Products and their intended use infringe one or more claims of United States Patent Nos. 6,471,694 (the "694 Patent"), 6,572,610 (the "610 Patent") and RE 40,049 (the "RE 049 Patent") (collectively the "Asserted Patents"), which are owned by AMS Research and exclusively licensed to CryoCor in certain fields of use.  Pursuant to Commission Rule 210.12(a)(9)(i), certified copies of the 610 Patent, the RE 049 Patent, and the 694 Patent are attached to this Complaint as Exhibits 1, 2 and 3, respectively.

1.4.    As required by Section 337(a)(2) and (3), a domestic industry for the 694 Patent, the 610 Patent, and the RE 049 Patent, and for products and technology protected by these patents, exists and/or is in the process of being established in the United States.

1.5.    Complainants seek an order pursuant to Section 337(d) excluding from entry into the United States all products imported by CryoCath that infringe the Asserted Patents. Complainants further seek a cease and desist order pursuant to Section 337(f) directing CryoCath and those acting in conjunction with CryoCath to cease the importation, promotion, marketing, advertising, demonstration, and warehousing of inventory for distribution, sale, and use of such products within the United States.

## II.    THE PARTIES

### A.    Complainants CryoCor and AMS Research

2.1.    Complainant CryoCor is a medical technology company based in the United States.  It is incorporated in the state of Delaware.  CryoCor is headquartered at 9717 Pacific Heights Boulevard, San Diego, California 92121.  CryoCor's most recent quarterly report accompanies this Complaint.  (See Ex. 4, CryoCor Inc.'s Third Quarter 2007 10-Q, at 6.)

2.2.    CryoCor is an industry leader in developing and manufacturing cryogenic technology to treat certain cardiac arrhythmias by creating lesions using cryoenergy, or extreme cold.  CryoCor's core product line is called The CryoCor™ Cardiac Cryoablation System ("the CryoCor Cryoablation System") and comprises a cryoablation catheter and a refrigeration console.  In August 2007, CryoCor received FDA approval for the treatment of AFL with the CryoCor Cardiac Cryoablation System.

2.3.    Complainant AMS Research is a Delaware corporation, and has its principal place of business at 10700 Bren Road West, Minnetonka, Minnesota 55343.  AMS Research Corporation is a wholly owned subsidiary of American Medical Systems, Inc., which is a wholly-owned subsidiary of American Medical Systems Holdings, Inc. ("AMS Holdings").

2.4.    AMS Holdings is headquartered in the United States, is a Delaware corporation, and has its principal place of business at 10700 Bren Road West, Minnetonka, Minnesota 55343.

AMS Holdings' most recent annual report accompanies this Complaint.  (Exhibit 5, American Medical Systems Holdings, Inc.'s 2006 Annual Report.)  AMS Holdings is the world's leading independent company focused on developing, manufacturing and marketing medical devices that restore male and female pelvic health.  (Id.)

      2.5.    On or about December 30, 2002, AMS Holdings acquired Cryogen, Inc. ("Cryogen") by merger.  (Ex. 6, American Medical Systems Holdings, Inc.'s Third Quarter 2003 10-Q, at 8.)  At the time, Cryogen was a corporation based in the United States and headquartered in San Diego California, and had entered into an exclusive, worldwide license agreement with CryoCor in a certain field of use involving patents and applications, including those that issued as the 694 Patent, the 610 Patent, and U.S. Patent No. 6,237,355, which later reissued as the RE 049 Patent.  (Ex. 7, Confidential 08/30/2000 License Agreement.)  Pursuant to 19 C.F.R. § 210.12(c), three copies of this confidential license agreement accompany this complaint.  (Id.)

      2.6.    In conjunction with the merger, AMS Holdings paid $36.2 million plus $4.7 million of acquisition-related costs.  (Ex. 6, American Medical Systems Holdings, Inc.'s Third Quarter 2003 10-Q at 6.)  In addition to the initial consideration, AMS Holdings also agreed to make an additional payment of up to $110 million, depending on product sales.  (Id.)  A principal purpose of the Cryogen acquisition by AMS Holdings was to "gain access to CryoGen's products and technology."  (Id.)  AMS Research now has all right, title and interest in the Asserted Patents, and stands as the licensor of the exclusive, worldwide field of use license to CryoCor.  (See Ex. 8, Assignments for the 694 Patent, 610 Patent and RE 049 Patent from American Medical Systems Gynecology, Inc. to AMS Research Corporation; see also Exhibits 15 and 16.)

### B.     Respondent CryoCath

2.7.     On information and belief, Respondent CryoCath is a corporation based in Canada.  CryoCath is a corporation organized and existing under the laws of the province of Quebec, Canada and has a principal place of business at 16771 Chemin Ste-Marie, Kirkland, Quebec, H9H 5H3, Canada.  One of CryoCath's most recent quarterly reports accompanies this Complaint.  (See Ex. 9, CryoCath Technologies, Inc.'s Third Quarter 2007 Report, at 47.)

2.8.     CryoCath is a medical technology company and operates in a single business segment, namely the development, manufacture and sale of cryoablation therapeutic technologies, including consoles and disposables (e.g., catheters and probes).  CryoCath, among other things, uses, sells, offers for sale, imports and/or has imported into the United States cryosurgical products to treat cardiac arrhythmias.  (Id. at 5 ("Today, the majority of our revenue is derived in the United States, with a significant portion coming from recurring, single use product sales." (emphasis added).)

## III.     THE PRODUCTS AT ISSUE

### A.     Complainant CryoCor's System and Components Thereof

3.1.     The products at issue generally pertain to treatment of cardiac arrhythmias. Cardiac arrhythmias are dysfunctions in the electrical activity that normally controls and maintains the highly coordinated contractions of the heart.  Arrhythmias cause the heart to pump blood less efficiently, cause potentially debilitating symptoms, and can result in life threatening events such as stroke.  CryoCor's development efforts have focused on a system for treating the two arrhythmias that are most difficult to treat:  atrial fibrillation, or AF, and right atrial flutter, or AFL.  AF is the most prevalent arrhythmia.  AFL is the second most prevalent arrhythmia and can lead to, and often coexists with, AF.

3.2.     Until recently, the standard approach for the treatment of atrial fibrillation has been anti-arrhythmic drug therapy, which often is ineffective and may cause serious, and

sometimes life-threatening, complications.  (Ex. 10, CryoCor's Summary of Safety and

Effectiveness, at 3 of 15.)  Other approaches include surgery, pacing therapies such as

implantable pacemakers or cardioverter-defibrillators (ICDs), and ablation of the

arrhythmogenic cardiac tissue using radiofrequency catheters.  (Id.)  Because of the limitations

and complications of these approaches, there has been substantial demand for a safe and

effective catheter ablation technology for the treatment and cure of atrial fibrillation and other

complex arrhythmias.

    3.3.     The CryoCor Cryoablation System addresses this demand.  Using the CryoCor

Cryoablation System, a physician can permanently interrupt the electrical signals that cause an

abnormal heart rate or rhythm.  (Id. at 1.)

    3.4.     The CryoCor Cryoablation System provides a novel technology for localizing and

treating cardiac arrhythmias.  CryoCor's proprietary system comprises the CryoCor Cryoablation

Console (which features an articulating arm housing a pre-cooler), as depicted below on the

right, and the CryoCor CryoBlator Catheter (a sterile, disposable, single-use percutaneous

cryoablation catheter), as depicted below on the left.  (See id.)  The system is designed to be

operated as a unit.  (Id.)



3.5.    As an example, the CryoCor Cryoablation System can be operated as follows. First, the CryoCor sheath dilator is inserted at the groin and the catheter is advanced into the sheath, through the femoral vein, and into the right atrium, as illustrated below in Image A.  The catheter is then articulated within the heart to the location where the physician wishes to make an ablation (Image B).  In the example below, the catheter is guided to edge of the tricuspid valve and a cryoablation is performed (Image C).  Additional ablations are then performed as necessary; in this example, ablations sufficient to create a lesion from the tricuspid valve to the ostium of the inferior vena cava are performed (Image D).  (Ex. 11, 01/30/2008 Webpage printout From CryoCor, Inc.'s Website at http://www.cryocor.com/corpprofile/procedure.htm at http://www.cryocor.com/clinical/atrial_flutter.htm.)



3.6.    To provide extreme cold at the tip of the cryoablation catheter, the console delivers a primary refrigerant in an open loop.  The primary refrigerant is liquefied by a closed loop pre-cooling refrigeration stage.  (Ex. 10, CryoCor's Summary of Safety and Effectiveness, at 4.)  Pre-cooling occurs in a heat exchanger located near the catheter/console interconnect, at

the end of the console's articulating arm.  (Id.)  The primary refrigerant reaches its lowest temperature via the phase change of the fluid (liquid to gas) after it exits a capillary tube at the distal tip of the cryoablation catheter.  (Id.)  The primary refrigerant (as a gas) is then returned from the catheter through the console to an outlet.  (Id.)

3.7.    Accompanying this complaint as Physical Exhibit 40 is a CryoCor catheter, as well as various photographs of the Physical Exhibit 40 at Exhibit 40.

**B.    Respondent CryoCath's Products and Components Thereof**

3.8.    Respondent CryoCath's Products include the Freezor Cardiac Cryoablation Catheter (the "Freezor Catheter"), umbilicals and accessories, and the CCT.2 CryoConsole (the "CryoConsole").  (Ex. 12, CryoCath's Summary of Safety and Effectiveness to the U.S. Food and Drug Administration, P020045 – CryoCath Freezor Cardiac Cryoablation Catheter and CTT.2 CryoConsole System, at 2 of 15; Ex. 13, CryoCath Technologies, Inc.'s "The Freezor Family" Product Illustration (with U.S. Flag); Ex. 14, 01/30/2008 Webpage printout of CryoCath's Website, http://www.cryocath.com/en/4.products/40.1.4.ep.usa.console. asp.)  The CryoCath Products at issue in this investigation are imported into the United States and offered for sale, sold, and used in the United States.

3.9.    Accompanying this complaint as Physical Exhibit 39 is a CryoCath Freezor Cardiac Cryoablation Catheter acquired in the United States, as well as various photographs of the Physical Exhibit 40 at Exhibit 40.

3.10.    A Freezor Catheter and CryoConsole are depicted below.  Cryogenic temperatures are produced at the distal tip of the catheter.  (Ex. 12, CryoCath's Summary of Safety and Effectiveness to the U.S. Food and Drug Administration, P020045 – CryoCath Freezor Cardiac Cryoablation Catheter and CTT.2 CryoConsole System, at 2 of 15.)  The distal

tip is placed on the inner walls of a beating heart, reached through the body's vasculature from a puncture in the skin.  (Id.)



## IV.    THE ASSERTED PATENTS

### A.    Identification, Ownership, and Enforcement Rights of the Asserted Patents

4.1.    Three Asserted Patents are the subject of this investigation:  U.S. Patent Nos. 6,471,694, 6,572,610, and RE 40,049.

4.2.    The 694 Patent duly and legally issued to Cryogen, Inc. as assignee on October 29, 2002, based on an application filed on August 9, 2000.  The 694 Patent is entitled "Control System For CryoSurgery."

4.3.    Each of the named inventors assigned all right, title and interest in the 694 Patent to Cryogen.  A certified copy of the assignment documents, as duly filed with the U.S. Patent and Trademark Office, is attached in Ex. 15.

4.4.    The 610 Patent duly and legally issued to Cryogen, Inc. as assignee on June 3, 2003, based on an application filed on August 21, 2001, which was published on February 27,

2003 as US 2003/0040740.  The 610 Patent is entitled "Cryogenic Catheter With Deflectable Tip."

4.5.    Each of the named inventors assigned all right, title and interest in the 610 Patent to Cryogen.  A certified copy of the assignment documents, as duly filed with the U.S. Patent and Trademark Office, is attached in Ex 15.

4.6.    The RE 049 Patent duly and legally issued to AMS Research as assignee on February 12, 2008, based on Application Serial No. 11/412,250, filed on April 26, 2006.  The RE 049 Patent is entitled "Precooled Cryogenic Ablation System."  The RE 049 Patent is a divisional application of reissue Application No. 10/446,390, and a reissue of U.S. Patent No. 6,237,355 ("the 355 Patent").

4.7.    The named inventor assigned all right, title and interest in the 355 Patent and Application Serial No. 10/446,390 to Cryogen.  A certified copy of the assignment documents, as duly filed with the U.S. Patent and Trademark Office, is attached as Exhibit 15.

4.8.    Cryogen assigned all right, title and interest in the Asserted Patents to American Medical Systems Gynecology, Inc.  A certified copy of the assignment document, as duly filed with the U.S. Patent and Trademark Office, is attached as Exhibit 16.

4.9.    American Medical Systems Gynecology, Inc., in turn, assigned all right, title and interest in the Asserted Patents to AMS Research.  A certified copy of the assignment document, as duly filed with the U.S. Patent and Trademark Office, is attached as Exhibit 8.

4.10.    On August 31, 2000, Cryogen granted an exclusive, worldwide license to certain patent rights, including the 694 Patent, 610 Patent, and the applications that led to the RE 049 Patent, to CryoCor in a certain field of use.  (Confidential Exhibit 7.)  Subsequent to an acquisition of Cryogen, AMS Research obtained all right, title and interest in the Asserted Patents.  (Ex. 8, Assignments for the 694 Patent, 610 Patent and RE 049 Patent from American

Medical Systems Gynecology, Inc. to AMS Research Corporation.)  AMS Research stands as the

licensor of the exclusive, worldwide field of use license to CryoCor.

4.11.    Pursuant to 19 C.F.R. §§ 210.12 (a)(9)(i), (ii) and 210.12(c), accompanying this

Complaint are:

- a certified copy of each Asserted Patent at Ex. 1 (610 Patent); Ex. 2 (RE 049 Patent); and Ex. 3 (694 Patent);

- a copy and three additional copies of the prosecution history of each Asserted Patent, which is separately and concurrently submitted as Appendix C (694 Patent (uncertified copy)); Appendix E (610 Patent (certified)); Appendix G (RE 049 Patent (certified));

- four copies of each patent and technical reference document mentioned in each Asserted Patent's prosecution history, which is separately and concurrently filed as Appendix D (694 Patent); Appendix F (610 Patent); Appendix G (RE 049 Patent);

- three copies of the Confidential Exhibit 7, the 08/31/2000 License Agreement between CryoCor and Cryogen, which is separately and concurrently submitted as Appendix A; and

- three copies of the Exhibit 17, the 06/28/2007 Public, redacted Development and License Agreement among CryoCor, Boston Scientific Corporation and Boston Scientific Scimed, Inc., which is separately and concurrently submitted as Appendix B.

**B.    The 694 Patent**

4.12.    Non-Technical Description of the 694 Patent[1]

a.    The 694 Patent is directed to an apparatus and method for automatic

operation of a refrigeration system for use in cryosurgery.  The refrigeration system

provides refrigeration power to a catheter for tissue ablation or mapping. The claimed

apparatus can monitor flow rates, pressures, and/or temperatures to achieve and maintain

optimum system performance.  Further, these parameters can be used to more safely

control the operation of the system.  The primary refrigeration system can be an open or

---

[1] This non-technical description does not construe the specification or any claim of the 694 Patent and is not intended to do so.

closed loop system and a secondary refrigeration system, which precools the primary refrigerant, is typically a closed loop. The system can control operation to a desired operational state, perform safety checks, and/or achieve safe shutdown. Such control is useful in the patient treatment setting.

b.     The 694 patent has 19 claims. Claims 1, 12 and 13 are independent claims, claims 2-11 depend directly or indirectly from claim 1, and claims 14-19 depend directly or indirectly from claim 13. At this time, at least claims 1, 2, 13 and 14 are believed to be infringed by the intended use of CryoCath's CryoCath Products, or components thereof, which are manufactured by CryoCath in Canada and then imported, offered for sale, sold, and used in the United States.

c.     Representative claim 13 is directed to a method for controlling a cryosurgical instrument, comprising: providing a refrigerant supply, a cryosurgery catheter including an expansion element, a temperature sensor, a pressure sensor, a flow sensor, a precool loop, and a control system connected to said sensors; flowing said refrigerant via a high pressure duct into said cryosurgery catheter; precooling said refrigerant in said precool loop; expanding said refrigerant in said catheter with said expansion element; sensing the temperature of said catheter with said temperature sensor; sensing the pressure of said expanded refrigerant with said pressure sensor; sensing the flow rate of said refrigerant with said flow sensor; and controlling said refrigerant with said control system, to maintain a selected catheter temperature, in response to signals from said temperature sensor, said pressure sensor, and said flow sensor.

### C.    The 610 Patent

4.13.    Non-Technical Description of the 610 Patent[2]

a.    The 610 Patent is directed to a flexible cryosurgical catheter.  The catheter allows the application of cold temperatures at locations within the human body via minimally invasive techniques.  More specifically, the catheter is passable through the larger blood vessels and cavities of the heart.  The catheter has a deflectable segment adjacent to its distal end (patient end) which can be deflected by remotely located means.  For example, a pull wire in the catheter is connected to the deflectable segment.  A deflection mechanism in the catheter handle allows for pulling on the pull wire to establish a desired curvature in the deflectable segment. The ability to establish a desired curvature can be beneficial in the treatment of cardiac arrhythmia to apply cryosurgical temperatures at selected locations in the patient's heart, to create localized areas of necrotic tissue.  The flexible catheter can have a heat transfer element, among other features, at or near its distal end.  The heat transfer element can be cooled to a cryosurgical temperature through pressure change of the refrigerant within the catheter.  The cooled catheter is placed in contact with a selected tissue to treat the tissue.  The target tissue is frozen, thereby destroying the abnormal tissue, with the healthy tissue around the treated tissue left uninjured.

b.    The 610 patent has 8 claims.  Claims 1-5 are independent claims and claims 6-7 depend directly or indirectly from claim 5.  At this time, at least claims 3, 5, 6 and 7 are believed to be infringed by CryoCath's CryoCath Products, or components thereof, that are manufactured by CryoCath in Canada and then imported, offered for sale, sold, and used in the United States.

---

[2] This non-technical description does not construe the specification or any claim of the 610 Patent and is not intended to do so.

      c.     Representative claim 5 is directed to a cryosurgical apparatus, comprising: a cryosurgical refrigeration unit; a control handle connected in fluid flow communication with said refrigeration unit; a torque transmitting flexible tubular catheter connected in fluid flow communication with said control handle, said control handle being adapted to impart axial torque to rotate said catheter; a deflectable tubular segment at a distal end of said catheter, said deflectable segment having a higher degree of flexibility than said catheter; a spine element within said deflectable segment, said spine element being constructed to define a preferred plane of deflection; a heat transfer element on a distal end of said deflectable segment; a refrigerant supply conduit within said catheter, said supply conduit being adapted to supply refrigerant from said refrigeration unit to said heat transfer element; a tip deflection mechanism in said control handle; a pull wire connecting said tip deflection mechanism to said heat transfer element, said tip deflection mechanism being adapted to impart tension to said pull wire to establish curvature of said deflectable segment of said catheter; and a sensor located near said distal end of said catheter.

**D.    The RE 049 Patent**

4.14.   Non-Technical Description of the RE 049 Patent[3]

      a.     The RE 049 Patent is directed to a method and apparatus for the performance of cryosurgery, such as in cardiac ablation to correct arrhythmias. The RE 049 Patent teaches, among other things, precooling of a primary refrigerant to liquefy the primary refrigerant. The precooling can be accomplished with a secondary refrigeration cycle using a second refrigerant. This approach can maximize the available cooling power of the primary refrigerant, and achieve the lower treatment temperatures. The

---

[3] This non-technical description does not construe the specification or any claim of the RE 049 Patent and is not intended to do so.

appropriate use of a secondary evaporative refrigeration system allows the system to precool and liquefy the primary high pressure refrigerant, before passage of the primary refrigerant through a primary expansion element. This refrigeration approach enables the generation of a sufficiently low temperature, and can maximize the available cooling power at the cold tip of a cryosurgical probe or catheter. This ultimately leads to improved tissue destruction as a physician is able to selectively cool discrete portions of biological tissue to very low temperatures in the performance of cryosurgery, without substantially cooling adjacent tissues of the organ.

b.      The RE 049 Patent has 3 claims. Claims 1 and 2 are independent claims, and claim 3 depends from claim 2. At this time, at least claims 2 and 3 are believed to be infringed by the CryoCath Products, or components thereof, that are manufactured by CryoCath in Canada and then imported, offered for sale, sold, and used in the United States.

c.      Representative claim 2 is directed to a cryosurgical instrument for ablation of cardiac tissue, comprising: a source of a gaseous primary refrigerant, wherein said primary refrigerant is a single gas and has a critical temperature; a source of a liquid secondary refrigerant, said secondary refrigerant having a critical temperature higher than said critical temperature of said primary refrigerant; a secondary expansion element connected to receive said liquid second refrigerant, said secondary expansion element being constructed to vaporize and expand said secondary refrigerant to a temperature below said critical temperature of said primary refrigerant; a primary-to-secondary heat exchanger having a primary refrigerant flow path connected to receive said gaseous primary refrigerant, and a secondary refrigerant flow path connected to receive said vaporized and expanded secondary refrigerant from said secondary expansion element,

14

said heat exchanger being constructed to cool and liquefy said primary refrigerant; a primary expansion element connected to receive said liquid primary refrigerant from said heat exchanger, said primary expansion element being constructed to vaporize and expand said primary refrigerant to a selected cryogenic temperature; and a cryoablation heat transfer element connected to receive said vaporized and expanded primary refrigerant.

### E.     Foreign Counterparts of the Respective Asserted Patents

4.15.     The following is a list of current foreign patents and foreign applications that are presently understood to correspond to the Asserted Patents:

- 694 Patent: Australia (AU2001282918B2); Canada (CA 2418893C); Canada 2516656); Canada (CA 2517747C); European Patent (EP1307155); WIPO (PCT WO 2002011638);

- 610 Patent: Australia (AU 2002323328B2); Canada (CA 2457150A1); European Patent (EP 1418857A4); Japan (JP 2004538083); WIPO (PCT WO 2003015651); and

- RE 40,049 (reissue of the 355 Patent): Austria (AT 297535); Australia (AU 754357B); Canada (CA 2378054C); Germany (DE60020705T2); European Patent (EP 1192396B1); Spain (ES 2242623T3); Japan (JP20035033123T); and WIPO (PCT WO 2001001049).

4.16.     Attached as Exhibits 18, 19 and 20 are charts listing each foreign patent and patent application that are presently understood to correspond to each Asserted Patent, and the status thereof.  On information and belief, no other foreign patents correspond to the Asserted Patents and no other foreign patent applications corresponding to the Asserted Patents are pending, rejected, or abandoned.

## V.     UNFAIR ACTS – CRYOCATH IS INFRINGING THE ASSERTED PATENTS

5.1.     On information and belief, Respondent CryoCath has been and still is infringing, contributing to infringement, and/or inducing infringement of each of the Asserted Patents in the United States.  CryoCath's infringing activities in the United States include at least using,

offering to sell, selling, importing and/or having imported one or more of its CryoCath Products. CryoCath has violated, and continues to violate, U.S. patent laws. CryoCath is not licensed under the Asserted Patents.

5.2.    On information and belief, CryoCath manufactures its CryoCath Products in Canada and imports, or sells for importation, its CryoCath Products into the United States. The CryoCath Products and their intended use include all the elements of at least claims 1, 2, 13 and 14 of the 694 patent, claims 3, 5, 6 and 7 of the 610 Patent, and claims 2 and 3 of the RE 049 Patent. As a result, at least these claims of the Asserted Patents are infringed in violation of Section 337(a)(1)(B)(i).

5.3.    On information and belief, CryoCath has received clearance from the United States Food and Drug Administration (the "FDA") to market its CryoCath Products in the United States. (Ex. 21,  12/06/2007 Webpage printout from the U.S. Food and Drug Administration Website for 7F Freezor Cardiac Cryoablation Catheter and CCT.2 CryoConsole System – P-20045 at http://www.fda.gov/cdrh/PDF2/P020045.html.)

5.4.    CryoCath states in one of its most recent quarterly reports:  "Today, the majority of our revenue is derived in the United States, with a significant portion coming from recurring, single-use product sales." (Ex. 9, CryoCath Technologies, Inc.'s Third Quarter 2007 Report, at 5 (emphasis added).)  Attached to this Complaint as Exhibit 22 is a copy of a CryoCath web page accessible via the Internet in the United States identifying CryoCath Products for the U.S. market. (Ex. 22, Webpage, "Ordering Information [in the USA].")

5.5.    On information and belief, CryoCath provides training in the use of its CryoCath Products for customers and potential customers in the United States. By using the CryoCath Products as instructed, CryoCath's customers and potential customers in the United States practice or will practice a method that infringes at least claims 13 and 14 of the 694 Patent.

5.6.     Among other things, CryoCath maintains an instructional video clip on its website showing a cryoablation procedure with its CryoCath Products.  (Ex. 23, 01/31/2008 Website printout of "Akron Children's Hospital Replay of Pediatric Cardiac Cryoablation" procedure at http://www.or-live.com/akronchildrens/1562/ [CryoCath's website provides links to this Akron website].)  On information and belief, CryoCath also created an in-service video for its CryoCath Products at the Cleveland Clinic, 9500 Euclid Avenue, Cleveland, OH 44106 USA.  This video is maintained by the Heart Rhythm Society Website.  (Ex. 24, 01/31/2008 Website printout of "Virtual Hands-On: CryoCath Technologies Cryoablation" at http://www.hrsonline.org/Education/SelfStudy/VHO/cryocath_technologies_cryoablation.cfm.)

5.7.     The CryoCath website also identifies at least six physicians in the United States who are available as medical advisors for the CryoCath Products "in the U.S.A."  These physicians are located at various cites throughout the United States, namely Des Moines, Iowa; Colorado Springs, Colorado; Richmond, Virginia; Hyannis, Massachusetts; Tampa, Florida; and Green Bay, Wisconsin.  An email address for each physician is also provided through CryoCath's website. (Ex. 41, 02/27/08 Webpage printout of Cryocath Technologies Inc.'s website of how to "Contact a Medical Advisor" at http://www.cryocath.com/en/2.patients/2.8medical.advisor.asp.)

5.8.     As set forth herein, CryoCath's CryoCath Products and their intended uses include all of the elements of at least claims 1, 2, 13, and 14 of the 694 patent, claims 3, 5, 6 and 7 of the 610 Patent, and claims 2 and 3 of the RE 049 Patent.  Pursuant to 19 C.F.R. § 210.12(a)(9)(vii), claim charts applying each of these exemplary claims to CryoCath's CryoCath Products and methods are attached as Exhibit 25 (694 Patent), Exhibit 26 (610 Patent) and Exhibit 27 (RE 049 Patent).  In the event that any of the remaining, unasserted claims are

infringed by CryoCath, a motion will be timely made to add these claims to the scope of the investigation.

5.9.    CryoCath's technical, instructional, and promotional literature describes the use of its CryoCath Products and components thereof by a method that would infringe at least claims 13 and 14 of the 694 Patent.  Exhibits 21, 28, and 29 are copies of the FDA Documents for the CryoCath CryoCath Products, CryoCath Operator's Manual, and Notes for Videos located in the Electrophysiological Knowledge Center.  The technical, instructional, and promotional literature constitute evidence of active steps taken by CryoCath to induce and enable its customers to practice at least claims 13 and 14 of the 694 Patent.

5.10.    CryoCath's CryoCath Products are not staple articles of commerce.  CryoCath specifically designed and markets its CryoCath Products for treating cardiac conditions with cryoablation.  The CryoCath Products have no substantial non-infringing uses.

## VI.    IMPORTATION AND SALE

6.1.    On information and belief, CryoCath manufactures its CryoCath Products in Canada and imports the products into the United States, or imports components of the CryoCath Products into the United States and assembles or has others assemble the CryoCath Products in the United States.  (See Ex. 9, CryoCath Technologies, Inc.'s Third Quarter 2007 Report, at 46.) For example, CryoCath's product labeling for its CryoCath Xtra catheter, obtained in the United States, indicates that it is "Made in Canada."  (Ex. 30, Confidential Declaration of Gregory J. Tibbitts, at ¶ 15.)



6.2.     Accompanying this Complaint as Confidential Exhibit 30 is the confidential

declaration of Mr. Gregory Tibbitts, CryoCor's Chief Financial Officer, who observed that the

CryoCath CryoCath Products and components thereof were displayed and offered for sale at the

Boston Atrial Fibrillation Symposium on January 17-19, 2008.  (Ex. 30, Confidential Declaration

of Gregory J. Tibbitts, at ¶ 14.)

6.3.     Attached to this Complaint are CryoCath's PMA and Form 510(k) Summaries as

filed with the FDA (Exhibit 31), which indicate that CryoCath is located in Canada,

manufactures its products there, and intends that its products be used in the United States.

6.4.     CryoCath states: "our direct sales force, comprised of both sales representative

and clinical specialists, have made great strides in penetrating our key markets.  To date, these

focal catheters [Freezor, Freezor Xtra and Freezor MAX] have been installed in over 325 centers

in both Europe and the United States."  (Ex. 32, CryoCath Technologies, Inc.'s 2007 Progress

Report at 13 (emphasis added).)  CryoCath illustrates its activity in the United States at page 14 of its 2007 Annual Report.



6.5.     CryoCath "operates in only one segment which is the sector related to the development, manufacture and sale of therapeutic cryoablation technologies and products."  (Id.) CryoCath identifies the United States as a "destination" of its products and the location of consoles at customers' premises.  (Ex. 9, CryoCath Technologies, Inc.'s Third Quarter 2007 Report at 46.)

**11. Segment Disclosure**

The Company carries on substantially all of its operations in Canada including manufacturing and shipping all of its products. All of its property, plant and equipment are located in Canada except for consoles located at customers' premises. It operates in only one segment which is the sector related to the development, manufacture and sale of therapeutic cryoablation technologies and products.

The following table presents sales by the destination of its products and the location of consoles at customers' premises.

| | Three months ended | | Nine months ended | |
|---|---|---|---|---|
| | June 30, 2007 $ | June 30, 2006 $ | June 30, 2007 $ | June 30, 2006 $ |
| United States | 7,383,845 | 6,617,416 | 22,278,574 | 20,477,626 |
| Europe | 3,722,461 | 2,574,255 | 9,635,792 | 7,243,100 |
| Canada | 261,401 | 188,532 | 438,178 | 371,200 |
| Other | 332,505 | 327,381 | 767,766 | 817,353 |
| | 11,700,212 | 9,707,584 | 33,120,310 | 28,909,279 |

6.6.    On information and belief, the accused CryoCath Products may be classified under at least the following Harmonized Tariff Schedule of the United States ("HTS") item numbers:  9018.39.00 and 9032.89.60.  These HTS numbers are intended for illustration only and are not intended to be restrictive in scope of the products accused in this investigation.

## VII.    LICENSES

7.1.    On about August 31, 2000, Cryogen granted an exclusive, worldwide license to the 694 Patent, the 610 Patent, and the applications that led to the RE 049 Patent to CryoCor in certain fields of use.  On about December 30, 2002, AMS Holdings acquired Cryogen by merger. (Ex. 6, American Medical Systems Holdings, Inc.'s Third Quarter 2003 10-Q.)  AMS Research now has all right, title and interest in certain patents and applications, including the Asserted Patents at issue in this investigation.  AMS Research stands as the licensor of the exclusive, worldwide field of use license to CryoCor.

7.2.    On June 28, 2007, CryoCor entered into a Development and License Agreement with Boston Scientific Corporation and Boston Scientific Scimed, Inc. (collectively "Boston") that provided Boston with, among other things, a sublicense to patents licensed (with a right to sublicense) by CryoCor, which include at least the RE 049 Patent.  (Ex. 17, 06/28/2007 License Agreement.)

7.3.    Pursuant to 19 C.F.R. § 210.12(c), copies of all license agreements accompany this Complaint as Exhibits 7 and 17.

7.4.    Except for the licenses described above, neither CryoCor nor any of its licensors or predecessors has licensed the 694 Patent, the 610 Patent, or the RE 049 Patent to anyone within the field of use granted to CryoCor.

21

## VIII.   DOMESTIC INDUSTRY

8.1.    As required by 19 U.S.C. § 1337(a)(2), a domestic industry, as defined by 19

U.S.C. § 1337(a)(3), exists in the United States with respect to the Asserted Patents.  CryoCor

manufactures cryosurgical systems that practice at least one claim of each Asserted Patent, for

which there has been a significant investment in plant and equipment, significant employment of

labor or capital, and/or substantial investment in the exploitation of the Asserted Patents.

8.2.    Claim charts illustrating that exemplary claim 13 of the 694 Patent, claim 5 of the

610 Patent, and claim 2 of the RE 049 Patent read on the CryoCor products, or method of using

those products, accompany this Complaint as Exhibits 33, 34, and 35, respectively.  Other

products manufactured and sold by Complainants in the United States may also be covered by

the Asserted Patents.

8.3.    There is and has been significant investment in inventory materials and equipment

in the United States with respect to the Asserted Patents.  (Ex. 30, Confidential Declaration of

Gregory J. Tibbitts, at ¶¶ 9-10.)  Attached to this Complaint as Confidential Exhibit 30 is

information about such investment in the inventory materials and equipment.

8.4.    There is and has been significant employment of labor or capital in the United

States with respect to the Asserted Patents.  (Id. at ¶¶ 8, 11-15.)  Accompanying this Complaint

as Confidential Exhibit 30 is information about employment of labor and capital in connection

with CryoCor's products that are within the scope of the Asserted Patents.

8.5.    CryoCor has about 56 employees involved with the patented subject matter,

which includes five engineering and technical employees working in research and development

activities for our cryoablation console, five engineering and technical employees working in

research and development activities for our cryoablation catheter, four non-technical employees

working in manufacturing of our cryoablation console, and five non-technical employees working in manufacturing of our cryoablation catheters.  (Id. at ¶ 8.)

8.6.     There is and has been substantial investment in the exploitation with respect to the Asserted Patents.  (Id. at ¶¶ 11-13.)  Accompanying this Complaint as Confidential Exhibit 30 is detailed information about the substantial investment in exploitation in connection with CryoCor's products that are within the scope of the Asserted Patents.

8.7.     CryoCor licensed the Asserted Patents from Cryogen for substantial consideration.  (Ex. 7, Confidential 08/31/2000 License Agreement.)  AMS paid $36.2 million plus $4.7 million of acquisition-related costs to acquire Cryogen and gain access to Cryogen's products and technology.  (Ex. 6, American Medical Systems Holdings, Inc.'s Third Quarter 2003 10-Q.)  In addition to the initial consideration, AMS Holdings also agreed to make an additional payment of up to $110 million, depending on product sales.  (Id.)

8.8.     Additionally, CryoCor has incurred significant expenses to obtain market approval from the United States Food and Drug Administration.  (Ex. 30, Confidential Declaration of Gregory J. Tibbitts, at ¶ 13.)  In August 2007, CryoCor received approval for the treatment of AFL with the CryoCor Cardiac Cryoablation System.  (Ex. 36, 08/01/2007 U.S. Department of Health and Human Services letter to CryoCor, Inc., P050024 - CryoCor Cryoablation System.)

8.9.     CryoCor is and has been incurring expenses in connection with the marketing and selling of CryoCor's products covered by the Asserted Patents in the United States, where CryoCor has received FDA approval.  (Ex. 4, CryoCor, Inc.'s Third Quarter 2007 10-Q.)  CryoCor is in the process of building its sales and marketing capabilities, and has recently hired a Vice President of Sales and Marketing, who will be leading these efforts. (Id.)

## IX.    RELATED LITIGATION

9.1.    CryoCor, AMS Research Corporation and CryoCath are parties to a patent infringement action, *CryoCor, Inc., et al. v. CryoCath Technologies, Inc.*, Civil Action, No. 08-0031-GMS, in the United States District Court for the District of Delaware.  This case was filed on January 16, 2008, and presently involves the 610 Patent and the 694 Patent.  The parties have stipulated to add the RE 049 Patent.  The 02/27/2008 status of the case is summarized in the Docket Report available on the District Court's Electronic Case Filing (ECF) System, attached as Exhibit 37.

9.2.    CryoCath and CryoCor are parties to a separately captioned patent infringement action, *CryoCath Technologies, Inc. v. CryoCor, Inc.*, Civil Action No. 07-631-GMS, in the United States District Court for the District of Delaware.  This case was filed on October 17, 2007, and involves patents owned by CryoCath.  The 02/27/2008 status of the case is summarized in the Docket Report available on the District Court's Electronic Case Filing (ECF) System, attached as Exhibit 38.

9.3.    In Canada, CryoCor, AMS Research Corporation and CryoCath are parties to a patent infringement action, *CryoCor, Inc., et al. v. CryoCath Technologies, Inc.*, Civil Action, No. T-66-08, in Federal Court.  This case was filed on January 15, 2008, by CryoCor and AMS Research Corp. and presently involves Canadian Patent Nos. 2,378,054, 2,516,656, and 2,517,747, one or more of which is related to the Asserted Patents.  Pursuant to an agreement between the parties, the Defendant on February 22, 2008 served the Plaintiffs with a demand for particulars.  The Plaintiffs are to provide a response by no later than March 7, 2008, following which the Defendant is to file its Defence, or any motion for particulars or other relief with respect to the Statement of Claim, by no later than March 21, 2008.

9.4.    On information and belief, other than the litigation described above, there has been no foreign or domestic court or agency litigation involving the 694 Patent, the 610 Patent, or the RE 049 Patent.

## X.    REQUESTED RELIEF

By reason of the foregoing, Complainants request that the Commission:

10.1.    Institute an immediate investigation pursuant to Section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337, into the unlawful importation into the United States, the sale for importation into the United States, and/or the use, sale or offer for sale within the United States after importation of certain CryoCath catheters, consoles, and other apparatus for cryosurgery and components thereof, that directly infringe or induce or contribute to the infringement of one or more claims of the Asserted Patents;

10.2.    Determine that there has been a violation of Section 337 of the Tariff Act of 1930;

10.3.    Issue a permanent exclusion order pursuant to Section 337(d) of the Tariff Act of 1930, as amended, excluding the entry into the United States of all of CryoCath's CryoCath Products and components thereof that directly infringe or induce or contribute to the infringement of one or more claims of the Asserted Patents and that are manufactured, imported, or sold by or on behalf of CryoCath, its affiliates, subsidiaries, successors, or assigns;

10.4.    Issue a permanent cease and desist order pursuant to Section 337(j) of the Tariff Act of 1930, as amended, prohibiting CryoCath, its affiliates, subsidiaries, successors, and assigns from marketing, demonstrating, distributing, offering for sale, selling, supporting, or transferring (including the movement or shipment of inventory in the United States) any of CryoCath's CryoCath Products and components thereof that directly infringe or induce or contribute to the infringement of one or more claims of the Asserted Patents; and

10.5.    Issue such additional and further relief as the Commission deems just and proper, based on the facts determined by the investigation and within the Commission's authority.

Respectfully submitted,

Date:  February 27, 2008

*Leland G Hansen*

Leland G. Hansen
Wil Rao
**McAndrews, Held & Malloy, Ltd.**
500 West Madison Street, 34th Floor
Chicago, Illinois 60661
(312) 775-8000
(312) 775-8100 - facsimile
*Email:  lhansen@mcandrews-ip.com*
*Email:  wrao@mcandrews-ip.com*

**Attorneys for AMS Research Corp.**

Kevin O'Brien
Kevin Sullivan
**Baker & McKenzie LLP**
815 Connecticut Avenue, NW
Washington, DC 20006-4078
(202) 452-7000
(202) 452-7074 - facsimile
*Email: kevin.m.o'brien@bakernet.com*

Howard N. Wisnia
James P. Conley
**Baker & McKenzie LLP**
12544 High Bluff Drive, Third Floor
San Diego, California 92130-3051
(858) 523-6200
(858) 259-8290 - facsimile
*Email: howard.n.wisnia@bakernet.com*

**Attorneys for CryoCor, Inc.**

26

# EXHIBIT B

June 30, 2007

# Q3



third quarter report



# Letter to Shareholders

Dear Shareholders,

The third quarter of 2007 was one of solid revenue growth while we also made further progress in several key strategic areas. We achieved record sales, driven by a marked uptake in growth of our core EP business. This EP growth is composed of ongoing solid growth in our core focal cryoablation business compounded by the rapid increase in the number of Arctic Front® Atrial Fibrillation (AFib) ablations in Europe. Last but not least, we successfully completed the sale of our surgical portfolio to ATS Medical, providing a financial runway to the US commercial launch of Arctic Front while creating the required focus on this blockbuster opportunity.

I would like to begin by summarizing a few points on the sale of the surgical portfolio to ATS.  The EP ablation market in general and the AFib market in particular, is a very large opportunity for CryoCath. We estimate the potential AFib market size to be at least $2 billion once fully addressed. Our strategy is to create a relentless focus around pursuing this opportunity and become a high growth, pure play and profitable EP company, focused on AFib. The sale of the surgical portfolio generated an initial payment of US$22 million.  In addition, we will receive US$2 million upon transfer of the manufacturing activity to ATS which is expected within the next twelve months, a fixed payment of US$2 million in June 2009 as well as revenue based performance payments of up to US$4 million between 2009 and 2010. We are excited that, with this strategic transaction, we create the required focus to successfully achieve our corporate goal, have sufficient financial resources to take us into the US launch of Arctic Front and increase shareholder value.

Moving to the financial results, Q3 2007 closed with record revenue of C$11.7 million or 20.5% growth versus previous year. With sales of C$8.3 million, our core EP business showed rapidly accelerating growth of 37.8% versus last year. Growth drivers are the ever increasing installed base of cryoablation consoles in the US and Europe and the expanding use of Arctic Front in Europe. The number of active Arctic Front user sites in Europe grew from approximately 6 at the end of Q2 to 20 by the end of Q3.

Gross profit in Q3 2007 improved to 58.0% as compared to 50.5% in Q3 of 2006 as a result of volume growth, ongoing improvements in manufacturing and the absence of one time items that negatively impacted the quarter last year.  We believe that our year-to-date gross profit of 60.7% is a more accurate reflection of the better performance of our manufacturing operation. The function of our supply chain continues to improve and our customer service levels are now consistently at healthy levels. We are comfortable that through a number of planned improvements and general volume uptake we can continue to steadily increase our gross margins to over 70% once Arctic Front is released in the US.

We have also made progress in our landmark STOP AF IDE trial. At the time of this letter, we have 15 sites operational in the US plus 2 in Canada, and we have enrolled nearly 100 patients. Reactivating all investigational sites following the March/April shutdown as well as processing all paperwork for new sites took more time than originally anticipated. Obtaining US approval for Arctic Front is one of our two key business objectives. The pace of enrolment will pick up due to the larger number of enrolling sites. We are driving further enrolment acceleration through intensified communication and site support, addressing insurance coverage issues and opening more sites. We maintain our target of completing enrollment at the end of this calendar year.

Our clinical outcomes in the use of Arctic Front for Paroxysmal AFib patients continue to be solid. In reports from large series of patients treated commercially over multiple centers in Europe, we see positive outcomes of up to 85%. Based on these strong results we continue to be upbeat about our second business objective which is driving rapid and profitable growth of Arctic Front in Europe. With supply constraints now eliminated, we have embarked on expanding the number of sites utilizing Arctic Front as well as increasing usage in existing sites. We have initiated our Professional Education program, the "Arctic Front Masters Program", and have entered a measured expansion phase of our European clinical and commercial support team. We are pleased to be able to report robust sales growth for our AFib business in Europe.

The future for CryoCath and our focused EP/AFib business is showing greater promise than ever before. We continue to strengthen our global leadership position by establishing cryoablation at an ever increasing number of sites. Over the past 12 months we have installed approximately 100 cryoconsoles and we foresee an ongoing expansion of our user base. Over the next 3 years, we anticipate having in excess of 150 productive Arctic Front sites in Europe. Driven by stronger revenue growth, increasing gross margins and diligent management of expenses, we believe we can significantly reduce cash burn over the medium term. Following our US launch expected in late 2009, we look forward to significantly growing revenues through realizing the blockbuster potential of our products and pipeline. This positive outlook for growth continues to be supported by our string of record quarterly results, the ongoing creation of a strong body of clinical evidence that supports the use of cryoablation as an effective therapy for AFib and our strong IP position.

I look forward to sharing reports on CryoCath's ongoing progress with you, and I would like to thank our shareholders as well as all our associates around the world for their continuing support as we move forward towards creating a large, profitable global leader in AFib therapy.

Jan Keltjens
President and Chief Executive Officer

## MANAGEMENT'S DISCUSSION AND ANALYSIS

The following information should be read in conjunction with the Company's unaudited interim financial statements for the third quarter ended June 30, 2007, which have been prepared in accordance with Canadian generally accepted accounting principles applied to interim financial statements, and its audited financial statements for the year ended September 30, 2006 and the related notes, which are prepared in accordance with Canadian generally accepted accounting principles.

### FORWARD-LOOKING STATEMENTS

This Management Discussion and Analysis may contain projections and other forward-looking statements. Forward-looking statements typically contain words such as "anticipate", "believe", "expect", "plan" or similar words suggesting future outcomes or statements regarding an outlook on the estimated amounts and timing of capital expenditures, anticipated future debt levels and incentive fees or revenues or other expectations, beliefs, plans, objectives, assumptions, intentions or statements about future events or performance. Factors which could cause future outcomes to differ materially from those set forth in the forward-looking statements include, but are not limited to: [i] obtaining sufficient and suitable financing to support operations, clinical trials and commercialization of products, [ii] capitalizing on partnering and acquisition opportunities, [iii] clinical trial timing and results, [iv] adequately protecting proprietary information and technology from competitors, [v] regulatory approvals, [vi] successfully competing in the targeted markets, and [vii] maintaining third party relationships, including key personnel, and key collaborators. By their nature, forward-looking statements involve numerous assumptions, inherent risks and uncertainties, both general and specific, that could cause actual results and experience to differ materially from the anticipated results or other expectations, predictions, forecasts or projections expressed in such forward-looking statements. Readers are cautioned not to place undue reliance on these forward-looking statements, and the Company does not undertake to update publicly or revise any forward-looking statements, whether as a result of new information, future events, or otherwise, unless required by any law or regulation of any securities commission. While these projections and other statements represent our best current judgment, they are subject to risks and uncertainties that could cause actual results to vary. Prospective investors should carefully consider the information contained under the heading "RISKS AND UNCERTAINTIES" in this Management Discussion and Analysis and all other information included in or incorporated by reference in this Management Discussion and Analysis, and in other filings found on SEDAR at www.sedar.com, before making investment decisions with regard to the securities of the Company.

Management prepared this review from information available to August 9, 2007.

### OVERVIEW

CryoCath Technologies Inc. ("CryoCath") is a fully integrated medical device company firmly committed to establishing cryotherapy as an ideal treatment for Atrial Fibrillation ("AF"). With our proven expertise and experience in cryoablation we believe we are well positioned to become the global leader in the ablation treatment of this disease.

AF is the most prevalent cardiac arrhythmia and is a leading cause of stroke. At present, there is no satisfactory therapy for the treatment of this serious medical condition and none of the current therapies, including drugs or heat-based ablation, address the underlying disease state in a complete and satisfactory manner. As such, AF represents an estimated untapped potential market worth up to US$2 billion annually.

At the core of our growth strategy to garner market share in the ablation treatment of AF is a comprehensive suite of products designed specifically to treat this disorder. These products

4

combine our cryoablation expertise with innovative balloon technology to produce minimally invasive catheter solutions.

Our primary catheter product to treat AF, Arctic Front, is already approved for use and beta-launched in Europe. Physician feedback so far has been encouraging. Initial results from the patients treated with Arctic Front in these centers have been very positive and acute success rates have been high. Arctic Front is also currently the subject of an FDA IDE pivotal study in the United States (STOP AF).

While the revenue potential for Arctic Front is certainly promising, at present the majority of our revenue is derived from our catheter cryoablation products, Freezor®, Freezor® Xtra, and Freezor® MAX, all of which are marketed to electrophysiologists. Today, the majority of our revenue is derived in the United States, with a significant portion coming from recurring, single-use product sales.

## OUR INDUSTRY AND KEY DRIVERS

### Cardiac Arrhythmias and Atrial Fibrillation

An arrhythmia is a problem in the heart's electrical system, similar to a short circuit on an electrical board. Arrhythmias disrupt the heart's normal rhythm, and compromise its normal pumping function. Two leading causes of arrhythmias are i) conduction is interrupted anywhere along the normal pathway; and ii) aberrant cells take over as the pacemaker.

Arrhythmias are commonly treated with ablation. Ablation is performed by identifying the cardiac cells causing the arrhythmia and rendering them permanently inactive. To do this, physicians position a thin catheter/probe on or near the area causing the arrhythmia. A refrigerant delivered through the catheter tip destroys, or ablates, a very small portion of heart tissue, thereby stopping the aberrant electrical pathway and allowing the heart to return to normal rhythm.

While ablation is the most common and effective treatment for many types of arrhythmias, today it is only used to treat those that originate in the upper portion of the heart (supraventricular tachyacardia or "SVT"). SVT's represent 75% of new arrhythmia cases annually.

There are several competitive products available to treat SVT arrhythmias. However, most use heat-based radio frequency technology. This technology can cause severe complications; a risk of accidentally damaging part of the heart's normal conduction system causing AV block, which requires the permanent implantation of a pacemaker, which can occur in up to 2% of heat-based ablation procedures. Another 5% of cases are aborted due to the risk of AV block.

Atrial Fibrillation ("AF") is a substantially more common arrhythmia for which there is currently no approved treatment. Approximately 2.3 million people in the United States and 15 million people worldwide currently have AF; more than 1.1 million new cases are diagnosed each year and its prevalence is only expected to increase as the population ages. In the U.S., nearly 75,000 strokes are attributed to AF each year, and up to 50% of AF patients will develop heart failure.

Cryoablation offers a safe alternative to heat-based ablation for the treatment of both SVT's and AF. Its positive attributes outweigh all other options now used. The risk of permanent damage to arrhythmia patients being treated with cryoablation is low. Clinical testing has demonstrated high success rates.

At present, CryoCath's line of cryo catheters is the principal cryo technology available in the United States, Europe and around the world.

## CORPORATE RESULTS AND ACCOMPLISHMENTS IN THE THIRD QUARTER OF 2007

- The Company announced that additional data on the Company's proprietary Arctic Front catheter system to treat AF was presented at the German Cardiac Society's 73rd Annual Conference, the premier annual event for German cardiologists, in Mannheim, Germany on April 12, 2007. Dr. Antz and Professors Schumacher and Jordaens presented acute and 3-month data on a total of 150 patients following ablation procedures. Acutely, over 90% of the pulmonary veins were successfully isolated. When pulmonary vein isolation was achieved, 75% of patients were AF-free after three or more months following a single procedure.

- CryoCath announced the presentation of 15 oral abstracts and posters, all pertaining to the use of CryoCath's technology to treat heart arrhythmias at the 28th Annual Scientific Sessions of the Heart Rhythm Society, held in Denver, Colorado May 9-12, 2007.

- On June 28, 2007, the Company announced that it has completed the sale of its surgical portfolio to a subsidiary of ATS Medical Inc. in a US $22 million cash transaction. With milestone payments, the agreement could increase in value to reach a total of US $30 million.

- On June 28, 2007, the Company also announced that data on the Company's proprietary Arctic Front catheter system to treat AF was presented at the European Society of Cardiology Conference in Lisbon, Portugal. Dr. Heinz-Friedrich Pitschner from the Kerckhoff-Klinik in Bad Nauheim presented data from three centers. Over 100 Arctic Front procedures have been completed at each clinic. In the cohort of true paroxysmal AF patients, 84% were free of AF after only one procedure. When additional patients with hypertension and persistent AF were analyzed, 63% were free of AF after one procedure. For patients with recurrence, chronic success rates rose to nearly 80% after a second procedure was performed.

## CORPORATE GOALS

Summarized below are the key corporate goals that were established by the Company at the beginning of the year.  The majority of these goals has either been accomplished or is on target. We expect that we will accomplish our objectives to reduce our operating burn, but expect to fall short of the target set.

### 1     Appoint High-Level Management

Strong corporate leadership is critical to any company's ability to execute on strategic objectives effectively and on-time. With Arctic Front set to emerge as a powerful cryoablation device to treat AF, we need to ensure that we put in place a leader with the commensurate skills, expertise and vision to drive CryoCath's performance to the next level.

### 2     Complete Enrollment of the STOP AF IDE trial

With Arctic Front as the dominant growth driver for our business, securing U.S. marketing approval for this product remains our top priority. With up to 20 US centers participating in our pivotal STOP AF IDE trial, we anticipate we will be able to complete enrollment in calendar 2007.

### 3     Expand Arctic Front Roll-Out in Europe

To date, physicians using Arctic Front in Europe have enjoyed high success rates. Now, in order to both establish Arctic Front as a leading modality for AF in this important market, and build a database of clinical experience in preparation for our U.S. launch, we intend to ramp up the European roll-out of Arctic Front with the addition new centers. These additional centers will expand usage and grow sales.

### 4     Reduce Operating Burn

Of critical importance to the successful operation of our business is the optimal use of resources. At present, the entire corporation's focus is aligned with maximizing the opportunity and potential of Arctic Front. With this focus in mind, our objective will be to deliver this and any other corporate initiatives, with our resources, ultimately reducing our burn rate to less than $11 million in fiscal 2007.

### 5     Increase Utilization of Installed Base

At present, CryoCath products are installed in over 450 electrophysiology centers worldwide. This growth reflects not only the medical community's increasing appetite for our cryoablation products, but also our sales representatives' and clinical specialists' acumen. Now in most key US centers, our goals in fiscal 2007 are to focus our sales field force's efforts to driving utilization of our products. Sales representatives and clinical specialists will work in tandem to maximize efficiencies in this regard. To ensure optimal results, marketing materials will support our sales field force's initiatives and compensation will be tied to performance in this metric.

### 6     Increase Installed Base

With CryoCath embedded in the majority of the key centers, we anticipate moderate growth in our installed base.

## OUR CRYOABLATION BUSINESS

CryoCath has developed and commercialized a line of focal catheters to treat patients with arrhythmias for use by electrophysiologists, cardiologists who specialize in the electrical system of the heart.

These catheters, Freezor, Freezor *Xtra* and Freezor *MAX*, all use cryoablation to eliminate defective pathways that cause arrhythmias. While these catheters look and navigate similar to heat-based catheters, they do not destroy tissue in the same way, nor do they pose the same risks as heat-based catheters.

Freezor and Freezor *Xtra* both have the unique ability to test an ablation site prior to creating a permanent lesion. By cooling a target site, a physician can see if they are in the right spot to eliminate an arrhythmia and ensure there are no signs of any danger to the patient. This process is referred to as CryoMapping (site testing); there is no comparable feature available for use with heat-based catheters. Many arrhythmias originate near the AV node; the most common one is AVNRT. While AVNRT is also the most commonly ablated arrhythmia, nearly 2% of cases treated result in AV block, a condition that results in the permanent implant of a pacemaker.

Freezor *MAX* delivers substantially more cooling power than both Freezor and Freezor *Xtra*. By providing the maximum amount of refrigerant over a larger tip, Freezor *MAX* enables physicians to make significantly larger and deeper lesions.

Our direct sales force, comprised of both sales representatives and clinical specialists, have made great strides penetrating our key markets. To date, these focal catheters have been installed in over 325 centers in both Europe and the United States. Third party distributors have installed these catheters in more than 125 centers in certain eastern European countries and Asia.

## OUR STRATEGY TO GROW CATHETER REVENUE

### Growing Utilization

Our approved EP focal catheters currently account for a little less than one half of our current revenue stream. As such, an important goal during the coming year will be to drive utilization of these products. With these catheters already installed in most key centers, we will further focus our sales force efforts to driving the use of our catheters, which we ultimately expect to result in rising disposable unit sales. Sales representatives and clinical specialists will work together on this initiative. To ensure optimal results, marketing materials will support the sales force's efforts to drive utilization.

### Atrial Fibrillation

While Freezor, Freezor *Xtra* and Freezor *MAX* have provided sustainable revenue growth, Arctic Front remains our largest opportunity for growth.

Arctic Front, for the treatment of Atrial Fibrillation ("AF"), was designed with three priorities in mind: safety, ease of use and efficacy.

Arctic Front is the world's first double balloon ablation catheter in which each balloon is made from a different material for an added layer of safety; if one balloon is comprised, the second will contain the nitrous oxide. More than 1000 patients have been treated with Arctic Front. This catheter is also easy to use. Since cryoablation is more forgiving than heat-based energy, it does not require precise alignment to be effective. The transmural quality of the lesions created by Arctic Front makes this catheter highly effective in treating AF. Early success rates recorded have been extremely high.

### Complete STOP AF Trial Enrollment

A critical corporate objective in 2007 will be to complete enrollment of our STOP AF IDE trial. This randomized trial will enroll approximately 270 patients with paroxysmal atrial fibrillation who have failed at least one drug therapy already, in up to 22 U.S. and Canadian centers. The primary endpoint, which will determine the trial's success, will be the number of patients who remain free from detectable AF 12-months after treatment. Dr. Douglas Packer of the Mayo Clinic is the principal investigator of the trial.

We are confident in our ability to complete enrollment in this trial by virtue of its design. While patients will be randomized into either a drug or treatment arm, those that fail in the drug arm will be able to cross-over into the treatment arm at 6 months after the drug failed. Secondly, a purposeful blend of both private clinics and academic institutions were chosen to participate in the study with a view to constant patient recruitment.

The STOP AF IDE trial, at this juncture, is the most important initiative this organization has undertaken. Successful completion of this trial, with positive results, will enable us to launch Arctic Front in the United States for the treatment of Atrial Fibrillation, a global market worth up to US$2 billion annually.

### Expand European Roll-Out

While the initial beta-launch of Arctic Front in Europe has been successful, another goal during fiscal 2007 will be to increase our presence in Europe and establish this product as a leading modality to treat AF. In order to accomplish this key objective, we will expand our sales and clinical support infrastructure, as well as develop Atrial Fibrillation disease state initiatives within individual country reimbursement environments, that describe the benefits of using Arctic Front to improve health economic outcome as we increase the number of centers within our installed base.  Not only will this initiative help drive revenue, it will also enable us to continue to build a database of clinical experience in preparation for support of our U.S. launch.

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

In preparing our financial statements, we are required to make estimates and assumptions that affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenue and expenses during the reporting periods.

We have identified the following accounting policies that we believe require application of management's most subjective judgments, often requiring the need to make estimates about the effect of matters that are inherently uncertain and may change in subsequent periods. Our actual results could differ from these estimates and such differences could be material.

### Warranty Obligations

The Company offers a warranty on various products. The Company estimates costs that may be incurred under its warranty program as liabilities when revenue for the underlying product is recognized and records the cost of warranty expense in the period these costs are incurred against this provision. Factors that affect the Company's warranty liability include the number of units sold, historical and anticipated rates of warranty claims, costs per claim, and type and duration of warranty coverage all of which require management to make estimates about future costs. The Company periodically assesses the adequacy of its recorded warranty liabilities and adjusts to income the amounts as necessary.

### Inventory Valuation

The Company values inventory based on its actual overhead and labor costs incurred during the year and raw materials at the lower of cost or replacement cost. An obsolescence reserve is established for all items, which are not part of a current or planned future bill of materials. The determination of future item usage requires management to make estimates about future sales.

### Impairment of Intellectual Property

On an ongoing basis, management reviews the carrying value of intellectual property and considers whether there has been impairment in this value. The review is based on the assessment of technological changes, the Company's intended use, and on the estimated undiscounted expected cash flows to be generated from the underlying intellectual property. Future cash flows and assessments of technological changes require management to make a number of estimates.

### Impairment of Other Long-Lived Assets

On an ongoing basis, management also reviews the carrying value of other long-lived assets including property plant and equipment and consoles at customers' premises and considers whether there has been impairment in their value. When the carrying value of a long-lived asset is less than its net recoverable value, as determined on an undiscounted future cash flow basis, an impairment loss is recognized based on future discounted cash flows. The determination of future cash flows to be generated from long-lived assets requires management to make a number of estimates.

### Refundable Investment Tax Credits

The Company incurs research and development expenditures, which are eligible for refundable investment tax credits (ITC's). The ITC's recorded are based on our estimates of expenditures which qualify and expected amounts to be recovered.

### Valuation Allowance for Future Tax Assets

The Company has recorded a valuation allowance on future tax assets primarily related to operating losses and research and development expenses carried forward. We have assumed that the related tax benefits are not likely to be realized based on our historical results and estimated future taxable income and tax planning strategies. The implementation of tax planning strategies or the generation of future taxable income could result in the recognition of some portion or all of these carry forwards as soon as we have a history of profits, which could result in a material increase in our results from operations through the recovery of future income taxes.

### Stock-Based Compensation

Assumptions that affect the Company's determination of the fair value of stock options include the determination of volatility factors and the life of the options issued, both of which require management to make assumptions about future events and have a direct impact on the determination of stock-based compensation expense.

### New Accounting Standards

The Canadian Institute of Chartered Accountants ("CICA") issued Hand Book Section 1530, "Comprehensive Income" which establishes standards for reporting and display of comprehensive income; Section 3855 "Financial Instruments – Recognition and Measurement" which establishes standards for the recognition and measurement of all financial instruments, provides a

characteristic-based definition of a derivative instrument, provides criteria to be used to determine when a financial instrument should be recognized, and provides criteria to be used to determine when a financial liability is considered to be extinguished; and Section 3865 " Hedges" which establishes standards of when and how hedges accounting may be applied. Hedge accounting is optional, however the Company has followed hedge accounting for hedges previously entered into.

The new standards are applicable for years beginning on or after October 1, 2006, and accordingly, the Company adopted them in the first quarter of 2007.

### Selected Annual Information
*(in thousands of dollars, except per share data)*

The following selected financial data should be read in conjunction with our financial statements and related notes thereto. The selected financial information is derived from our audited financial statements for each of the three most recently completed financial years ended September 30.

| | 2006 $ | 2005 $ | 2004 $ |
|---|---|---|---|
| *Years ended September 30* | | | |
| **Statements of Operations** | | | |
| Sales | 38,376 | 33,291 | 24,336 |
| Gross profit | 20,551 | 19,909 | 14,226 |
| Net loss | 29,966 | 18,592 | 22,563 |
| Net loss before write-offs and amortization | 23,690 | 14,615 | 19,323 |
| Basic and diluted net loss per share | 0.79 | 0.51 | 0.68 |
| *As at September 30* | | | |
| **Balance Sheets** | | | |
| Total assets | 54,475 | 66,260 | 58,721 |
| Total long-term liabilities | 22,628 | 11,084 | 10,227 |

## RESEARCH AND DEVELOPMENT PROJECTS

The following is a summary of the main research and development activities and results of quarter ended June 30, 2007.

The Company is developing a platform medical device technology to address one of the most prevalent cardiovascular diseases within the cardiovascular field:

### Tachyarrhythmia – rapid and irregular heartbeats;

CryoCath is developing and commercializing catheters and probes to treat patients with rapid and irregular heartbeats by eliminating the defective pathways, which cause the tachyarrhythmia. Such catheters look and navigate like heat-based catheters but do not destroy tissue in the same manner and, unlike existing devices, can potentially treat known tachyarrhythmias. When using very low temperatures (generally below –30°C for more than two minutes), an injury to the

11

diseased tissue occurs which induces both intracellular and extracellular ice crystal formation. This ultimately results in cell death due to rupturing of the cell membrane and chemical changes in the cell itself, resulting in the restoration of normal electrical activity and beating of the heart. The underlying extra-cellular tissue matrix remains largely unaffected by this ice crystal formation, thereby minimizing damage to the structure of the heart.

CryoCath is developing a range of catheter designs for the treatment of tachyarrhythmia. These include focal catheters (*Freezor, Freezor Xtra*, and *Freezor MAX*), and balloon catheter (*Arctic Front*) CryoAblation products.

Freezor , Freezor *Xtra* and Freezor *MAX* are focal ablation catheters that have been developed for the treatment of cardiac tachyarrhythmia requiring a focal lesion in heart tissue. The Freezor, Freezor *Xtra* and Freezor *MAX* catheters are deflectable and torquable, incorporating three electrocardiogram rings and a temperature sensor at the tip for temperature monitoring and control.

Arctic Front is a balloon catheter that has been developed or that is designed to create lesions near or in the ostea (openings) of the pulmonary veins to treat atrial fibrillation.

### Tachyarrhythmia

The Arctic Front catheter is being developed and designed to overcome the three principal obstacles in providing a commercially viable ablation solution for treating Atrial Fibrillation (AF) - safety limitations, inappropriate chronic success rates, and lengthy/complex procedures. All the clinical results from the prior use of cryoenergy in and around the pulmonary veins suggests that this energy source does not result in serious adverse events such as stenosis (narrowing of the vein), thrombosis (clot formation), and esophageal perforation - three complications that have been consistently reported with alternative heat-based ablation systems. Early data suggests success rates well above traditional point to-point RF ablation techniques. The innovative balloon design allows large surface areas of the atrial and ostial tissue of the pulmonary vein to be ablated at one time, thereby reducing the number of lesions required and reducing the procedure time and complexity. The balloon's natural contours allow for simple and effective anatomical placement of the catheter balloon in the target region of the atrial and ostial tissue of the pulmonary vein. As a result, procedures are expected to be completed in less than 3.0 hours (skin-to-skin).

The Company announced in March 2005 that it had received clearance from the United States Food and Drug Administration (FDA) to initiate an Investigational Device Exemption (IDE) study for the treatment of Atrial Fibrillation (AF). The study saw the use of two CryoCath catheters, Arctic Front to treat AF and Freezor *MAX* to treat Atrial Flutter when concomitant to AF. The initial stage of this trial treated approximately 18 AF patients. The trials endpoints were to be acute and long-term safety and efficacy (AF free with or without drugs).

The Company announced in April 2006 that it would expand the feasibility stage of its Cryo STOP AF trial by enrolling an estimated 15 additional patients to expand its' experience with Arctic Front's revised design.

Arctic Front's revised design incorporates a number of improvements implemented following the start of the feasibility stage, including two balloon sizes, based on physician feedback from clinical use in Europe and the USA. As a result of these collective changes, the FDA had requested that more patients be treated prior to the start of the pivotal portion of the U.S. IDE trial.

On September 5, 2006, the Company announced that it had received conditional approval by the U.S. Food and Drug Administration (FDA) for its STOP AF trial, allowing the Company to proceed to the pivotal stage of its Investigational Device Exemption ("IDE") trial for the Company's proprietary Arctic Front™ catheter to treat Atrial Fibrillation (AF).

Conditional approval allowed CryoCath to start the trial at 5 centers enrolling up to 75 patients. Patients in the controlled trial will be randomized into two arms; one cohort receiving cryoablation therapy with Arctic Front (the ablation cohort); the other receiving currently prescribed drug

therapies (the control cohort). For every two patients in the ablation arm, there will be one in the control arm. Patients in the trial will be highly symptomatic paroxysmal AF patients who have failed at least one anti-arrhythmic drug. The trial's primary endpoint will be the absence of detectable AF at the end of the 12-month follow-up period. The trial's design also allows patients randomized into the drug arm to cross over into the ablation arm.

On November 28, 2006, the Company received notification from the U.S. Food and Drug Administration (FDA) allowing the Company to expand its pivotal investigational Device (IDE) STOP AF trial to 150 patients and 20 centers. To date, 17 centers are operational and 96 patients have already been enrolled.

On March 28, 2007, CryoCath received notification from the U.S. Food and Drug Administration (FDA), allowing the Company to expand its pivotal Investigational Device (IDE) STOP AF trial for Arctic Front® to the full cohort of patients in all 20 centers.

CryoCath discovered a small one-time packaging issue with FlexCath [TM] steerable sheath units, an access system used in conjunction with Arctic Front to aid in deploying it to targeted pulmonary veins. The Company initiated a voluntary product removal from the clinical centers, corrected the issue and worked closely with FDA to ensure the corrective measures were reviewed and approved. This review had minimal impact on the study.

To-date, we have been very satisfied with our ability to start up centers and their corresponding ability to enroll patients in landmark trial. Based on this experience, the Company believes we can complete enrolment by the end of 2007.

### Electrophysiology, Arctic Front® Program

The Arctic Front® System consists of an Arctic Front® Cardiac CryoAblation Catheter, a 12Fr CryoCath FlexCath[TM] Steerable Sheath, a GenV CryoConsole and accessories.

### Catheter

The Arctic Front® Catheter is designed to create lesions outside of the pulmonary veins of the left atria. The catheter is a single use, disposable device and connected to a GenV console with two umbilicals. It is 10.5Fr in size and designed to be passed through a 12Fr CryoCath FlexCath Steerable Sheath. It is also designed to be deflectable in two directions and to be an over-the-wire catheter accepting a 0.035" guidewire through its center lumen. Occlusion of the pulmonary vein is the primary indicator for cryoablation success. Occlusion is assessed fluoroscopically via injection of contrast media and with ultrasound technology.

### Sheath

FlexCath[TM] Steerable Sheath is designed to provide additional maneuverability for catheters that are advanced through the sheath and into the right or left chambers of the heart.

The 12F FlexCath Steerable Sheath Project was initiated at CryoCath Technologies Inc. to support, and be part of, the Arctic Front System. The FlexCath Steerable Sheath allows for critical positioning of the AF Balloon segment on the target site.

It is a single use, disposable, steerable intravascular device.  The FlexCath sheath is packaged with a dilator.

A next generation device is being developed to implement process and design refinements. The changes will also include implementation of a molded handle, a custom Hemostasis valve, shaft color change, and new packaging.

### Console

The GenV Universal CryoConsole houses the electrical and mechanical components as well as proprietary software for controlling and recording a CryoTherapy procedure. It stores and controls the delivery of liquid refrigerant to the catheter, recovers the refrigerant vapor from the catheter. Multiple features are built into the catheters and CryoConsole system to ensure safety. The GenV Universal CryoConsole is a commercial platform compatible with a variety of linear and balloon catheters from the Freezor® and Arctic Front families of product. The primary goal of the project is universal catheter compatibility, but the product shall include new features and design improvements as well.

### Selected Quarterly Financial Information
*(in thousands of dollars, except per share data)*

The selected summary sets forth, for the quarters indicated, selected financial data of the Company:

| Selected Financial Data | Fiscal Year Ended 2005 $ | Fiscal Year Ended 2006 $ | | | | Fiscal Year Ending 2007 $ | | |
|---|---|---|---|---|---|---|---|---|
| | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 |
| Sales | 9,993 | 8,922 | 10,279 | 9,708 | 9,467 | 10,077 | 11,344 | 11,700 |
| Gross profit | 5,506 | 5,574 | 6,175 | 4,901 | 3,901 | 6,158 | 7,156 | 6,792 |
| Sale of distribution rights | – | – | – | 210 | 24 | – | – | – |
| Gain on sale of surgical portfolio | – | – | – | – | – | – | – | 10,119 |
| Net loss and other comprehensive loss | 4,479 | 4,440 | 6,699 | 8,354 | 10,473 | 3,539 | 6,026 | 2,363 |
| Basic Earnings (loss) per share | (0.12) | (0.12) | (0.18) | (0.22) | (0.27) | (0.09) | (0.16) | 0.06 |
| Diluted Earnings (loss) per share | (0.12) | (0.12) | (0.18) | (0.22) | (0.27) | (0.09) | (0.16) | 0.05 |

## REVENUES

### Electrophysiology and Surgical Product Sales Summary
*(in thousands of dollars)*

| Fiscal Periods | Total $ | Equipment $ | Disposables $ | % Change on Disposable Sales (quarter over quarter) | % Change on Disposable Sales (quarter over previous year's quarter) |
|---|---|---|---|---|---|
| Q4 2005 | 9,993 | 2,249 | 7,744 | 5 | 41 |
| | | | | | |
| Q1 2006 | 8,922 | 1,215 | 7,707 | - | 59 |
| Q2 2006 | 10,279 | 1,814 | 8,465 | 10 | 30 |
| Q3 2006 | 9,708 | 1,339 | 8,369 | (1) | 14 |
| Q4 2006 | 9,467 | 990 | 8,477 | 1 | 9 |
| | | | | | |
| Q1 2007 | 10,077 | 1,395 | 8,682 | 2 | 13 |
| Q2 2007 | 11,344 | 1,572 | 9,772 | 13 | 15 |
| Q3 2007 | 11,700 | 2,356 | 9,344 | (4) | 12 |

Sales of our electrophysiology and surgical products rose 20.5% or $2.0 million in the third quarter of 2007 in comparison with the sales totals for the third quarter of 2006 and 14.6% or $4.2 million for the first nine months ended June 30, 2007 versus the first nine months of last year. Unit sales increased substantially as well, 12.7% versus the third quarter of 2006 and 12.6 % when compared to the period from October 1, 2005 to June 30, 2006.

In particular, electrophysiology product sales rose 37.8% in the third quarter of 2007 and 18.8% for the year to date in comparison with the electrophysiology product sales for the third quarter of 2006 and for the first nine months of last year, respectively. Unit sales of our electrophysiology product increased 25.3% versus the third quarter of 2006 and 12.0% when compared to the period from October 1, 2005 to June 30, 2006.

The following new electrophysiology product approvals and expanded launches accounted for a significant portion of these increases.

i.   In the fourth quarter of fiscal 2005, the Company announced it had received CE Mark regulatory approval for three key products: Arctic Front; a new generation console (GEN V) designed to work with the Arctic Front catheter; and the FlexCath Steerable Sheath. These approvals allowed the Company to sell products in all countries of the European Union.

ii.  In March 2007, the Company also announced that it had received CE Mark Approval for its Generation V Universal Console which can operate its focal line of catheters as well as Arctic Front.

The Company also continues to grow its installed base of cryo console systems around the world. At June 30, 2007 the Company had installed a total of 928 electrophysiology and surgical systems, an increase of 111 consoles over the 817 sites in place at September 2006. Electrophysiology Systems accounted for 69 of the 111 systems installed since September 30, 2006.

After a successful beta launch of Arctic Front in Europe in 2006 and with this approval of the Universal Console, our goal for 2007 is to increase upon this European presence, expand our rollout and establish this product as a leading modality to treat AF.

The Company's sales continue to be concentrated in the United States. The following table shows the significant proportion of total sales in the US and the impact of the sales of Arctic Front in the EU.

| | | | | Sales |
|---|---|---|---|---|
| | Three Months ended | | Nine Months ended | |
| | June 30, 2007 % | June 30, 2006 % | June 30, 2007 % | June 30, 2006 % |
| U.S. | 63.1 | 68.2 | 67.3 | 70.8 |
| Europe | 31.8 | 26.5 | 29.1 | 25.1 |
| Other | 5.1 | 5.3 | 3.6 | 4.1 |
| | 100.0 | 100.0 | 100.0 | 100.0 |

As referred to previously, the Company sold its surgical portfolio of products to ATS Medical at the end of the third quarter of this year. This surgical product portfolio represented approximately one third of the Company's total product sales in 2007. This sale will of course have a short-term impact and affect our fourth quarter numbers, decrease our previously reported revenue projections, and reduce our overall growth targets for 2007.

This sale however allows us to increase the focus of our entire organization on our core EP ablation business and the AFib market, in particular our Arctic Frost product. As a result we believe that this negative impact will be short-lived and compensated by the increased sales from our EP business resulting from this renewed focus.

### Gross Profit

| | Three Months ended | | Nine Months ended | |
|---|---|---|---|---|
| | June 30, 2007 $ | June 30, 2006 $ | June 30, 2007 $ | June 30, 2006 $ |
| Total | 6,791,809 | 4,901,108 | 20,105,046 | 16,650,385 |

Gross profit increased by approximately $1.9 million in the third quarter of 2007 versus the third quarter of 2006, and by approximately $3.5 million for the first nine months of this fiscal year versus the first nine months of last year. As a percentage of sales, margins also showed improvements as gross profit for the third quarter of 2007 were 58.1% (2006 – 50.5%) and 60.7% for the period from October 1, 2006 to June 30, 2007 (2006 – 57.6%).

These results continue the improvements and trends first seen in the first two quarters of 2007. They reflect the results of our focus on the product supply process, which has resulted in

16

increased output, better yields, and the increase in the percentage of sales from our new generation of products.

The 2006 gross margins also reflected a number of corrective actions required to adjust the problems identified and documented in our 2006 annual report,

### Interest Income

|  | Three Months ended | | Nine Months ended | |
|---|---|---|---|---|
|  | June 30, 2007 $ | June 30, 2006 $ | June 30, 2007 $ | June 30, 2006 $ |
| Total | 107,810 | 147,106 | 280,838 | 457,907 |

The decrease in interest income is mainly attributable to the decrease in funds available for investment. Funds available in the third quarter of 2007 averaged $ 9.9 million (2006 - $17.0 million), in the second quarter $12.9 million (2006 - $20.5 million), and in the first quarter $14.0 million (2006 - $23.3 million).

## EXPENSES

### Research and Development Expenses, Net of Investment Tax Credits

|  | Three Months ended | | Nine Months ended | |
|---|---|---|---|---|
|  | June 30, 2007 $ | June 30, 2006 $ | June 30, 2007 $ | June 30, 2006 $ |
| Total | 3,363,477 | 3,244,981 | 8,560,119 | 9,269,725 |

Research and development expenses, before investment tax credits, for the third quarter of 2007, to support the research and development projects outlined previously, amounted to $3.5 million (2006 - $3.4 million) and $9.1 million for the period from October 1, 2006 to June 30, 2007 (2006 – $9.8 million)

Development expenses included in these numbers have decreased significantly over the same period in the prior year due to the elimination of non-core development projects, as certain projects reached their clinical phase or as certain projects were completed as related products received their approval for sale.

Clinical expenses, on the other hand, increased by approximately $500,000 in the third quarter of 2007 versus the third quarter of 2006 and $1,400,000 in the first nine months of 2007 versus last year, reflecting our ongoing STOP AF IDE pivotal trial enrollment.

### Administrative Expenses

|  | Three Months ended | | Nine Months ended | |
|---|---|---|---|---|
|  | June 30, 2007 $ | June 30, 2006 $ | June 30, 2007 $ | June 30, 2006 $ |
| Total | 1,748,761 | 1,698,116 | 4,899,034 | 4,064,450 |

Administrative expenses increased by approximately $100,000 in the third quarter of 2007 and by approximately $800,000 for the first nine months of the year over the corresponding period last year. A significant portion of these extra administrative costs are as a result of the Company's decision to invest the required resources in building a robust infrastructure required for rapid and sustainable growth.

### Sales and Marketing Expenses

| | Three Months ended | | Nine Months ended | |
|---|---|---|---|---|
| | June 30, 2007 $ | June 30, 2006 $ | June 30, 2007 $ | June 30, 2006 $ |
| Total | 6,770,695 | 7,124,941 | 19,128,230 | 19,967,145 |

Overall sales and marketing expenditures decreased in the periods, demonstrating the increased efficiencies in our sales and marketing processes, and were in line with our corporate objective of reducing our operating burn. Notwithstanding this overall decrease, however, certain expenses and sector spending rose.

Commissions, freight, and other variable expenses increased in line with the growth in revenues. Investments, including the hire of additional sales representatives and clinical specialists, were also made in our European region in order to accomplish our key objective of increasing the Company's presence in Europe with Arctic Front and to build on the success of the initial launch.

Sales and marketing expenses for the third quarter of 2007 were $6.8 million or 57.9% of sales and $19.1 million or 57.8% of sales for the nine-month period ended June 30, 2007. These numbers were less than the numbers for the comparative periods of last year when sales and marketing expenses totaled $7.1 million or 73.4% of sales for the third quarter of 2006 and $20.0 million or 69.1% of sales for the nine-month period ended June 30, 2006.

The Company also continued to participate in a number of European and U.S. marketing conventions, conferences, and other events in the periods. For example, CryoCath announced the presentation of oral abstracts and posters at the 28th Annual Scientific Sessions of the Heart Rhythm Society in Denver and announced that data on the Arctic Front Catheter System was presented at the European Society of Cardiology Conference in Lisbon.

### Amortization

#### 1. Amortization and Write-off of Consoles at Customers' Premises

| | Three Months ended | | Nine Months ended | |
|---|---|---|---|---|
| | June 30 $ | June 30, 2006 $ | June 30, 2007 $ | June 30, 2006 $ |
| Total | 264,289 | 486,089 | 742,601 | 1,226,329 |

During 2006, the Company reviewed the valuation of certain of the capital assets and consequently wrote-off certain of its consoles at customers' premises. Consoles at customers' premises were also significantly reduced last year as a significant number of consoles reached or neared the end of their 3-year life. As a result, the amortization expense and write-offs of these assets decreased in 2007 as compared to the expenses for 2006. The amortization expense of these assets will also be affected in the future by the consoles sold to ATS at the end of the third quarter.

### 2. Amortization of Property, Plant, and Equipment, and Intellectual Property

|  | Three Months ended | | Nine Months ended | |
|---|---|---|---|---|
|  | June 30, 2007 $ | June 30, 2006 $ | June 30, 2007 $ | June 30, 2006 $ |
| Total | 901,584 | 1,003,979 | 2,522,408 | 2,366,307 |

The amortization of the costs of licenses acquired is included in the amortization of these capital assets. The amortization of the Endocare License, in particular, increased in 2007 versus 2006 as a result of a higher number of units sold and an adjustment in the targeted units to be used in the amortization base.  As a result of the disposition of certain rights it acquired under this Endocare license purchase agreement, amortization of our intellectual rights will decrease significantly in the fourth quarter of 2007 and other subsequent periods.

### 3. Amortization of Deferred Finance Charges

|  | Three Months ended | | Nine Months ended | |
|---|---|---|---|---|
|  | June 30, 2007 $ | June 30, 2006 $ | June 30, 2007 $ | June 30, 2006 $ |
| Total | 84,424 | 57,856 | 343,122 | 155,686 |

Deferred financing costs include the fair value of options granted to Investissement Quebec related to a loan put in place in 2004, arrangement fees paid to the National Bank, and other expenses associated with these facilities. The amortization of the deferred finance costs increased as a result of the following significant additions:

On November 29, 2005, the Company received approval from the TSX to extend the term of the options it granted to Investissement Quebec under the Biolevier program from an initial term of 5 years to a 10-year term, and the options were revalued with an increase in the deferred financing fees of $325,700.

On July 17, 2006, the Company drew down the remaining $10,100,000 under its existing loan agreement with Investissement Quebec, and the remaining 285,715 options vested. The fair value of these options on the vesting date was $488,573, which increased deferred financing fees.

These amounts will be amortized to expense over the remaining terms of the loans using the effective yield method.

On August 11, 2006, the Company signed a new credit facility with a new Canadian chartered bank. The related arrangement and legal fees totaling $157,077 were recorded as deferred financing costs and will be amortized over the terms of the corresponding operating and term facilities. The amortization expense of these costs in the third quarter of 2007 was $3,133 (nil in the third quarter of 2006), and $99,081 for the first nine months of the year (2006 – nil).

At June 30, 2007, they are classified against long-term debt on the balance sheet.

### Interest on Long-Term Debt

|  | Three Months ended | | Nine Months ended | |
| --- | --- | --- | --- | --- |
|  | June 30, 2007 $ | June 30, 2006 $ | June 30, 2007 $ | June 30, 2006 $ |
| Total | 645,399 | 282,036 | 1,858,447 | 783,394 |

The increase of the interest expense corresponds to the following additions to the Company's outstanding long-term credit facilities:

i.   On July 17, 2006, the Company drew down the remaining $10.1 million under its loan agreement with Investissement Quebec, and
ii.  On November 30, 2006, received $3.5 million from the National Bank of Canada under the term portion of a new credit facility.

### Foreign Exchange Loss

|  | Three Months ended | | Nine Months ended | |
| --- | --- | --- | --- | --- |
|  | June 30, 2007 $ | June 30, 2006 $ | June 30, 2007 $ | June 30, 2006 $ |
| Total | 1,381492 | 253,561 | 655,332 | 166,452 |

The significant loss in the third quarter of 2007 was due principally to the continued decrease of the U.S. dollar in relation to the Canadian dollar. The U.S. dollar was trading at $1.15 versus the Canadian dollar at the beginning of the quarter, but closed at a rate of $1.06 at June 30, 2007, a drop of $0.09 in the period (2006 - $0.05).

The foreign exchange impact on reported sales revenue in 2007 versus 2006 was however relatively insignificant as the average exchange rate for the third quarter of 2007 was $1.10 and $1.12 for the third quarter of 2006. On a year-to-date basis, sales would also not have been impacted significantly as the U.S. dollar average exchange rate dropped from an average of $1.15 for the nine month period ended June 30, 2006 to $1.14 for the comparative period in 2007.

U.S. dollar denominated expenses however, helped offset this foreign exchange exposure with a corresponding favorable reduction. These U.S. dollar denominated operating expenses are expected to continue to provide a partial natural hedge against future fluctuations in the value of the U.S. dollar. The Company's U.S. dollar denominated sales are expected however to grow at a rate exceeding the growth of the U.S. dollar denominated expenses.

The loss for the three months ended June 30, 2007 also reflected the negative fluctuation in other foreign currencies as well during the period. The Euro was trading at 1.41 versus the Canadian dollar at the beginning of the year, at 1.54 on March 31, 2007, and closed at 1.44 on June 30, 2007.

### Non-cash Compensation Expense

|  | Three Months ended | | Nine Months ended | |
| --- | --- | --- | --- | --- |
|  | June 30, 2007 $ | June 30, 2006 $ | June 30, 2007 $ | June 30, 2006 $ |
| Total | 300,100 | 445,000 | 1,069,856 | 1,245,894 |

The fair value of options granted is amortized over the Company's standard vesting period of four years. As such, non-cash compensation expenses are normally expected to increase over the first four years of adoption, which ended on September 30, 2006, as additional stock options are granted to and vest to the employees.

Non-cash compensation expenses for the third quarter of 2007 actually decreased $144,900 when compared to the third quarter expense for 2006, as the number of options forfeited in the first nine months of 2007 rose significantly as well. This significant increase in forfeitures is directly attributable to the Company's resource realignment initiative in October 2006 and the departure of certain executives in the latter half of 2006.

### Other Expenses

|  | Three Months ended | | Nine Months ended | |
| --- | --- | --- | --- | --- |
|  | June 30, 2007 $ | June 30, 2006 $ | June 30, 2007 $ | June 30, 2006 $ |
| Total | - | 179,490 | 299,274 | 179,490 |

#### i.    Severance and Other Involuntary Employee Termination Costs

On September 22, 2006, the Board of Directors approved a resource realignment initiative which resulted in involuntary terminations of 29 employees on October 3 and 4, 2006. The total cost of the realignment initiative was expected to amount to $519,000. During fiscal year 2006, the Company recorded $290,288 as a charge to operations with respect to the associated severance costs. An additional amount of $299,274 was recorded in the period October 1, 2006 to December 31, 2006, to cover the remaining cost of the realignment initiative and to record some additional severance related costs.

#### ii.    Executive Severance Costs

During the third quarter of 2006, the Company incurred certain severance costs with respect to the departure of an executive. Included in the total of $179,490 are non-cash compensation expenses of $1,913.

### Gain on Sale of Surgical Portfolio

On June 19, 2007, the Company entered into an agreement with a subsidiary of ATS Medical Inc. for the sale of its surgical portfolio and related tangible and intangible assets and rights, including certain rights it acquired under the Endocare license purchase agreement. CryoCath's surgical products are defined as its line of argon-based cardiac surgical cryoablation devices, including products known under the FrostByte® and SurgiFrost® names.

Under the terms of the agreement, CryoCath received US $22 million cash at closing and will receive US $2 million two years after closing, US $2 million upon the achievement of certain manufacturing transition milestones, and up to US $4 million based on future sales of SurgiFrost® XL planned for commercial release in the second half of 2007.

The sale transaction closed on June 28, 2007. The gain on the sale transaction, net of transaction costs of $2,069,682, amounted to $10,118,581.

For the periods ended June 30, 2007 sales related to its surgical portfolio were as follows:

|  | Three months ended | | Nine months ended | |
| --- | --- | --- | --- | --- |
|  | June 30, 2007 $000 | June 30, 2006 $000 | June 30, 2007 $000 | June 30, 2006 $000 |
| Sales | 3,415 | 3,694 | 10,793 | 10,115 |

The sale of our surgical business marks a significant milestone in our strategy to transition CryoCath into a focused and fast growing electrophysiology cryoablation company. It also advances CryoCath towards the accomplishment of two core goals. First, we now have a clear financial pathway to the U.S. approval and launch of Arctic Front, our flagship product targeting the US$2 billion atrial fibrillation opportunity. Secondly, we can focus to achieve rapid, profitable growth in Europe for our EP-AF business. Due to this increased focus as well as the non-dilutive nature of the financing, we believe this transaction creates great value for our shareholders.

We expect that this increased focus will translate itself into greater sales starting in 2008 which will more than compensate for any loss revenue from this disposition. The Company has also a number of cost savings initiatives in process to ensure that we will maximize the cost reductions falling out of this transaction and the savings from the increased focus.

## LIQUIDITY AND CAPITAL RESOURCES

On August 11, 2006, the Company signed a new credit facility with the National Bank of Canada. The credit facility includes an $11 million revolving operating line and a $3.5 million term loan. A direct advance under the term facility of $3.5 million was received on November 30, 2006. The bank indebtedness under the operating line totaled $7.7 million at June 30, 2007.

The Company has access to approximately $35.3 million in unrestricted cash, cash equivalents, and borrowing facilities. The Company continues to believe that it will be able to access sufficient working capital to meet its current and future anticipated requirements.

Working capital was $28.2 million at June 30, 2007. The increase in working capital since March 31, 2007 of $12.9 million, can be explained in large part by the receipt of the proceeds on the sale of our surgical portfolio (USD $22 million). This increase in cash was offset by a further draw down of $4.7 million in our operating line supporting our current operations and an increase in accounts payables and accrued liabilities totaling $4.7 million.

The principal uses of our cash resources in operations were:

| | Three Months ended | | Nine Months ended | |
| --- | --- | --- | --- | --- |
| | June 30, 2007 $ | June 30, 2006 $ | June 30, 2007 $ | June 30, 2006 $ |
| Net loss for the period, excluding items not affecting cash | **(4,678,769)** | **(5,637,914)** | **(9,989,453)** | **(13,349,241)** |
| Net cash from (used in) operating activities | **(478,196)** | **(5,833,737)** | **(8,589,152)** | **(14,456,149)** |

## ACQUISITION OF CAPITAL EXPENDITURES

| | Three Months ended | | Nine Months ended | |
| --- | --- | --- | --- | --- |
| | June 30, 2007 $ | June 30, 2006 $ | June 30, 2007 $ | June 30, 2006 $ |
| Consoles at customer premises | **481,950** | **476,400** | **1,407,958** | **1,572,615** |
| Property, plant, and equipment | **755,296** | **460,080** | **1,329,252** | **1,401,969** |
| Intellectual property | **106,897** | **72,491** | **330,089** | **365,413** |
| | **1,344,143** | **1,008,971** | **3,067,299** | **3,339,997** |

The Company placed an additional $0.5 million of consoles at customers' premises in the quarter ended June 30, 2007, which, together with consoles sold outright to the customers, increased the Company's installed base of cryo console systems around the world to 928 electrophysiology and surgical systems.  This total represents an increase of 42 consoles in the third quarter of 2007 (48 for the third quarter of 2006).  The surgical cryoconsole systems, referred to above, were transferred over to ATS Medical as part of the disposition of our surgical portfolio.

The Company incurred an additional $0.1 million for the quarter ended June 30, 2007 in capital expenditures to enhance the Company's patents and to protect its intellectual property portfolio which, at June 30, 2007 consisted of approximately 61 issued United States patents, 16 issued patents in other countries, and 56 applications pending in the United States and corresponding applications pending in Canada and Europe.

Property, plant and equipment additions increased in the quarter as the Company invested an amount of $350,000 in its clean rooms.

## CAPITAL STOCK

As at July 31, 2007, the number of issued and outstanding common shares of the Company totaled 38,128,121 and the number of options granted and outstanding amounted to 4,119,449.

## COMMITMENTS

### Asset purchase agreement

On June 19, 2007, the Company entered into an agreement with a subsidiary of ATS Medical Inc. for the sale of its surgical portfolio and related tangible and intangible assets and rights. In accordance with the provision of this agreement the companies also entered into the following agreements:

Manufacturing agreement

In connection with the transition of the surgical business to ATS, CryoCath will manufacture, assemble and supply ATS the argon-based cryoablation devices purchased under the Purchase Agreement for a period of 12 months at CryoCath's fully loaded cost of manufacturing multiplied by a predetermined and agreed-upon mark-up.

Technology license agreement

As a condition of the Purchase Agreement, CryoCath granted to ATS a perpetual worldwide fully paid license for the use of specified patents, know-how, and confidential information in a predefined and specified field of use.

### Other license agreements

In the normal course of business, the Company has entered into various other license, development and collaboration agreements for the use and development of products and technology. Under existing agreements, the Company could have to pay royalties of 3% of net sales of specific products.

### Other contractual obligations ($000)

|  | Payments Due By Period | | | | |
|---|---|---|---|---|---|
| Other Contractual Obligations | Total | Less than 1 year | 1 – 3 years | 4-5 Years | After 5 years |
| Bank Term Debt | 2,844 | 1,138 | 1,706 | - | - |
| Other Long-Term Debt | 24,131 | - | 6,033 | 12,066 | 6,032 |
| Equipment Capital Lease | 27 | 11 | 16 | - | - |
| Operating Lease | 793 | 288 | 505 | - | - |
| Total Other Contractual Obligations | 27,795 | 1,437 | 8,260 | 12,066 | 6,032 |

### Derivative Instruments

From time to time, the Company enters into foreign exchange forward contracts that expire in less than one year for the sale of U.S. dollars, to manage foreign exchange risks. There were no outstanding foreign exchange forward contracts at June 30, 2007.

### Related Party Transactions

There were no related party transactions for the third quarter ended June 30, 2007 (2006 - $37,115). The total of all related party transactions, included in research and development and sales and marketing expenses, billed to us by directors of the Company for the period October 1, 2006 to June 30, 2007 was $4,638 (2006 - $56,140).

### Proposed Transactions

The Company, from time to time, considers transactions that could be material. Announcements of any such transactions would be made as appropriate and as required in accordance with applicable law.

### Payment of Dividends

The Company has not paid dividends to date and its current intention is to reinvest future earnings in order to finance the growth of its business. As a result, the Company does not intend to pay dividends in the foreseeable future. Any future determination to pay dividends is at the discretion of the Company's Board of Directors and will depend on the Company's financial condition, results of operations, capital requirements and such other factors as the Board of Directors of the Company deems relevant.

## EFFECTIVENESS OF INTERNAL DISCLOSURE CONTROLS

The Chief Executive Officer and Chief Financial Officer, together with other members of management have designed internal controls over financial reporting, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with the issuer's generally accepted accounting principles. Management assessed the design effectiveness of such controls as of June 30, 2007.

Based on the work completed to-date, the Company has identified numerous material weaknesses in its existing internal controls over financial reporting and as a consequence, a number of entity-level controls and process-level controls were assessed to be ineffective. Some of these deficiencies resulted in restatements to the first and second quarters of 2006, which were previously re-filed and numerous adjustments to the fourth quarter 2006 financial statements. In reaching this conclusion, the Company recognized the following factors.

(i)     The resignation of the CEO, CFO, and other senior management, as well as a significant loss of key finance department personnel, resulted in significant weaknesses in entity-level controls in respect of management review of financial results. This situation also resulted in material weaknesses in various processes as a result of a lack of reviews and approvals. This was compounded by the Company's inability to recruit and train new employees on a timely basis.

(ii)    Post-implementation weaknesses and the lack of user training in the rollout of the Company's new ERP system.

(iii)   Ineffective controls in relation to the segregation of duties and user access to certain ERP business process applications, nor were there effective controls in place to monitor user access.

(iv)    An insufficient complement of personnel and personnel with an appropriate level of accounting knowledge; experience and training in the application of generally accepted accounting principles, commensurate with the Company's financial reporting requirements, complexity, and operating activities.

(v)     Modifications to certain systems and processes for which the controls could not be observed or assessed.

As a result of these weaknesses, there is a risk that a material misstatement would not be detected.

The Company plans to continue to review and make necessary changes to the overall design of its control environment, including the roles and responsibilities of each functional group within the organization and working structure, as well as implementing policies and procedures to improve the overall internal control over financial reporting.

The Company has started this process by hiring a permanent Chief Financial Officer and a permanent Chief Executive Officer. The Company is in the process of implementing a remediation plan to address the material weaknesses identified to-date.

To address the material weaknesses, management significantly expanded its closing process to include additional analysis and other post-closing procedures.

### Risk and Uncertainties

If any of the following risks actually occur, the business, results of operations and financial condition of the Company could be adversely affected. In any such case, the market price of common shares could decline, and investors may lose all or part of their investment.

### Early Stage Development

Having been founded in 1994, CryoCath is still at an early stage of its development and has a limited operating history. Certain of its products or processes are at an early stage of development or commercialization. Prior to commercialization of any potential products, significant additional investment in research and development and clinical trials will be necessary to complete the development of such products. Furthermore, it is unknown whether any of its potential products will meet applicable healthcare regulatory standards and obtain the requisite regulatory approvals. It is not certain whether products can be produced or continued to be produced in commercial quantities at a reasonable cost and be successfully marketed, nor is it known whether CryoCath's investment in any such product candidates will be recovered through sales or royalties. Certain products or processes currently being developed by CryoCath will not be commercially available in major markets for several years and CryoCath may encounter unforeseen difficulties or delays in operations as well as potential difficulties in realizing manufacturing and purchasing efficiencies.

### Limited Revenues, History of Significant Losses and Accumulated Deficit

CryoCath is in the early stages of commercialization of its products. During the nine month period ended June 30, 2007, the Company achieved approximately $33.1 million in product sales. As of June 30, 2007, the Company's deficit, accumulated from its inception in 1994, is approximately $174.2 million. The Company anticipates that it will incur continued operating expenses in connection with the research, development, testing and approval of its proposed products and it expects these expenses to result in continuing operating losses for the foreseeable future. If the Company is unable to develop, obtain regulatory clearance for, and successfully commercialize its product candidates, it will not be able to significantly increase revenues or achieve profitable operations.

### Government Regulation

Numerous statutes and regulations govern the manufacture and sale of medical device products in Canada, the United States, Europe and other countries and regions of the world where CryoCath markets and intends to market its products. Such legislation and regulations bear upon, inter alia, the approval of manufacturing facilities, testing procedures and controlled research, review and approval of manufacturing, pre-clinical and clinical data prior to marketing approval including adherence to Good Manufacturing Practices established by the FDA during production and storage, as well as regulation of marketing activities including advertising and labeling.

As such, CryoCath's products and processes, which are currently in development, require significant development, testing and the investment of significant funds prior to their commercialization. There can be no assurance that any of such products or processes will actually be developed. The completion of clinical testing and the obtaining of required approvals are expected to take several years and to require the expenditure of substantial resources. There can be no assurance that clinical trials will be completed successfully within any specified period of time, if at all. Furthermore, clinical trials may be delayed or suspended at any time by CryoCath or by the FDA or by Therapeutic Products Directorate (Canada), if it is determined at any time that the subjects or patients are being exposed to unacceptable health risks. Any failure or delay in obtaining regulatory approvals could adversely affect CryoCath's ability to utilize its technology, and may adversely affect its operations. Furthermore, no assurance can be given that CryoCath's product candidates will prove to be safe and effective in clinical trials or that they will receive the requisite regulatory approval. Moreover, any regulatory approval of a medical device, which is eventually obtained, may entail limitations on the indicated uses for which that medical device may be marketed. Furthermore, it must be noted that product approvals may be withdrawn if problems occur following initial marketing or if compliance with regulatory standards is not maintained. Similar restrictions are imposed in markets other than the United States and Canada.

Potential investors should be aware of the risks, problems, delays, expenses and difficulties, which CryoCath may encounter in light of the extensive regulatory environment in which its business is carried on.

### Rapid Technological Change

The industry in which CryoCath operates is characterized by rapid and substantial technological change. There can be no assurance that developments by others will not render its products or technologies non-competitive or that it will be able to keep pace with technological developments. Research and development by others may render its technology or products non-competitive or obsolete or may result in the production of treatments or cures superior to any therapy to be developed by CryoCath. Moreover, alternate forms of medical treatment may be competitive with its products.

### Ability to Manage Future Growth

Future growth, if any, may cause a significant strain on the Company's management and its operational, financial, human and other resources. The Company's ability to manage growth effectively will require it to implement and improve operational, financial, manufacturing and management information systems and to expand, train, manage and motivate employees. These demands may require the addition of management and other personnel and the development of additional expertise. Any increase in resources devoted to research, product development and marketing and sales efforts without a corresponding increase in operational, financial, manufacturing and management information systems could have a material adverse effect on the Company's business, financial condition and results of operations.

### Dependence on Key Personnel

CryoCath depends on certain key personnel and the loss of services of one or more of said persons could adversely affect the Company. It is necessary for CryoCath to continue to implement and improve its management systems and to continue to recruit, develop and train employees in order to manage its growth effectively. While it has been able to attract and retain skilled and experienced personnel in the past, no assurance can be given that it will be able to do so in the future.

### Competition

Technological competition is intense in the industry in which CryoCath operates. CryoCath's competitors may have developed or may be developing technologies, which may be the basis for competitive products. Some of these products may prove to be more effective and less costly

than the products developed or being developed by CryoCath. Some of the organizations which could be considered to be its competitors have substantially more financial and technical resources, more extensive research and development capabilities and greater marketing, distribution, production and human resources than CryoCath does. Moreover, competitors may develop products before CryoCath develops its own products and obtain regulatory approval for such products more rapidly than CryoCath.

### Patents and Proprietary Rights

CryoCath's success depends, in part, on its ability to secure and protect its patents and trade secrets and to operate without infringing on the proprietary rights of others or having third parties circumvent the rights that it owns or licenses. CryoCath has filed applications for patents in Canada, the United States and in foreign markets. The patent positions of healthcare and biopharmaceutical firms including CryoCath are uncertain and involve complex questions of law and fact for which important legal issues remain unresolved. Therefore, it is not clear whether its pending patent applications will result in the issuance of patents or whether CryoCath will develop additional proprietary products which are patentable. Moreover, it is not clear whether the patents issued or to be issued to CryoCath will provide it with any competitive advantages or if any such patents will be the target of challenges by third parties, whether the patents of others will interfere with CryoCath's ability to market its products or whether third parties will circumvent its patents by means of alternate processes. Furthermore, it is possible for others to develop products that have the same effect as its products on an independent basis or to design around products that CryoCath patented.

Patent applications relating to or affecting CryoCath's business have been filed by a number of healthcare and biopharmaceutical companies. Some of these applications have been received. A number of these technologies, applications or patents may conflict with its technologies or patent applications and such conflict could reduce the scope of patent protection that it could otherwise obtain or even lead to refusal of its patent applications.

There is no assurance that CryoCath could enter into licensing arrangements at a reasonable cost, or develop or obtain alternative technology in respect of patents issued to third parties that incidentally cover its products. Any inability to secure licenses or alternative technology could result in delays in the introduction of some of its products or even lead to prohibition of the development, manufacture or sale of certain products by CryoCath. Moreover, CryoCath could potentially incur substantial legal costs in defending legal actions that allege patent infringement or by instituting patent infringement suits against others.

It is not possible for CryoCath to be certain that it is the creator of inventions covered by pending patent applications or that it was the first to file patent applications for any such inventions. No assurance can be given that its patents, once issued, would be declared by a court to be valid or enforceable, or that a competitor's technology or product would be found to infringe its patents.

Moreover, much of CryoCath's know-how technology that is not patentable may constitute trade secrets. Therefore, CryoCath requires its employees, consultants, advisors and collaborators to enter into confidentiality agreements. However, no assurance can be given that such agreements will provide for a meaningful protection of its trade secrets, know-how or other proprietary information in the event of any unauthorized use or disclosure of information.

### Potential Product Liability

A risk of product liability claims and related negative publicity is inherent in the development of medical device products and the Company faces business level uncertainties related to its products and personnel. Product liability insurance is expensive, its availability is limited, and may not be available on terms acceptable to CryoCath, if at all. The commercialization of its potential products could be inhibited or prevented by an inability to maintain sufficient insurance coverage on reasonable terms or to otherwise protect against potential product liability claims. A product liability claim against CryoCath or the withdrawal of a product from the market could have a material adverse effect upon it and its financial condition.

The Company's products are manufactured to exacting quality standards and have many built-in safety features. Nevertheless, a risk of product liability claims and related negative publicity is inherent in the development and commercialization of medical products. Such claims against the Company or recall or withdrawal of a product from the market could have a material adverse effect on the Company's reputation and financial condition.

### Healthcare Reimbursement

CryoCath's ability to commercialize its products with success may depend, in part, on the extent to which reimbursement to patients for the cost of such products and related treatment will be available from governmental health administration authorities, private health coverage insurers and other healthcare organizations. The prices of medical products and services are increasingly being challenged. There exists significant uncertainty as to the reimbursement status of newly approved healthcare products. Therefore, no assurance can be given that adequate third party coverage will be available to patients that allow CryoCath to maintain price levels sufficient for the realization of an appropriate return on its investment in product development.

### Additional Financing Requirements and Access to Capital

Significant additional funds are required for further research and development, planned clinical trials, regulatory approvals, and the marketing of CryoCath's products. An attempt may be made to raise additional funds for these purposes through public or private equity or debt financing, and collaborations with other healthcare companies or financing from other sources may be undertaken. There can be no assurance that additional funding will be available on terms which are acceptable to CryoCath and which would result in successful commercialization of its products. If adequate funding is not available, CryoCath may be required to delay, reduce, or eliminate one or more of its research programs or obtain funds through corporate partners or others who may require it to relinquish significant rights to protect candidates or on less favorable terms than it would otherwise accept.

### Unproven Market

CryoCath believes that there will be many different applications for products successfully derived from its core technology and that the anticipated market for products under development will continue to expand. However, no assurance can be given that these beliefs will prove to be correct owing, in particular, to competition from existing or new products and the yet to be established commercial viability of CryoCath's products.

### Volatility of Share Price

Market prices for shares of medical device companies are often volatile. Factors such as announcements of technological innovations, new commercial products, patents, the development of proprietary rights by CryoCath or by others, results of clinical studies, regulatory actions, publication financial results or public concern over the safety of medical device products and other factors could have a significant effect on the share price for the common shares.

### Payment of Dividends

The Company has never declared or paid any dividends on its Common Shares. The Company currently intends to retain future earnings, if any, to finance further research and development and the expansion of its business. As a result, the return on an investment in its Common Shares will depend upon any future appreciation in value. There is no guarantee that the common shares will appreciate in value or even maintain the price at which they were purchased.

### Foreign Currency Exchange

The Company operates and intends to generate revenue and expenses internationally, which are likely to be denominated in the United States dollar and other foreign currencies. The Company's intended international business will be subject to risks typical of an international business including, but not limited to, differing tax structures, myriad regulations and restrictions and general foreign exchange rate volatility. A decrease in the value of such foreign currencies relative to the Canadian dollar could result in downward price pressure for the Company's products in such jurisdictions or losses from currency exchange rate fluctuations. The Company cannot be sure that any hedging techniques will be successful or that its business, results of operations, financial condition and cash flows will not be materially adversely affected by exchange rate fluctuations.

## OUTLOOK

The Company expects to be able to continue to grow its core EP business  revenues in fiscal 2007, through both increased utilization at the centers it already has CryoCath's technology installed at and by introducing the technology into new centers. Key to this growth in the coming year will be increased sales in Europe as Arctic Front is rolled out to more centers in this region. While the Company expects to reduce its cash operating burn rate in the coming year, it does expect to incur continued losses from operations. In large part, this will be as a result of the significant investments required to advance and complete the enrolment in the STOP AF IDE pivotal study to secure U.S. marketing approval.

Notwithstanding this anticipated loss, management believes that the Company has made important advances in its corporate development. The Company's status as an organization with annual revenues of approximately $40 million with consistent year over year growth makes it attractive to a large base of potential shareholders, thereby improving its ability to access capital markets and commercial lenders to fund growth.

I, *Jan Keltjens*, President and CEO at CryoCath Technologies Inc, certify that:

1. I have reviewed the interim filings (as this term is defined in Multilateral Instrument 52-109 *Certification of Disclosure in Issuers' Annual and Interim Filings*) of CryoCath Technologies Inc. for the interim period ending June 30, 2007.

2. Based on my knowledge, the interim filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, with respect to the period covered by the interim filings; and

3. Based on my knowledge, the interim financial statements together with the other financial information included in the interim filings fairly present in all material respects the financial condition, results of operations and cash flows of the issuer, as of the date and for the period presented in the interim filings.

4. The issuer's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures over financial reporting for the issuer, and we have:

   a. Designed such disclosure controls and procedures, or caused them to be designed under our supervision, to provide reasonable assurance that material information relating to the issuer is made known to us by others within those entities, particularly during the period in which the interim filings are being prepared.

   b. Designed such internal control over financial reporting, or caused it to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with the issuer's GAAP; and

5. I have caused the issuer to disclose in the interim M D & A any change in the issuer's internal control over financial reporting that occurred during the issuer's most recent interim period that has materially affected, or is reasonably likely to materially affect, the issuer's internal control over financial reporting.

Date: August 9, 2007

Jan Keltjens
President and Chief Executive Officer

31

I, *L. Derek Lindsay*, Chief Financial Officer at CryoCath Technologies Inc, certify that:

1. I have reviewed the interim filings (as this term is defined in Multilateral Instrument 52-109 *Certification of Disclosure in Issuers' Annual and Interim Filings*) of CryoCath Technologies Inc. for the interim period ending June 30, 2007.

2. Based on my knowledge, the interim filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, with respect to the period covered by the interim filings; and

3. Based on my knowledge, the interim financial statements together with the other financial information included in the interim filings fairly present in all material respects the financial condition, results of operations and cash flows of the issuer, as of the date and for the period presented in the interim filings.

4. The issuer's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures over financial reporting for the issuer, and we have:

   (a) Designed such disclosure controls and procedures, or caused them to be designed under our supervision, to provide reasonable assurance that material information relating to the issuer is made known to us by others within those entities, particularly during the period in which the interim filings are being prepared.

   (b) Designed such internal control over financial reporting, or caused it to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with the issuer's GAAP; and

5. I have caused the issuer to disclose in the interim M D & A any change in the issuer's internal control over financial reporting that occurred during the issuer's most recent interim period that has materially affected, or is reasonably likely to materially affect, the issuer's internal control over financial reporting.

Date: August 9, 2007

L. Derek Lindsay
Chief Financial Officer

32

**CryoCath Technologies Inc.**
**Notice of disclosure of Non-Auditor Review of Interim Financial Statements for the three months ended June 30, 2007 and 2006.**

Pursuant to National Instrument 51-102, Part 4, subsection 4.3(3)(a) issued by the Canadian Securities Administrators, if the external auditors have not performed a review of the interim financial statements, the interim financial statements must be accompanied by a notice indicating that they have not been reviewed by the external auditors.

The accompanying unaudited interim financial statements of the Company for the interim periods ended June 30, 2007 and 2006, have been prepared in accordance with Canadian generally accepted accounting principles and are the responsibility of the Company's management.

The Company's external auditors, Ernst & Young LLP, have not performed a review of these interim financial statements in accordance with the standards established by the Canadian Institute of Chartered Accountants for a review of interim financial statements by the external auditors of an entity.

Dated this 9th day of August 2007

**Balance Sheets (unaudited)**

| As at | June 30 2007 $ | September 30 2006 $ |
|---|---|---|
| **ASSETS** | | |
| **Current assets** *(notes 5 and 6)* | | |
| Cash and cash equivalents | 31,979,747 | 9,178,123 |
| Cash subject to restrictions *(note 6)* | 568,750 | - |
| Short-term investments held to maturity | - | 5,616,907 |
| Accounts receivable | 10,205,449 | 8,119,660 |
| Investment tax credits receivable | 993,148 | 502,033 |
| Inventories *(note 4)* | 7,852,349 | 7,105,974 |
| Prepaid expenses | 180,146 | 1,044,039 |
| **Total current assets** | 51,779,589 | 31,566,736 |
| Cash subject to restrictions *(note 6)* | 853,125 | - |
| Balance of sale (note 10 ) | 1,608,168 | - |
| Net investments in leases | - | 5,967 |
| Deferred financing charges *(notes 5 and 6)* | - | 2,636,636 |
| Consoles at customers' premises *(notes 5 and 6)* | 1,904,786 | 1,858,465 |
| Property, plant, and equipment *(notes 5 and 6)* | 3,516,517 | 3,212,551 |
| Intellectual property *(notes 5 and 6)* | 2,887,372 | 15,194,606 |
| | 62,549,557 | 54,474,961 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| **Current liabilities** | | |
| Bank indebtedness *(note 5)* | 7,700,000 | - |
| Accounts payable and accrued liabilities | 14,113,534 | 10,201,378 |
| Fair value of derivative financial instruments | 48,860 | - |
| Current portion of long-term debt (note 6) | 1,148,269 | - |
| Current portion of deferred revenue | 538,900 | 491,683 |
| **Total current liabilities** | 23,549,563 | 10,693,061 |
| Long-term debt *(note 6)* | 23,560,084 | 22,399,317 |
| Deferred revenue | 294,922 | 228,774 |
| **Total liabilities** | 47,404,569 | 33,321,152 |
| **Shareholders' equity** | | |
| Capital stock *(note 7)* | 180,777,848 | 180,655,193 |
| Contributed surplus | 8,539,199 | 7,469,343 |
| Deficit | (174,172,059) | (166,970,727) |
| **Total shareholders' equity** | 15,144,988 | 21,153,809 |
| | 62,549,557 | 54,474,961 |

See accompanying notes.

**Statement of Operations and Deficit (unaudited)**

| | Three months ended June 30, 2007 $ | Three months ended June 30, 2006 $ | Nine months ended June 30, 2007 $ | Nine months ended June 30, 2006 $ |
|---|---|---|---|---|
| **REVENUES** | | | | |
| Sales | **11,700,212** | 9,707,584 | **33,120,310** | 28,909,279 |
| Cost of sales (including amortization, and console write-downs of $868,179 and $2,421,486; 2006 - $1,164,673 and $2,613,473) | **4,908,403** | 4,806,476 | **13,015,264** | 12,258,894 |
| **Gross Profit** | **6,791,809** | 4,901,108 | **20,105,046** | 16,650,385 |
| Surgical distribution rights (note 8) | **-** | 209,600 | **-** | 209,600 |
| | **6,791,809** | 5,110,708 | **20,105,046** | 16,859,985 |
| Interest income | **107,810** | 147,106 | **280,838** | 457,907 |
| | **6,899,619** | 5,257,814 | **20,385,884** | 17,317,892 |
| **EXPENSES** | | | | |
| Research and development | **3,499,617** | 3,385,375 | **9,051,234** | 9,764,437 |
| Investment tax credits | **(136,140)** | (140,394) | **(491,115)** | (494,712) |
| Net research and development | **3,363,477** | 3,244,981 | **8,560,119** | 9,269,725 |
| Administrative | **1,748,761** | 1,698,116 | **4,899,034** | 4,064,450 |
| Sales and marketing | **6,770,695** | 7,124,941 | **19,128,230** | 19,967,145 |
| Amortization of intellectual property | **58,625** | 56,139 | **173,459** | 165,218 |
| Amortization of property, plant, and equipment | **239,070** | 269,256 | **670,064** | 813,945 |
| Amortization of deferred financing charges | **84,424** | 57,856 | **343,122** | 155,686 |
| Interest on long-term debt | **645,399** | 282,036 | **1,858,447** | 783,394 |
| Foreign exchange loss | **1,381,492** | 253,561 | **655,332** | 166,452 |
| Loss on foreign exchange embedded derivative | **62,882** | - | **48,860** | - |
| Non-cash compensation expense | **300,100** | 445,000 | **1,069,856** | 1,245,894 |
| Other expenses (note 9) | **-** | 179,490 | **299,274** | 179,490 |
| | **14,654,925** | 13,611,376 | **37,705,797** | 36,811,399 |
| **Net income (loss) and other comprehensive income (loss) before undernoted item** | **(7,755,306)** | (8,353,562) | **(17,319,913)** | (19,493,507) |
| Gain on sale of surgical portfolio (note 10) | **10,118,581** | - | **10,118,581** | - |
| **Net income (loss) and other comprehensive income (loss)** | **2,363,275** | (8,353,562) | **(7,201,332)** | (19,493,507) |
| Deficit, beginning of period | **(176,535,334)** | (148,144,210) | **(166,970,727)** | (137,004,265) |
| **Deficit, end of period** | **(174,172,059)** | (156,497,772) | **(174,172,059)** | (156,497,772) |
| **Weighted average number of common shares** | **38,016,719** | 37,866,322 | **37,985,809** | 37,748,090 |
| **Basic earnings (loss) per share** | **0.06** | (0.22) | **(0.19)** | (0.52) |
| **Diluted earnings (loss) per share (note 7(f))** | **0.05** | (0.22) | **(0.19)** | (0.52) |

**Statement of Cash Flows (unaudited)**

| | Three Months Ended | Three Months Ended | Nine Months Ended | Nine Months Ended |
|---|---|---|---|---|
| | **June 30, 2007** | June 30, 2006 | **June 30, 2007** | June 30, 2006 |
| | **$** | $ | **$** | $ |
| **OPERATING ACTIVITIES** | | | | |
| Net income (loss) and other comprehensive income (loss) for the period | **2,363,275** | (8,353,562) | **(7,201,332)** | (19,493,507) |
| Items not affecting cash | | | | |
| Gain on sale of surgical portfolio | **(10,118,581)** | - | **(10,118,581)** | - |
| Non-cash compensation expense | **300,100** | 445,000 | **1,069,856** | 1,245,894 |
| Interest on long-term debt | **591,769** | 282,036 | **1,732,124** | 783,394 |
| Amortization of intellectual property | **552,085** | 639,168 | **1,526,502** | 1,277,443 |
| Amortization of consoles at customers' premises | **264,289** | 486,089 | **742,601** | 1,226,329 |
| Amortization of property, plant, and equipment | **349,499** | 364,811 | **995,906** | 1,088,864 |
| Amortization of deferred financing charges | **84,424** | 57,856 | **343,122** | 155,686 |
| Unrealized loss on foreign exchange embedded derivatives | **62,882** | - | **48,860** | - |
| Unrealized foreign exchange loss | **871,489** | 440,688 | **871,489** | 366,656 |
| | **(4,678,769)** | (5,637,914) | **(9,989,453)** | (13,349,241) |
| Net change in non-cash working capital balances relating to operations | **4,261,128** | (163,176) | **1,276,530** | (1,138,364) |
| Increase in net investments in leases | **-** | 16,376 | **5,967** | 49,557 |
| Increase (decrease) in deferred revenue | **(60,505)** | (49,023) | **117,804** | (18,101) |
| **Cash flows related to operating activities** | **(478,146)** | (5,833,737) | **(8,589,152)** | (14,456,149) |
| **INVESTING ACTIVITIES** | | | | |
| Net proceeds from sale of surgical portfolio | **20,222,586** | - | **20,222,586** | - |
| Proceeds from maturities of short-term investments | **-** | 18,189,541 | **5,616,907** | 45,709,482 |
| Acquisition of short-term investments | **-** | (12,633,678) | **-** | (22,140,941) |
| (Increase) decrease in cash subject to restrictions | **109,375** | - | **(1,421,875)** | - |
| Acquisition of intellectual property | **(106,897)** | (72,491) | **(330,089)** | (365,413) |
| Acquisition of property, plant, and equipment | **(755,296)** | (460,080) | **(1,329,252)** | (1,401,969) |
| Increase in consoles at customers' premises | **(481,950)** | (476,400) | **(1,407,958)** | (1,572,615) |
| **Cash flows related to investing activities** | **18,987,818** | 4,546,892 | **21,350,319** | 20,228,544 |
| **FINANCING ACTIVITIES** | | | | |
| Issuance of common shares | **-** | 75,000 | **120,105** | 473,612 |
| Decrease in employee share purchase loans | **-** | 30,000 | **2,550** | 46,320 |
| Decrease (increase) in deferred financing charges | **-** | 506 | **(167)** | 506 |
| Repayment of bank indebtedness | **-** | (220,000) | **-** | (220,000) |
| Increase in long-term debt | **-** | - | **3,534,000** | - |
| Repayment of long-term debt | **(221,284)** | - | **(663,407)** | - |
| Increase in bank indebtedness | **4,700,000** | - | **7,700,000** | 5,000,000 |
| **Cash flow related to financing activities** | **4,478,716** | (114,494) | **10,693,081** | 5,300,438 |
| **Effect of exchange rate change on cash and cash equivalents** | **(652,624)** | (17,567) | **(652,624)** | (2,769) |
| **Net change in cash and cash equivalents** | **22,335,764** | (1,418,906) | **22,801,624** | 11,070,064 |
| Cash and cash equivalents, beginning of period | **9,643,983** | 13,141,131 | **9,178,123** | 652,161 |
| **Cash and cash equivalents, end of period** | **31,979,747** | 11,722,225 | **31,979,747** | 11,722,225 |
| **Cash and cash equivalents consist of:** | | | | |
| Cash | **29,840,947** | 6,241,477 | **29,840,947** | 6,241,477 |
| Cash equivalents - commercial paper and other investments with maturities less than 90 days | **2,138,800** | 5,480,748 | **2,138,800** | 5,480,748 |
| | **31,979,747** | 11,722,225 | **31,979,747** | 11,722,225 |
| **Supplemental cash flow information** Cash paid during the period for : interest | **217,612** | 67,625 | **376,948** | 104,085 |

## 1.   Description of Business

CryoCath Technologies Inc. (the "Company") was incorporated on August 24, 1994 under Part IA of the *Québec Companies Act*.

The Company is a medical device Company and operates in a single business segment which is the development, manufacture and sale of proprietary cryoablation therapeutic technologies, including consoles and disposables (catheters and probes).

To date, the Company has financed its cash requirements primarily through share issuances, the sale of its products, investment tax credits, government grants, debt financing and interest income. The success of the Company is dependent on obtaining the necessary regulatory approvals, generating further revenues on the sales of its products and achieving future profitable operations. It may be necessary for the Company to raise additional funds for the continuing development and marketing of its products and technologies.

## 2.   Interim Financial Statements and Accounting Policies

The unaudited interim financial statements have been prepared by the Company in accordance with Canadian generally accepted accounting principles applicable to interim financial statements, and follow the same accounting policies and methods of their application as the most recent annual audited financial statements. In the opinion of Management, all adjustments necessary for a fair presentation are reflected in the unaudited interim financial statements. Such adjustments are of a normal and recurring nature. The results of operations for the interim periods are not necessarily indicative of the operating results for the full year. The unaudited interim financial statements do not include all the disclosures required according to Canadian generally accepted accounting principles for annual financial statements, and should therefore be read in conjunction with the audited financial statements and notes thereto for the year ended September 30, 2006.

## 3.   Changes in Accounting Policies

Effective October 1, 2006, the Company adopted the following recently introduced CICA Handbook Sections:

(a)   Section 3855, "Financial Instruments – Recognition and Measurement" provides guidance on the recognition and measurement of financial assets, financial liabilities and derivative financial instruments. This new standard requires that all financial assets and liabilities be accounted for using one of three available accounting models, being: held-to-maturity, available-for-sale or held-for-trading. All financial instruments classified as available-for-sale or held-for-trading, and derivative financial instruments meeting certain recognition criteria, are carried at fair value. Changes in the fair value of financial instruments designated as held-for-trading and recognized derivative financial instruments are charged or credited to the statement of operations for the relevant period, while changes in the fair value of financial instruments designated as available-for-sale are charged or credited to other comprehensive income.  All other financial assets and liabilities are accounted for at cost or at amortized cost depending upon the nature of the instrument. Financial assets and liabilities designated as held-to-maturity are initially recognized at their fair values, with any resulting premium or discount from the face value being amortized to income or expense using the effective interest method. After their initial fair value measurement, they are measured at amortized cost using the effective interest rate method. The standard requires the Company to make certain elections, upon initial adoption of the new rules, regarding the accounting model to be used to account for each financial instrument. This new section also requires that transaction costs incurred in connection with the issuance of financial instruments

either be capitalized and presented as a reduction of the carrying value of the related financial instrument or expensed as incurred. If capitalized, transaction costs must be amortized to income using the effective interest method. This section does not permit the restatement of financial statements of prior periods.

Following is a summary of the accounting model the Company has elected to apply to each of its significant categories of financial instruments outstanding as of October 1, 2006 and/or June 30, 2007:

| | |
|---|---|
| Short-term investments (debt instruments) | held-to-maturity |
| Accounts receivable | held-to-maturity |
| Accounts payable | held-to-maturity |
| Long-term debt | held-to-maturity |

In addition, the Company has elected to account for transaction costs related to the issuance of financial instruments as a reduction of the carrying value of the related financial instruments. With respect to embedded derivatives, the Company has elected to recognize only those derivatives embedded in contracts issued, acquired or substantively modified on or after October 1, 2002 as permitted by the transitional provisions set out in section 3855.

The adoption of this new section did not result in any significant adjustments to the carrying values of the Company's previously recognized financial assets and liabilities as at October 1, 2006. However, since the Company has elected to capitalize transaction costs, deferred financing costs are now presented as a reduction of the long-term debt balance. The value of these deferred financing costs as at October 1, 2006 was $2,636,636. Further, the Company has identified and recognized certain embedded derivative financial instruments in the amount of $48,860 in the period October 1, 2006 to June 30, 2007. The value of these embedded derivative financial instruments as at October 1, 2006 was insignificant. These derivative financial instruments represent foreign currency swaps embedded in certain distribution agreements, which include minimum purchase commitments. This amount was recorded as a current liability as of June 30, 2007 with the resulting loss having been credited to operations.

b)   Section 1530, "Comprehensive Income", along with Section 3251, "Equity" which amends Section 3250, "Surplus", require enterprises to present comprehensive income and its components as well as net income in their financial statements. Further, they require enterprises to separately present changes in equity during the period as well as components of equity at the end of the period, including comprehensive income. Since the Company does not have any elements of comprehensive income, the adoption of these sections did not have any impact on the Company's financial statements.

c)   Section 3865, "Hedges" allows optional treatment providing that hedges be designated as either fair value hedges, cash flow hedges or hedges of a self-sustaining foreign operation. Since the Company does not currently have any hedging programs in place, the adoption of this section did not have any impact on the Company's financial statements.

**4.    Inventories**

|  | As at<br>June 30, 2007<br>$ | As at<br>September 30, 2006<br>$ |
|---|---|---|
| Raw Materials | 3,765,627 | 3,363,921 |
| Work-in-Progress | 748,827 | 368,079 |
| Finished Goods | 3,337,895 | 3,373,974 |
|  | 7,852,349 | 7,105,974 |

**5.    Bank Indebtedness**

|  | As at<br>June 30, 2007<br>$ | As at<br>September 30, 2006<br>$ |
|---|---|---|
| Direct advances under the revolving operating facility bear interest at Canadian prime plus 1.75% (7.75% at June 30, 2007) and are collateralized by a general security agreement in respect of a first charge on the Company's present and future inventory, claims (including accounts receivable, investment tax credits, and bank deposits) and short-term investments and a second charge on all of the property, plant, and equipment and intellectual property. | 7,700,000 | — |

As at September 30, 2006, under a prior banking agreement, the Company had access to a $5,000,000 line of credit, limited to the value of short-term investments and cash and cash equivalents held by a Canadian chartered bank, which amounted to $11,452,229 at September 30, 2006. The line of credit carried interest at the Canadian chartered bank's prime rate plus 0.5% or 6.5% as at September 30, 2006, collateralized by investment tax credits receivable, accounts receivable, inventories, and short-term investments. This collateral was released and the new credit facility was activated in November 2006. As at September 30, 2006, this facility was unused.

On August 11, 2006 the Company signed a new credit facility with a new senior lender, national Bank of Canada.  The credit facility includes an $11,000,000 revolving operating line, subject to the value of the underlying collateral, and a $3,500,000 term loan.

## 6.  Long-Term Debt

a) The long-term debt consists of:

| | As at June 30,2007 $ | As at September 30,2006 $ |
|---|---|---|
| Investissement Quebec (IQ) loan, bearing interest at Investissement Quebec's own borrowing rate plus 2.5% (10% at June 30, 2007 and 10.0% at September 30, 2006), repayable in four equal annual instalments of $6,032,860 starting in March 2011 (2006-repayable annually at a rate of 25% of net income), maturing in June 2014, collateralized by a first fixed and floating charge of $26,000,000 on all of the property, plant, and equipment; and intellectual property of the Company and second charge on all other assets. | 24,131,441 | 22,399,317 |
| Term loan with a Canadian chartered bank, bearing interest at variable rates, either at Canadian prime or US base rate plus 2.0%, (8% at June 30, 2007) payable by way of 9 consecutive quarterly instalments, 1 being in the amount of $218,750, the following 4 such instalments being in the amount of $306,250 each, and the last 4 such instalments being in the amount of $350,000 each, maturing on November 30, 2009, collateralized by a general security agreement in respect of a first charge on the Company's present and future inventory, claims (including accounts receivable, investment tax credits, and bank deposits) and short-term investments, a second charge on all of the property, plant, and equipment and intellectual property, and a cash collateral account equal to 50% of the outstanding borrowings under the term loan. | 2,843,750 | — |
| Capital lease obligation, with an effective annual interest rate of 10.13%, maturing in October 2009, secured by the computer software under capital lease and payable by way of 28 installments of interest and principal of $1,075 | 26,843 | — |
| | 27,002,034 | 22,399,317 |
| Less current portion of long-term debt | (1,148,269) | — |
| | 25,853,765 | 22,399,317 |
| Less deferred financing charges | (2,293,681) | |
| | 23,560,084 | 22,399,317 |

As at June 30, 2007, minimum installments on the term loan and capital lease obligation are as follows:

| | |
|---|---|
| 2007 | 221,345 |
| 2008 | 1,236,032 |
| 2009 | 1,412,150 |
| 2010 | 1,066 |
| 2011 to 2014 | 24,131,441 |
| | 27,002,034 |

(b)  Other terms and conditions of the loan agreement with Investissement Quebec (IQ) dated September 25, 2003 for a loan in the amount of $20,000,000. under the Biolevier program:

(i) The terms of the loan allow the Company to defer principal payments and capitalize interest for the first three-year period ended June 9, 2007. Interest is due on a monthly basis thereafter. Interest capitalized from inception to June 30, 2007 amounted to $4,131,441 (as at September 30, 2006 - $2,399,317) and has been included in the loan facility amount.

(ii) Interest can be converted to a fixed rate after the final loan disbursement.

(iii) Upon request by the Company, and subject to certain conditions, IQ will release the first fixed and floating charge against any specific intellectual property for which the Company is in the process of entering into a licensing, marketing or operating agreement.

(iv) As part of the agreement the Company granted 571,429 options to Investissement Quebec to purchase common shares at an exercise price of $6.19 per share for a period of 5 years from the date of the first disbursement of funds. According to the terms of the loan agreement, at least 50% of the options became exercisable as of the first drawdown on the loan. Furthermore, up to 75% became exercisable prorated if the Company drew down between 50% and 75% of the available facility, and the remainder of the options became exercisable when 75% of the facility was utilized.

On November 29, 2005 the Company received approval from the TSX to extend the term of the options it granted to Investissement Quebec under the Biolevier program from an initial term of 5 years to a 10-year term, or February 11, 2014. Such extension was already provided in the agreement with Investissement Quebec under the Biolevier program and was conditional upon changes being made to the rules of the TSX to allow for options to be granted with a term loan longer than five years. As a result the options were revalued with an increase in the deferred financing fees of $325,700. These fees will be amortized over the remaining life of the loan using the effective yield method.

On July 17, 2006, the Company drew down the remaining $10,100,000 under its existing loan agreement with Investissement Quebec, and therefore the remaining 285,715 options vested. The fair value of these options on the vesting date, using the Black-Scholes option-pricing model was $488,573. This amount was recorded as a deferred financing cost and will be amortized to expense over the remaining term of the loan using the effective yield method.

(c)  Certain of the terms and conditions of the loan agreement with IQ were modified on June 28, 2007 in conjunction with the Company's sale of its surgical portfolio to a subsidiary of ATS Medical Inc. The key modifications include:

(i) The repayment of the principal balance in four equal annual installments of $6,032,860 starting in March 2011.

(ii) The accelerated repayment of a portion of the principal balance equal to a percentage, not to exceed 25%, of the proceeds of any private or public equity financing completed by the Company which is in excess of an agreed upon amount.

(iii) An additional grant of 133,333 options to Investissement Quebec to purchase common shares at an exercise price of $3.75 for a period expiring February 11, 2014, conditional upon and vesting with the receipt of TSX approval.

41

d)   The Company incurred $157,076 of fees with respect to the facilities with a Canadian chartered bank, which are recorded as deferred financing fees against long-term debt and are charged to income in proportion to the term of the related facility. These fees will be amortized over the remaining life of the loan using the effective yield method.

## 7.   Capital Stock

a)   The authorized, issued and outstanding common shares and convertible preferred shares consist of:

Common shares

Authorized

An unlimited number of common shares without par value.

An unlimited number of convertible preferred shares without par value, voting, participating, and convertible into common shares.

Issued and outstanding

|  | Number of shares | Stated Capital |
|---|---|---|
|  | # | $ |
| **Balance as at September 30, 2006** | **37,988,618** | 180,655,193 |
| Issued on exercise of options | **47,100** | 120,105 |
| Repayment of employee share purchase loans | **-** | 2,550 |
| **Balance as at June 30, 2007** | **38,035,718** | 180,777,848 |

Preferred shares.

There are no convertible preferred shares outstanding.

b)   Stock option plans

The changes to the number of stock options granted by the Company, and their weighted average exercise price are as follows:

|  | Nine-month period ended June 30, 2007 | Weighted average exercise price ($) |
|---|---|---|
|  | # | $ |
| **Balance, beginning of period** | **4,090,425** | **5.52** |
| Granted | 961,680 | 2.51 |
| Exercised | (47,100) | 2.55 |
| Forfeited | (718,957) | 5.80 |
| **Balance, end of period** | **4,306,053** | **4.85** |
| **Options exercisable, end of period** | **2,583,293** | **5.74** |

The Company recorded an expense of $300,100 related to stock option awards granted during the third quarter of fiscal 2007 (2006 - $445,000) and $1,069,856 for the period from October 1, 2006 to June 30,

2007 (2006 - $1,245,894) with a corresponding credit to contributed surplus. The fair value of option grants during the third quarter of fiscal 2007 was estimated at the date of grant using the following assumptions: weighted-average risk-free interest rate of 4.37% (4.16% for the period from October 1, 2006 to June 30, 2007); dividend yield of nil (nil % for the period from October 1, 2006 to June 30, 2007); weighted-average volatility factor of the expected market price of the Company's common shares of 51.8% (51.2% for the period from October 1, 2006 to June 30, 2007); and a weighted-average expected life of the options of 10 years.

The estimated fair value of the options is amortized to expense on a straight-line basis over the option's vesting period.

The weighted average fair value of stock options granted during the third quarter of fiscal 2007, under the Black-Scholes option-pricing model, and above assumptions was $2.59 ($1.62 for the period from October 1, 2006 to June 30, 2007).

For options which were granted in fiscal 2002 and 2003, the Company will continue to present pro forma net loss as if the fair value had been applied to those awards by determining a pro-forma expense on a straight-line basis over the option's vesting price. The fair value of option granted in 2002 and 2003 was estimated at the date of grant using the following assumptions: weighted-average risk-free interest rate of 4.6%; dividend yield of nil: weighted-average volatility factor of the expected market price of the Company's common shares of 51%; and a weighted-average expected life of the options of 10 years. The weighted-average, fair value of stock options granted during fiscal 2002 and 2003, under the Black-Scholes option-pricing model, and above assumptions, was $4.32.

The pro forma information regarding net loss has been determined as if the Company had accounted for stock options granted during the period October 1, 2001 to September 30, 2003 under the fair value method and assumes normal vesting. The reported net loss and loss per share would have increased to the pro forma amounts for each of the periods, as follows:

| | Three months ended | | Nine months ended | |
| | June 30, 2007 $ | June 30, 2006 $ | June 30, 2007 $ | June 30, 2006 $ |
|---|---|---|---|---|
| Net income (loss) – as reported | 2,363,275 | (8,353,562) | (7,201,332) | (19,493,507) |
| Pro forma stock-based compensation | 2,636 | (152,785) | (79,804) | (487,531) |
| Net loss – pro forma | 2,365,911 | (8,506,347) | (7,281,136) | (19,981,038) |
| Basic earnings (loss) per share – as reported | 0.06 | (0.22) | (0.19) | (0.52) |
| Pro forma stock-based compensation | - | - | (0.01) | (0.01) |
| Basic earnings (loss) per share – pro forma | 0.06 | (0.22) | (0.19) | (0.53) |
| Diluted earnings (loss) per share – as reported | 0.05 | (0.22) | (0.19) | (0.52) |
| Pro forma stock-based compensation | - | - | - | - |
| Diluted earnings (loss) per share – pro forma | 0.05 | (0.22) | (0.19) | (0.52) |

(c)    Options granted under the long-term debt

The options granted under the long-term debt consist of:

i) Under the terms of the loan agreement with Investissement Quebec a total of 285,714 options vested on June 10, 2004, the date of the first disbursement of $9,900,000. The fair value of these options on the vesting date, calculated with an expected life of 5 years, amounted to $1,302,856.

As a result of the extension to a 10-year life approved by the TSX on November 29, 2005, the options were revalued with an increase in the deferred financing fees of $325,700. The revaluation was estimated at the date of approval by the TSX using the following assumptions: weighted-average risk-free interest rate of 4.01%; dividend yield of nil; weighted-average volatility factor of the expected market price of the Company's common shares of 50.2%; and weighted-average expected life of the options of 8.2 years.

ii) The Company drew down the remaining $10,100,000 under the loan agreement with Investissement Quebec on July 17, 2006 and the remaining 285,715 options vested. The fair value of these options on the vesting date, using the Black-Scholes option pricing model with a volatility factor of 48.9%, a risk-free interest rate of 4.46%, a dividend yield of nil and an expected life of 7.6 years amounted to $488,573.

iii) The additional grant of 133,333 options to Investissement Quebec per the modifications to the loan agreement dated June 28, 2007 is disclosed in Note 6(c).

These amounts were recorded as deferred financing costs, as were the other costs associated with this facility in the amount of $880,379 (as at September 30, 2006 - $880,379). These costs are amortized to expense over the term of the loan using the effective yield method.

(d)    Employee Share Purchase Loans

The employee share purchase loans, which are no longer available, have been recorded as a reduction of capital stock. The loans are non-interest bearing, have a maximum ten-year repayment period and are collateralized by the underlying shares. Since December 12, 2002, the Company has not extended new loans pursuant to the Stock Option Plan. As at June 30, 2007, the amount of the employee share purchase loans was $50,450 (as at September 30, 2006 - $53,000). There are 19,000 common shares (as at September 30, 2006 - 19,875) pledged as collateral for the outstanding employee loans with a fair market value at June 30, 2007 of $71,630 (as at September 30, 2006 - $44,321). During the year ended September 30, 2006, a share purchase loan to an officer of $233,069 was forgiven. The corresponding expense was included in other expenses on the statement of operations.

(e)    Inducement Options

Under the terms of an employment agreement and in accordance with Section 613c of the Toronto Stock Exchange Company Manual the Company granted 759,770 options for the purchase of common shares. These options vest over 4 years and expire ten years from the grant date.

The fair value of these options on the vesting date, using the Black-Scholes option pricing model with a volatility factor of 51.9%, a risk-free interest rate of 4.14%, a dividend yield of NIL, and an expected life of 10 years amounted to $1,557,529.

The fair value of these inducement options is amortized to expense on a straight-line basis over the options vesting period.

44

(f)    Diluted loss per share

There were no adjustments to the weighted average number of shares outstanding for the purpose of calculating diluted loss per share because to do so would be anti-dilutive. Securities which could dilute loss per share include employee options totalling 4,306,053 (as at September 30, 2006 – 4,090,425), shares held as collateral under the employee share purchase plan in the amount of 19,000 (as at September 30, 2006 – 19,875), the options granted under the long-term debt in the amount of 704,762 (as at September 30, 2006 – 571,429), and inducement options totalling 759,770 (as at September 30, 2006 – NIL).

## 8.    Sale of Surgical Distribution Rights

During the third quarter ended June 30, 2006, the Company sold the rights to certain of its US territory hospital accounts to a distributor allowing them exclusive access to these accounts for the purpose of selling surgical cryoablation products. In return, the distributor paid the Company $209,600 which was recorded in the quarter. In addition, the distributor was to pay a royalty fee on the future sales derived from these accounts for the next three years.

## 9.    Other Expenses

Other Expenses consist of:

i) Severance and Other Involuntary Employee Termination Costs

On September 22, 2006, the Board of Directors approved a resource realignment initiative which resulted in involuntary terminations of 29 employees on October 3 and 4, 2006. The total cost of the realignment initiative was expected to amount to $519,000. During fiscal year 2006, the Company recorded $290,288 as a charge to operations with respect to the associated severance costs. An additional amount of $299,274 was recorded in the period October 1, 2006 to December 31, 2006, to cover the remaining cost of the realignment initiative and to record some additional severance related costs.

ii) Executive Severance Costs

During the third quarter of 2006, the Company incurred certain severance costs with respect to the departure of an executive. Included in the total of $179,490 are non-cash compensation expenses of $1,913.

## 10. Sale of surgical portfolio

On June 19, 2007, the Company entered into an agreement with a subsidiary of ATS Medical Inc. for the sale of its surgical portfolio and related tangible and intangible assets and rights, including certain rights it acquired under the Endocare license purchase agreement. CryoCath's surgical products are defined as its line of argon-based cardiac surgical cryoablation devices, including products known under the FrostByte® and SurgiFrost® names.

Under the terms of the agreement, CryoCath received US $22 million (CDN $23.6 million) cash at closing and will receive US $2 million two years after closing, US $2 million upon the achievement of certain manufacturing transition milestones, and up to US $4 million based on future sales of SurgiFrost® XL planned for commercial release in the second half of 2007. The balance of sale receivable amounting to US $2 million was recorded at its fair value in accordance with our accounting policy for Financial Instruments.

45

The sale transaction closed on June 28, 2007. The gain on the sale transaction, net of transaction costs of $2,069,682, amounted to $10,118,581.

For the periods ended June 30, 2007, sales related to the Company's surgical portfolio were as follows:

|  | Three months ended | | Nine months ended | |
| --- | --- | --- | --- | --- |
|  | June 30, 2007 $ | June 30, 2006 $ | June 30, 2007 $ | June 30, 2006 $ |
| Sales | 3,415,260 | 3,694,169 | 10,793,051 | 10,114,835 |

## 11. Segment Disclosure

The Company carries on substantially all of its operations in Canada including manufacturing and shipping all of its products. All of its property, plant and equipment are located in Canada except for consoles located at customers' premises. It operates in only one segment which is the sector related to the development, manufacture and sale of therapeutic cryoablation technologies and products.

The following table presents sales by the destination of its products and the location of consoles at customers' premises.

|  | Three months ended | | Nine months ended | |
| --- | --- | --- | --- | --- |
|  | June 30, 2007 $ | June 30, 2006 $ | June 30, 2007 $ | June 30, 2006 $ |
| United States | 7,383,845 | 6,617,416 | 22,278,574 | 20,.477,626 |
| Europe | 3,722,461 | 2,574,255 | 9,635,792 | 7,243,100 |
| Canada | 261,401 | 188,532 | 438,178 | 371,200 |
| Other | 332,505 | 327,381 | 767,766 | 817,353 |
|  | 11,700,212 | 9,707,584 | 33,120,310 | 28,909,279 |

|  | Consoles at customers' premises at cost | |
| --- | --- | --- |
|  | As at June 30, 2007 $ | As at September 30, 2006 $ |
| United States | 2,218,156 | 2,408,213 |
| Europe | 1,291,919 | 1,746,568 |
| Canada | 63,942 | 217,977 |
|  | 3,574,017 | 4,372,758 |

## 12.  Related Party Transactions

There were no related party transaction for the third  quarter ended June 30, 2007  (2006 - $37,115). The total of all related party transactions, included in research and development and sales and marketing expenses, billed to us by directors of the Company for the period October 1, 2006 to June 30, 2007 was $4,638 (2006 - $56,140).

## 13.  Defined Contribution Employee Pension Plan

The Company has a 401K defined contribution Employee Pension Plan for some of its U.S. employees. Contributions to this Plan are expensed as incurred.

The Company makes a matching contribution equal to 50% of the employee's contribution, to a maximum of 3% of the employee's annual remuneration. These Employer contributions vest fully with the employee once 24 months of continuous service has been reached.

The expense for the defined contribution plan during the third quarter ended June 30, 2007 totalled $18,258 (2006 - $20,290) and $60,076 for the period from October 1, 2006 to June 30, 2007 (2006 - $51,360)

## 14. Comparative Figures

The comparative financial statements have been reclassified from statements previously presented to conform to the presentations of the current period financial statements.



CryoCath Technologies Inc.
16771 Chemin Ste-Marie
Kirkland, Quebec
H9H 5H3
+1 514 694 1212
www.cryocath.com

# EXHIBIT C

## CRYOCATH

# CRYOCATH NEWS

• CryoCath News

News Archives

Image Library

Awards

## News

### CryoCath Announces Fiscal 2007 Third Quarter Results

**Montreal, Quebec, Canada - August 9, 2007** - CryoCath Technologies Inc., the global leader in cryotherapy products to treat cardiovascular disease, today announced financial results for the third quarter, ended June 30, 2007.

Selected Third Quarter Financial and Operational Highlights:

- Reported record third quarter revenue of $11.7 million, a 20.5% quarter-over-quarter increase

- Revenue in core EP business grew by 37.8% quarter over quarter to $8.3 million, reflecting strong performance of Arctic Front® in Europe

- Increased gross margins to 58.0% from 50.5% in the third quarter of 2006

- Transformation of company into a high growth pure play EP/AFib company with relentless focus on its blockbuster potential through Arctic Front approval in the US and driving rapid profitable growth in Europe.

- Completed sale of surgical portfolio to ATS Medical in a cash transaction valued at US$22 million. With milestone payments, the agreement could increase in value to reach a total of US$30 million. These proceeds provide sufficient financial means to fund operations into the US launch of Arctic Front.

"The third quarter of 2007 was one of solid revenue growth while we also made significant progress in several key strategic areas. We achieved record sales, driven by a marked uptake in growth of our core EP business," said Jan Keltjens, President and CEO. "This increase in EP revenue is composed of ongoing growth in our core focal cryoablation business, compounded by the rapidly accelerating growth in the number of Atrial Fibrillation ablations utilizing our flagship Arctic Front system in an increasing number of trained sites in Europe. Last but not least, we successfully completed the sale of our surgical portfolio to ATS Medical, providing financial runway to the US commercial launch of Arctic Front while creating the required focus on this blockbuster opportunity".

"We also made good progress towards our goal of achieving Arctic Front approval in the US. We continue to believe that we can complete enrolment towards the end of this calendar year. Furthermore the on-going clinical results that we receive from commercial use in Europe continue to create confidence in the efficacy of our products."

The Company's total sales reached $11.7 million for the third quarter, an increase of 20.5% over the $9.7 million for the same quarter last year. For the nine-month period ending June 30, 2007, sales increased 14.6% to $33.1 million compared to $28.9 million in the same period a year ago.

Gross margins for the third quarter of fiscal 2007 were $6.8 million or 58.0% of sales, an increase over the $4.9 million or 50.5% seen in the third quarter of fiscal 2006. On a nine-month year-to-date basis, gross margins were $20.1 million or 60.7% of sales, versus $16.7 million or 57.6% from the same period a year ago. The increase in gross margins reflects higher revenues and the impact of ongoing improvements in our manufacturing operation, partially offset by mix and one-time charges taken last year.

The Company's sales and marketing expenses for the third quarter of 2007 decreased to $6.8 million compared to $7.1 million in the same period last year. On a nine-month year-to-date basis, sales and marketing expenses were $19.1 million versus $20.0 million for the same period a year ago. The decreases are associated with lower headcount and better control over discretionary expenses.

Net research and development expenses for the quarter ended June 30, 2007 was $3.4 million compared to $3.2 million in the same quarter last year



**MEDIA HIGHLIGHT**

**Cured for life.** A 14-year-old student's supraventricular tachycardia is cured with cryoablation.

View news item ›
More Media Highlight ›

**KEEP UP TO DATE ON CRYOCATH**

Sign up  to receive news and information on CryoCath clinical trials, product launches and more.

Sign up now! ›

primarily as a result of higher clinical costs. On a nine-month year-to-date basis, net R&D expenses were $8.6 million versus $9.3 million in the same period in 2006. The decrease year to date is due to a significant decrease in non-core R&D projects partly offset by higher clinical costs incurred in the STOP AF IDE trial.

Administrative expenses for the third quarter of 2007 increased to $1.8 million from $1.7 million for the same period last year. On a nine-month year-to-date basis, administrative expenses were $4.9 million versus $4.1 million for the same period a year ago. The increase in both periods is driven by continued spending to develop the robust infrastructure to support rapid and sustainable growth.

Other expenses, primarily composed of non-cash items, totaled $2.8 million in the quarter as compared to $1.5 million in the same quarter last year. For the nine months year to date, other expenses were $5.1 million compared to $3.5 million last year. The increased expense in both periods was driven by foreign exchange losses due to the appreciation of the Canadian dollar and high interest expense related to the additional debt taken on in July 2006.

CryoCath's net income for the third quarter ended June 30, 2007 was $2.4 million or $0.06 per share as a result of the $10.1 million gain recorded on the sale of the surgical business. In the third quarter of fiscal 2006, the company recorded a net loss of $8.4 million or ($0.22) per share. On a nine month year-to-date basis, the company posted a net loss of $7.2 million or ($0.19) per share. For the same period one year ago, the company recorded a net loss of $19.5 million or ($0.52) per share.

Operating burn for the quarter decreased by 17.0% to $4.7 million versus $5.6 million in the third quarter of 2006. On a nine-month year-to-date basis, operating burn decreased to $10.0 million from $13.3 million in 2006. The decrease in burn is primarily related to higher revenues and gross margins.

The Company, as of June 30, 2007, had access to approximately $35.3 million in cash and borrowing facilities. The increase is the direct result of the sale of the surgical portfolio to ATS Medical and provides sufficient runway to the US commercial launch of Arctic Front expected in late 2009.

The Company will host a conference call to discuss the second quarter results on Friday, August 10, 2007 at 8:30 am EST. The call will be audio-cast live and archived for 90 days and www.cryocath.com.

Click here to view the Financial Statements.

**About CryoCath**

CryoCath - www.cryocath.com - is a medical technology company that leads the world in cryotherapy products to treat cardiovascular disease. With a priority focus on providing physicians with a complete solution of catheter products to treat cardiac arrhythmias, CryoCath has multiple products approved in the U.S., across Europe and several ROW countries. The Company is developing additional products to expand its pipeline of products to treat cardiac arrhythmias. This press release includes "forward-looking statements" that are subject to risks and uncertainties, including with respect to the timing of regulatory trials and their outcome. For information identifying legislative or regulatory, economic, climatic, currency, technological, competitive and other important factors that could cause actual results to differ materially from those anticipated in the forward looking statements, see CryoCath's annual report available at www.sedar.com under the heading Risks and Uncertainties in the Management's Discussion and Analysis section.

**For further information, please contact:**

Michael Moore
Phone: (416) 815-0700 ext. 241
E-mail: mmoore@equicomgroup.com

Michael Moore
Phone: (416) 815-0700 ext. 241
E-mail: mmoore@equicomgroup.com

# EXHIBIT D

*SEC Info*   Home   Search   My Interests   Help   Sign In   *Please Sign In*

## Cryocor Inc · 10-Q · For 9/30/07

**Filed On 11/14/07 4:01pm ET · SEC File 0-51410 · Accession Number 1193125-7-247303**

| Find | | in | this filing. | Show | docs searched | and | every "hit". |

Help...   *Wildcards:* ? (any letter), * (many). *Logic:* for Docs: & (and), | (or); for Text: | (anywhere), "(&)" (near).

| As Of | Filer | Filing | As/For/On | Docs:Pgs | Issuer | Agent |
|-------|-------|--------|-----------|----------|--------|-------|
| 11/14/07 | Cryocor Inc | 10-Q | 9/30/07 | 7:64 | | RR Donnelley/FA |

---

### Quarterly Report · Form 10-Q
### Filing Table of Contents

| Document/Exhibit | Description | Pages | Size |
|------------------|-------------|-------|------|
| **1: 10-Q** | **Quarterly Report** | **HTML** | **358K** |
| 2: EX-10.20 | First Amendment to Employment Agreement – Edward F. Brennan | HTML | 18K |
| 3: EX-10.21 | First Amendment to Employment Agreement – Gregory J. Tibbitts | HTML | 18K |
| 4: EX-10.22 | Amended and Restated Executive Employment Agreement | HTML | 39K |
| 5: EX-31.1 | Section 302 Ceo Certification | HTML | 9K |
| 6: EX-31.2 | Section 302 Cfo Certification | HTML | 8K |
| 7: EX-32 | Section 906 Ceo and Cfo Certification | HTML | 8K |

---

### 10-Q · Quarterly Report
### Document Table of Contents

| Page | (sequential) | | (alphabetic) | Top |
|------|-------------|--|-------------|-----|

**(sequential)**

1  1st Page
"  Table of Contents
"  Financial Statements
"  Consolidated Balance Sheets as of September 30, 2007 (Unaudited) and December 31, 2006
"  Consolidated Statements of Operations for the three and nine months ended September 30, 2007 and 2006 (Unaudited)
"  Consolidated Statements of Cash Flows for the nine months ended September 30, 2007 and 2006 (Unaudited)
"  Notes to Consolidated Financial Statements (Unaudited)
"  Management s Discussion and Analysis of Financial Condition and Results of Operations
"  Quantitative and Qualitative Disclosures about Market Risk
"  Controls and Procedures
"  Part Ii. Other Information
"  Legal Proceedings
"  Risk Factors
"  Unregistered Sales of Equity Securities and Use of Proceeds
"  Exhibits
"  Signatures

**(alphabetic)**

• Alternative Formats (RTF, XML, et al.)
• Consolidated Balance Sheets as of September 30, 2007 (Unaudited) and December 31, 2006
• Consolidated Statements of Cash Flows for the nine months ended September 30, 2007 and 2006 (Unaudited)
• Consolidated Statements of Operations for the three and nine months ended September 30, 2007 and 2006 (Unaudited)
• Controls and Procedures
• Financial Statements
• Legal Proceedings
• Management s Discussion and Analysis of Financial Condition and Results of Operations
• Notes to Consolidated Financial Statements (Unaudited)
• Part Ii. Other Information
• Quantitative and Qualitative Disclosures about Market Risk
• Risk Factors
• Signatures
• Table of Contents
• Unregistered Sales of Equity Securities and Use of Proceeds

*This is an EDGAR HTML document rendered as filed.  [ Alternative Formats ]*

Form 10-Q

Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# FORM 10-Q

(Mark One)

☒    **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended September 30, 2007

OR

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission File Number 000-51410

# CryoCor, Inc.
### (Exact name of Registrant as specified in its Charter)

| | |
|---|---|
| **Delaware** | 33-0922667 |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification Number) |

**9717 Pacific Heights Boulevard**
**San Diego, California 92121**
(Address of Principal Executive Offices, including Zip Code)

**(858) 909-2200**
(Registrant's Telephone Number, Including Area Code)

**N/A**
(Former name, former address and former fiscal year if changed since last report)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    YES ☒    NO ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of *"accelerated filer and large accelerated filer"* in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐          Accelerated filer ☐          Non-accelerated filer ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    YES ☐    NO ☒

The number of shares of the Registrant's common stock outstanding as of October 31, 2007 was 12,566,481.

Table of Contents

**CRYOCOR, INC.**
**QUARTERLY REPORT ON FORM 10-Q FOR THE PERIOD ENDED SEPTEMBER 30, 2007**
**TABLE OF CONTENTS**

|  |  |  | Page No. |
|---|---|---|---|
| **PART I. FINANCIAL INFORMATION** |  |  |  |
| Item 1. | Financial Statements |  | 3 |
|  | Consolidated Balance Sheets as of September 30, 2007 (Unaudited) and December 31, 2006 |  | 3 |
|  | Consolidated Statements of Operations for the three and nine months ended September 30, 2007 and 2006 (Unaudited) |  | 4 |
|  | Consolidated Statements of Cash Flows for the nine months ended September 30, 2007 and 2006 (Unaudited) |  | 5 |
|  | Notes to Consolidated Financial Statements (Unaudited) |  | 6 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations |  | 12 |
| Item 3. | Quantitative and Qualitative Disclosures about Market Risk |  | 20 |
| Item 4. | Controls and Procedures |  | 20 |
| **PART II. OTHER INFORMATION** |  |  | 21 |
| Item 1. | Legal Proceedings |  | 21 |
| Item 1A. | Risk Factors |  | 21 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds |  | 36 |
| Item 6. | Exhibits |  | 36 |
| Signatures |  |  | 38 |

Table of Contents

ITEM 1.     FINANCIAL STATEMENTS.

CryoCor, Inc.

**Consolidated Balance Sheets**
*(in thousands except for the number of shares and par values)*

| | September 30, 2007 | December 31, 2006 |
|---|---|---|
| | (Unaudited) | |
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 4,934 | $ 3,025 |
| Short-term investments | 10,560 | 15,979 |
| Accounts receivable, net | 63 | 56 |
| Inventories, net | 926 | 820 |
| Prepaid expenses and other current assets | 640 | 555 |
| Total current assets | 17,123 | 20,435 |
| Property and equipment, net | 528 | 610 |
| Other assets | 647 | 297 |
| Total assets | $ 18,298 | $ 21,342 |
| **Liabilities and stockholders' equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 421 | $ 212 |
| Accrued compensation | 383 | 1,002 |
| Accrued clinical development liabilities | 846 | 942 |
| Accrued liabilities | 391 | 429 |
| Deferred revenue | 395 | 78 |
| Current portion of long-term debt | 1,303 | 6,857 |
| Total current liabilities | 3,739 | 9,520 |
| Long-term debt, less current portion | 4,341 | — |
| Stockholders' equity: | | |
| Preferred stock, $0.001 par value, 5,000,000 shares authorized; zero shares outstanding at September 30, 2007 (unaudited) and December 31, 2006 | — | — |
| Common stock, $0.001 par value, 75,000,000 shares authorized; 12,561,981 and 11,030,366 shares issued and outstanding at September 30, 2007 (unaudited) and December 31, 2006, respectively | 13 | 11 |
| Additional paid in capital | 106,491 | 96,709 |
| Accumulated other comprehensive income | 131 | 114 |
| Accumulated deficit | (96,417) | (85,012) |
| Total stockholders' equity | 10,218 | 11,822 |
| Total liabilities and stockholders' equity | $ 18,298 | $ 21,342 |

See accompanying notes.

3

Table of Contents

**CryoCor, Inc.**

**Consolidated Statements of Operations**
*(in thousands except per share amounts)*
**(Unaudited)**

| | Three months ended September 30, | | Nine months ended September 30, | |
|---|---|---|---|---|
| | **2007** | **2006** | **2007** | **2006** |
| Revenue: | | | | |
| Product revenue | $ 46 | $ 214 | $ 184 | $ 486 |
| Collaboration revenue | 167 | — | 167 | — |
| Total revenue | 213 | 214 | 351 | 486 |
| Operating expenses: | | | | |
| Cost of revenue | 683 | 542 | 1,962 | 1,852 |
| Research and development | 2,191 | 1,369 | 5,699 | 4,295 |
| Selling, general and administrative | 1,375 | 1,672 | 4,044 | 5,618 |
| Total costs and expenses | 4,249 | 3,583 | 11,705 | 11,765 |
| Loss from operations | (4,036) | (3,369) | (11,354) | (11,279) |
| Interest income | 244 | 274 | 702 | 883 |
| Interest expense | (242) | (268) | (753) | (808) |
| Net loss | (4,034) | (3,363) | (11,405) | (11,204) |
| Basic and diluted net loss per common share | $ (0.32) | $ (0.31) | $ (0.97) | $ (1.04) |
| Shares used to compute basic and diluted net loss per common share | 12,526 | 10,768 | 11,813 | 10,726 |

See accompanying notes.

4

Table of Contents

**CryoCor, Inc.**

**Consolidated Statements of Cash Flows**
*(in thousands)*
**(Unaudited)**

|  | Nine months ended September 30, | |
|  | 2007 | 2006 |
|---|---|---|
| **Operating activities** | | |
| Net loss | $(11,405) | $(11,204) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 208 | 221 |
| Non-cash share-based compensation | 1,473 | 1,534 |
| Amortization of debt discount | 176 | 215 |
| Amortization of premium/discount on short-term investments | (410) | (98) |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | (8) | 33 |
| Inventories | (106) | (148) |
| Prepaid expenses and other assets | (434) | 24 |
| Accounts payable | 210 | (309) |
| Deferred revenue | 317 | (123) |
| Accrued liabilities | (759) | 34 |
| Net cash used in operating activities | (10,738) | (9,821) |
| **Investing activities** | | |
| Purchases of property and equipment | (126) | (155) |
| Purchases of short-term investments | (14,524) | (17,027) |
| Proceeds from sales of short-term investments | 20,375 | 21,275 |
| Net cash provided by investing activities | 5,725 | 4,093 |
| **Financing activities** | | |
| Proceeds from issuance of common stock, net | 7,801 | — |
| Proceeds from issuance of common stock under stock plans, net | 121 | 92 |
| Proceeds from long-term debt | 6,000 | — |
| Principal payments on capital leases | — | (2) |
| Principal payments on long-term debt | (7,000) | — |
| Net cash provided by financing activities | 6,922 | 90 |
| Effect of exchange rate changes on cash | — | (20) |
| Net increase (decrease) in cash and cash equivalents | 1,909 | (5,658) |
| Cash and cash equivalents at beginning of period | 3,025 | 10,583 |
| Cash and cash equivalents at end of period | $ 4,934 | $ 4,925 |
| **Supplemental disclosures of cash flow information:** | | |
| Cash payments for interest | $ 511 | $ 591 |

See accompanying notes.

5

Table of Contents

CRYOCOR, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(UNAUDITED)

**Note 1. Organization and Basis of Presentation**

*Organization*

CryoCor, Inc. ("*CryoCor*" or the "*Company*" or "*we*"), a Delaware corporation, is a medical technology company that has developed and manufactures a minimally invasive, disposable catheter system based on proprietary cryoablation technology for the treatment of certain cardiac arrhythmias.

In 2001, the Company established a wholly owned German subsidiary, CryoCor GmbH, in order to market and support the Company's products in the European community. In 2002, the Company received European regulatory approval for the commercial sale of the Company's products. In November 2005, the Company announced its intention to close CryoCor GmbH and sell its products in Europe solely through European distributors. At present, the majority of the Company's revenues relate to sales to European customers. See Note 2 for further details on the closure of the subsidiary.

*Basis of Presentation*

We have prepared the accompanying unaudited consolidated financial statements in accordance with United States generally accepted accounting principles ("*GAAP*") for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X. Accordingly, they do not include all of the information and disclosures required by GAAP for complete financial statements. In the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a fair presentation have been included. Intercompany accounts have been eliminated in consolidation. Operating results for the three and nine months ended September 30, 2007 are not necessarily indicative of the results that may be expected for the year ending December 31, 2007. For further information see our financial statements and related disclosures thereto for the year ended December 31, 2006 in our Annual Report on Form 10-K filed on March 30, 2007 with the Securities and Exchange Commission ("*SEC*").

**Note 2. Balance Sheet Information**

*Cash and Cash Equivalents*

The Company considers all highly-liquid investments purchased with an original maturity of three months or less to be cash equivalents. As of September 30, 2007 and December 31, 2006, the Company's cash and cash equivalents were held in financial institutions in the United States and consist of deposits in money market funds, commercial paper, and corporate bonds, which were unrestricted as to withdrawal or use.

*Investment Securities*

Investment securities generally consist of high-grade auction rate securities, United States government debt securities, corporate debt securities and asset-backed securities. The Company classifies all securities as available-for-sale, as the sale of such securities may be required prior to maturity to implement management strategies. These securities are carried at fair value, with the unrealized gains and losses reported as a component of other comprehensive income (loss) until realized. Realized gains and losses from the sale of available-for-sale securities, if any, are determined on a specific identification basis. A decline in the market value below cost of any available-for-sale security that is determined to be other than temporary results in a revaluation of its carrying amount to fair value and an impairment charge to earnings, resulting in a new cost basis for the security. No such impairment charges were recorded for the periods presented.

Premiums and discounts are amortized or accreted over the life of the related security as an adjustment to yield using the straight-line method. The amortization and accretion, interest income and realized gains and losses are included in interest income within the Consolidated Statements of Operations. Interest income is recognized when earned.

6

Table of Contents

As of September 30, 2007 and December 31, 2006, the contractual maturity of all investment securities was less than one year. The composition of investments and gross unrealized gains and losses at September 30, 2007 and December 31, 2006 were as follows (in thousands):

|  | September 30, 2007 | | | December 31, 2006 | | |
| --- | --- | --- | --- | --- | --- | --- |
|  | Amortized Cost | Unrealized Gains | Unrealized Losses | Fair Value | Amortized Cost | Unrealized Gains | Unrealized Losses | Fair Value |
| Corporate debt securities | 10,531 | 29 | — | 10,560 | 12,735 | 6 | — | 12,741 |
| Asset-backed securities |  |  |  |  | 3,238 | — | — | 3,238 |
|  | $ 10,531 | $ 29 | $ — | $10,560 | $ 15,973 | $ 6 | $ — | $15,979 |

### Inventories

Inventories consist of the following (in thousands):

|  | September 30, 2007 | December 31, 2006 |
| --- | --- | --- |
| Raw materials | $ 556 | $ 612 |
| Work-in-progress | 96 | 38 |
| Finished goods | 312 | 208 |
|  | 964 | 858 |
| Less reserves for excess and obsolete inventories | (38) | (38) |
| Inventory, net | $ 926 | $ 820 |

### Restructuring Accrual

The Company recorded restructuring charges of $252,000 in connection with the closing of CryoCor GmbH during 2006 and $45,000 remains accrued on the balance sheet at September 30, 2007, primarily due to payments owed on the remaining term of the facility lease, which will run through June 2008. The Company has not incurred any additional restructuring costs in connection with the closing of CryoCor GmbH subsequent to September 30, 2006.

In January 2006, the Company received a "non-approvable" letter from the United States Food and Drug Administration ("FDA") related to its application for premarket approval ("PMA") for the treatment of right atrial flutter, a cardiac arrhythmia. As a result of that letter, the Company restructured its operations in early March 2006 whereby it reduced its staffing levels to reduce its monthly cash requirements. During 2006, the Company recorded severance expenses of $280,000 and sales and marketing contract termination expenses of $50,000 associated with the restructuring, all of which was paid during 2006. The Company's San Diego facilities were not impacted by the restructuring plan and all restructuring activities were substantially completed as of July 2006. In 2006, the Company amended its PMA, and in August 2007, the Company was notified by the FDA that its PMA for right atrial flutter had been approved.

### Long-Term and Short-Term Debt

In June 2007, the Company entered into a loan and security agreement (the "Loan Agreement") with Oxford Finance Corporation, ATEL Ventures, Inc. and Silicon Valley Bank (together, the "Lenders") that provides the Company with a $14,000,000 credit facility, as evidenced by secured promissory notes. The Company paid off its previous outstanding debt facility in full prior to entering into the Loan Agreement. The credit facility is available in two draws, with the first draw of $6,000,000 received in June 2007, and the second draw of $8,000,000 becoming available for borrowing by the Company after the occurrence of both of the following conditions: (i) approval is received from the FDA of the Company's application for pre-market approval for the treatment of right atrial flutter with the CryoCor Cardiac Cryoablation System which has occurred, and (ii) the Company receives unrestricted net cash proceeds of at least $20.0 million from the closing of an equity financing. Upon the applicable drawdown, the Company will make interest-only payments for the first nine months following each advance, and will then make principal payments to fully amortize the advance over the subsequent 30-month term (the "Term Loan"). The Term Loan bears interest at a rate of 11.77% per annum. The Loan Agreement provides that the credit facility is secured by the Company's assets, excluding intellectual property.

In connection with entering into the Loan Agreement, the Company issued warrants to the Lenders to purchase 93,697 shares of common stock at a price of $5.23 per share. The fair value of the warrants was $388,000 based on the stock price on the date of grant of $4.81 per common share, an expected life of ten years, an estimated volatility rate of 86%, and an estimated risk-free interest

Table of Contents

rate of 5.12%. The fair value of the warrants was recorded as a discount to the credit facility and is being amortized to interest expense on a straight-line basis over the 36-month term of the loan. The remaining unamortized fair value of the warrants is $356,000 at September 30, 2007. The warrants are exercisable through June 2017.

**Note 3. Share-Based Payments**

Total share-based compensation expense recognized in our consolidated statement of operations related to stock options granted to employees and non-employee directors was as follows (in thousands, except per share data):

|  | Three months ended September 30, 2007 | Three months ended September 30, 2006 | Nine months ended September 30, 2007 | Nine months ended September 30, 2006 |
|---|---|---|---|---|
| Share-based compensation costs included in: |  |  |  |  |
| Cost of revenue | $ 110 | $ 99 | $ 316 | $ 300 |
| Research and development | 152 | 130 | 442 | 359 |
| Selling, general, and administrative | 205 | 280 | 569 | 844 |
| Total share-based compensation costs | 467 | 509 | 1,327 | 1,503 |
| Income tax benefit recognized | — | — | — | — |
| Impact on net loss | $ 467 | $ 509 | $ 1,327 | $ 1,503 |
| Share-based compensation expense, per common share: |  |  |  |  |
| Basic and diluted | $ 0.04 | $ 0.05 | $ 0.11 | $ 0.14 |

We recognized share-based employee compensation expense of $592,000 and $349,000 under the provisions of the Financial Accounting Standards Board ("*FASB*") Statement of Financial Accounting Standard ("*SFAS*") No. 123 (revised 2004), *Share-Based Payment,* during the nine months ended September 30, 2007 and 2006, respectively, in addition to $735,000 and $1,154,000 in compensation expense recorded as required under Accounting Principles Board Opinion No. 25, *Accounting for Stock Issued to Employees*, and related interpretations during the nine months ended September 30, 2007 and 2006, respectively. Both of these amounts are included in the table above. Due to the Company's net operating losses, the Company did not realize any tax benefits for the tax deductions from share-based payment arrangements during the three and nine months ended September 30, 2007 and 2006.

As of September 30, 2007, $2.7 million of total unrecognized compensation cost related to unvested share-based compensation arrangements granted under the CryoCor 2000 Stock Option Plan, the 2005 Equity Incentive Plan and the 2005 Non-Employee Director Plan is expected to be recognized over a weighted-average period of 1.7 years.

Table of Contents

**Note 4. Net Loss per Common Share**

    Basic net loss per share attributable to common stockholders is calculated by dividing the net loss attributable to common stockholders by the weighted-average number of common shares outstanding for the period, without consideration for common stock equivalents. Diluted net loss per share attributable to common stockholders is computed by dividing the net loss attributable to common stockholders by the weighted-average number of common share equivalents outstanding for the period determined using the treasury-stock method. For purposes of this calculation, common stock subject to repurchase by the Company, stock options and warrants are considered to be common stock equivalents and are only included in the calculation of diluted net loss per share when their effect is dilutive.

|  | Three months ended September 30, | | Nine months ended September 30, | |
|---|---|---|---|---|
|  | 2007 | 2006 | 2007 | 2006 |
|  | (in thousands, except per share amounts) | | | |
| **Historical** | | | | |
| Numerator: | | | | |
| Net loss | $ (4,034) | $ (3,363) | $(11,405) | $(11,204) |
| Denominator: | | | | |
| Weighted-average common shares outstanding | 12,528 | 10,773 | 11,815 | 10,739 |
| Weighted-average unvested common shares subject to repurchase | (2) | (5) | (2) | (13) |
| Denominator for basic and diluted net loss per common share | 12,526 | 10,768 | 11,813 | 10,726 |
| Basic and diluted net loss per common share | $ (0.32) | $ (0.31) | $ (0.97) | $ (1.04) |
| **Historical outstanding anti-dilutive securities not included in diluted net loss per common share:** | | | | |
| Options to purchase common stock | 1,646 | 1,626 | 1,646 | 1,626 |
| Warrants to purchase common and convertible preferred stock | 756 | 83 | 756 | 83 |
|  | 2,402 | 1,709 | 2,402 | 1,709 |

**Note 5. Equity**

    In April 2007, the Company completed a private placement of its common stock, raising a total of $5.5 million. The Company issued 1,052,423 shares of common stock under the private placement, at a price of $5.14 per share, representing the closing bid on the Nasdaq Stock Market on the date the securities purchase agreement was signed. The investors in the transaction purchased warrants that are exercisable, in total, for 578,824 shares of common stock at an exercise price of $5.14 per share. The warrants were purchased by the investors at a price of $0.07 per warrant share and will be recorded as equity in accordance with the FASB's Emerging Issues Task Force Issue No. 00-19, *Accounting for Derivative Financial Instruments Indexed to, and Potentially Settled in, a Company's Own Stock*. The warrants will become exercisable six months after the issuance, and the warrants expire in April 2012.

    In June 2007, the Company entered into a series of agreements with Boston Scientific Corporation ("*BSC*") and Boston Scientific Scimed, Inc ("*BSS*"), including a common stock purchase agreement with BSS pursuant to which it sold to BSS 368,188 shares of its common stock for a total of $2.5 million. The purchase price of each share of common stock sold was $6.79. Pursuant to the common stock purchase agreement, a second purchase of shares of the Company's common stock for an aggregate purchase price of $2.5 million will take place within ten business days after the date, if any, that certain milestones specified in a related development and license agreement are achieved. The purchase price of each share of common stock to be sold in the second closing will be determined at the time of such closing based on the greater of (a) $2.53 and (b) the product of (i) the average closing sales price of the Company's common stock on the Nasdaq Stock Market for the 60 consecutive trading days prior to the second closing and (ii) 1.25.

**Note 6. Collaboration Agreement**

    In June 2007, the Company entered into a development and license agreement with BSC and BSS pursuant to which the Company may develop certain products and license to BSC intellectual property to permit BSC to commercialize certain products. The agreement provides for payments by BSC to the Company as consideration for the Company's performance of its development obligations and also provides for possible royalty payments by each party to the other party if certain elections are made. The Company will conduct development activities under the agreement pursuant to a development plan that sets forth a description of items to be provided, including specifications and requirements. In conjunction with signing the agreement, the Company

Table of Contents

received an advance payment of $500,000 against the development milestones, and may receive additional payments based upon the successful completion of the development milestones, and will receive royalty payments if either the balloon product or the console being developed under the development and license agreement are sold.

Per our revenue recognition policy, revenue from a milestone achievement is recognized when earned based on several criteria. If not earned, the milestone achievement is recognized over the remaining minimum period of our performance obligations under the agreement. Therefore, advance payments we receive in excess of amounts earned are classified as deferred revenues until earned. At September 30, 2007, $333,000 of the advance payment received from BSC remains deferred and will be recognized through March 31, 2008.

**Note 7. Recent Accounting Pronouncements**

In September 2006, the FASB issued SFAS No. 157, *Fair Value Measurements* ("*SFAS 157*"). SFAS 157 defines fair value, establishes a framework for measuring fair value in generally accepted accounting principles and expands disclosures about fair value measurements. This Statement applies only to fair value measurements that are already required or permitted by other accounting standards. Accordingly, this Statement does not require any new fair value measurements. SFAS 157 is effective for fiscal years beginning after December 15, 2007. The Company's adoption of SFAS 157 is not expected to have a material effect on its consolidated financial position or results of operations.

In February 2007, the FASB issued SFAS No. 159, *The Fair Value Option for Financial Assets and Financial Liabilities—Including an amendment of FASB Statement No. 115* ("*SFAS 159*"). SFAS 159 permits entities to choose to measure many financial instruments and certain other items at fair value. The objective is to improve financial reporting by providing entities with the opportunity to mitigate volatility in reported earnings caused by measuring related assets and liabilities differently without having to apply complex hedge accounting provisions. SFAS 159 is effective for fiscal years beginning after November 15, 2007. The Company's adoption of SFAS 159 is not expected to have a material effect on its consolidated financial position or results of operations.

In July 2006, the FASB issued Interpretation No. 48, *Accounting for Uncertainty in Income Taxes, an interpretation of FASB Statement No. 109* ("*FIN 48*"). FIN 48 prescribes a recognition threshold and measurement process for recording in the financial statements uncertain tax positions taken or expected to be taken in a tax return. Additionally, FIN 48 provides guidance on the derecognition, classification, accounting in interim periods and disclosure requirements for uncertain tax positions. The accounting provisions of FIN 48 became effective for the Company beginning January 1, 2007.

At December 31, 2006, the Company had $29.2 million in deferred tax assets. The deferred tax assets are primarily composed of federal and state tax net operating loss ("*NOL*") carryforwards and federal and state research and development ("*R&D*") credit carryforwards. Due to uncertainties surrounding the Company's ability to generate future taxable income to realize these assets, a full valuation allowance has been established to offset this amount. Additionally, utilization of the NOL and R&D credit carryforwards may be subject to a substantial annual limitation due to ownership changes that have occurred previously or that could occur in the future under Sections 382 and 383 of the Internal Revenue Code of 1986, as well as similar state provisions. These ownership changes may limit the amount of NOL and R&D credit carryforwards that can be utilized annually to offset future taxable income and tax, respectively. In general, an ownership change, as defined by Sections 382 and 383, results from transactions increasing the ownership of certain shareholders or public groups in the stock of a corporation by more than 50 percentage points over a three-year period. Since the Company's formation, the Company has raised capital through the issuance of capital stock on several occasions which, combined with the purchasing shareholders' subsequent disposition of those shares, may have resulted in a change of control, as defined by Sections 382 and 383, or could result in a change of control in the future upon subsequent disposition. The Company has not currently completed a study to assess whether a change in control has occurred or whether there have been multiple changes of control since the Company's formation due to the significant complexity and cost associated with such a study. If the Company experienced a change in control as defined by Section 382 at any time since the Company's formation, utilization of the NOL or R&D credit carryforwards would be subject to an annual limitation which is determined by first multiplying the value of the Company's stock at the time of the ownership change by the applicable long-term tax-exempt rate, and then could be subject to additional adjustments, as required. Any limitation may result in the expiration of a portion of the NOL or R&D credit carryforwards before utilization. Further, until a study is completed and any limitation determined, no amounts are being presented as an uncertain tax position under FIN 48. The Company believes that if a change of control occurred, the amount subject to limitation could be significant. Any amounts that the Company determines will expire prior to their utilization due to such limitations will be removed from deferred tax assets with a corresponding reduction of the valuation allowance.

Table of Contents

**Note 8. Litigation**

On October 18, 2007, CryoCath Technologies Inc. (*"CryoCath"*) initiated legal proceedings against the Company in the United States District Court in Delaware, seeking a declaration that the Company's cryoablation system infringes a number of CryoCath's United States issued patents. The Company believes that these allegations are without merit, and intends to vigorously defend its interests in these matters. The Company intends to file its response to these proceedings by December 5, 2007; however, a trial date for these proceedings has not been set. The Company expects that the resolution of these matters will not have a material adverse effect on its business, financial condition or results of operations. However, due to the uncertainties inherent in litigation, no assurance can be given as to the outcome of these proceedings.

11

Table of Contents

ITEM 2.        MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*The statements in this Form 10-Q that are not descriptions of historical facts may be forward-looking statements that are subject to risks and uncertainties. These include statements related to the timing for regulatory review and approvals, if any, for the CryoCor Cardiac Cryoablation System, or cryoablation system, in the United States for use in treating atrial fibrillation, or AF, the timing for when we will submit an application for premarket approval, or PMA, for AF, statements related to our pivotal trial for the treatment of AF, statements related to the recent United States Food and Drug Administration Advisory Panel meeting that we participated in, statements related to our restructuring, our plans for commercializing our products, the timing for product sales in the United States, our anticipated continuing net losses, the amount and timing of future spending to develop existing and new product candidates, including in connection with related clinical trials, post-market registry studies and PMA filings, if any, our expenses in connection with our litigation with CryoCath Technologies Inc. and the outcome of that litigation, and the period over which our existing cash reserves will be sufficient to fund our ongoing operations, all of which are prospective. Such statements are only predictions and reflect our expectations and assumptions as of the date of this Form 10-Q based on currently available operating, financial, and competitive information. The actual events or results may differ materially from those projected in such forward-looking statements due to a number of factors, including risks involved with our ability to obtain regulatory approval in the United States for our cryoablation system for use in treating AF, risks associated with our ability to submit a PMA for AF, risks associated with our ability to successfully commercialize our cryoablation system in the United States and elsewhere, risks associated with our dependence on patents and proprietary rights, risks associated with our protection and enforcement of our patents and proprietary rights, risks associated with the development or availability of competitive products or technologies, risks associated with our ability to obtain additional financing as necessary, and the other risks and uncertainties identified in the section of this Form 10-Q entitled "Risk Factors" and elsewhere in this Form 10-Q and in our other publicly available documents. These forward-looking statements speak only as of the date of this Form 10-Q. We expressly disclaim any intent or obligation to update any of these forward-looking statements after the filing of this Form 10-Q to reflect actual results, changes in our expectations, or otherwise. The following information should be read in conjunction with the consolidated financial statements and the notes thereto included in this Form 10-Q.*

*This Management's Discussion and Analysis of Financial Condition and Results of Operations should be read in conjunction with the consolidated financial statements, including related notes, appearing in the Form 10-K for the year ended December 31, 2006 filed with the Securities and Exchange Commission, or SEC, on March 30, 2007.*

**Overview**

We have developed and manufacture a minimally invasive system based on our proprietary cryoablation technology for the treatment of cardiac arrhythmias. Cardiac arrhythmias are dysfunctions in the electrical activity of the heart that normally controls and maintains the highly coordinated contractions of the heart. Arrhythmias cause the heart to pump blood less efficiently, cause potentially debilitating symptoms and can result in life threatening events such as stroke. We have focused our initial development efforts on designing a system for treating atrial fibrillation, or AF, and right atrial flutter, or AFL, the two most common and difficult to treat arrhythmias. AF is the most prevalent arrhythmia and AFL is the second most prevalent arrhythmia and can lead to, and often coexists with, AF.

In August 2007, we received approval of our application for premarket approval, or PMA, from the United States Food and Drug Administration, or FDA, for the treatment of AFL with our CryoCor Cardiac Cryoablation System, or cryoablation system. We are in the process of building our sales and marketing capabilities, and have recently hired a Vice President of Sales and Marketing, who will be leading these efforts. We began selling cryoablation catheters for the treatment of AFL in the United States in the fourth quarter of 2007.

In August 2007, we completed the enrollment of our pivotal trial for the treatment of AF and believe that we are the first company to complete the enrollment of a randomized pivotal trial for the treatment of AF. In September 2007, we were invited by the FDA to present our experience to an Advisory Panel convened by the FDA to discuss the status of atrial fibrillation pivotal trials. During this Advisory Panel, we discussed our experience in completing enrollment of the AF pivotal trial, and certain members of the Advisory Panel noted our successful efforts in completing enrollment in the pivotal trial. We believe this Advisory Panel was an important meeting as the Advisory Panel recommended to the FDA that it maintain the existing requirement for randomized clinical trial designs, and commented on the use of different methodologies for evaluating the success of ablation therapy, based upon current clinical practice. We believe that, in addition to those specified in the clinical trial protocol, the FDA will consider these different methodologies which we will present in our analysis of the results from our clinical trial. Based upon the anticipated time required to follow our patients subsequent to their cryoablation treatments, we anticipate that we will file a PMA for the treatment of AF in 2008, that this PMA will be reviewed by an Advisory Panel to the FDA and that a decision from the FDA on whether

12

Table of Contents

or not to approve our cryoablation system for the treatment of AF will be received in 2009. There can be no assurance that the FDA will determine to approve our cryoablation system for the treatment of AF.

In June 2007, we signed a development and license agreement with Boston Scientific Corporation, or BSC, and Boston Scientific Scimed, Inc., or BSS, under which we agreed to modify our existing console to run a cryoablation balloon catheter developed by BSC. Under the terms of a second separate agreement, BSS made an equity investment and will make development milestone payments if specified development milestones are achieved. We will receive royalties from BSC upon the commercial sales of the BSC balloon catheter and upon the sale of any consoles by BSC, if any such sales occur.

Our product, the cryoablation system, is designed to treat cardiac arrhythmias through the use of extreme cold, or cryoenergy, to ablate, or destroy, targeted cardiac cells. Unlike radiofrequency, or RF, and other heat-based ablation technologies, which can destroy both the targeted cardiac cells and the extracellular material that binds the cells together, cryoablation leaves the material surrounding the cardiac cells fully intact. As a result, cryoablation may reduce the occurrence and severity of complications observed with heat-based ablation technologies. Our cryoablation system utilizes our proprietary technology that allows it to generate, deliver and transfer high levels of cryoenergy enabling large lesion sizes, shorter procedure times and enhanced system versatility. We believe these advantages provide better therapeutic efficacy and give us a greater ability to treat the more complex arrhythmias, such as AF and AFL, than competing cryoablation technologies. We believe our cryoablation system eliminates or reduces many of the drawbacks and risks associated with surgical and other heat-based ablation procedures.

We are currently selling our products in the United States, where we have received FDA approval for the treatment of AFL, and in Europe, where we have been approved for the treatment of all supraventricular tachycardias, including AF and AFL. In the United States, we are commercializing with a direct CryoCor sales force, and are also evaluating a co-marketing relationship with a marketing partner. We have recently hired a Vice President of Sales and Marketing to lead our efforts to commercialize our product in the United States. However, our ability to build and install our planned base of cryoablation consoles and to hire the additional sales and support personnel necessary to support this installed base will be impacted by our available financial resources, and we may not hire additional sales and support personnel or make the capital expenditures necessary to achieve these objectives unless we are able to raise additional financing on satisfactory terms. We do not anticipate generating significant product revenues until we obtain FDA marketing approval of our cryoablation system for the treatment of AF. We market our cryoablation system in Europe through European distributors, and our products are sold in the United Kingdom, Germany, Denmark, Belgium, the Netherlands and Italy. In the near term, we do not intend to sign additional distribution agreements in Europe and we may never sign additional distribution agreements.

To date, we have generated minimal revenues and we have incurred net losses in each year since our inception. We expect these losses to continue as we complete our clinical trial activities and continue to develop our product candidates, and for at least the next several years after our commercial launch in the United States for the treatment of AFL. We have financed our operations primarily through private placements of common stock and preferred stock, convertible promissory notes, bank debt, and the proceeds of our initial public offering completed in July 2005, which raised aggregate net proceeds of $35.4 million. In addition, in April 2007, we completed a private placement of our common stock which raised aggregate gross proceeds of $5.5 million, and in June 2007, we sold $2.5 million in common stock to BSS.

*Financial Operations*

*Product Revenues.* Our product revenue through September 30, 2007 have come from a limited number of commercial sites in Europe. To date, we have not generated substantial revenues in Europe as our financial resources have primarily been dedicated to product development and clinical trials in the United States. This has prevented us from providing the resources necessary to broadly market our cryoablation system in Europe and from increasing the number of consoles placed in Europe. In October 2007, we began selling catheters for our cryoablation system in the United States for the treatment of AFL. We do not anticipate generating significant product revenues until we obtain FDA marketing approval of our cryoablation system for the treatment of AF. For the foreseeable future, we expect that any revenues we generate from sales of our products for the treatment of AFL will fluctuate from quarter-to-quarter.

*Research and Development Expenses.* Our research and development expenses primarily consist of costs incurred to further our research and development activities and include salaries and related employee benefits, including non-cash share-based compensation, costs associated with clinical trials, pre-clinical activities, regulatory activities, research-related overhead expenses, fees paid to external service providers and fees paid under contracts with research organizations, which conduct certain research and development activities on our behalf. We expense research and development costs as they are incurred.

13

Table of Contents

*Selling, General and Administrative Expenses.* Our selling, general and administrative expenses consist primarily of cash compensation and non-cash share-based compensation for executive, finance and administrative personnel. Other significant costs include professional fees for accounting and legal services, including legal services associated with our efforts to obtain and maintain protection for the intellectual property related to our cryoablation system. We anticipate that we will incur significant costs in the future related to our intellectual property litigation with CryoCath Technologies Inc., or CryoCath. We intend to increase our sales and marketing capabilities at a measured pace, which will also increase our selling expenses.

### Results of Operations

We anticipate that our results of operations will fluctuate for the foreseeable future due to several factors, such as the progress of our research and development efforts, the timing and outcome of regulatory submissions, and quarterly variations in sales activities and results. Due to these uncertainties, results of future operations are difficult to predict.

### Three months ended September 30, 2007 and 2006

*Product Revenue and Collaboration Revenue.* Product revenue decreased $168,000 to $46,000 for the three months ended September 30, 2007, compared to $214,000 for the three months ended September 30, 2006. The decrease was primarily due to the reduced sales activities in Europe associated with the restructuring and closure of our German subsidiary during 2006. Collaboration revenue increased to $167,000 for the three months ended September 30, 2007 from $0 for the three months ended September 30, 2006 due to the partial recognition of an advance payment received under our development and license agreement with BSC and BSS.

Deferred revenue increased from $78,000 at December 31, 2006 to $395,000 at September 30, 2007 due primarily to an advance payment of $500,000 received against development milestones under our development and license agreement with BSC and BSS, of which $333,000 remains deferred at September 30, 2007. We are recognizing the advance payment over the expected development period of the contract, and expect full recognition of the advance payment by March 31, 2008.

*Cost of Revenue.* Cost of revenue increased $141,000 to $683,000 for the three months ended September 30, 2007, compared to $542,000 for the three months ended September 30, 2006. The increase during the three months ended September 30, 2007 is primarily related to increased personnel costs of $107,000. Cost of revenue is high relative to the volume of product revenue due to the fixed costs associated with manufacturing our product. Included in cost of revenue for the three months ended September 30, 2007 and 2006 were non-cash share-based compensation of $110,000 and $103,000, respectively.

*Research and Development Expenses.* Research and development expenses increased $822,000 to $2.2 million for the three months ended September 30, 2007, compared to $1.4 million for the three months ended September 30, 2006. The increase was primarily related to the costs related to the efforts under the BSC/BSS development and license agreement and the Quantum development project of $145,000 and personnel costs of $378,000. In addition, we incurred increased non-cash share-based compensation of $47,000, and additional clinical and preclinical costs of $148,000. Included in research and development expenses for the three months ended September 30, 2007 and 2006 were non-cash share-based compensation of $178,000 and $131,000, respectively.

*Selling, General and Administrative Expenses.* Selling, general and administrative expenses decreased $297,000 to $1.4 million for the three months ended September 30, 2007, compared to $1.7 million for the three months ended September 30, 2006. The decrease was primarily due to non-recurring severance costs of $464,000 associated with our separation agreement with our former Chief Executive Officer during 2006, lower non-cash share-based compensation of $65,000 during the three months ended September 30, 2007, and non-recurring costs related to the closure of CryoCor GmbH in mid-2006 of $86,000. These decreases were partially offset by higher legal costs of $151,000 and costs associated with the initiation of our commercial launch of $154,000. Included in selling, general and administrative expenses for the three months ended September 30, 2007 and 2006 were non-cash share-based compensation of $225,000 and $290,000, respectively.

### Nine months ended September 30, 2007 and 2006

*Product Revenue and Collaboration Revenue.* Product revenue decreased $302,000 to $184,000 for the nine months ended September 30, 2007, compared to $486,000 for the nine months ended September 30, 2006. The decrease was due to the reduced sales activities in Europe associated with the restructuring and closure of our German subsidiary. Collaboration revenue increased to $167,000 for the nine months ended September 30, 2007 from $0 for the nine months ended September 30, 2006 due to the partial recognition of an advance payment received under our development and license agreement with BSC and BSS.

14

Table of Contents

Deferred revenue increased from $78,000 at December 31, 2006 to $395,000 at September 30, 2007 due to an advance payment of $500,000 received against development milestones under our development and license agreement with BSC and BSS, of which $333,000 remains deferred at September 30, 2007. We are recognizing the advance payment over the expected development period of the contract, and expect full recognition of the advance payment by March 31, 2008.

*Cost of Revenue.* Cost of revenue increased $110,000 to $2.0 million for the nine months ended September 30, 2007, compared to 1.9 million for the nine months ended September 30, 2006. These results are relatively comparable, period to period, and are high relative to the volume of product revenue due to the fixed costs associated with manufacturing our product. Included in cost of revenue for the nine months ended September 30, 2007 and 2006 were non-cash stock-based compensation of $324,000 and $304,000, respectively.

*Research and Development Expenses.* Research and development expense increased $1.4 million to $5.7 million for the nine months ended September 30, 2007, compared to $4.3 million for the nine months ended September 30, 2006. The increase in 2007 was primarily related to the costs associated with our FDA Advisory Panel meeting for our PMA for the treatment of AFL and related regulatory consulting of $257,000, costs related to our third-party clinical research organization of $324,000, the costs related to the research and development efforts under the BSC/BSS development and license agreement and the Quantum development project of $310,000, increased non-cash share-based compensation of $149,000, as well as increased compensation expense for bonus accruals related to our FDA Advisory Panel meeting and subsequent approval of our cryoablation system for the treatment of AFL and our employee retention program of $496,000. These increases were partially offset by lower clinical trials costs of $120,000 related to lower enrollment in our ongoing AF clinical trial than enrollment in the nine months ended September 30, 2006. Included in research and development expenses for the nine months ended September 30, 2007 and 2006 were non-cash share-based compensation of $511,000 and $362,000, respectively.

*Selling, General and Administrative Expenses.* Selling, general and administrative expenses decreased $1.6 million to $4.0 million for the nine months ended September 30, 2007, compared to $5.6 million for the nine months ended September 30, 2006. The decrease was primarily due to lower personnel costs, including severance, as a result of our staff restructuring in early 2006 of $821,000, lower operating costs associated with the closure of CryoCor GmbH in mid-2006 of $796,000, and lower non-cash share-based compensation of $231,000. These decreases were partially offset by higher legal costs of $242,000, recruiting costs associated with the search for our Vice President of Sales and Marketing of $111,000, as well as increased investor relation, audit, Sarbanes Oxley consulting and IT support of $183,000. Included in selling, general and administrative expenses for the nine months ended September 30, 2007 and 2006 were non-cash share-based compensation of $637,000 and $868,000, respectively.

**Liquidity and Capital Resources**

We have incurred losses since our inception in August 2000. As of September 30, 2007, we had an accumulated deficit of $96.4 million. We have funded our operations to date from proceeds of our initial public offering, private placements of equity, bank debt and debt securities for aggregate net cash proceeds of $105.3 million. These net proceeds include an April 2007 private placement of our common stock which raised gross proceeds of $5.5 million, as well as gross proceeds of $2.5 million from our sale of common stock to BSS in June 2007. In addition, BSC paid us an advance milestone payment of $500,000 under our development and license agreement, which is being recognized as revenue over the period time when we expect to complete our performance obligations under the agreement.

As of September 30, 2007, we had long-term and short-term debt outstanding of $6.0 million (excluding a debt discount related to the fair value of warrants issued in connection with this outstanding debt of $356,000), working capital of $13.4 million and cash, cash equivalents and short-term investments totaling $15.5 million. Our debt outstanding is under a new credit facility completed in June 2007, and in conjunction with the new facility, we paid off our previous debt facility of $7.0 million in full. Based upon our planned level of expenditures, we believe that our existing funds, including the expected collection of the remaining $4.0 million from our collaboration with Boston Scientific will be adequate to meet our anticipated cash requirements through 2008, and in order to continue to fund our operations beyond that date, we will need to seek additional financing.

*Net Cash Used in Operating Activities.* Net cash used in operating activities increased $917,000 to $10.7 million for the nine months ended September 30, 2007, compared to $9.8 million for the nine months ended September 30, 2006. The net cash used in both of these periods primarily reflects the net loss for each period, offset in part by depreciation and amortization, non-cash share-based compensation, amortization of debt discount and changes in operating assets and liabilities, including deferred revenue. Our operating losses have been within our expectations.

15

Table of Contents

*Net Cash Provided by Investing Activities.* Net cash provided by investing activities increased $1.6 million to $5.7 million for the nine months ended September 30, 2007, compared to $4.1 million for the nine months ended September 30, 2006. Cash provided by investing activities relates to purchases and maturities of short-term investments as well as purchases of property and equipment. The increase in net cash provided by investing activities for the nine months ended September 30, 2007 is primarily related to a higher level of maturities of short-term investments compared to the nine months ended September 30, 2006.

*Net Cash Provided by Financing Activities.* Net cash provided by financing activities increased $6.8 million to $6.9 million for the nine months ended September 30, 2007, compared to $90,000 for the nine months ended September 30, 2006. Net cash provided by financing activities during the nine months ended September 30, 2007 was primarily attributable to our private placement of common stock in April 2007, our June 2007 development and license agreement with BSC/BSS, under which BSS purchased shares of common stock, and our new June 2007 credit facility. These cash inflows were partially offset by the pay-off of our existing $7.0 million debt facility. During the nine months ended September 30, 2006, net cash provided by financing activities was primarily attributable to proceeds from the issuance of common stock related to awards granted under our equity incentive plans.

**Operating Capital and Capital Expenditure Requirements**

To date, we have had limited commercial sales in Europe and in the United States and we have not yet achieved profitability. In August 2007, we received FDA approval of our PMA for the treatment of AFL with our cryoablation system, and we began selling catheters for our cryoablation system in the United States for the treatment of AFL in October 2007. We anticipate that we will continue to incur net losses for the next several years as we continue to develop our products, continue our clinical programs, expand our corporate infrastructure and commercially launch our cryoablation system in the United States for the treatment of AF, if approved. We expect that we will need to generate significant product revenues to achieve profitability.

We do not expect to generate significant product revenues until we obtain FDA marketing approval of our cryoablation system for the treatment of AF. Even though the FDA recently approved our PMA for the treatment of AFL, we do not anticipate broadly commercializing our cryoablation system until we have secured additional financing on satisfactory terms. Our ability to build and install our planned base of cryoablation consoles and to hire the additional sales and support personnel necessary to support this installed base will be impacted by our available financial resources, and we may not hire additional sales and support personnel or make the capital expenditures necessary to achieve these objectives unless we are able to raise additional financing on satisfactory terms. Based upon our planned level of expenditures, we believe that our existing funds, including the expected collection of the remaining $4.0 million from our collaboration with Boston Scientific will be adequate to meet our anticipated cash requirements through 2008, and in order to continue to fund our operations beyond that date, we will need to seek additional financing. We expect to sell additional equity or debt securities or obtain an additional credit facility, or to access the additional funds available under our existing credit facility, to increase our financial resources. The sale of additional equity and convertible debt securities will result in additional dilution to our stockholders. If we raise additional funds through the issuance of convertible debt securities, these securities would have rights senior to those of our common stock and could contain covenants that would restrict our operations. We may require additional capital beyond our currently forecasted amounts. Any such required additional capital may not be available on reasonable terms, if at all. If we are unable to obtain additional financing, we may be required to reduce the scope of, delay or eliminate some or all of our planned clinical and commercial activities, and research and development efforts, or to cease operations.

As a condition to the FDA approving our PMA for AFL, we agreed to sponsor a post-market registry study of our cryoablation system. In this registry study, we will collect safety and effectiveness data over a one-year follow-up period on our cryoablation system for the treatment of AFL in 325 patients. We will also collect safety and effectiveness data over a one-year period on competing RF ablation systems for the treatment of AFL in 325 patients. The compliance requirements for a company sponsoring a registry study are less complex than a pre-market clinical study, and we believe that we will be able to collect the required safety and effectiveness data without significant difficulty. We anticipate that the cost of conducting the post-market registry study will be between $1.0 million and $1.5 million and will be incurred over a multi-year period. We intend to begin the registry study in the second quarter of 2008.

On February 21, 2006, we issued a press release announcing that we implemented a restructuring plan intended to reduce our burn rate and to permit us to finance ourselves with our then existing cash, cash equivalents and short-term investments until December 2007. The decision to implement a restructuring plan was in response to a communication that we received from the FDA informing us that our PMA for the treatment of AFL using our cryoablation system was not approvable at that time based on the data we submitted.

The restructuring plan included a reduction in our workforce which resulted in severance-related costs of $280,000, including benefits. We also incurred $50,000 in restructuring expense associated with terminating various sales and marketing associated contracts. In total, we incurred $330,000 in costs associated with the restructuring plan, which was completed during July 2006.

16

Table of Contents

In August 2006, we created an incentive compensation program for our non-executive full-time employees. Under the terms of the program, employees that remained with the Company through August 31, 2007 would receive a payment of 20% of their 2006 annual salary. The incentive payments and related employer taxes and fees were paid on August 31, 2007 and totaled $520,000. We have continued this program through 2008, and anticipate making payments of 5% of annual salary in December 2007, and an additional 15% of their existing annual salaries in 2008; however, we are evaluating the circumstances and criteria under which the employees would be eligible to receive this 15% payment in 2008. Additionally, at the end of August 2006, we did not extend our employment agreement with our former Chief Executive Officer, Gregory Ayers. Under the terms of his employment agreement, he received separation compensation of one year's salary, or $450,000, over the 12 months subsequent to his departure. As of September 30, 2007, all of the amounts due have been paid.

At present, we have a wholly owned subsidiary in Germany that previously sold our products in Germany, Belgium, and the Netherlands. We discontinued the activities of this subsidiary in 2006 and are currently pursuing the dissolution of this subsidiary. We incurred restructuring charges of $252,000 in conjunction with the closing of our subsidiary, of which $45,000 remains accrued at September 30, 2007. We have signed distribution agreements for the sale of our cryoablation system in the United Kingdom and Italy, and our United Kingdom distributor supports our customers in Germany, Belgium, Denmark and the Netherlands. In the near term, we do not intend to sign additional distribution agreements in Europe and we may never sign additional distribution agreements. In the United States, we are commercializing with a direct CryoCor sales force, and are also evaluating a co-marketing relationship with a marketing partner. We have recently hired a Vice President of Sales and Marketing to lead our efforts to commercialize our product in the United States. However, our ability to build and install our planned base of cryoablation consoles and to hire the additional sales and support personnel necessary to support this installed base will be impacted by our available financial resources, and we may not hire additional sales and support personnel or make the capital expenditures necessary to achieve these objectives unless we are able to raise additional financing on satisfactory terms. Even though the FDA recently approved our PMA for the treatment of AFL and we have begun selling our cryoablation system in the United States for the treatment of AFL, we do not anticipate generating significant product revenues until we obtain FDA marketing approval of our cryoablation system for the treatment of AF.

We anticipate spending at least $2.4 million in external costs during the remainder of 2007 and 2008 for existing clinical trials and regulatory activities related to using our cryoablation system to treat AFL and AF, and an anticipated clinical trial for our next generation catheter, Quantum. In addition, we anticipate spending an additional $1.0 million—$1.5 million on the registry study required by the FDA as a condition for approval for our cryoablation system for the treatment of AFL. We believe the total costs for our existing clinical trials for AFL and AF, excluding the registry study, and the development of our existing product candidates will require approximately $8.8 million during the remainder of 2007 and 2008, with our remaining cash and cash equivalents being used to prosecute and maintain our intellectual property portfolio, including in connection with our litigation with CryoCath, to fund our facility, manufacturing and quality system operations and to fund our working capital and general corporate requirements during this same period.

We have filed requests with the United States Patent and Trademark Office, or USPTO, seeking to invoke interference proceedings involving two patents owned by CryoCath and two of our patent applications to determine who first invented certain primary and pre-cooling refrigeration system designs and certain heat exchanger designs. During 2006, the USPTO agreed to reissue a patent licensed from CryoGen that we consider to be important to our efforts to invoke interference proceedings. To date, the USPTO has not invoked interference proceedings. If interference proceedings are invoked and we are not successful in these proceedings, we could fail to get rights to certain patent claims. Although we do not believe this finding would be material to our ability to operate, we believe an award of these rights to us may have a material effect on CryoCath's ability to compete with us in the United States. We may incur substantial costs in pursuit of these proceedings.

On October 18, 2007, CryoCath initiated legal proceedings against us in the United States District Court in Delaware, seeking a declaration that the Company's cryoablation system infringes a number of CryoCath's United States issued patents. The Company believes that these allegations are without merit, and intends to vigorously defend its interests in these matters. The Company intends to file its response to these proceedings by December 5, 2007, however, a trial date for these proceedings has not been set. We expect to incur significant legal costs defending our interests in these matters, and we may incur additional legal costs based on our intellectual property strategy. These legal costs, and the impact on our current cash resources, may require us to seek additional debt or equity financing earlier than we had anticipated.

Our forecasts of the period of time through which our financial resources will be adequate to support our operations and the costs to complete clinical trials, post-market registry studies and development of products, as well as to engage in our litigation with CryoCath, are forward-looking statements and involve risks and uncertainties, and actual results could vary as a result of a number of factors, including the factors discussed in the "Risk Factors" section of this Form 10-Q, and in our other securities filings filed with the Securities and Exchange Commission, or SEC. We have based these estimates on assumptions that may prove to be wrong, and we may be required to utilize our available capital resources sooner than we currently expect.

17

Table of Contents

Our future funding requirements will depend on many factors, including, but not limited to:

- the commercial acceptance of our product in the United States, including after we initiate sales efforts targeting AF, if ever;

- the costs of establishing sales, marketing and distribution capabilities;

- the costs of filing, prosecuting, and maintaining our owned and licensed patent applications and patents, and defending and enforcing these patents and other intellectual property rights, including in connection with our litigation with CryoCath;

- our ability to obtain FDA approval for the treatment of AF or other regulatory approval for our products;

- the scope, rate of progress and cost of our clinical trials and other research and development activities;

- the costs and timing of seeking regulatory approvals, including participation in FDA advisory panel meetings and performing any required additional studies or trials;

- clinical trial results;

- acceptance by the FDA of our clinical trial design and data to support applications for marketing approval of the desired indications;

- the extent and level of reimbursement for cryoablation;

- the effect of competing products and technologies; and

- the terms and timing of any collaborative, licensing and other arrangements that we may establish.

Future capital requirements will also depend on the extent to which we acquire or invest in other businesses, products and technologies, but, other than our development and license agreement with BSC and BSS, we currently have no commitments or agreements relating to any of these types of transactions.

We have service agreements with clinical sites, individuals and institutional research organizations for the conduct of our AF pivotal trial. We make payments to these sites and organizations based upon the actual number of patients enrolled and the period of follow-up in the trials, and we have accrued approximately $652,000 in fees and expenses through September 30, 2007 in connection with our AF pivotal trial. We do not have minimum payment obligations under these agreements and the amount to be paid to each center and the timing of those payments will vary based on the negotiated amount paid for each patient to be treated and for each patient screened who fails to participate in the clinical trial. We anticipate that the external cash outlay of completing our AF pivotal trial and submitting a PMA for the treatment of AF with our cryoablation system will be approximately $1.7 million during the remainder of 2007 and 2008. However, due to the variability associated with these agreements and the timing of patient enrollment, we are unable to estimate with certainty the future patient enrollment costs we will incur. In addition to the $1.7 million in external cash outlay, we expect to incur additional expenses in connection with the preparation of our regulatory filings, including costs associated with employees and consultants, as well as related legal expenses.

We have agreed to cover the treatment costs for certain patients in our AF pivotal trial who are either not insured, or who are insured but were declined coverage by their insurance company for the costs associated with our procedure. As of September 30, 2007, we have agreed to cover the treatment costs for 11 patients at an estimated cost of approximately $210,000, of which $155,000 remains unpaid and is therefore included in the accrued clinical development liabilities on our balance sheet at September 30, 2007. We anticipate that up to 10 additional patients may be declined for insurance coverage, and for whom we would pay the treatment costs. We project that if we cover these costs, the additional estimated cost of treatment would be $15,000 to $35,000 each. The total estimated costs for covering the costs of these treatments are included in our estimated $1.7 million above.

**Critical Accounting Policies and Significant Judgments and Estimates**

Our Management's Discussion and Analysis of Financial Condition and Results of Operations is based on our consolidated financial statements, which have been prepared in accordance with United States generally accepted accounting principles. The preparation of these financial statements requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the financial statements as well as the reported revenues and expenses during the reporting periods. On an ongoing basis, we evaluate our estimates and judgments. We base our estimates on historical experience and on various other factors that we believe are reasonable under the circumstances, the results of which form the basis for making judgments about the carrying value of assets and liabilities that are not readily apparent from other sources. Actual results may differ from these estimates under different assumptions or conditions.

18

Table of Contents

We believe that the following accounting policies and estimates are most critical to a full understanding and evaluation of our reported financial results.

### Revenue Recognition

We comply with SEC Staff Accounting Bulletin No. 104, *Revenue Recognition in Financial Statements*, or SAB 104, and the Financial Accounting Standards Board, or FASB, Statement of Financial Accounting Standards No. 48, or SFAS 48, *Revenue Recognition When Right of Return Exists*. SAB 104 and SFAS 48 set forth guidelines on the timing of revenue recognition based upon factors such as passage of title, installation, payment terms and ability to return products. We recognize revenue when all of the following criteria are met: (i) persuasive evidence that an arrangement exists; (ii) delivery of the products and/or services has occurred; (iii) the selling price is fixed or determinable; (iv) collectibility is reasonably assured; and (v) the ability to return the product has expired.

Historically, customers had the right to return products until one month following the expiration date of the product, which had been six months after its production. Effective October 1, 2006, our products now expire one year after production and we modified our return policy such that we will no longer grant a right to return products upon expiration of the one year product life. As we have had limited sales of our products, we currently recognize revenues when the customer has paid for the product and, if applicable, the right of return, if any, has expired.

As we begin selling our products in the United States for the treatment of AFL and if they gain market acceptance and our sales volumes increase, we will monitor our shipments, returns, maintenance costs and bad debts. Eventually, we anticipate recording revenues upon shipment, accruing estimated warranty costs and estimated returns as a reduction of revenue upon shipment and accruing bad debts as a selling, general and administrative cost.

Revenue from a milestone achievement is recognized when earned, as evidenced by acknowledgment from our collaborator, provided that (i) the milestone event is substantive and its achievability was not reasonably assured at the inception of the agreement, (ii) the milestone represents the culmination of an earnings process, (iii) the milestone payment is non-refundable and (iv) our performance obligations after the milestone achievement will continue to be funded by our collaborator at a level comparable to the level before the milestone achievement. If all of these criteria are not met, the milestone achievement is recognized over the remaining minimum period of our performance obligations under the agreement. We defer non-refundable upfront fees under our collaborations and recognize them over the period in which we have significant involvement or perform services, using various factors specific to each collaboration. Amounts we receive for research funding for a specified number of full-time researchers are recognized as revenue as the services are performed. Advance payments we receive in excess of amounts earned are classified as deferred revenues until earned.

### Clinical Trial Expenses

Clinical trial costs are a component of research and development expenses and include fees paid to participating hospitals and other service providers which conduct clinical trial activities with patients on our behalf. The various costs of the trial are contractually based on the nature of the service and we accrue the costs as the services to the patient are provided.

### Share-Based Payments

We have four share-based compensation plans consisting of three stock option programs and an employee stock purchase plan. As a result of adopting the FASB's Statement of Financial Accounting Standards No. 123 (revised 2004), *Share-Based Payment*, or SFAS 123(R), on January 1, 2006, we recognized share-based employee and non-employee director compensation expense of $592,000 and $349,000 during the nine months ended September 30, 2007 and 2006, respectively, in addition to $735,000 and $1,154,000 in compensation expense recorded as required under Accounting Principles Board Opinion No. 25, *Accounting for Stock Issued to Employees*, during the nine months ended September 30, 2007 and 2006, respectively. We calculated this expense based on the fair values of the share-based compensation awards as estimated using the Black-Scholes option valuation model. Use of this model requires us to make assumptions about expected future volatility of our stock price and the expected term of the stock options that we grant. Calculating share-based compensation expense under SFAS 123(R) also requires us to make assumptions about expected future forfeiture rates for our stock option awards. As of September 30, 2007, total unrecognized compensation expense related to unvested share-based compensation arrangements already granted under our various plans was $2.7 million, which we expect will be recognized over a weighted-average period of 1.7 years. However, it is difficult to predict the actual amount of share-based compensation expense that we will recognize in future periods because that expense can be affected by changes in the amount or terms of our share-based compensation awards issued in the future, changes in the assumptions used in our model to value those future awards, changes in our stock price, and changes in interest rates, among other factors.

Table of Contents

**Recent Accounting Pronouncements**

In September 2006, the FASB issued SFAS No. 157, *Fair Value Measurements* (*"SFAS 157"*). SFAS 157 defines fair value, establishes a framework for measuring fair value in generally accepted accounting principles and expands disclosures about fair value measurements. This Statement applies only to fair value measurements that are already required or permitted by other accounting standards. Accordingly, this Statement does not require any new fair value measurements. SFAS 157 is effective for fiscal years beginning after December 15, 2007. The Company's adoption of SFAS 157 is not expected to have a material effect on its consolidated financial position or results of operations.

In February 2007, the FASB issued Statement of Financial Accounting Standards No. 159, *The Fair Value Option for Financial Assets and Financial Liabilities—Including an amendment of FASB Statement No. 115*, or SFAS 159. SFAS 159 permits entities to choose to measure many financial instruments and certain other items at fair value. The objective is to improve financial reporting by providing entities with the opportunity to mitigate volatility in reported earnings caused by measuring related assets and liabilities differently without having to apply complex hedge accounting provisions. SFAS 159 is effective for fiscal years beginning after November 15, 2007. Our adoption of SFAS 159 is not expected to have a material effect on its consolidated financial position or results of operations.

In July 2006, the FASB issued Interpretation No. 48, *Accounting for Uncertainty in Income Taxes*, or FIN 48. FIN 48 prescribes a recognition threshold and measurement process for recording in the financial statements uncertain tax positions taken or expected to be taken in a tax return. Additionally, FIN 48 provides guidance on the derecognition, classification, accounting in interim periods and disclosure requirements for uncertain tax positions. The provisions of FIN 48 are effective for fiscal years beginning after December 15, 2006, with the cumulative effect of the change in accounting principle recorded as an adjustment to retained earnings. We have adopted FIN 48 as of January 1, 2007, and compliance with this guidance did not have a significant impact on our results of operations or financial position.

### ITEM 3.     QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

The primary objective of our investment activities is to preserve our capital for the purpose of funding operations while at the same time maximizing the income we receive from our investments without significantly increasing risk. To achieve these objectives, our investment policy allows us to maintain a portfolio of cash equivalents and short-term investments in a variety of securities, including money market funds, corporate debt securities and asset-backed securities. Due to the short-term nature of our investments, we currently believe that we have no material exposure to interest rate risk.

We have some activities in foreign currencies, principally our commercial efforts in Europe, which are denominated in euros and British pound sterling. We do not currently use derivative financial instruments to mitigate this exposure. We do not expect fluctuations in foreign exchange rates to have a material impact on our financial condition or results of operations.

### ITEM 4.     CONTROLS AND PROCEDURES

**Evaluation of Disclosure Controls and Procedures**

Regulations under the Securities Exchange Act of 1934, or the Exchange Act, require public companies to maintain *"disclosure controls and procedures"* which are defined to mean a company's controls and other procedures that are designed to ensure that information required to be disclosed in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms. CryoCor's management, including our Chief Executive Officer, who is our principal executive officer, and our Chief Financial Officer, who is our principal financial officer, conducted an evaluation as of the end of the period covered by this report of the effectiveness of our disclosure controls and procedures. Based on their evaluation, our Chief Executive Officer and our Chief Financial Officer concluded that our disclosure controls and procedures were effective for this purpose.

**Changes in Internal Control over Financial Reporting**

Our Chief Executive Officer and our Chief Financial Officer have determined that there were no changes in our internal controls over financial reporting during our most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Limitation on Effectiveness of Controls**

It should be noted that any system of controls, however well designed and operated, can provide only reasonable and not absolute assurance that the objectives of the system are met. The design of any control system is based, in part, upon the benefits of the control system relative to its cost. Control systems can be circumvented by the individual acts of some persons, by collusion of two or more people, or by management override of the control. In addition, over time, controls may become inadequate because

Table of Contents

of changes in conditions, or the degree of compliance with the policies or procedures may deteriorate. Because of these and other inherent limitations of control systems, there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions, regardless of how remote.

## PART II—OTHER INFORMATION

### ITEM 1.     LEGAL PROCEEDINGS

On October 18, 2007, CryoCath initiated legal proceedings against us in the United States District Court in Delaware, seeking a declaration that the Company's cryoablation system infringes a number of CryoCath's United States issued patents. The Company believes that these allegations are without merit, and intends to vigorously defend its interests in these matters. The Company intends to file its response to these proceedings by December 5, 2007, however, a trial date for these proceedings has not been set. We expect to incur significant legal costs defending our interests in these matters, and we may incur additional legal costs based on our intellectual property strategy. These legal costs, and the impact on our current cash resources, may require us to seek additional debt or equity financing earlier than we had anticipated.

We are also involved in interference proceedings previously described under the heading *"Legal Proceedings"* in our Form 10-K for the period ending December 31, 2006, filed with the SEC on March 30, 2007.

### ITEM 1A.     RISK FACTORS

*Except for the historical information contained herein, this Form 10-Q contains forward-looking statements that involve risks and uncertainties. Our actual results may differ materially from those discussed here. Factors that could cause or contribute to differences in our actual results include those discussed in the following section, as well as those discussed in Part I, Item 2 entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations" and elsewhere throughout this Form 10-Q. You should consider carefully the following risk factors, together with all of the other information included in this Form 10-Q. Each of these risk factors could adversely affect our business, operating results and financial condition, as well as adversely affect the value of an investment in our common stock.*

*\*The Company has marked with an asterisk those risk factors that reflect changes from the risk factors included in the Company's Annual Report on Form 10-K filed with the SEC.*

**\*We will need substantial additional funding to continue our operations and may be unable to raise capital when needed, or at all, which would force us to delay, curtail or eliminate our clinical programs or product development programs.**

We will need to raise substantial additional capital to:

- increase our commercialization activities for our products in the United States;

- fund our operations and clinical trials;

- continue our research and development;

- enforce our proprietary rights including the interference request we filed with the USPTO; and

- defend, in litigation or otherwise, any claims that we infringe third party patents or other intellectual property rights, including in connection with our litigation with CryoCath.

We believe that our cash, cash equivalents and short-term investment balances including the expected collection of the remaining $4.0 million from the Boston Scientific collaboration will be sufficient to meet our planned cash requirements through 2008. However, our future funding requirements will depend on many factors, including but not limited to:

- the commercial acceptance of our product in the United States, including after we initiate sales efforts targeting AF, if ever;

- the costs of establishing sales, marketing and distribution capabilities;

- the costs of filing, prosecuting, and maintaining our owned and licensed patent applications and patents, and defending and enforcing these patents and other intellectual property rights, including in connection with our litigation with CryoCath;

- our ability to obtain FDA approval for AF or other regulatory approval for our products;

- the scope, rate of progress and cost of our clinical trials and other research and development activities;

- the costs and timing of seeking regulatory approvals, including participation in FDA advisory panel meetings and performing any required additional studies or trials;

- clinical trial results;

21

Table of Contents

- acceptance by the FDA of our clinical trial design and data to support marketing approval for the desired indications;

- the extent and level of reimbursement for cryoablation;

- the effect of competing products and technologies; and

- the terms and timing of any collaborative, licensing and other arrangements that we may establish.

Until we can generate sufficient product revenue, which may never occur, we expect to finance our future cash needs through public or private equity offerings, debt financings or corporate collaboration and licensing arrangements. If we raise additional funds by issuing equity securities, our stockholders may experience dilution. Debt financing, if available, may involve restrictive covenants, and we may not meet the conditions required to access the additional funding under our existing credit facility, specifically, that we raise an additional $20 million in equity capital prior to December 31, 2007. Examples of such restrictive covenants, all of which we are subject to under our current loan agreement, include limitations on our ability to incur additional debt or liens on any of our assets, dispose of our property, make dividend payments or distributions to our stockholders or enter into transactions that would result in a change in control of us. The terms of any additional debt or equity financing may not be favorable to us or our stockholders. If we raise additional funds through collaboration and licensing arrangements with third parties, it may be necessary to relinquish some rights to our technologies or our product candidates or grant licenses on terms that are not favorable to us. If we are unable to raise adequate funds, we may have to liquidate some or all of our assets or delay, reduce the scope of or eliminate some or all of our clinical or product development programs or commercialization efforts, which may harm our business, financial condition, results of operations and future growth prospects.

***We may not be able to fund our existing capital needs.***

Although we recently completed a series of transactions, including a private placement of common stock that brought in gross proceeds of $5.5 million in April 2007, a restructuring of our debt in June 2007, the receipt of gross proceeds of $2.5 million from BSS in June 2007 in connection with the purchase of shares of our common stock, and the receipt of an advance payment against development milestones from BSC under the related development and license agreement, there can be no assurance that we will be able to obtain additional funds on satisfactory terms, or at all, to fund our operations beyond when our existing cash resources will have been expended. If we cannot obtain sufficient additional financing over the next 12 to 15 months, we may be forced to restructure or significantly curtail our operations, file for bankruptcy or cease operations. The consolidated financial statements do not include any adjustments relating to the recoverability and classification of recorded asset amounts or amounts and classification of liabilities that might be necessary should we be forced to take any such actions.

***We have a limited operating history, have a history of operating losses, expect to continue to incur losses and may never become profitable.***

We have a limited operating history and have only recently received approval from the FDA to commercialize our product in the United States for the treatment of AFL. Even though we have received approval to commercialize our product for the treatment of AFL, we will not hire the additional personnel or make the capital expenditures that are necessary to broadly commercialize our cryoablation unless we are able to raise additional financing on satisfactory terms. We do not anticipate generating significant product revenues until we obtain FDA marketing approval of our cryoablation system for the treatment of AF and our product candidates may require additional development, clinical trials, regulatory clearances or approvals by the FDA if they are to be commercially accepted. There can be no assurance that we will be able to raise the additional capital needed to broadly commercialize our system for the treatment of AFL, and we may never broadly commercialize our system for the treatment of AFL.

As of September 30, 2007, we had an accumulated deficit of $96.4 million. We have incurred net losses in each year since our inception in August 2000, including net losses of $15.1 million, $17.1 million, and $15.8 million for the years ended December 31, 2006, 2005, and 2004, respectively as well as a net loss of $11.4 million for the nine months ended September 30, 2007. We expect to continue to incur significant and increasing operating losses, in the aggregate and on a per share basis, for the next several years. These losses, among other things, have had and will continue to have an adverse effect on our stockholders' equity, net current assets and working capital. Because of the risks and uncertainties associated with developing medical devices, we are unable to predict the extent of any future losses or when we will become profitable, if at all.

We expect that our primary expenses for the next 24 months will be costs for conducting our clinical trial for AF, costs to be incurred related to our development and license agreement with BSC, costs associated with preparing our PMA for AF, other costs associated with new product development, costs associated with our intellectual property strategy and current litigation, and

22

Table of Contents

costs associated with our post-market registry studies for AFL. If we are able to secure additional financing, we expect that we would also incur increased costs for commercializing our product in the United States for the treatment of AFL. We expect that our general and administrative and legal costs will continue to increase due to the additional operational and regulatory burdens applicable to public companies. In addition, we anticipate that the interference we have filed with the USPTO will be declared in 2007 and substantial financial resources will be required to support this action, and to support our ongoing patent infringement litigation with CryoCath. If we receive FDA marketing approval of our cryoablation system for AF and we are able to secure additional financing, we expect to incur significantly increased sales, marketing, manufacturing, and compliance expenses. We do not currently have the required approval to market our cryoablation system in the United States for the treatment of AF and we may not receive this approval. We may not become profitable even if we obtain FDA approval for AF and succeed in commercializing our cryoablation system in the United States. As a result, we cannot be sure when we will become profitable, if at all.

*We may need to engage in costly patent litigation against our competitors, which may harm our business, financial condition, results of operations and cash flow.*

The medical device industry is characterized by a large number of patents, patent filings and frequent litigation based on allegations of patent infringement. For example, on October 18, 2007, CryoCath initiated legal proceedings against us in the United States District Court in Delaware, seeking a declaration that our cryoablation system infringes a number of CryoCath's United States issued patents. Additionally, competitors may have filed applications for or have been issued patents and may obtain additional patents and proprietary rights related to products or processes that we compete with or are similar to ours. We may not be aware of all of the patents potentially adverse to our interests that may have been issued to others. Based on the litigious nature of the medical device industry and the fact that we may pose a competitive threat to some companies who own or control various patents, we believe that as we begin to engage in and continue on with commercialization activities in the United States, there is a significant risk that one or more third parties, in addition to CryoCath, will assert a patent infringement claim, as CryoCath already has, against the manufacture, use or sale of our cryoablation system. The CryoCath lawsuit seeks damages from CryoCor and an injunction that would prevent us from selling our cryoablation system, and will be expensive to defend. Any other similar lawsuit could also seek to prevent us from commercializing our cryoablation system or enjoin us from selling it, may seek damages from us, and would likely be expensive for us to defend against. We cannot predict if or when any third party patent holder, in addition to CryoCath, will file suit for patent infringement. We can provide no assurance as to the outcome of the CryoCath litigation.

The outcome of patent litigation is subject to substantial uncertainties, especially in medical device-related patent cases that may, for example, turn on the interpretation of claim language by the court which may not be to our advantage and also the testimony of experts as to technical facts upon which experts may reasonably disagree. Our involvement in the CryoCath patent litigation will, and our involvement in other patent litigation could, result in significant expense. Some of our competitors have considerable resources

available to them and a strong economic incentive to undertake substantial efforts to stop or delay us from bringing our cryoablation system to market and achieving market acceptance. We, on the other hand, are an early stage company with comparatively few resources available to us to engage in costly and protracted litigation. Moreover, regardless of the outcome, patent litigation against us or by us, including the CryoCath litigation, could significantly disrupt our development and commercialization efforts, divert our management's attention and quickly consume our financial resources.

In addition, if third parties file patent applications or are issued patents claiming technology also claimed by us in pending applications, we may be required to participate in interference proceedings with the USPTO or in other proceedings outside the United States, including oppositions, to determine priority of invention or patentability. For example, we have filed requests with the USPTO seeking to invoke an interference proceeding involving certain patents owned by CryoCath. If we are not successful in this proceeding, this proceeding could result in us failing to gain rights to certain patent claims. Even if we are successful, we may incur substantial costs and the time and attention of our management and scientific personnel will be diverted in pursuit of these proceedings.

In the event that we are found to infringe any valid claim in a patent held by a third party, including in connection with the CryoCath litigation, we may, among other things, be required to:

- pay actual damages, plus increased damages up to triple the actual damages and the other party's attorneys' fees, which may be substantial;

- obtain licenses to the infringed intellectual property, which may not be available to us on acceptable terms, or at all;

- cease the development, manufacture, use and/or sale of products that infringe the patent rights of others through a court-imposed sanction called an injunction;

Table of Contents

- expend significant resources to redesign our technology so that it does not infringe others' patent rights, or to develop or acquire non-infringing technology, which may not be possible; and/or

- discontinue manufacturing or other processes incorporating infringing technology.

If we need to redesign our products to avoid third party patents, we may suffer significant regulatory delays associated with conducting additional studies or submitting technical, manufacturing or other information related to any redesigned product and, ultimately, in obtaining approval. Further, any such redesigns may result in less effective and/or less commercially desirable products.

Additionally, any involvement of us in litigation in which we are accused of infringement, including the CryoCath litigation, may result in negative publicity about us or our cryoablation system, injure our relations with any then-current or prospective customers and cause delays in the commercialization of our cryoablation system.

***We may never receive additional milestone payments or equity investments from BSC or BSS.***

Under our development and license agreement with BSC, we are responsible for modifying our existing cryoablation console to meet certain technical specifications of BSC. Even if we are able to make the requested modifications which meet the required technical specifications, it is possible that BSC may determine, in its sole judgment, that it does not wish to continue under the development and license agreement, which would mean that we would not receive any additional milestone payments or equity investments, and it is possible that we may have to refund to BSC a portion of the initial milestone payment received, if we are not able to demonstrate that we have incurred costs comparable to the initial milestone payment. A decision by BSC to discontinue the development and license agreement would harm our business. Additionally, even if we are successful in modifying our cryoablation console to meet BSC's technical specifications, and we receive all payments as required under the development and license agreement and common stock purchase agreement, there can be no assurance that our decision to collaborate with BSC will result in any future royalty payments, and there can be no assurance that we will receive any other benefits, commercial or financial, under our development and license agreement with BSC.

***We are dependent on the success of our cryoablation system, which to date has only been approved by the FDA for the treatment of AFL in the United States. If we are unable to achieve our product development goals, gain FDA approval to commercialize our cryoablation system in the United States for the treatment of AF, or experience significant delays in doing so, our stock price may decline and we may be forced to cease operations.***

We have expended significant time, money and effort in the development of our cryoablation system, which to date has only received FDA approval for the treatment of AFL. Our cryoablation system is still in clinical testing for the treatment of AF, has not yet received FDA approval for the treatment of AF and may never be commercialized in the United States for the treatment of AF. We do not anticipate generating significant product revenues until we obtain FDA marketing approval of our cryoablation system for the treatment of AF. In our public announcements, we have provided estimates for the timing of the accomplishment of various clinical, regulatory and other product development goals relating to our cryoablation system, which we sometimes refer to as milestones. These milestones include the submission of data from our clinical trials to the FDA, the timing of FDA approval for our cryoablation system and other clinical and regulatory events. These estimates are based on a variety of assumptions. The actual timing of these milestones can vary dramatically compared to our estimates, in some cases for reasons beyond our control, and we may never achieve some or all of these milestones. For example, in January 2006, the FDA informed us that our PMA for the treatment of AFL was not approvable based on the data we had submitted. In response, we amended our PMA based upon a different analysis of chronic effectiveness, and the FDA has recently decided to approve our PMA for the treatment of AFL. If we do not meet our estimated milestones as publicly disclosed for AF, our business may be harmed and our stock price may decline. If our cryoablation system is not approved by the FDA for the treatment of AF, or if our cryoablation system is not commercially accepted for the treatment of AFL or AF, we may be forced to cease operations.

We will need separate FDA approval supported by a separate clinical trial for each proposed indication for our cryoablation system. We intend to seek FDA approval of our cryoablation system to treat AF, and currently can only market our cryoablation system for AFL, which is the indication for which we have received FDA approval. If the FDA does not approve our cryoablation system for treating AF, we will continue to market our cryoablation system only for AFL. For each indication, the FDA's marketing approval process is expensive and the outcome is uncertain. To obtain FDA marketing approval, we are required to submit detailed and comprehensive scientific data demonstrating safety and effectiveness of our cryoablation system to the FDA's satisfaction. The marketing approval process also requires passing FDA inspection of our manufacturing facilities and of the clinical trial records for data integrity and compliance with regulatory requirements. The FDA's PMA approval review process generally takes one to three years after filing, but may take longer. The FDA has not approved any medical device for treating AF.

Table of Contents

We cannot assure you that we will obtain FDA approval to market our cryoablation system in the United States for AF in a timely manner or at all. In addition, even though we have received FDA approval for the treatment of AFL, we may never obtain approval for AF. If we fail to obtain FDA approval for AF or if our cryoablation system is not commercially adopted for the treatment of AFL, we may be forced to cease our operations. In addition, if we do not receive FDA approval for the AF indication, we may never become profitable.

***As a condition to the approval of our PMA for the treatment of AFL, the FDA is requiring us to conduct a registry study of patients treated for AFL with our cryoablation system, and of patients treated with radiofrequency catheters that are approved for the treatment of AFL. If we have difficulty completing the registry study, or if the FDA believes that the safety and effectiveness results for patients treated with our cryoablation system are not good, then the FDA could rescind the approval of our device for the treatment of AFL.***

To obtain FDA approval for marketing of our cryoablation system for the treatment of AFL, we agreed to conduct a registry study of patients treated for AFL with our cryoablation system, and to include as part of the registry study patients treated for AFL with competing radiofrequency devices approved for the treatment of AFL. The FDA could determine that the results we obtain of patients treated with cryoablation do not justify continuing to make our product available for commercialization in the United

States, and they could rescind our approval for the treatment of AFL. Additionally, although we intend to begin the registry study in the second quarter of 2008 and will seek to complete the enrollment as soon as possible, we may not be able to find patients who agree to join our registry study and it is possible that the FDA could believe that we are not actively working to complete the registry study and rescind our approval for the treatment of AFL on that basis until additional data is collected. If the FDA chooses to rescind the approval of our product for the treatment of AFL, our business would be materially harmed and our stock price would likely decline substantially, and we may not be able to reinstate our ability to commercialize our product in the United States for the treatment of AFL.

***If the data from our AF clinical trial does not demonstrate the safety and effectiveness of our cryoablation system to the FDA's satisfaction, we will not receive FDA approval to market our cryoablation system in the United States for the treatment of AF.***

To obtain FDA approval for marketing of our cryoablation system for the treatment of AF, our pivotal trial for AF must generate data demonstrating that our cryoablation system is safe and effective. The FDA's grant of permission to proceed with the AF pivotal trials does not constitute a binding commitment that the FDA will consider either trial design adequate to support approval for our cryoablation system. In addition, there can be no assurance that the data generated during the pivotal trial will meet our chosen safety and effectiveness endpoints or otherwise produce results that will lead the FDA to grant marketing approval. We may never receive PMA approval from the FDA for the treatment of AF.

***We may not complete our pivotal trial for AF on schedule, or at all, or it may be conducted improperly, which may delay or preclude FDA approval for marketing our cryoablation system for this indication.***

The completion of our pivotal trial for AF may be delayed or terminated for many reasons, including, but not limited to:

- subjects withdraw from our pivotal trial at a higher withdrawal rate than we expected when designing the trial;

- the FDA places our pivotal trial on hold;

- insufficient capital to fund the pivotal trial;

- supply shortages of the catheters used in the pivotal trial;

- recalls of the catheters used in the pivotal trial;

- subjects are not followed-up at the rate we currently expect;

- subjects experience an unacceptable rate or severity of adverse side effects;

- third party clinical investigators do not perform our pivotal trial on our anticipated schedule or consistent with the clinical trial protocol, Good Clinical Practice and regulatory requirements, or other third party organizations do not perform data collection and analysis in a timely or accurate manner;

- inspections of our clinical trial sites by the FDA or Institutional Review Boards, or IRBs, find regulatory violations that require us to undertake corrective action, suspend or terminate one or more sites, or prohibit us from using some or all of the data in support of our PMA application;

- changes in laws, governmental regulations or administrative actions force us to modify the conduct of our trials or otherwise create unexpected burdens;

- the reimbursement by governmental and other third party payers changes;

25

Table of Contents

- the interim results of our clinical trials are inconclusive or negative;

- one or more of the IRBs for our clinical trial sites suspends or terminates our trial at an investigational site, precludes enrollment of additional subjects, or withdraws its approval of our trial;

- one or more of our clinical investigators withdraws from our trial or deviates from our approved protocol;

- complications occur during cryoablation procedures that result in a decision by our Data Safety and Monitoring Board to delay or stop the clinical trial; or

- third parties, investigators and contract laboratories conducting our pivotal trial do not perform as contractually required or expected.

Subject enrollment in clinical trials and successful completion of subject follow-up in clinical trials depend on many factors, including the size of the subject population, the nature of the trial protocol, the proximity of subjects to clinical sites, the eligibility criteria for the trial, and subject compliance. Subjects may be discouraged from continuing to participate in our clinical trial if the trial protocol requires them to undergo extensive pre- and post-treatment procedures to assess the safety and effectiveness of our cryoablation system. We have seen a higher withdrawal rate of patients than we originally anticipated in our AF clinical trial. Withdrawal rates may continue to increase as we conduct our AF clinical trial because the follow up period for the AF trial is 12 months as opposed to six months for the AFL trial. In addition, subjects participating in our clinical trial may die before completion of their follow-up. Moreover, it may be difficult to successfully follow our subjects for the required 12-month period. Although to date we have successfully followed all our subjects from our AF feasibility study for the required 12-month period, historical results may not be indicative of our future performance. Additionally, we have seen a higher withdrawal rate of patients than we originally anticipated which required us to request from the FDA that we be able to enroll more than the 160 patients originally planned. In January 2007, the FDA approved our request to increase the size of our pivotal trial. The FDA may require that we enroll additional patients in order to complete our dataset.

Failure of subjects to continue to participate in a trial may cause an increase in costs and delays in our clinical trial or result in the failure of the trial, which could cause us to fail to secure FDA marketing approval of our cryoablation system in a timely manner, if at all.

Our development costs will increase if we have material delays in our clinical trial or if we need to perform additional or larger clinical trials than planned. Serious or unexpected adverse events during a clinical trial could cause us to modify, suspend, repeat, or terminate a trial, or to cancel the entire program.

***We may need to enroll additional patients to be able to demonstrate safety and effectiveness of our device, if our dataset of evaluable patients for our AF pivotal trial is not deemed large enough.***

When we designed the size of our AF pivotal trial, we made certain assumptions about the number of patients to be enrolled to permit us to evaluate the results of each arm of our clinical trial. During the conduct of our pivotal trial, patients have withdrawn from our clinical study for reasons not in our control, such as, they were randomized to medical management, or drug therapy, or were not covered by insurance, and withdrew from the trial. If we do not have a sufficiently large evaluable patient population for our analysis when we have completed enrollment and patient follow-up, we may need to increase enrollment until we can generate a sufficiently large evaluable patient population. For example, the FDA has approved our request to enroll an additional 20 patients, up to 180 patients in total.

***In order to receive and maintain FDA approval of our product candidates, our manufacturing facilities and the manufacturing facilities of our suppliers must comply with applicable regulatory requirements. If we fail to achieve or maintain regulatory approval of these manufacturing facilities, we may be forced to cease operations.***

Commercialization of our products and product candidates require access to, or the development of, manufacturing facilities that meet applicable regulatory and quality standards to manufacture a sufficient supply of our products. We believe we will need eventually to obtain additional commercial-scale manufacturing facilities. These facilities must be evaluated and qualified under our quality system to ensure that they meet our production and quality standards. The FDA also must inspect and approve facilities that manufacture our products for United States commercial purposes, as well as the manufacturing processes and specifications for our products prior to granting marketing approval of our cryoablation system. Suppliers of certain components of, and products used to manufacture, our products also must comply with FDA and foreign regulatory requirements, which often require significant resources and subject us and our suppliers to potential regulatory inspections and stoppages. We or our suppliers may not satisfy these requirements. If we or our suppliers do not achieve and maintain required regulatory approval for our manufacturing operations, including for any additional commercial-scale manufacturing facilities that we may obtain in the future, our commercialization efforts in the United States, if any, could be delayed, which could impair our business and financial condition and could require us to cease operations.

26

Table of Contents

***If the integrity of a catheter used as part of our cryoablation system is compromised, serious injury or death may occur, which could lead the FDA to delay or deny or withdraw marketing approval.***

Our cryoablation system works by utilizing a pressurized system that delivers nitrous oxide to chill the tip of a catheter to freeze heart tissue in contact with the catheter tip while the catheter is in contact with the patient's heart. Although our cryoablation system is designed to prevent leaks in the catheter and to prevent the flow of nitrous oxide into the catheter if the catheter has been ruptured, nitrous oxide could enter the blood stream if the catheter developed a leak, which could result in serious injury to a patient, or even death. In April 2005, during routine quality control testing of a lot of Model 1200 catheters, we identified several instances of inadequate seals in the joint where the articulation section is welded to the catheter shaft, which could have allowed a leak of nitrous oxide into a patient. We initiated an investigation which covered several weeks to identify the source of the catheter integrity breaches, but were unable to find a specific root cause. In May 2005, we initiated a voluntary recall in Europe of all eight of the outstanding lots of our Model 1200 catheter and removed the Model 1200 from clinical trial use.

If a future leak were to occur, the FDA could deny or delay or withdraw marketing approval until we modified our device and provided proof that a similar failure could not recur. Any future leak could lead to additional recalls, cause us to incur financial liability and prevent our system from gaining market acceptance among physicians, healthcare payers, patients and the medical community, any of which could harm our business, financial condition, results of operations and growth prospects.

***If the pulmonary vein isolation, or PVI, or any other ablation procedure performed in our AF pivotal trial fails to provide a significant benefit to patients, or has serious adverse effects, we may not be able to obtain FDA approval for marketing our cryoablation system.***

AF is a complex disease and its origin and progression are not well understood in the medical community. The effectiveness of ablation in moderating AF has not been demonstrated in a controlled clinical trial. The FDA could deny approval of our cryoablation system if our pivotal AF trial does not show that AF ablation performed with our cryoablation system provides a greater benefit to patients than medical management with anti-arrhythmic medications alone.

The PVI procedure when performed with radiofrequency ablation has been associated with stroke, pulmonary vein stenosis, a narrowing of the pulmonary vein that can have serious adverse health implications. Other heat based ablation technologies used for AF ablation have been associated with risks such as the formation of atrial esophageal fistulas, or channels, between the heart and the esophagus. Although we believe that cryoablation reduces this risk as compared to heat-based ablation, we and the medical community do not have a complete understanding of the presentation and progression of these complications. If patients have strokes, develop significant pulmonary vein stenosis, atrio-esophageal fistulas, or other unanticipated adverse effects in our pivotal AF trial, the FDA could deny approval to market our cryoablation system, which could harm our business, financial condition, results of operations and growth prospects.

***If approved by the FDA for AF, our cryoablation system will likely be limited to use as a second line therapy for patients with AF who have failed drug treatment, which could limit our sales.***

Our pivotal AF trial will study our cryoablation system only in patients who have failed drug therapy. For this reason, if the FDA approves our cryoablation system for the treatment of AF, it is likely that the FDA will require us to label and advertise our cryoablation system only for the treatment of patients who have failed drug therapy. This restriction could limit our sales. Additional clinical trials will be required to obtain approval for use in a broader population of patients.

***Our future growth depends on physician adoption and market acceptance of our cryoablation system, which may not occur.***

Our cryoablation system may not gain market acceptance among physicians, patients, healthcare payers or the medical community. The degree of market acceptance of any product that we may develop will depend on a number of factors, including:

- the perceived safety and effectiveness of the product;
- the prevalence and severity of any side effects;
- the procedure time associated with the use of the product;
- potential advantages over alternative treatments;
- our ability to adequately fund the commercialization of the product;
- the strength of marketing and distribution support; and

27

Table of Contents

- sufficient third party coverage or reimbursement.

If our cryoablation system, or any other product that we may develop, does not achieve an adequate level of acceptance by physicians, patients or healthcare payers, we may not generate significant product revenue, if any, and we may not become profitable.

We believe that another factor that will impact the degree of market acceptance of any of our products is our ability to educate physicians to change their screening and referral practices in order to ensure physician acceptance of our system. For example, despite the lack of effectiveness of treating AF and AFL with drugs, many physicians routinely prescribe drugs to patients suffering from AF and AFL without offering any treatment alternatives even when drug therapy is failing. We intend to target our sales efforts to electrophysiologists because they are often the physicians treating both AF and AFL. However, the initial point of contact of patients experiencing AF and AFL may be general practitioners. If referring physicians are not properly educated about AF and AFL and the potential benefits of using our cryoablation system over drug therapy in particular in circumstances where drug therapy fails, they may not refer AF and AFL patients who have been unsuccessfully treated with drug therapy to electrophysiologists for our cryoablation system procedure, which may impair our business, financial condition and results of operations.

***Our product candidates could be recalled and any failure to comply with FDA regulations could subject us to enforcement action.***

The FDA and similar foreign governmental authorities have the authority to require the recall of commercialized products in the event of material regulatory deficiencies or defects in design or manufacture. A government mandated or voluntary recall by us could occur as a result of component failures, device malfunctions, adverse events, such as serious injuries or deaths, or quality-related issues such as manufacturing errors or design or labeling defects. Recalls of our cryoablation system would divert managerial and financial resources, harm our reputation with customers and have an adverse effect on our financial condition and results of operations. A recall announcement could also negatively affect our stock price.

After the FDA permits a device to enter commercial distribution, numerous additional regulatory requirements apply. We may incur significant costs to comply with such requirements. These requirements include, among others:

- compliance with the Quality System Regulations, which require manufacturers to follow elaborate design, testing, control, documentation and other quality assurance procedures during the manufacturing process;

- the FDA's general prohibition against promoting products for unapproved or *"off-label"* uses;

- the Medical Device Reporting regulation, which requires that manufacturers report to the FDA if their device may have caused or contributed to a death or serious injury or malfunctioned in a way that would likely cause or contribute to a death or serious injury if it were to recur; and

- the Reports of Corrections and Removals regulation, which requires manufacturers to report recalls and field actions to the FDA if initiated to reduce the risk to health posed by the device or to remedy a violation of the Federal Food, Drug, and Cosmetic Act, or FDCA.

Even if our products are approved, stringent FDA conditions of approval may significantly impact our sales and earnings depending on the scope and complexity of such conditions. The FDA enforces these requirements with inspections and market surveillance. If the FDA finds that we have failed to comply with one of these requirements, it could institute a wide variety of enforcement actions, ranging from a Warning Letter to more severe sanctions, including the following:

- fines, injunctions and civil penalties;

- recall or seizure of our products;

- operating restrictions, partial suspension or total shutdown of production;

- refusing requests for 510(k) clearance or PMA approval of new products;

- withdrawing 510(k) clearance or PMA approvals already granted; and

- criminal prosecution.

Any of these enforcement actions could be costly and significantly harm our business, financial condition and results of operations.

28

Table of Contents

***If we are unable to obtain and maintain protection for our intellectual property, the value of our technology and products may be adversely affected.***

Our business and competitive positions are dependent upon our ability to protect our proprietary technology. Because of the substantial length of time and expense associated with development of new products, we, along with the rest of the medical device industry, place considerable importance on obtaining and maintaining patent protection for new technologies, products and processes. The patent positions of medical device companies, including ours, are generally uncertain and involve complex legal and factual questions. Our owned and licensed patent applications may not protect our technologies and products because, among other things:

- any patents issued to us, our collaborators or our licensors, may not provide a basis for a commercially viable product or provide us with any competitive advantage;

- any patents issued to us, our collaborators or our licensors may be challenged, as is currently ongoing in the CryoCath litigation, circumvented or invalidated by third parties;

- all pending patent applications may not result in issued patents; and

- any additional proprietary technologies that we develop may not be patentable.

We attempt to protect our intellectual property position by filing United States patent applications related to our proprietary technology, inventions and improvements that are important to the development of our business. Currently, we own or license 39 issued United States patents and a number of pending United States patent applications covering various aspects of our products and technology.

We also own or license 24 patents issued outside of the United States and have a number of pending patent applications outside the United States. Limitations on patent protection in some countries outside the United States, and the differences in what constitutes patentable subject matter in these countries, may limit the protection we have under patents issued to us outside of the United States. In addition, laws of foreign countries may not protect our intellectual property to the same extent as would laws of the United States. In determining whether or not to seek a patent or to license any patent in a particular foreign country, we weigh the relevant costs and benefits, and consider, among other things, the market potential of our product candidates in the jurisdiction, and the scope and enforceability of patent protection afforded by the law of the jurisdiction. Failure to obtain adequate patent protection for our proprietary product candidates and technology would impair our ability to be commercially competitive in these markets.

***Our ability to market our products may be impaired by the intellectual property rights of third parties.***

We are aware of numerous United States patents owned or licensed by third parties in areas potentially related to the technology used in our cryoablation system. These third parties include CryoCath, Johnson & Johnson, the Regents of the University of California and Spembly Medical Ltd. These third parties or our other competitors may have issued patents that cover technologies that we use in producing our product candidates, or that we use in treating patients with our product candidates. CryoCath initiated legal proceedings against us in the United States District Court in Delaware, seeking a declaration that our cryoablation system infringes a number of CryoCath's United States issued patents. Other owners of patents or their licensees may also assert that the manufacture, use or sale of our cryoablation system infringes one or more claims of their patents.

The possibility of litigation, in addition to the CryoCath litigation, being filed against us based on one or more of these or other patents or other intellectual property is a significant risk. Because of the uncertainty inherent in any intellectual property litigation, a court may determine that current or future third party patents, including CryoCath patents, contain one or more claims that are valid, enforceable and infringed upon by our cryoablation system.

There is also a risk that other third party patents or intellectual property rights in areas of technology related to our products of which we are not aware may materially and adversely affect our business. Moreover, because patent applications can take many years to issue, there may be currently pending patent applications of which we are not yet aware that may result in issued patents that if successfully asserted against us, would materially and adversely affect our business, financial condition and results of operations.

***We depend on single source suppliers for our cryoablation system components and the loss of these suppliers could prevent or delay our clinical trials, commercialization of our cryoablation system in the United States and additional sales of our cryoablation system in Europe.***

We do not have long-term contracts with our third party suppliers for any of the equipment and components that are used in our manufacturing process. Our suppliers may have difficulty supplying components that meet our required specifications or needs. None of our suppliers has agreed to maintain a guaranteed level of production capacity. Establishing additional or replacement suppliers for these components may cause us to incur substantial costs and take a considerable amount of time, may require product redesign and could result in the need for submission to the FDA of a PMA supplement or possibly a separate PMA, which would cause

29

Table of Contents

us to incur considerable expense. We also may have difficulty obtaining similar components from other suppliers that are acceptable to our quality requirements and specifications, the FDA or foreign regulatory authorities. Even if available, similar components from other suppliers could be significantly more expensive. Any delays, regulatory or otherwise, could delay the manufacture and delivery of our cryoablation system and impact the commercialization of our cryoablation system in the United States and sales of our cryoablation system in Europe and adversely impact our business.

***If we are unable to manage our growth, our future revenue and operating results may be adversely affected.***

We will need to expand our sales and marketing operations and grow our research and development, product development and administrative operations. This expansion would place a significant strain on our management and operational and financial resources. Our current and planned personnel, systems, procedures and controls may not be adequate to support our growth. To manage our growth and in connection with commercializing our cryoablation system in the United States, we will be required to improve existing, and implement new, operational and financial systems, procedures and controls and expand, train and manage our growing employee base. If we were unable to manage our growth effectively, our business and operating results could be harmed.

***We have limited manufacturing capabilities and manufacturing personnel, and if our manufacturing facilities are unable to provide an adequate supply of products, our growth could be limited and our business could be harmed.***

We currently manufacture our cryoablation system at our facilities in San Diego, California. If there was a disruption to our manufacturing operations, we would have no other means of manufacturing our cryoablation system until we have restored and re-qualified our manufacturing capability at our facilities or developed alternative manufacturing facilities. Additionally, any damage to or destruction of our San Diego facilities or our equipment, prolonged power outage or contamination at our facility would significantly impair our ability to produce our cryoablation system. If we were unable to produce sufficient quantities of our cryoablation system for use in our current and planned clinical trials, or if our manufacturing process yields substandard cryoablation systems, completion of our AF clinical trials and commercialization activities for AFL and AF in the United States, as well as sales of our cryoablation systems in Europe, would be delayed.

We currently have limited resources, facilities and experience to commercially manufacture our products and product candidates. In the first half of 2006, we restructured our workforce, including reductions in our manufacturing staffing that has reduced our capacity to manufacture catheters and consoles. Currently, we can only produce sufficient quantities of catheters to support our existing clinical trials and our expected commercial sales for 2007 and 2008. To produce our cryoablation system in the quantities that we believe will be required to meet anticipated market demand in the United States in the event that we receive regulatory approval for AF, we will need to increase, or *"scale up"*, the production process by a significant factor over the current level of production. There are technical challenges to scaling up manufacturing capacity, and developing commercial-scale manufacturing facilities would require the investment of substantial additional funds and hiring and retaining additional management and technical personnel who have the necessary manufacturing experience. We may not successfully complete any required scale up in a timely manner, or at all due to such technical difficulties and/or insufficient funds. If we are unable to do so, we may not be able to produce our cryoablation system in sufficient quantities to meet the requirements for the launch of the product in the United States if we receive the required regulatory approval from the FDA for AF, or to meet demand for our cryoablation system in the United States for AFL or in Europe. If we obtain regulatory approval from the FDA for our cryoablation system for AF but are unable to manufacture a sufficient supply of our cryoablation systems, our revenues, business and financial prospects would be materially adversely affected. In addition, if we obtain regulatory approval for our cryoablation system for AF, but the scaled up production process is not efficient or produces cryoablation systems that do not meet quality and other standards, our future gross margins, if any, will be adversely affected.

***We have never manufactured our Quantum catheter in large quantities, and we may experience delays and difficulties in our manufacturing of this catheter.***

Our Quantum catheter is more complicated to manufacture than our CryoBlator catheter, and our experience in manufacturing the initial prototypes indicate that it will take longer to manufacture a single Quantum catheter than as required to manufacture a single CryoBlator catheter. This complexity may delay our ability to advance the Quantum catheter into human clinical trials. However, we believe we will develop efficiencies in manufacturing our Quantum catheter to permit us to manufacture it in a commercially viable amount of time. For example, the time required to initially manufacture the Model 1100 catheter, and time required to initially manufacture the Model 1200 catheter, were substantially longer than the time currently required to manufacture our CryoBlator catheter. In addition, after we have conducted further animal studies, we may determine that Quantum is not suitable for human use, and we may discontinue the development of the catheter.

30

Table of Contents

***We must be licensed to handle and use hazardous materials and may be liable for contamination or other harm caused by hazardous materials that we use.***

We use hazardous materials in our research and development and manufacturing processes. We are subject to federal, state and local regulations governing use, storage, handling and disposal of these materials and waste products. We are currently licensed to handle such materials in all states in which we operate, but there can be no assurances that we will be able to retain those licenses in the future. In addition, we must become licensed in all states in which we plan to expand. Obtaining those additional licenses is an expensive and time consuming process, and in some cases we may not be able to obtain those licenses at all.

Although we believe that our procedures for the use, handling, storing and disposing of these materials comply with legally prescribed standards, we cannot completely eliminate the risk of contamination or injury resulting from hazardous materials and we may incur liability as a result of any such contamination or injury. In the event of an accident, we could be held liable for damages or penalized with fines, and the liability could exceed our resources. We have also incurred and may continue to incur expenses related to compliance with environmental laws. Such future expenses or liability could have a significant negative impact on our business, financial condition and results of operations. Further, we cannot assure you that the cost of complying with these laws and regulations will not materially increase in the future.

***Quality-control difficulties in our manufacturing processes could delay our clinical development programs and commercialization activities or prevent us from continuing the development of our product candidates.***

Our sterile products, including our catheters and our sheaths, must be produced in a highly controlled, clean environment to minimize foreign particles and other contaminants. Despite stringent quality controls, weaknesses in process control or minute impurities in materials may cause a substantial percentage of defective products in a lot. If we are unable to maintain stringent quality controls, or if contamination problems arise, our clinical development and commercialization activities in the United States and our sales efforts in Europe could be delayed or terminated, which would harm our business, financial condition and results of operations.

***If we fail to obtain an adequate level of reimbursement for our products by third party payers, there may be no commercially viable markets for our product candidates or the markets may be much smaller than expected.***

The availability and amount of reimbursement by governmental and other third party payers affect the market for our products and product candidates. The effectiveness, safety, performance and cost-effectiveness of our products and product candidates and of any competing products will determine the availability and level of reimbursement. We believe that reimbursement may be subject to increased restrictions both in the United States and in international markets in the future. New legislation, regulation or reimbursement policies of third party payers may adversely affect the demand for our products and product candidates and limit our ability to sell our products and product candidates on a profitable basis. In addition, third party payers continually attempt to minimize or reduce the costs of healthcare by challenging the prices charged for healthcare products and services.

Reimbursement and healthcare payment systems in international markets vary significantly by country, and include both government sponsored healthcare and private insurance. To obtain reimbursement or pricing approval in some countries, we may be required to produce clinical data, which may involve one or more clinical trials, that compares the cost-effectiveness of our products to other available therapies. We may not obtain international reimbursement or pricing approvals in a timely manner, or at all. Our failure to receive international reimbursement or pricing approvals would negatively impact market acceptance of our products in the international markets in which those approvals are sought.

If reimbursement for our products is unavailable or limited in scope or amount, or if pricing is set at unsatisfactory levels, market acceptance of our products would be impaired and our business, financial condition, results of operations and future revenues, if any, would be adversely affected.

***We may be subject, directly or indirectly, to federal and state healthcare fraud and abuse laws and regulations and, if we are unable to fully comply with such laws, could face substantial penalties.***

Our operations may be directly or indirectly affected by various broad state and federal healthcare fraud and abuse laws, including the Federal Healthcare Programs' Anti-Kickback Statute, which prohibits any person from knowingly and willfully offering, paying, soliciting or receiving remuneration, directly or indirectly, to induce or reward either the referral of an individual for an item or service, or the ordering, furnishing or arranging for an item or service, for which payment may be made under federal healthcare programs, such as the Medicare and Medicaid programs. If our past or present operations, including our consulting arrangements with physicians who use our product, are found to be in violation of these laws, we or our officers may be subject to civil or criminal penalties, including large monetary penalties, damages, fines, imprisonment and exclusion from Medicare and Medicaid program participation. If enforcement action were to occur, our business and financial condition would be harmed.

31

Table of Contents

***We may be subject to federal and state false claims laws which impose substantial penalties.***

Now that we are selling our product in the United States, it is possible that some of our customers may file claims for reimbursement with government programs such as Medicare and Medicaid. As a result, we may be subject to the federal False Claims Act if we knowingly *"cause"* the filing of false claims. Violations may result in substantial civil penalties, including treble damages. The federal False Claims Act also contains *"whistleblower"* or *"qui tam"* provisions that allow private individuals to bring actions on behalf of the government alleging that the defendant has defrauded the government. In recent years, the number of suits brought in the healthcare industry by private individuals has increased dramatically. Various states have enacted laws modeled after the federal False Claims Act, including *"qui tam"* provisions, and some of these laws apply to claims filed with commercial insurers.

We are unable to predict whether we could be subject to actions under the federal False Claims Act, or the impact of such actions. However, the costs of defending claims under the False Claims Act, as well as sanctions imposed under the False Claims Act, could significantly affect our financial performance.

***If we are unable to establish adequate sales and marketing capabilities or enter into and maintain arrangements with third parties to sell and market our cryoablation system, our business may be harmed.***

We have just begun building a sales organization in the United States and have limited experience as a company in the sales, marketing and distribution of medical devices. Now that we have received FDA approval of our PMA for AFL, we are commercializing in the United States with a direct CryoCor sales force, and may market in the United States with a marketing partner. Developing a sales force is expensive and time consuming and could delay or limit the success of our commercialization activities. We may not be able to develop this capacity on a timely basis or at all. Additionally, due to our limited cash resources, we will not hire the additional personnel or make the capital expenditures that are necessary to broadly commercialize our cryoablation system unless we are able to raise additional financing on satisfactory terms. We may choose to contract with third parties, including distributors or agents, to perform sales, marketing and distribution services in the United States. If we enter into arrangements with third parties to perform sales, marketing and distribution services in the United States, our product revenues could be lower than if we directly sold, marketed and distributed our cryoablation system, or any other product that we may develop. Furthermore, if we enter into co-promotion or other marketing and sales arrangements with third parties, any revenues received will depend in part on the skills and efforts of these third parties, and we do not know whether these efforts will be successful. Some or all of our future distributors may have products or product candidates that compete with ours, and they may have an incentive not to devote their best efforts to marketing our products.

We have signed distribution agreements with third parties in Europe to market and sell our cryoablation system in the United Kingdom and Italy. In the near term, we do not intend to sign additional distribution agreements in Europe and we may never sign additional distribution agreements. If our relationships with our distributors do not progress as anticipated, if we seek to identify alternative distributors and are unable to do so, or if their sales and marketing strategies fail to generate sales of our products in the future, our business, financial condition and results of operations would be harmed. We have closed our subsidiary in Germany through which we historically distributed our product in Belgium, the Netherlands and Germany and as a result may no longer continue to sell our product in these geographic areas.

***The medical device industry is highly competitive and subject to rapid technological change. If our competitors are better able to develop and market products for similar indications that are safer, more effective, or gain greater acceptance in the marketplace than any products that we may develop, our commercial opportunities will be reduced or eliminated.***

The medical device industry is characterized by rapidly advancing technologies and a strong emphasis on proprietary products, designs and processes and intense competition. Our products and product candidates face and will face intense competition. Many of our competitors have significantly greater financial resources and expertise in research and development, manufacturing, preclinical testing, conducting clinical trials, obtaining regulatory approvals and marketing approved products than we do. Smaller or early stage companies may also prove to be significant competitors, particularly through collaborative arrangements with large and established companies. These third parties compete with us in recruiting and retaining qualified personnel, establishing clinical trial sites and patient registration for clinical trials, as well as acquiring technology and technology licenses complementary to our programs or advantageous to our business.

Our competitors may:

- develop and patent processes or products earlier than us;

- obtain regulatory approvals for competing products more rapidly than us; and

Table of Contents

• develop safer, more effective and/or less expensive products or technologies that render our technology, products or product candidates obsolete or non-competitive.

If any of the foregoing occurs, our business will be harmed and our commercial opportunities will be reduced or eliminated.

***We face the risk of product liability claims and may not be able to obtain insurance on favorable terms, or at all.***

Our business exposes us to the risk of product liability claims that are inherent in the testing, manufacturing and marketing of medical devices. We may be subject to product liability claims, including frivolous lawsuits, if our cryoablation system causes, or appears to have caused, an injury. Claims may be made by consumers, healthcare providers, third party strategic collaborators or others selling our products. Although we have product liability and clinical trial liability insurance that we believe is appropriate for our company, this insurance is subject to deductibles and coverage limitations. Our current product liability insurance may not continue to be available to us on acceptable terms, if at all, and, if available, the coverage may not be adequate to protect us against any future product liability claims. If we are unable to obtain insurance at acceptable cost or on acceptable terms with adequate coverage or otherwise protect against potential product liability claims, we will be exposed to significant liabilities, which may harm our business. A product liability claim, recall or other claim with respect to uninsured liabilities or for amounts in excess of insured liabilities could have a material adverse effect on our business, financial condition and results of operations.

We may be subject to claims against us even if an alleged injury is due to the actions of others. For example, we rely on the expertise of physicians, nurses and other associated medical personnel to perform the medical procedures and related processes relating to our cryoablation system. If these medical personnel are not properly trained or are negligent in using our cryoablation system, the therapeutic effect of our cryoablation system may be diminished or the patient may suffer critical injury, which may subject us to liability. In addition, an injury resulting from the activities of our suppliers may serve as a basis for a claim against us.

We do not and will not promote our cryoablation system for off-label or otherwise unapproved uses. However, we cannot prevent a physician from using our cryoablation system for any off-label applications. If injury to a patient results from such an inappropriate use, we may become involved in a product liability suit, which will likely be expensive to defend.

These liabilities could prevent or interfere with our clinical efforts, product development efforts and any subsequent product commercialization efforts. Defending a suit, regardless of merit, could be costly, could divert management attention and might result in adverse publicity, which could result in the withdrawal of, or inability to recruit, clinical trial volunteers or reduced acceptance of our products in the market.

***Failure to obtain additional regulatory approval in foreign jurisdictions will prevent us from expanding the commercialization of our products abroad.***

We may pursue marketing our products in a number of international markets. Although our cryoablation system has been approved for commercialization in the European Union, or EU, and for the treatment of AFL in the United States, in order to market our products in other foreign jurisdictions, we will need to obtain separate regulatory approvals. The approval procedure varies among jurisdictions and can involve substantial additional testing. Approval by the FDA does not ensure approval by regulatory authorities in other jurisdictions, and approval by one foreign regulatory authority does not ensure approval by regulatory authorities in other foreign jurisdictions or by the FDA. The foreign regulatory approval process may include all of the risks associated with obtaining FDA approval in addition to other risks. In addition, the time required to obtain foreign approval may differ from that required to obtain FDA approval and we may not obtain foreign regulatory approvals on a timely basis, if at all. We may not be able to file for regulatory approvals and may not receive necessary approvals to commercialize our products in any market other than in the United States for the treatment of AFL, and in the EU.

33

Table of Contents

***Our efforts to discover, develop and commercialize new product candidates beyond our cryoablation system are at an early stage and are subject to a high risk of failure.***

We expect that a key element of our strategy will be to discover, develop and commercialize new products for the treatment of AFL and AF as extensions of, or in addition to, our cryoablation system. For example, we are completing development of our next generation catheter, Quantum, which we expect to introduce into clinical testing in the first quarter of 2008. Research programs to identify new product candidates require substantial technical, financial and human resources, whether or not any product candidates are ultimately identified. Our research programs may initially show promise in identifying potential product candidates, yet fail to yield product candidates for clinical development for many reasons, including the following:

- the research may not be successful in identifying potential product candidates;

- there is a high rate of attrition for product candidates in preclinical trials;

- competitors may develop alternatives that render our product candidates obsolete; and

- product candidates may on further study be shown to have harmful side effects or other characteristics that indicate they are unlikely to be effective.

If we fail to develop and commercialize new product candidates, our business would be harmed.

***We are highly dependent on our officers and other employees, and if we are not able to retain them or to recruit and retain additional qualified personnel, our business will suffer.***

We are highly dependent upon our senior management and scientific staff. The loss of services of one or more of our members of senior management could delay or prevent the successful completion of our pivotal trials or the commercialization of our cryoablation system in the United States. Although we have employment agreements with each of our executive officers, their employment with us is *"at will,"* and each executive officer can terminate his agreement with us at any time. We do not carry keyman insurance on any of our current executive officers.

In the event we need to hire additional qualified scientific, commercial, operations, regulatory, quality assurance and control and administrative personnel, we may not be able to attract and retain qualified personnel on acceptable terms given the competition for such personnel among medical device companies. Our offices are located in San Diego, where competition for personnel with healthcare industry skills is intense. If we fail to identify, attract, retain and motivate these highly skilled personnel, or if we lose current employees, we may be unable to continue our development and commercialization activities.

***We may incur increased costs as a result of recently enacted and proposed changes in laws and regulations.***

Recently enacted and proposed changes in the laws and regulations affecting public companies, including the provisions of the Sarbanes-Oxley Act of 2002, or the Sarbanes-Oxley Act, and rules related to corporate governance and other matters subsequently adopted by the SEC and the Nasdaq Stock Market, or Nasdaq, could result in increased costs to us and may divert our management's attention from other matters that are important to our business. The new rules and any related regulations that may be proposed in the future could make it more difficult or more costly for us to obtain certain types of insurance, including directors' and officers' liability insurance, and we may be forced to accept reduced policy limits and coverage or incur substantially higher costs to obtain the same or similar coverage. The impact of these events could also make it more difficult for us to attract and retain qualified persons to serve on our board of directors, our board committees or as executive officers. We are presently evaluating and monitoring developments with respect to new and proposed rules and cannot predict or estimate the amount of the additional costs we may incur or the timing of such costs.

Legislative and regulatory proposals to amend the FDA regulatory and healthcare systems could impact our ability to sell our products profitably, if at all. In the United States in recent years, new legislation has been proposed at the federal and state levels that would effect major changes in the healthcare system. In addition, new regulations and interpretations of existing healthcare statutes and regulations are frequently adopted.

***Failure to achieve and maintain effective internal controls in accordance with Section 404 of the Sarbanes-Oxley Act could have a material adverse effect on our business and stock price.***

As a public company, we will be required to document and test our internal control procedures in order to satisfy the requirements of Section 404 of the Sarbanes-Oxley Act, which requires, among other things, annual management assessments of the effectiveness of our internal controls over financial reporting and, for 2008, a report by our independent auditors that both addresses management's assessments and provides for the independent auditor's assessment of the effectiveness of our internal controls. During the course of our future testing, we may identify deficiencies which we may not be able to remediate in time to meet our deadline for compliance with Section 404.

34

Table of Contents

Testing and maintaining internal controls also involves significant costs and could divert our management's attention from other matters that are important to our business. We may not be able to conclude on an ongoing basis that we have effective internal controls over financial reporting in accordance with Section 404, and our independent auditors may not be able or willing to issue a favorable assessment of our conclusions. Failure to achieve and maintain an effective internal control environment could harm our operating results and could cause us to fail to meet our reporting obligations. Inferior internal controls could also cause investors to lose confidence in our reported financial information, which could have a negative effect on the trading price of our stock.

***Changes in European to United States currency exchange rates may increase our expenses or reduce our revenues.***

We currently market our cryoablation system in certain foreign markets through European distributors. The related distribution agreements may provide for payments in a foreign currency. Accordingly, if the United States dollar strengthens against the euro or British pound sterling our United States dollar payments from such distributors, if any, will decrease.

We may become exposed to fluctuations in other foreign currencies in the future, and our exposure to foreign currency exchange rates may adversely affect our business, financial condition and results of operations.

***Our stock price has been volatile and may continue to be volatile.***

Our stock price has been and may continue to be volatile. The stock market in general and the market for small medical device companies in particular have experienced extreme volatility that has often been unrelated to the operating performance of particular companies. The price for our common stock will be determined in the marketplace and may be influenced by many factors, including:

- failure of any of our products or product candidates to achieve commercial success;
- results of our clinical trials;
- failure of any of our product candidates to receive FDA or other regulatory approvals;
- success or failure to raise any additional capital on a timely basis or on acceptable terms;
- future sales of our common stock;
- regulatory developments in the United States and foreign countries;
- developments, disputes or litigation concerning patents or other proprietary rights, including our current litigation with CryoCath;
- ability to manufacture our products to commercial standards;
- public concern over our products;
- the departure of key personnel;
- variations in our financial results or those of companies that are perceived to be similar to us;
- changes in the structure of healthcare payment systems;
- changes in reimbursement;
- investors' perceptions of us; and
- general economic, industry and market conditions.

A decline in the market price of our common stock could cause our stockholders to lose some or all of their investment and may adversely impact our ability to attract and retain employees and raise capital. There can no assurance that in the future, the market price of our common stock will not be impacted by similar events.

***Provisions in our amended and restated certificate of incorporation and amended and restated bylaws and applicable Delaware law may prevent or discourage third parties or our stockholders from attempting to replace our management or influencing significant decisions.***

Provisions in our amended and restated certificate of incorporation and amended and restated bylaws may have the effect of delaying or preventing a change in control of us or our management, even if doing so would be beneficial to our stockholders. These provisions include:

- dividing our board of directors into three classes serving staggered three-year terms;
- authorizing our board of directors to issue preferred stock without stockholder approval;
- prohibiting stockholder actions by written consent;

35

Table of Contents

- limiting the persons who may call special meetings of stockholders;
- prohibiting our stockholders from making certain changes to our certificate of incorporation or bylaws except with 66 $^2$/3% stockholder approval; and
- requiring advance notice for raising business matters or nominating directors at stockholders' meetings.

We are also subject to provisions of the Delaware corporation law that, in general, prohibit any business combination with a beneficial owner of 15% or more of our common stock for three years unless the holder's acquisition of our stock was approved in advance by our board of directors. Together, these charter and statutory provisions could make the removal of management more difficult and may discourage transactions that otherwise could involve payment of a premium over prevailing market prices for our common stock.

***Our principal stockholders and management own a significant percentage of our outstanding common stock and will be able to exercise significant influence over our affairs.***

Our executive officers, current directors and holders of five percent or more of our common stock, as of October 31, 2007, beneficially owned approximately 64.8% of our common stock based on the SEC's rules for determining beneficial ownership. These stockholders will likely be able to determine the composition of our board of directors, retain the voting power to approve all matters requiring stockholder approval and continue to have significant influence over our operations. The interests of these stockholders may be different than the interests of other stockholders on these matters. This concentration of ownership could also have the effect of delaying or preventing a change in our control or otherwise discouraging a potential acquirer from attempting to obtain control of us, which in turn could reduce the price of our common stock.

ITEM 2.        UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS

**Use of Proceeds**

Our first Registration Statements on Form S-1 (Reg. Nos. 333-123841 and 333-126582), as amended, relating to our initial public offering was declared effective by the SEC on July 13, 2005. The offering commenced the same day and 3,709,090 shares of common stock were sold on our behalf at $11.00 per share, for an aggregate offering price of $40.8 million. Following the sale of shares, the offering was terminated. The net offering proceeds to us, after deducting underwriting discounts and commissions and estimated offering expenses, were approximately $35.4 million.

We invested $35.4 million in proceeds from the offering, net of underwriting discounts and commissions and offering expenses, in money market funds, United States government or corporate bond securities, and asset-backed securities. Through September 30, 2007, we have used all of the proceeds from our initial public offering for research and development activities, clinical trial activities, expenses related to our facility, manufacturing and quality system operations, sales and marketing activities, the pay-off of our $7.0 debt facility in June 2007, and for working capital and general corporate purposes.

The foregoing payments were direct payments made to third parties who were not our directors or officers (or their associates), persons owning ten percent or more of any class of our equity securities or any other affiliate, except that a portion of the proceeds used for general corporate purposes included regular compensation for our officers and directors.

ITEM 6.        EXHIBITS

The exhibits listed on the accompanying index to exhibits are filed or incorporated by reference (as stated therein) as part of this Quarterly Report on Form 10-Q.

| Exhibit Number | Description of Exhibit |
|---|---|
| 3.1 | Amended and Restated Certificate of Incorporation (1) |
| 3.2 | Amended and Restated Bylaws of the Company (2) |
| 4.1 | Form of Common Stock Certificate of the Company (1) |
| 4.2 | Amended and Restated Investor Rights Agreement dated June 4, 2003 between the Company and certain of its stockholders (1) |
| 4.3 | Securities Purchase Agreement, dated April 20, 2007, by and among the Registrant and the purchasers listed on the signature pages thereto. (3) |

36

**Table of Contents**

| Exhibit Number | Description of Exhibit |
|---|---|
| 4.4 | Form of Warrant. (3) |
| 4.5 | Form of Warrant to Purchase Stock. (4) |
| 4.6 | Common Stock Purchase Agreement, dated June 28, 2007, by and between the Registrant and Boston Scientific Scimed, Inc. (5) |
| 4.7 | Registration Rights Agreement, dated June 28, 2007, by and between the Registrant and Boston Scientific Scimed, Inc. (5) |
| 10.20 | First Amendment to Employment Agreement, dated August 31, 2007 by and between the Registrant and Edward F. Brennan. |
| 10.21 | First Amendment to Employment Agreement, dated August 31, 2007 by and between the Registrant and Gregory J. Tibbitts. |
| 10.22 | Amended and Restated Executive Employment Agreement, dated September 5, 2007, by and between the Registrant and Helen S. Barold |
| 31.1 | Certification of Chief Executive Officer pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Securities and Exchange Act of 1934, as amended |
| 31.2 | Certification of Chief Financial Officer pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Securities and Exchange Act of 1934, as amended |
| 32 | Certification of Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |

(1)  Filed as an exhibit to the Company's Registration Statement on Form S-1 (File No. 333-123841) originally filed with the Securities and Exchange Commission on April 5, 2005, as amended, and incorporated herein by reference.

(2)  Incorporated by reference to the registrant's Current Report on Form 8-K filed with the SEC on July 25, 2007.

(3)  Incorporated by reference to the registrant's Current Report on Form 8-K filed with the SEC on April 25, 2007.

(4)  Incorporated by reference to the registrant's Current Report on Form 8-K filed with the SEC on June 22, 2007.

(5)  Incorporated by reference to the registrant's Current Report on Form 8-K filed with the SEC on June 29, 2007.

\*   Indicates management contract or compensatory plan.

+   Confidential treatment has been requested with respect to certain portions of this exhibit. Omitted portions have been filed separately with the Securities and Exchange Commission.

37

Table of Contents

**CryoCor, Inc.**

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Date: November 14, 2007

CryoCor, Inc.

By:  /s/ *Gregory J. Tibbitts*
     Gregory J. Tibbitts
     Vice President, Finance and Chief Financial Officer
     (Principal Financial and Accounting Officer)

38

**Dates Referenced Herein** *and* **Documents Incorporated By Reference**

| *This 10-Q Filing* | *Date* ▼ | *Other Filings* |
|---|---|---|
| | 6/4/03 | |
| | 12/31/04 | |
| | 4/5/05 | S-1 |
| | 7/13/05 | 4, 3/A, 3, S-1MEF |
| | 12/31/05 | 5, 10-K |
| | 1/1/06 | |
| | 2/21/06 | 8-K |
| | 9/30/06 | 10-Q |
| | 10/1/06 | |
| | 12/15/06 | |
| | 12/31/06 | 10-K |
| | 1/1/07 | |
| | 3/30/07 | 10-K |
| | 4/20/07 | 8-K |
| | 4/25/07 | 8-K, 4 |
| | 6/22/07 | 8-K |
| | 6/28/07 | 8-K |
| | 6/29/07 | 8-K, 4 |
| | 7/25/07 | 8-K |
| | 8/31/07 | |
| | 9/5/07 | 4 |
| For The Period Ended | 9/30/07 | |
| | 10/18/07 | |
| | 10/31/07 | |
| Filed On / Filed As Of | 11/14/07 | |
| | 11/15/07 | |
| | 12/5/07 | |
| | 12/15/07 | |
| | 12/31/07 | |
| | 3/31/08 | |

Top                                    List All Filings

---

*Alternative Formats:*  Rich Text / Word (`.rtf`),  Text (`.txt`),  EDGAR (`.sgml`),  XML (`.xml`),  et al.

---

*Copyright © 2008 **Fran Finnegan & Company** All Rights Reserved.*
*www.secinfo.com - Mon, 10 Mar 2008 16:26:22.4 GMT - Help at SEC Info*

*This is an EDGAR HTML document rendered as filed.  [ Alternative Formats ]*

---

<div style="border:1px solid">First Amendment to Employment Agreement - Edward F. Brennan</div>

**Exhibit 10.20**

## FIRST AMENDMENT TO
## EMPLOYMENT AGREEMENT

This First Amendment (the *"Amendment"*) to the Employment Agreement (the *"Agreement"*) dated January 17, 2005, by and between CryoCor, Inc., a Delaware corporation (the *"Company"*), and Edward F. Brennan (the *"Executive"*), is entered into effective as of August 31, 2007 (the *"Effective Date"*).

### RECITALS

WHEREAS, the Company and the Executive desire to amend the Agreement to extend the severance period following a termination of the Executive's employment without Cause.

### AGREEMENT

NOW THEREFORE, in consideration of the benefits and mutual promises hereinafter set forth, the parties hereto agree as follows:

1.    Capitalized terms used but not otherwise defined in this Amendment shall have the meanings given such terms in the Agreement.

2.    A new Section 3.3.5 is hereby inserted as follows:

**(a)** "**3.3.5 280G.** Anything in this Agreement to the contrary notwithstanding, if any payment or benefit the Executive would receive under this Agreement, taken together with any other agreement or benefit plan of the Company (including stock options) (*"Payment"*) would (i) constitute a *"parachute payment"* within the meaning of Section 280G of the Internal Revenue Code of 1986, as amended (the *"Code"*), and (ii) but for this sentence, be subject to the excise tax imposed by Section 4999 of the Code (the *"Excise Tax"*), then such Payment shall be equal to the Reduced Amount. The *"Reduced Amount"* shall be either (x) the largest portion of the Payment that would result in no portion of the Payment being subject to the Excise Tax or (y) the largest portion, up to and including the total, of the Payment, whichever amount, after taking into account all applicable federal, state and local employment taxes, income taxes, and the Excise Tax (all computed at the highest applicable marginal rate), results in the Executive's receipt, on an after-tax basis, of the greater amount of the Payment notwithstanding that all or some portion of the Payment may be subject to the Excise Tax. If a reduction in payments or benefits constituting *"parachute payments"* is necessary so that the Payment equals the Reduced Amount, the reduction shall occur in the order the Executive elects in writing, *provided, however,* that such election shall be subject to Company approval if made on or after the date on which the event that triggers the Payment occurs.

The accounting firm engaged by the Company for general audit purposes as of the day prior to the effective date of the Change in Control shall perform the

foregoing calculations. If the accounting firm so engaged by the Company is serving as accountant or auditor for the individual, entity or group effecting the Change in Control, the Company shall appoint a nationally recognized accounting firm to make the determinations required hereunder. The Company shall bear all expenses with respect to the determinations by such accounting firm required to be made hereunder.

The accounting firm engaged to make the determinations hereunder shall provide its calculations, together with detailed supporting documentation, to the Executive and the Company within fifteen (15) calendar days after the date on which the Executive's right to a Payment is triggered (if requested at that time by the Executive or the Company) or such other time as requested by the Executive or the Company. If the accounting firm determines that no Excise Tax is payable with respect to a Payment, either before or after the application of the Reduced Amount, it shall furnish the Executive and the Company with an opinion reasonably acceptable to the Executive that no Excise Tax will be imposed with respect to such Payment. Any good faith determinations of the accounting firm made hereunder shall be final, binding and conclusive upon the Executive and the Company."

3.    Section 4.4.2 of the Agreement is hereby amended and restated in its entirety as follows:

"**4.4.2 Without Cause.** *If the Company terminates the Executive's employment without Cause, the Company shall pay the Executive's base salary and accrued and unused vacation earned through the date of termination, at the rate in effect at the time of termination subject to standard deductions and withholdings. In addition, upon the Executive's execution of a Release (as defined in Section 4.4.3 below), the Executive shall receive i) the equivalent of fifteen (15) months of the Executive's then current Base Salary less standard deductions and withholdings, paid on the Company's regular payroll dates and in accordance with its regular payroll practices; ii) provided the Executive timely elects COBRA health insurance continuation coverage, reimbursement of COBRA premiums for a period of fifteen (15) months following termination; and iii) accelerated vesting of the Options specified in Section 3.3 of this Agreement such that the Options shall be deemed vested as to a number of shares equal to that which would have been vested had the Executive remained in the continuous service of the Company in accordance with the Plan for a period of fifteen (15) months following the termination of his employment.*"

4.    A new Section 4.4.3 is hereby inserted as follows:

"**4.4.3 Release.** Notwithstanding the provisions of Sections 3.3.4 and 4.4.2, the Executive's entitlement to any and all compensation and benefits under Sections 3.3.4 and 4.4.2 is expressly conditioned on the Executive's execution and delivery to the Company (and the expiration of any revocation period) of an effective waiver and release of claims (a form of which is attached hereto as Exhibit A) (a **"*Release*"**) within the time period set forth therein (but in no event

later than forty-five (45) days after the date of termination), which shall be material to <u>the Company</u>'s obligation to provide any such compensation and benefits."

5.   A new Section 4.6 is hereby inserted as follows:

"**4.6 Application of Code Section 409A.** Compensation and benefits payable under the Agreement, to the extent of payments made from the date of the Executive's termination through March 15th of the calendar year following such termination, are intended to constitute separate payments for purposes of Section 1.409A-2(b)(2) of the Treasury Regulations and thus payable pursuant to the *"short-term deferral"* rule set forth in Section 1.409A-1(b)(4) of the Treasury Regulations; to the extent such payments are made following said March 15th, they are intended to constitute separate payments for purposes of Section 1.409A-2(b)(2) of the Treasury Regulations made upon an involuntary termination from service and payable pursuant to Section 1.409A-1(b)(9)(iii) of the Treasury Regulations, to the maximum extent permitted by said provision, with any excess amount being regarded as subject to the distribution requirements of Section 409A(a)(2)(A) of the Code, including, without limitation, the requirement of Section 409A(a)(2)(B)(i) of the Code that payment to the Executive be delayed until 6 months after separation from service if the Executive is a *"specified employee"* within the meaning of the aforesaid section of the Code at the time of such separation from service."

6.   Except as specifically amended by this Amendment, the terms and conditions of the Agreement shall remain in full force and effect.

7.   This Amendment is made in California. This Amendment shall be construed and interpreted in accordance with the internal laws of the State of California.

8.   This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF,** the parties have executed this Amendment as of the Effective Date.

**CRYOCOR, INC.**

By:   /s/ *Gregory J. Tibbitts*

Name:   Gregory J. Tibbitts

Title:   Chief Financial Officer and VP, Finance


/s/ *Edward F. Brennan*

**Edward F. Brennan**, **Ph.D.**

**Dates Referenced Herein** *and* **Documents Incorporated By Reference**

| *This 10-Q Filing* | *Date* | *Other Filings* |
|---|---|---|
| | ▼ | |
| | 1/17/05 | |
| | 8/31/07 | |
| For The Period Ended | 9/30/07 | |
| Filed On / Filed As Of | 11/14/07 | |

Top                                                    List All Filings

*Alternative Formats:*   Rich Text / Word (.rtf),  Text (.txt),  EDGAR (.sgml),  XML (.xml),  et al.

*Copyright © 2008* **Fran Finnegan & Company**  *All Rights Reserved.*
*www.secinfo.com* - Mon, 10 Mar 2008 16:19:43.1 GMT - *Help at SEC Info*

*This is an EDGAR HTML document rendered as filed.  [ <u>Alternative Formats</u> ]*

---

First Amendment to Employment Agreement - Gregory J. Tibbitts

**Exhibit 10.21**

FIRST AMENDMENT TO
EXECUTIVE EMPLOYMENT AGREEMENT

This First Amendment (the **"Amendment"**) to the Executive Employment Agreement (the **"Agreement"**) dated <u>July 1, 2004</u>, by and between CryoCor, Inc., a Delaware corporation (**"CryoCor"**), and <u>Gregory J. Tibbitts</u> (**"Tibbitts"**), is entered into effective as of <u>August 31, 2007</u> (the **"Effective Date"**).

RECITALS

**WHEREAS,** CryoCor and Tibbitts desire to amend the Agreement to extend the severance period following a termination of Tibbitts' employment without Cause.

AGREEMENT

**NOW THEREFORE,** in consideration of the benefits and mutual promises hereinafter set forth, the parties hereto agree as follows:

1.   Capitalized terms used but not otherwise defined in this Amendment shall have the meanings given such terms in the Agreement.

2.   Section 7.3 of the Agreement is hereby amended and restated in its entirety as follows:

*"7.3 <u>Termination Without Cause by CryoCor/Severance.</u> CryoCor may terminate Tibbitts' employment under this Agreement without Cause at any time, with or without advance notice. In the event of such termination, Tibbitts will receive the Base Salary then in effect, prorated to the date of termination, and continuation of his Base Salary for a period of twelve (12) months, payable in accordance with CryoCor's regular payroll cycle, provided that Tibbitts: (a) complies with all surviving provisions of this Agreement as specified in subsection 13.8 below; and (b) executes a Release (as defined in Section 7.5 below). All other CryoCor obligations to Tibbitts will be automatically terminated and completely extinguished."*

3.   Section 7.4(b) of the Agreement is hereby amended and restated in its entirety as follows:

"7.4(b) <u>280G</u>. Anything in this Agreement to the contrary notwithstanding, if any payment or benefit Tibbitts would receive under this Agreement, taken together with any other agreement or benefit plan of CryoCor (including stock options) (**"Payment"**) would (i) constitute a *"parachute payment"* within the meaning of Section 280G of the Internal Revenue Code of 1986, as amended (the **"Code"**), and (ii) but for this sentence, be subject to the excise tax imposed by Section 4999 of the Code (the **"Excise Tax"**), then such Payment shall be equal to the Reduced Amount. The **"Reduced Amount"** shall be either (x) the largest portion of the Payment that would result in no portion of the Payment being subject to the Excise Tax or (y) the largest portion, up to and including the total, of the Payment, whichever amount, after taking into account all applicable

federal, state and local employment taxes, income taxes, and the Excise Tax (all computed at the highest applicable marginal rate), results in Tibbitts' receipt, on an after-tax basis, of the greater amount of the Payment notwithstanding that all or some portion of the Payment may be subject to the Excise Tax. If a reduction in payments or benefits constituting *"parachute payments"* is necessary so that the Payment equals the Reduced Amount, the reduction shall occur in the order Tibbitts elects in writing, *provided, however*, that such election shall be subject to CryoCor approval if made on or after the date on which the event that triggers the Payment occurs.

The accounting firm engaged by CryoCor for general audit purposes as of the day prior to the effective date of the Change in Control shall perform the foregoing calculations. If the accounting firm so engaged by CryoCor is serving as accountant or auditor for the individual, entity or group effecting the Change in Control, CryoCor shall appoint a nationally recognized accounting firm to make the determinations required hereunder. CryoCor shall bear all expenses with respect to the determinations by such accounting firm required to be made hereunder.

The accounting firm engaged to make the determinations hereunder shall provide its calculations, together with detailed supporting documentation, to Tibbitts and CryoCor within fifteen (15) calendar days after the date on which Tibbitts' right to a Payment is triggered (if requested at that time by Tibbitts or CryoCor) or such other time as requested by Tibbitts or CryoCor. If the accounting firm determines that no Excise Tax is payable with respect to a Payment, either before or after the application of the Reduced Amount, it shall furnish Tibbitts and CryoCor with an opinion reasonably acceptable to Tibbitts that no Excise Tax will be imposed with respect to such Payment. Any good faith determinations of the accounting firm made hereunder shall be final, binding and conclusive upon Tibbitts and CryoCor."

**4.** A new Section 7.5 is hereby inserted as follows:

"7.5 <u>Release.</u> Notwithstanding the provisions of Sections 7.3 and 7.4, Tibbitts' entitlement to any and all compensation and benefits under Sections 7.3 and 7.4 is expressly conditioned on Tibbitts' execution and delivery to CryoCor (and the expiration of any revocation period) of an effective waiver and release of claims (a ***"Release"***) in a form acceptable to CryoCor, releasing all claims, known or unknown, that Tibbitts may have against CryoCor arising out of or any way related to Tibbitts' employment or termination of employment with CryoCor, within the time period set forth therein (but in no event later than forty-five (45) days after the date of termination), which shall be material to CryoCor's obligation to provide any such compensation and benefits."

5.  A new Section 7.6 is hereby inserted as follows:

"7.6 <u>Application of Code Section 409A</u>. Compensation and benefits payable under the Agreement, to the extent of payments made from the date of Tibbitts' termination through March 15th of the calendar year following such termination, are intended to constitute separate payments for purposes of Section 1.409A-2(b)(2) of the Treasury Regulations and thus payable pursuant to the *"short-term deferral"* rule set forth in Section 1.409A-1(b)(4) of the Treasury Regulations; to the extent such payments are made following said March 15th, they are intended to constitute separate payments for purposes of Section 1.409A-2(b)(2) of the Treasury Regulations made upon an involuntary termination from service and payable pursuant to Section 1.409A-1(b)(9)(iii) of the Treasury Regulations, to the maximum extent permitted by said provision, with any excess amount being regarded as subject to the distribution requirements of Section 409A(a)(2)(A) of the Code, including, without limitation, the requirement of Section 409A(a)(2)(B)(i) of the Code that payment to Tibbitts be delayed until 6 months after separation from service if Tibbitts is a *"specified employee"* within the meaning of the aforesaid section of the Code at the time of such separation from service."

6.  Except as specifically amended by this Amendment, the terms and conditions of the Agreement shall remain in full force and effect.

7.  This Amendment will be governed by and construed in accordance with the laws of the United States and the State of California. Each party consents to the jurisdiction and venue of the state or federal courts in San Diego, California, if applicable, in any action, suit, or proceeding arising out of or relating to this Amendment.

8.  This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF,** the parties have executed this Amendment as of the Effective Date.

**CRYOCOR, INC.**

By:   /s/ *Edward F. Brennan*

Name:   Edward F. Brennan

Title:   President and Chief Executive Officer

/s/ *Gregory J. Tibbitts*

**Gregory J. Tibbitts**

**Dates Referenced Herein** *and* **Documents Incorporated By Reference**

| *This 10-Q Filing* | *Date* | *Other Filings* |
|---|---|---|
| | ▼ | |
| | 7/1/04 | |
| | 8/31/07 | |
| For The Period Ended | 9/30/07 | |
| Filed On / Filed As Of | 11/14/07 | |

Top                                                         List All Filings

*Alternative Formats:*   Rich Text / Word `(.rtf),` Text `(.txt),` EDGAR `(.sgml),` XML `(.xml),` et al.

*Copyright © 2008* **Fran Finnegan & Company**  *All Rights Reserved.*
*www.secinfo.com - Mon, 10 Mar 2008 16:27:36.0 GMT - Help at SEC Info*

*This is an EDGAR HTML document rendered as filed.  [ Alternative Formats ]*

---

> **Amended and Restated Executive Employment Agreement**

**Exhibit 10.22**

### AMENDED AND RESTATED EXECUTIVE EMPLOYMENT AGREEMENT

This Amended and Restated Executive Employment Agreement (*"Agreement"*) is made effective as of September 5, 2007 (*"Effective Date"*), by and between CryoCor, Inc. (*"CryoCor"*) and Helen Barold (*"Barold"*) and amends, restates and supersedes in its entirety the Executive Employment Agreement by and between CryoCor and Barold dated August 30, 2007. This Agreement also supersedes in its entirety the Employment Offer Letter by and between CryoCor and Barold dated August 3, 2006.

The parties agree as follows:

1. Employment. CryoCor has employed Barold since August 2006, and Barold has accepted such employment, upon the terms and conditions set forth herein.

2. Duties.

2.1 Position. Barold is employed as Chief Medical Officer, reporting to the Chief Executive Officer (*"CEO"*), and shall have the duties and responsibilities assigned by CryoCor both upon initial hire and as may be reasonably assigned from time to time. Initially, Barold's duties shall include oversight of clinical and regulatory affairs, including discussions with the FDA related the atrial flutter and atrial fibrillation clinical initiatives. Barold shall perform faithfully and diligently all duties assigned to him. CryoCor reserves the right to modify Barold's position and duties at any time in its sole and absolute discretion, provided that the duties assigned are consistent with the position of a senior executive and that Barold continues to report to the CEO.

2.2 Best Efforts/Full-time. Barold will expend her best efforts on behalf of CryoCor, and will abide by all policies and decisions made by CryoCor, as well as all applicable federal, state and local laws, regulations or ordinances. Barold will act in the best interest of CryoCor at all times. Barold shall devote her full business time and efforts to the performance of her assigned duties for CryoCor, unless Barold notifies CryoCor in advance of her intent to engage in other paid work and receives CryoCor's express written consent to do so. CryoCor agrees that Barold will continue her clinical practice approximately one day per week.

2.3 Covenant Not To Compete. Except with prior written consent of CryoCor's Board of Directors, Barold will not, during the term of this Agreement, in any period during which Barold is receiving compensation or any other consideration from CryoCor, including, but not limited to, severance pay or benefits pursuant to Section 7 herein, engage in competition with CryoCor, either directly or indirectly, in any manner or capacity, as advisor, principal, agent, affiliate, promoter, partner, officer, director, employee, stock holder, owner, co-owner, consultant, or any member of any association or otherwise, in any phase of the business of developing, manufacturing and marketing of products or services which are in the same field of use or which otherwise compete with the products or services or proposed products or services of CryoCor.

2.4 Work Location. Barold's principal place of work shall be located in Bethesda, Maryland, or such other location as the parties may agree upon from time to time.

3. Term. The term of this Agreement shall begin on the Effective Date and shall continue until it is terminated pursuant to Section 7 herein (*"Term"*).

4. Compensation.

4.1 Base Salary. As compensation for Barold's performance of her duties hereunder, CryoCor shall pay to Barold a Base Salary of Two Hundred Fifty Thousand Dollars ($250,000) per year, payable in accordance with CryoCor's normal payroll practices, less required deductions for state and federal withholding tax, social security and all other employment taxes and payroll deductions.

4.2 Incentive Bonus. Barold will be eligible for an incentive bonus of up to 25% of Base Salary, less required deductions for state and federal withholding tax, social security and all other employment taxes and payroll deductions ("*Bonus*"). This Bonus shall be based upon the achievement of certain company-wide goals and milestones to be mutually agreed to following discussions amongst the management team, with final approval of the Compensation Committee of the Board of Directors.

4.3 Stock Options. CryoCor's Board of Directors granted Barold an initial incentive stock option to purchase 125,000 shares of CryoCor common stock ("*Common Stock*") under CryoCor, Inc.'s 2005 Stock Option Plan (the "*Plan*") at an exercise price equal to the fair market value of that stock on the date of grant of such option (the "Initial Option). The Initial Option vests 50% over a four year period following the date of grant thereof, and 50% upon the approval of CryoCor's PMA for atrial fibrillation. The Board of Directors granted Barold a second incentive stock option to purchase 60,000 shares of Common Stock under the Plan at an exercise price equal to the fair market value of that stock on the date of grant of such option (the "*Second Option*"). The Second Option vests ratably on a monthly basis over a 48-month period following the date of grant thereof. Subject to the approval of the Board of Directors or the Compensation Committee thereof, Barold will receive an additional incentive stock option to purchase 30,000 shares of Common Stock under the Plan at an exercise price equal to the fair market value of that stock on the date of grant of such option (the "*Additional Option*"). The Additional Option shall vest 25% on the first anniversary following the date of grant thereof with the remainder vesting ratably on a monthly basis over the following 36-month period.

4.4 Performance and Salary Review. CryoCor will periodically review Barold's performance on no less than an annual basis. Adjustments to salary or other compensation, if any, will be made by CryoCor in its sole and absolute discretion.

4.5 Employment Taxes. All of Barold's compensations shall be subject to customary withholding taxes and any other employment taxes as are commonly required to be collected or withheld by CryoCor.

5. Customary Fringe Benefits. Barold will be eligible for all customary and usual fringe benefits generally available to senior executives of CryoCor, subject to the terms and conditions of CryoCor's benefit plan documents. CryoCor reserves the right to change or eliminate the fringe benefits on a prospective basis, at any time, effective upon notice to Barold.

6. Business Expenses. Barold will be reimbursed for all reasonable, out-of-pocket business expenses incurred in the performance of her duties on behalf of CryoCor. To obtain reimbursement, expenses must be submitted promptly, with appropriate supporting documentation, in accordance with CryoCor's policies.

7. Termination.

7.1 At-Will Employment. Either Barold or CryoCor shall have the right to terminate the employment relationship at any time, with or without cause or advance notice, subject to the provisions set forth in Section 7 herein. It is expressly understood that the employment relationship is at-will. CryoCor reserves the right to modify Barold's position or duties to meet business needs and to use discretion in deciding on appropriate discipline. Any change to this at-will employment relationship must be by a specific, written agreement signed by Barold and the President and CEO of CryoCor.

7.2 Termination for Cause by CryoCor. Notwithstanding Section 7.1 above, CryoCor may terminate Barold's employment immediately at any time for Cause. For purposes of this Agreement, "Cause" is defined as the Board of Directors determination of any of the following: (a) acts or omissions constituting gross negligence, recklessness or willful misconduct on the part of Barold with respect to Barold's obligations or otherwise relating to the business of CryoCor; (b) Barold's material breach of this Agreement or CryoCor's Employee Innovations and Proprietary Rights Agreement; (c) Barold's conviction or entry of a plea of nolo contendere for fraud, misappropriation or embezzlement, or any felony or crime of moral turpitude; (d) Barold's willful neglect of duties as determined in the sole and exclusive discretion of the Board of Directors; (e) Barold's failure to perform the essential functions of her position, with or without reasonable accommodation, due to a mental or physical disability; and (f) Barold's death. With respect to (a), (b) and (d) above, CryoCor shall give Barold written notice of the offending conduct and a 30-day opportunity to cure any such violation or failure before terminating Barold's employment for Cause; provided however, that Barold shall only be entitled to one cure period in any consecutive three month period. In the event Barold's employment is terminated in accordance with this subsection 7.2, Barold shall be entitled to receive only the Base Salary then in effect, prorated to the date of termination. All other CryoCor obligations to Barold pursuant to this Agreement will become automatically terminated and completely extinguished. In addition, Barold will not be entitled to receive the severance payment described in subsection 7.3 below.

7.3 Termination Without Cause by CryoCor/Severance. CryoCor may terminate Barold's employment under this Agreement without Cause at any time, with or without advance notice. In the event of such termination, Barold will receive the Base Salary then in effect, prorated to the date of termination, and continuation of her Base Salary for a period of twelve (12) months, payable in accordance with CryoCor's regular payroll cycle, provided that Barold: (a) complies with all surviving provisions of this Agreement as specified in subsection 13.8 below; and (b) executes a Release (as defined in Section 7.5 below). All other CryoCor obligations to Barold will be automatically terminated and completely extinguished.

7.4 Termination Upon A Change In Control.

(a) Acceleration of Vesting Upon a Change in Control (as defined in the Plan) of CryoCor, 50% of the then unvested shares shall immediately vest and become exercisable. In addition, in the event Barold's Continuous Service (as defined in the Plan) with CryoCor ceases as a result of a Termination After Change in Control (as defined in the stock option agreement applicable to such shares), then all of the then unvested shares shall immediately vest and become exercisable upon Barold's execution of a Release (as defined in Section 7.5 below).

(b) 280G. Anything in this Agreement to the contrary notwithstanding, if any payment or benefit Barold would receive under this Agreement, taken together with any other agreement or benefit plan of CryoCor (including stock options) ("Payment") would (i)

constitute *"parachute payment"* within the meaning of Section 280G of the Internal Revenue Code of 1986, as amended (the *"Code"*), and (ii) but for this sentence, be subject to the excise tax imposed by Section 4999 of the Code (the *"Excise Tax"*), then such Payment shall be equal to the Reduced Amount. The *"Reduced Amount"* shall be either (x) the largest portion of the Payment that would result in no portion of the Payment being subject to the Excise Tax or (y) the largest portion, up to and including the total, of the Payment, whichever amount, after taking into account all applicable federal, state and local employment taxes, income taxes, and the Excise Tax (all computed at the highest applicable marginal rate), results in Barold's receipt, on an after-tax basis, of the greater amount of the Payment notwithstanding that all or some portion of the Payment may be subject to the Excise Tax. If a reduction in payments or benefits constituting *"parachute payments"* is necessary so that the Payment equals the Reduced Amount, the reduction shall occur in the order Barold elects in writing, *provided, however*, that such election shall be subject to CryoCor approval if made on or after the date on which the event that triggers the Payment occurs."

The accounting firm engaged by CryoCor for general audit purposes as of the day prior to the effective date of the Change in Control shall perform the foregoing calculations. If the accounting firm so engaged by CryoCor is serving as accountant or auditor for the individual, entity or group effecting the Change in Control, CryoCor shall appoint a nationally recognized accounting firm to make the determinations required hereunder. CryoCor shall bear all expenses with respect to the determinations by such accounting firm required to be made hereunder.

The accounting firm engaged to make the determinations hereunder shall provide its calculations, together with detailed supporting documentation, to Barold and CryoCor within fifteen (15) calendar days after the date on which Barold's right to a Payment is triggered (if requested at that time by Barold or CryoCor) or such other time as requested by Barold or CryoCor. If the accounting firm determines that no Excise Tax is payable with respect to a Payment, either before or after the application of the Reduced Amount, it shall furnish Barold and CryoCor with an opinion reasonably acceptable to Barold that no Excise Tax will be imposed with respect to such Payment. Any good faith determinations of the accounting firm made hereunder shall be final, binding and conclusive upon Barold and CryoCor.

7.5 <u>Release</u>. Notwithstanding the provisions of Sections 7.3 and 7.4, Barold's entitlement to any and all compensation and benefits under Sections 7.3 and 7.4 is expressly conditioned on the Barold's execution and delivery to CryoCor (and the expiration of any revocation period) of an effective waiver and release of claims (a *"Release"*) in a form acceptable to CryoCor, releasing all claims, known or unknown, that Barold may have against CryoCor arising out of or any way related to Barold's employment or termination of employment with CryoCor, within the time period set forth therein (but in no event later than forty-five (45) days after the date of termination), which shall be material to CryoCor's obligation to provide any such compensation and benefits.

7.6 <u>Application of Code Section 409A</u>. Compensation and benefits payable under the Agreement, to the extent of payments made from the date of Barold's termination through March 15th of the calendar year following such termination, are intended to constitute separate payments for purposes of Section 1.409A-2(b)(2) of the Treasury Regulations and thus payable pursuant to the *"short-term deferral"* rule set forth in Section 1.409A-1(b)(4) of the Treasury Regulations; to the extent such payments are made following said March 15th, they are intended to constitute separate payments for purposes of Section 1.409A-2(b)(2) of the Treasury Regulations made upon an involuntary termination from service and payable pursuant

to Section 1.409A-1(b)(9)(iii) of the Treasury Regulations, to the maximum extent permitted by said provision, with any excess amount being regarded as subject to the distribution requirements of Section 409A(a)(2)(A) of the Code, including, without limitation, the requirement of Section 409A(a)(2)(B)(i) of the Code that payment to Barold be delayed until 6 months after separation from service if Barold is a *"specified employee"* within the meaning of the aforesaid section of the Code at the time of such separation from service.

8. No Conflict of Interest. During the term of Barold's employment with CryoCor and during any period Barold is receiving payments from CryoCor, Barold must not engage in any work, paid or unpaid, that creates an actual or potential conflict of interest with CryoCor. Such work shall include, but is not limited to, directly or indirectly competing with CryoCor in any way, or acting as an officer, director, employee, consultant, stockholder, volunteer, lender, or agent of any business enterprise of the same nature as, or which is in direct competition with, the business in which CryoCor is now engaged or in which CryoCor becomes engaged during the term of Barold's employment with CryoCor, as may be determined by CryoCor in its sole discretion. If CryoCor believes such a conflict exists during the term of this Agreement, CryoCor may ask Barold to choose to discontinue the other work or resign employment with CryoCor. If CryoCor believes such a conflict exists during any period in which Barold is receiving payments pursuant to this Agreement, CryoCor may ask Barold to choose to discontinue the other work or forfeit the remaining severance payments. In addition, Barold agrees not to refer any client or potential client of CryoCor to competitors of CryoCor, without obtaining CryoCor's prior written consent, during the term of Barold's employment and during any period in which Barold is receiving payments from CryoCor pursuant to this Agreement.

9. Confidentiality and Proprietary Rights. As a condition of employment, Barold agrees to read, sign and abide by CryoCor's Employee Innovations and Proprietary Rights Assignment Agreement, which is provided with this Agreement and incorporated herein by reference.

10. Non-Solicitation.

10.1 Nonsolicitation of Customers or Prospects. Barold acknowledges that information about CryoCor's customers is confidential and constitutes trade secrets. Accordingly, Barold agrees that during the Term of this Agreement and for a period of one (1) year after the termination of this Agreement, Barold will not, either directly or indirectly, separately or in association with others, interfere with, impair, disrupt or damage CryoCor's relationship with any of its customers or customer prospects by soliciting or encouraging others to solicit any of them for the purpose of diverting or taking away business from CryoCor.

10.2 Nonsolicitation of CryoCor's Employees. Barold agrees that during the Term of this Agreement and for a period of one (1) year after the termination of this Agreement, Barold will not, either directly or indirectly, separately or in association with others, interfere with, impair, disrupt or damage CryoCor's business by soliciting, encouraging or attempting to hire any of CryoCor's employees or causing others to solicit or encourage any of CryoCor's employees to discontinue their employment with CryoCor.

11. Injunctive Relief. Barold acknowledges that Barold's breach of the covenants contained in sections 8-10 (collectively *"Covenants"*) would cause irreparable injury to CryoCor and agrees that in the event of any such breach, CryoCor shall be entitled to seek temporary, preliminary and permanent injunctive relief without the necessity of proving actual damages or posting any bond or other security.

12. <u>Agreement to Arbitrate</u>. To the fullest extent permitted by law, Barold and CryoCor agree to arbitrate any controversy, claim or dispute between them arising out of or in any way related to this Agreement, the employment relationship between CryoCor and Barold and any disputes upon termination of employment, including but not limited to breach of <u>contract</u>, tort, discrimination, harassment, wrongful termination, demotion, discipline, failure to accommodate, family and medical leave, compensation or benefits claims, constitutional claims; and any claims for violation of any local, state or federal law, statute, regulation or ordinance or common law. Claims for workers' compensation, and unemployment insurance benefits are excluded. For the purpose of this agreement to arbitrate, references to *"CryoCor"* include all parent, subsidiary or related entities and their employees, supervisors, officers, directors, agents, pension or benefit plans, pension or benefit plan sponsors, fiduciaries, administrators, affiliates and all successors and assigns of any of them, and this agreement shall apply to them to the extent Barold's claims arise out of or relate to their actions on behalf of CryoCor.

12.1 <u>Consideration</u>. The mutual promise by CryoCor and Barold to arbitrate any and all disputes between them (except for those referenced above) rather than litigate them before the courts or other bodies, provides the consideration for this agreement to arbitrate.

12.2 <u>Initiation of Arbitration</u>. Either party may exercise the right to arbitrate by providing the other party with written notice of any and all claims forming the basis of such right in sufficient detail to inform the other party of the substance of such claims. In no event shall the request for arbitration be made after the date when institution of legal or equitable proceedings based on such claims would be barred by the applicable statute of limitations.

12.3 <u>Arbitration Procedure</u>. The arbitration will be conducted in San Diego, California by a single neutral arbitrator and in accordance with the then current rules for resolution of employment disputes of the American Arbitration Association (*"AAA"*). The parties are entitled to representation by an attorney or other representative of their choosing. The arbitrator shall have the power to enter any award that could be entered by a judge of the trial court of the State of California, and only such power, and shall follow the law. In the event the arbitrator does not follow the law, the arbitrator will have exceeded the scope of her or her authority and the parties may, at their option, file a motion to vacate the award in court. The parties agree to abide by and perform any award rendered by the arbitrator. The arbitrator shall issue the award in writing and therein state the essential findings and conclusions on which the award is based. Judgment on the award may be entered in any court having jurisdiction thereof.

12.4 <u>Costs of Arbitration</u>. CryoCor shall bear the cost of the arbitration filing and hearing fees, and the cost of the arbitrator.

13. <u>General Provisions</u>.

13.1 <u>Successors and Assigns</u>. The rights and obligations of CryoCor under this Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of CryoCor. Barold shall not be entitled to assign any of Barold's rights or obligations under this Agreement.

13.2 <u>Waiver</u>. Either party's failure to enforce any provision of this Agreement shall not in any way be construed as a waiver of any such provision, or prevent that party thereafter from enforcing each and every other provision of this Agreement.

13.3 <u>Attorneys' Fees</u>. Each side will bear its own attorneys' fees in any dispute unless a statutory section at issue, if any, authorizes the award of attorneys' fees to the prevailing party.

13.4 <u>Severability</u>. In the event any provision of this Agreement is found to be unenforceable by an arbitrator or court of competent jurisdiction, such provision shall be deemed modified to the extent necessary to allow enforceability of the provision as so limited, it being intended that the parties shall receive the benefit contemplated herein to the fullest extent permitted by law. If a deemed modification is not satisfactory in the judgment of such arbitrator or court, the unenforceable provision shall be deemed deleted, and the validity and enforceability of the remaining provisions shall not be affected thereby.

13.5 <u>Interpretation; Construction</u>. The headings set forth in this Agreement are for convenience only and shall not be used in interpreting this Agreement. This Agreement has been drafted by legal counsel representing CryoCor, but Barold has participated in the negotiation of its terms. Furthermore, Barold acknowledges that Barold has had an opportunity to review and revise the Agreement and have it reviewed by legal counsel, if desired, and, therefore, the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

13.6 <u>Governing Law</u>. This Agreement will be governed by and construed in accordance with the laws of the United States and the State of California. Each party consents to the jurisdiction and venue of the state or federal courts in San Diego, California, if applicable, in any action, suit, or proceeding arising out of or relating to this Agreement.

13.7 <u>Notices.</u> Any notice required or permitted by this Agreement shall be in writing and shall be delivered as follows with notice deemed given as indicated: (a) by personal delivery when delivered personally; (b) by overnight courier upon written verification of receipt; (c ) by telecopy or facsimile transmission upon acknowledgment of receipt of electronic transmission; or (d) by certified or registered mail, return receipt requested, upon verification of receipt. Notice shall be sent to the addresses set forth below, or such other address as either party may specify in writing.

13.8 <u>Survival</u>. Sections 7 (*"Termination"*), 8 (*"No Conflict of Interest"*), 9 (*"Confidentiality and Proprietary Rights"*), 10 (*"Nonsolicitation"*), 11 (*"Injunctive Relief"*), 12 (*"Agreement to Arbitrate"*), 13 (*"General Provisions"*) and 14 (*"Entire Agreement"*) of this Agreement shall survive Barold's employment by CryoCor.

14. <u>Entire Agreement</u>. This Agreement, including the CryoCor Employee Innovations and Proprietary Rights Assignment Agreement <u>incorporated herein by reference</u> and CryoCor, Inc.'s 2000 Stock Option Plan and related option documents described in subsection 4.3 of this Agreement, constitutes the entire agreement between the parties relating to this subject matter and supersedes all prior or simultaneous representations, discussions, negotiations, and agreements, whether written or oral including the employment offer letter dated <u>June 1, 2004</u>. This Agreement may be amended or modified only with the written consent of Barold and the President/CEO of CryoCor. No oral waiver, amendment or modification will be effective under any circumstances whatsoever.

THE PARTIES TO THIS AGREEMENT HAVE READ THE FOREGOING AGREEMENT AND FULLY UNDERSTAND EACH AND EVERY PROVISION CONTAINED HEREIN. WHEREFORE, THE PARTIES HAVE EXECUTED THIS AGREEMENT ON THE DATES SHOWN BELOW.

<u>HELEN BAROLD</u>

Dated: <u>September 5, 2007</u>

/s/ ___***Helen Barold***___
5217 Wissiomag Road
<u>Bethesda</u>, <u>MD</u> <u>20816</u>

CRYOCOR, INC.

Dated: <u>September 5, 2007</u>

By:  ___/s/ ***Edward F. Brennan***___
<u>Edward F. Brennan</u>, PhD
President/CEO
CryoCor, Inc.
9717 Pacific Heights Blvd.
<u>San Diego</u>, <u>CA</u> <u>92121</u>

**Dates Referenced Herein** *and* **Documents Incorporated By Reference**

| *This 10-Q Filing* | *Date* | *Other Filings* |
|---|---|---|
| | ▼ | |
| | 6/1/04 | |
| | 8/3/06 | 4/A, 8-K |
| | 8/30/07 | 8-K |
| | 9/5/07 | 4 |
| For The Period Ended | 9/30/07 | |
| Filed On / Filed As Of | 11/14/07 | |

Top                                    List All Filings

---

*Alternative Formats:*  Rich Text / Word (`.rtf`),  Text (`.txt`),  EDGAR (`.sgml`),  XML (`.xml`),  et al.

---

*Copyright © 2008* **Fran Finnegan & Company**  *All Rights Reserved.*
*www.secinfo.com - Mon, 10 Mar 2008 16:20:33.1 GMT - Help at SEC Info*

*This is an EDGAR HTML document rendered as filed.  [ Alternative Formats ]*

---

| Section 302 CEO Certification |
|---|

**Exhibit 31.1**

**CERTIFICATION**

I, Edward F. Brennan, Ph.D., certify that:

1. I have reviewed this quarterly report on Form 10-Q of CryoCor, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15 (e) and 15d-15(e)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this report based on such evaluation; and

c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 14, 2007

/s/ *Edward F. Brennan, Ph.D.*
Edward F. Brennan, Ph.D.
Chief Executive Officer
(Principal Executive Officer)

**Dates Referenced Herein**  *and*  **Documents Incorporated By Reference**

| *This 10-Q Filing* | *Date* | *Other Filings* |
|---|---|---|
| | ▼ | |
| For The Period Ended | 9/30/07 | |
| Filed On / Filed As Of | 11/14/07 | |

Top                                             List All Filings

---

*Alternative Formats:*   Rich Text / Word (.rtf),  Text (.txt),  EDGAR (.sgml),  XML (.xml),  et al.

---

*Copyright © 2008* **Fran Finnegan & Company**  *All Rights Reserved.*
*www.secinfo.com - Mon, 10 Mar 2008 16:21:38.1 GMT - Help at SEC Info*

*This is an EDGAR HTML document rendered as filed.  [ Alternative Formats ]*

**Section 302 CFO Certification**

**Exhibit 31.2**

**CERTIFICATION**

I, Gregory J. Tibbitts, certify that:

1. I have reviewed this quarterly report on Form 10-Q of CryoCor, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15 (e) and 15d-15(e)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this report based on such evaluation; and

c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 14, 2007

/s/ *Gregory J. Tibbitts*

Gregory J. Tibbitts
Vice President, Finance and Chief Financial Officer
*(Principal Financial and Accounting Officer)*

**Dates Referenced Herein** *and* **Documents Incorporated By Reference**

| *This 10-Q Filing* | *Date* | *Other Filings* |
|---|---|---|
| | ▼ | |
| For The Period Ended | 9/30/07 | |
| Filed On / Filed As Of | 11/14/07 | |

Top                                                      List All Filings

---

***Alternative Formats:***   Rich Text / Word `(.rtf)`,  Text `(.txt)`,  EDGAR `(.sgml)`,  XML `(.xml)`,  et al.

---

Copyright © 2008 **Fran Finnegan & Company**  *All Rights Reserved.*
*www.secinfo.com - Mon, 10 Mar 2008 16:22:07.0 GMT - Help at SEC Info*

*This is an EDGAR HTML document rendered as filed.  [ Alternative Formats ]*

---

**Section 906 CEO and CFO Certification**

**Exhibit 32**

**CERTIFICATION**

Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. § 1350, as adopted), Edward F. Brennan, Ph.D., the Chief Executive Officer of CryoCor, Inc. (the *"Company"*), and Gregory J. Tibbitts, the Chief Financial Officer of the Company, each hereby certifies that, to the best of his knowledge:

1.   The Company's Quarterly Report on Form 10-Q for the quarter ended September 30, 2007, to which this Certification is attached as Exhibit 32 (the *"Periodic Report"*), fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934, as amended; and

2.   The information contained in the Periodic Report fairly presents, in all material respects, the financial condition of the Company at the end of the period covered by the Periodic Report and results of operations of the Company for the period covered by the Periodic Report.

Date:  November 14, 2007

| | |
|---|---|
| /s/ *Edward F. Brennan, Ph.D.* | /s/ *Gregory J. Tibbitts* |
| Edward F. Brennan, Ph.D. | Gregory J. Tibbitts |
| Chief Executive Officer | Vice President, Finance and Chief Financial Officer |

This certification accompanies the Form 10-Q to which it relates, is not deemed filed with the Securities and Exchange Commission and is not to be incorporated by reference into any filling of the Company under the Securities Act of 1933, as amended, or Securities Exchange Act of 1934, as amended (whether made before or after the date of the Form 10-Q), irrespective of any general incorporation language contained in such filing.

**Dates Referenced Herein** *and* **Documents Incorporated By Reference**

| *This 10-Q Filing* | *Date* | *Other Filings* |
| --- | --- | --- |
| | ▼ | |
| For The Period Ended | 9/30/07 | |
| Filed On / Filed As Of | 11/14/07 | |

Top                                    List All Filings

---

*Alternative Formats:*   Rich Text / Word `(.rtf)`,  Text `(.txt)`,  EDGAR `(.sgml)`,  XML `(.xml)`,  et al.

---

*Copyright © 2008* **Fran Finnegan & Company**  *All Rights Reserved.*
*www.secinfo.com - Mon, 10 Mar 2008 16:22:58.1 GMT -* *Help at SEC Info*