**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CRYOCOR, INC. and AMS RESEARCH CORPORATION, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 08-031-GMS |
| v. | ) | |
| | ) | |
| CRYOCATH TECHNOLOGIES, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| CRYOCATH TECHNOLOGIES, INC., | ) | |
| | ) | |
| Counterclaimant, | ) | |
| v. | ) | |
| | ) | |
| CRYOCOR, INC. and AMS RESEARCH CORPORATION, | ) | |
| | ) | |
| Counterdefendants. | ) | |

**CRYOCATH'S ANSWERING BRIEF OPPOSING PLAINTIFFS' MOTION TO
DISMISS COUNTS III, IV, AND XI OF DEFENDANT'S COUNTERCLAIMS,
OR, IN THE ALTERNATIVE, TO BIFURCATE AND STAY THE SAME**

ASHBY & GEDDES
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888

*Attorneys for CryoCath Technologies, Inc.*

*Of Counsel:*

Jason R. Buratti
Jeffery L. Kamenetsky
Christopher & Weisberg, P.A.
200 East Las Olas Boulevard
Suite 2040
Fort Lauderdale, FL 33301
Telephone: (954) 828-1488
Facsimile: (954) 828-9122

Dated: April 16, 2008

{00209892;v1}

**Table of Contents**

INTRODUCTION ......................................................................................................... 1

NATURE AND STAGE OF PROCEEDINGS ........................................................... 1

SUMMARY OF CRYOCATH'S ARGUMENT ......................................................... 2

FACTUAL BACKGROUND ....................................................................................... 3

   A.   The Amended Complaint and CryoCath's Answer and   Counterclaims ......................... 3
   B.   Sham Litigation Counterclaim – Count IV ..................................................... 4
   C.   Unfair Competition Counterclaim – Count XI ................................................ 4
   D.   Antitrust Counterclaim – Count III .................................................................. 5

ARGUMENT ................................................................................................................. 6

   A.   The Plaintiffs' Motion Should Be Denied Because CryoCath   Made the Required  Short And Plain Statement Of Its Claim ................................. 6
   B.   The Plaintiffs Ask the Court to Erroneously and Unfairly Interject  Evidence-Gathering into the Notice Pleading Standard ................................. 7
   C.   Absence of Noerr-Pennington Immunity Need Not Be  Pled, But Is ................ 9
   D.   CryoCath Properly Pled "Sham Litigation" in Count IV ............................... 10
   E.   CryoCath Properly Pled Delaware Unfair Competition in   Count XI ........... 11
   F.   CryoCath Properly Alleges Sherman Act Violations in Count III .................. 12
      1.   Detailed Facts Need Not Be Pled, But They Are ................................... 13
      a.  CryoCath Properly Alleges A Relevant Market, And Plaintiffs Brief Acknowledges And Identifies that Market ................................................ 13
        b.   CryoCath Properly Alleges Anticompetitive Conduct And Antitrust Injury – Count III. ........................................................................................ 14
        c.   CryoCath Properly Alleges Monopolization – Count III ......................... 16
        d.   CryoCath Properly Alleges Attempted Monopolization –   Count III ....... 17
   G.   Timing Is Irrelevant to the Instant Determination ......................................... 18
   H.   Patent Misuse ................................................................................................... 19
   I.   Plaintiffs Failed to Carry their Burden to Justify A Stay   or Bifurcation ...... 19
      a.   The Facts of this Case Counsel In Favor of Not Staying   or Birfurcating ......... 19
      b.   A Stay Would Prejudice CryoCath ..................................................... 20
      c.   Bifurcation Of Discovery Would Provide No Efficiencies   And Is Likely To Cause Discovery Problems Or Interfere   With Prospects For Settlement ................ 21

CONCLUSION ............................................................................................................. 22

## Table of Authorities

**Cases**

*Advo, Inc. v. Philadelphia Newspapers*, 51 F. 3d 1191 (3d Cir. 1995) ........................................ 17

*Allen v. Howmedica Leibinger, Inc.*, 197 F. Supp. 2d 101 (D. Del. 2002).................................. 11

*Brotech Corp. v. White Eagle Int'l Techs. Group Inc.*, No. CIV. A.03-232, 2004 WL 1427136, (E.D. Pa June 21, 2004) ........................................................................................................ 15

*Chip-Mender, Inc. v. The Sherwin-Williams, Co.*, No. C 05-3465 PJH, 2006 U.S. Dist. LEXIS 2176 (N.D. Cal, Jan. 3, 2006) ............................................................................................. 18

*Cognex Corp. v. Nat'l Instruments Corp.*, C.A. 00-442-JJF, 2001 U.S. Dist. LEXIS 25555 (D. Del. June 29, 2001).................................................................................................... 3, 19

*Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) .................... 12

*Enzo Life Sciences, Inc. v. Digene Corp.*, 295 F. Supp. 2d 424, 427 (D. Del. 2003) ................... 6

*Hosp. Bldg. Co. v. Trs. of Rex Hosp.,* 425 U.S. 738,  96 S. Ct. 1848, 48 L. Ed. 2d 338 (1976)..... 7

*Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318 (Fed. Cir. 1998) ...................... 11

*Int'l Business Machines Corp. v. Comdisco, Inc.*, 1993 WL 259102 (Del. Super. 1993) ............ 11

*Leeward Petroleum Limited v. Mene Grande Oil Co.*, 415 F. Supp. 158 (D. Del. 1976) .......... 6,7

*Les Shockley Racing, Inc. v. National Hot Rod Assoc.*, 884 F. 2d 504, 508-9 (9th Cir. 1989) ..... 15

*Lis v. Robert Packer Hosp.,* 579 F. 2d 819 (3d Cir. 1978) ........................................................ 21

*Lum v. Bank of Am.*, 361 F. 3d 217 (3d Cir. 2004) ...................................................................... 7

*Mathews v. Lancaster Gen. Hosp.*, 87 F. 3d 624 (3d Cir. 1996) ................................................ 15

*Menkowitz v. Pottstown Mem'l Med. Ctr.*, 154 F. 3d 113 (3d Cir. 1998)..................................... 6

*Midwest Indus., Inc. v. Karavan Trailers, Inc.*, 175 F. 3d 1356 (Fed.Cir. 1999) ........................ 11

*Mitel Corp. v. A&A Connections, 1998 U.S. Dist. LEXIS 3576, No. Civ. A. 97-cv-4205, 1998 WL 136529 (E.D. Pa. Mar. 20, 1998)* ...................................................................................... 14

*Moore North America, Inc. v. Poser Business Forms, Inc.*, 2000 WL 1480992 (D. Del. 2000).. 11

*Nami v. Fauver*, 82 F. 3d 63 (3d Cir. 1996)................................................................................. 6

*Neitzke v. Williams*, 490 U.S. 319 (1989) .................................................................. 6

*Pegasus Dev. Corp. v. DIRECTV, Inc.*, No. C.A. 00-1020-GMS,
2003 U.S. Dist. LEXIS 8052 ...................................................................................... 20

*Pennsylvania ex rel. Zimmerman v. Pepsico, Inc.,* 836 F. 2d 173 (3d Cir. 1988) ........................ 6

*Petroleum Ltd. V. Mene Grande Oil Co.*, 415 F. Supp. 158 (D. Del. 1976) ................................ 6

*Piecknick v. Pennsylvania*, 36 F. 3d 1250 (3d Cir. 1994) ............................................. 6

*Poller v. Columbia Broadcasting,* 368 U.S. 464, 82 S. Ct. 486, 7 L. Ed. 2d 458 (1962). .............. 7

*Q-Pharma, Inc. v. Andrew Jergens Co.*, 360 F. 3d 1295 (Fed. Cir. 2004) ................................ 12

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F. 3d 430 (3d Cir. 1997) ......................... 13

*Rypac Packaging Machinery Incorp. v. Coakley*, 2000 WL 567895 (Del. Ch. 2000) ................. 11

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993) .......................................... 15

*Syncsort Inc. v. Innovative Routines Int'l, Inc.*, No. CIV .04-3623(WHW), 2005 U.S. Dist.
LEXIS 15432, (D.N.J. May 6, 2005) ....................................................................... 16

*Synopsys, Inc. v. Magma Design Automation,* 2006 U.S. Dist. LEXIS 33751; 64 Fed. R. Serv. 3d
(Callaghan) 847 (D. Del. 2006) ............................................................................. 21

*Syrrx, Inc. v. Oculus Pharm. Inc.*, No. CIV. .A.02-321-JJF, 2002 U.S. Dist. 14893 ................... 6

*Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043 (Del. Super. 2001) ............................. 11

*Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F. 3d 1341 (Fed. Cir. 2004) ............... 2, 9, 10

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) .............. 17

*Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F. 3d 1340 (Fed. Cir. 1999 .................................. 9

**Rules**

FED. R. CIV. P. 8(a)(2)............................................................................................. 7

FED. R. CIV. P. 12(b)(6) ................................................................................ 1,2,6,12,14,16

CryoCath Technologies, Inc. ("CryoCath") opposes CryoCor, Inc.'s and AMS Research Corporation's (collectively "plaintiffs") motions (1) to dismiss Count III (Patent Misuse and Violation of Sherman Act Section 2), Count IV (Sham Litigation) and Count XI (Delaware Unfair Competition) of CryoCath's Counterclaims and (2) to stay and bifurcate those Counts.

## INTRODUCTION

The plaintiffs assert two patents they *know* cannot be infringed by the medical devices they accuse of infringement. This use of the judiciary improperly attempts to extend the plaintiffs' alleged patent monopolies beyond their physical scope, violating United States antitrust laws and constituting sham litigation and unfair competition. CryoCath properly seeks to redress this type of abuse of process and unfair competition by pursuing those counterclaims in this case brought by the plaintiffs. The plaintiffs admit they have notice of the elements of CryoCath's counterclaims. The claims include well pled details, so the plaintiffs focus in their brief on cases and arguments directed to "evidence," "findings," "proof" and other *factual* determinations. But their motion comes under Fed. R. Civ. P. 12(b)(6), which does not permit consideration of evidence or findings and only asks if claims are stated. They are. Discovery will vet out the evidentiary questions raised in the plaintiffs' motion. Rule 12(b)(6) requires the Court to accept CryoCath's notice pleading as true. Third Circuit precedent compels denial of the plaintiffs' motion to dismiss. And a stay or bifurcation does not serve the interests of justice and would prejudice CryoCath.

## NATURE AND STAGE OF PROCEEDINGS

On October 15, 2007, CryoCath sued CryoCor in this District for infringing six of CryoCath's patents. *CryoCath Techs. Inc. v. CryoCor, Inc.*, Civil Action No. 07-631 (D. Del. 2007). On January 15, 2008, CryoCor (together with the owner of the Asserted Patents, AMS

Research)[1] retaliated with the instant suit alleging infringement of two patents, DI 1, and later amended its Complaint to assert a third patent, DI 9. CryoCath answered and counterclaimed both times, requesting declaratory judgment that the Asserted Patents are invalid, not enforceable and not infringed, that this litigation is a sham, that the plaintiffs committed antitrust violations and engaged in unfair competition, and to declare infringement of a CryoCath patent.[2] DI 7, 10. The plaintiffs filed a motion to dismiss CryoCath's Counterclaims III (Antitrust), IV (Sham Litigation), and XI (Unfair Competition) under Fed. R. Civ. P. 12(b)(6). DI 12. This paper answers that motion after an agreed to extension of time associated with a co-pending ITC Investigation initiated by the plaintiffs. DI 17. The plaintiffs improperly assert the same two patents in the ITC, but CryoCath cannot seek redress of its antitrust, sham litigation, or unfair competition claims in that forum. *See* 19 U.S.C. §1337(d)(1). The parties are presently completing their Rule 26(f) conference and have agreed to commence discovery.

## SUMMARY OF CRYOCATH'S ARGUMENT

CryoCath's detailed pleadings in Counts III, IV, and XI address each element they must prove to establish monopolization and attempted monopolization (Count III), sham litigation (Count IV) and unfair competition (Count XI). The plaintiffs did not even identify an element missing from CryoCath's pleading Counts IV and XI. Since the plaintiffs' Rule 12(b)(6) motion depends upon a failure to state a claim, their failure to identify a missing claim element compels denial of their motion as to Counts IV and XI.

The plaintiffs rely almost exclusively on *Noerr-Pennington* immunity to justify dismissal of CryoCath's Counterclaim Counts III, IV and XI. But "this immunity is hardly absolute." *Unitherm Food Sys., v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1356 (Fed. Cir. 2004). Absent

---

[1] "Asserted Patents" means the plaintiffs' patents-in-suit, as defined by them at DI 12, page 2.
[2] The counterclaim patent relates to a different technology than that issue in the 2007 case against CryoCor.

absoluteness, which would require departing from binding precedent, the plaintiffs' motion should be denied to the extent it depends upon the immunity.

As to motions to dismiss, and particularly for antitrust claims, both the Supreme Court and Third Circuit mandate that dismissal prior to an opportunity for discovery should be granted very sparingly. The plaintiffs brought CryoCath to Court by improperly attempting to enlarge the scope of two of their patents. Discovery will reveal their real motive for this case. CryoCath should not be deprived of its day in Court by an erroneous dismissal of its well-plead claims in Counts III, IV and XI. Those Counts are well pled, as shown more fully below, and the plaintiffs own circular and self-defeating arguments establish why their motion to dismiss should be denied.

Nor is a stay or bifurcation appropriate, since the plaintiffs failed to make the required showing of "a clear case of hardship or inequity." *Cognex Corp. v. Nat'l Instruments Corp.*, C.A. 00-442-JJF, 2001 U.S. Dist. LEXIS 25555, at *4 (D. Del. June 29, 2001). Moreover, plaintiffs are unable to make such a showing. The plaintiffs' proposed stay would prejudice CryoCath and unnecessarily expend judicial and party resources. Accordingly, the Court should also deny their motion to bifurcate and stay.

## FACTUAL BACKGROUND

### A.    The Amended Complaint and CryoCath's Answer and Counterclaims

Nearly four months after CryoCath sued CryoCor in October 2007, plaintiff CryoCor retaliated with this action, joined by plaintiff AMS Research, who allegedly owns the three patents asserted against CryoCath (the "Asserted Patents"). DI 1, DI 9. Two of the Asserted Patents cannot be infringed by CryoCath's accused products; both AMS and CryoCor knew that, but they retaliated anyway. DI 10. The plaintiffs' knowingly improper assertion of the two

patents beyond their physical scope in this case renders them liable for at least sham litigation, unfair competition, monopolization and attempted monopolization. *Id.*

### B.    Sham Litigation Counterclaim – Count IV

CryoCath alleges that plaintiffs use the judiciary for improper business purposes by attempting to enforce two patents that they know CryoCath does not infringe. DI 10 at ¶¶ 57, 59, 64-66. That is, the plaintiffs abused process by bringing this sham litigation. CryoCath's sham litigation counterclaim identifies two patents extended beyond their scope, pleads that the plaintiffs know they overextend and provides the reason they do so (unfair business advantage and stifling competition), identifies the action (this one), and even details which claims the plaintiffs improperly broaden and how. Discovery will show that the plaintiffs knowingly and intentionally initiated this sham litigation. Discovery will also reveal their true intent. An example of this intent may well have been to attempt to drive their value up to create a bidding war by disingenuously inducing settlement talks with litigants. Indeed, Boston Scientific Corporation today announced its acquisition of CryoCor. See Ex. D. Either way, and regardless of who the players are, the plaintiffs did not identify any elements missing from CryoCath's Count IV pleading.

### C.    Unfair Competition Counterclaim – Count XI

CryoCath alleges that the plaintiffs' sham litigation in Delaware courts is an unfair method of competition. DI 10 at ¶¶ 57, 59 and 86-88. The plaintiffs' brought suit against CryoCath for infringement despite knowing that the claims of the '694 patent and the claims of the RE '049 patent can not read on CryoCath's accused devices. DI 10 at ¶¶ 40-45, 47, 48-53 and 55. Discovery will determine whether the plaintiffs unfairly compete with their improperly Asserted Patents by abusing process (among other things). The plaintiffs did not identify any elements missing form CryoCath's Count XI pleading.

### D.    Antitrust Counterclaim – Count III

CryoCath alleges that the plaintiffs' sham litigation violates Section 2 of the Sherman Act.  DI 10 at ¶¶ 37-39, 40-45, 47-53, and 54-62.  The plaintiffs actually <u>admit</u> twice that sham litigation constitutes a violation of Section 2.  Br.[3] at 3, 12.  That is, CryoCath pleads the very anticompetitive conduct the plaintiffs admit constitutes a Section 2 violation.

CryoCath alleges the relevant market in the United States is "cryosurgical products to treat heart disorders" and specifically cardiac arrhythmias. DI 10 at ¶ 37.  The plaintiffs identify that definition in their brief.  Br. at 7.  And they admit the Asserted Patents "relate to the treatment of cardiac arrhythmias."  Br. at 2.  The market for antitrust Count III is defined in the pleading and acknowledged in the plaintiffs' brief.

CryoCath further alleges a related submarket on "certain uses" within the United States. DI 10 at ¶ 38.  In fact, only one submarket exists for the CryoCor product – treatment of atrial flutter (AFL), for which CryoCor's products are approved.[4]  Plaintiff CryoCor also claims on its website it holds a "barrier to entry" of competition respecting either the market or the submarket. Ex. C.   The submarket is defined in the pleading and the plaintiffs' own propaganda confirms that and even indicates the potential for an anti-competition barrier to entry.

The plaintiffs know exactly what "certain uses" means and their arguments to the contrary (Br. at 20) are disingenuous.  Discovery will establish which of the pled markets yields antitrust liability for the plaintiffs' anticompetitive conduct that CryoCath pleads injures consumers and competitors alike. DI 10 at 60.

---

[3] "Br." refers to Plaintiffs' Opening Brief In Support of Their Motion to Dismiss Counts III, IV and XI of Defendant's Counterclaims, or, in the Alternative, to Bifurcate and Stay the Same, DI 12.
[4] CryoCath's products are approved in another related submarket, atrialventricular nodal reentry tachycardia (AVNRT). See *e.g.* Ex. A.

# ARGUMENT

### A.   The Plaintiffs' Motion Should Be Denied Because CryoCath Made the Required Short And Plain Statement Of Its Claim

Third Circuit precedent compels liberal construction of antitrust complaints. *Pennsylvania ex rel. Zimmerman v. Pepsico, Inc.,* 836 F.2d 173, 179 (3d Cir. 1988). The standard by which a court determines the sufficiency of a complaint under a Rule 12(b)(6) motion is well known. *Leeward Petroleum Ltd. V. Mene Grande Oil Co.*, 415 F.Supp. 158, 162 (D. Del. 1976). This Court must accept as true all allegations in CryoCath's pleading and must draw all reasonable factual inferences in the light most favorable to the non-moving party. *Syrrx, Inc. v. Oculus Pharm. Inc.*, No. CIV. A.02-321-JJF, 2002 U.S. Dist. 14893, *2 (D. Del. 2002) (citing *Neitzke v. Williams*, 490 U.S. 319, 326 (1989)); *Piecknick v. Pennsylvania*, 36 F.3d 1250, 1255 (3d Cir. 1994). The plaintiffs acknowledge this standard. Br at 10. "Additionally, a plaintiff need not allege the existence of every element of his or her claim as long as the allegations plead facts sufficient to provide the defendant with 'fair notice of the transaction.'" *Enzo Life Sciences, Inc. v. Digene Corp.*, 295 F. Supp. 2d 424, 427 (D. Del. 2003) (citing *Menkowitz v. Pottstown Mem'l Med. Ctr.*, 154 F.3d 113, 124 (3d Cir. 1998)). CryoCath's pleading far exceeds this standard to survive the instant motion.

Accepting CryoCath's well-pled allegations as true, the plaintiffs knowingly assert two of their patents beyond their scope. That conduct constitutes antitrust violations and unfair competition. See generally, DI 10 at Counterclaims. Ultimately, the question is not whether CryoCath will prevail at trial, but whether it should be given an opportunity to offer evidence in support of its claims. *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir. 1996).

The Supreme Court - like the Third Circuit - applies liberal pleading requirements; CryoCath was only required to provide "a short and plain statement of the claim showing that the

pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964, 167 L. Ed. 2d 929 (2007); *see also* Fed. R. Civ. P. 8(a)(2). Because of the inherently fact-dependent nature of antitrust claims, courts are "extremely liberal in construing antitrust complaints." *Lum v. Bank of Am.*, 361 F.3d 217, 228 (3d Cir. 2004); *see also Leeward Petroleum Ltd. v. Mene Grande Oil Co.*, 415 F. Supp. 158 at 167 ("Anti-trust complaints must be leniently read, with deference to proof of complex factual situations."). CryoCath's pleading easily meets this burden.

Rather than identify specific failures in the pleadings, though, the plaintiffs would have CryoCath plead *evidence* in addition to putting them on notice of their abuse of process in this District. That is not the standard to determine whether a claim is stated, and it is the reason the plaintiffs' motion should be denied and discovery commenced.

### B.    The Plaintiffs Ask the Court to Erroneously and Unfairly Interject Evidence-Gathering into the Notice Pleading Standard

In antitrust cases, "proof is largely in the hands of the alleged conspirators...." *Poller v. Columbia Broadcasting*, 368 U.S. 464, 473, 82 S. Ct. 486, 7 L. Ed. 2d 458 (1962). Dismissal prior to giving a victim of anticompetitive conduct its day in court should be granted very sparingly. *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 746, 96 S. Ct. 1848, 48 L. Ed. 2d 338 (1976). And it should depend upon applicable law, not cases that turn on merit-based determinations.

But the plaintiffs argue CryoCath's counterclaims are "facially defective" (Br. at 1) based primarily on merit decisions and not motions to dismiss. Of 58 cited cases, 35 cases turn on

merits decisions like summary judgment motions or motions for judgment.[5]  Twenty-three, 23,

decisions emanated from a motion to dismiss.[6]  Of those, five do not relate to antitrust, unfair

competition or sham litigation,[7] two were dismissed because movant lacked standing,[8] one was

dismissed for inability to sue the Federal Government or its employees,[9] and two were

overturned on appeal.[10]  Of the remaining thirteen cases, one required "monopoly leveraging,"

which the plaintiffs do not (and cannot) argue,[11] one relates to bank mergers,[12] one was

dismissed based on contract law not antitrust law,[13] one was dismissed based on energy policy

that created a supplier not a competitor as required by antitrust laws,[14] five pertained to leave to

amend,[15] and one was dismissed under *Noerr* for failure to *find* misconduct.[16]  The three

remaining cases are distinguished on their facts and law in this paper.

   This summary shows the plaintiffs selected law that may be applicable *after* discovery,

*e.g.*, when the Court decides whether *testimony* (like in the *C.R. Bard* case) constitutes

"affirmative evidence" that proves CryoCath's allegations.  Most of the plaintiffs' law does not

apply where CryoCath's allegations are accepted as true – as they must be in considering this

motion.  The plaintiffs repeatedly argue *proofs* had to be pled.  In the *PRE, Atlantic Exposition*

---

[5] *Advo; Akzona; American Hoist; Atlantic Exposition; B. Braun; Brown Shoe; Brownsville Golden Age; Brunswick; C.R. Bard; Capital Imaging; Carroll Touch; Cheminor Drugs; City of Columbia; Dentsply; Eastern; FilmTec; Glaverbel Societe; Harrison Aire; Heerwagen; Honeywell Int'l; Illinois Tool Works; In re Innotron; Intergraph; MedImmune; Nobelpharma; Pastore; Pharmacia; Professional Real Estate; Q-Pharma; Spectrum Sports; Times-Picayune; U.S. v. Grinnell; Virginia Panel; Walker Process; and Windsurfing Int'l.*
[6] *Bell Atlantic; Bristol-Myers Squibb; Chip-Mender; City of Pittsburgh; Conley; Crane & Shovel Sales; Crossroads Cogeneration; D.P. Enters; Evancho; Fresh Made; George Haug; Gianna Enters; Hydranautics; Les Shockley Racing; Morse; North Jersey Secretarial; Parker; Queen City Pizza; Schor; Schuylkill Energy; Sentinel Trust; U.S. v. Philadelphia Nat'l Bank; and Verizon Communications.*
[7] *Conley; D.P. Enters; Evancho; Morse; Sentinel Trust.*
[8] *City of Pittsburgh; Verizon Communication.*
[9] *North Jersey Secretarial.*
[10] *Bell Atlantic; Hydranautics.*
[11] *Schor.*
[12] *U.S. v. Philadelphia Nat'l Bank.*
[13] *Queen City Pizza.*
[14] *Schulkill Energy.*
[15] *Chip-Mender; Fresh Made; Les Shockley; Gianna Enters; Parker.*
[16] *Bristol-Myers Squibb.*

and *Brunswick* case recitations, for example, the plaintiffs refer to "findings" and "showings," not pleadings. Br at 15-17. In their citations to *Schuylkill Energy*, *Heerwagen*, *George Haug* and *Pastore,* they seek "proofs" and "examinations." Br at 18-19. On motions for *summary judgment* and for *judgment as a matter of law after trial*, all evidence must be weighed, and proofs, findings and showings applied. That information need not be set out in pleadings, though. See *Poller, Hosp. Bldg., infra.* The Court should decline plaintiffs' invitation to convert these evidentiary determinations into pleading requirements and ignore the law.

**C.    Absence of *Noerr-Pennington* Immunity Need Not Be Pled, But Is**

The plaintiffs rely heavily in this motion to dismiss Counts III, IV and XI on an illusory proposition that CryoCath had to plead some exception to their alleged *Noerr-Pennington* immunity. Br at 1-2, 5-6, 11-12, 22-23. But the immunity is a defense, not a claim. That makes it the plaintiffs' burden to show this defense after discovery of a well pled claim, not a reason to dismiss the Counts. Tellingly, the plaintiffs cite no authority that CryoCath needed to rebut that alleged defense in its pleading. None exists.

More importantly, "this immunity is hardly absolute." *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1356 (Fed. Cir. 2004). The plaintiffs' bad faith infringement allegations strip them of the immunity that the patent law *may* provide. *Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1355 (Fed. Cir. 1999). And the defendants admit that sham litigation (which CryoCath alleges) is an antitrust violation. Br at 8.[17] The sham litigation specifically identified by CyroCath comprises the misuse of the '694 and RE '049 patents. The plaintiffs' illegal acts under the color of their patents will preclude them from putting on the defense of

---

[17] CryoCath agrees that "enforcing valid patents is not an antitrust violation," Br at 8, but that's not what the plaintiffs are doing.

*Noerr-Pennington* immunity. *See Unitherm Food*, 375 F.3d at 1356. CryoCath was not required to plead that the defense is not available.

As with the plaintiffs inappropriate attempt to require evidence pleading, they seek to place the burden on antitrust victims to plead that the violators' defenses are not available. That burden would be too great and further enhance the pleading requirement. The Court should reject the plaintiffs' circular argument so that discovery of their improper acts can commence. The Court should reject the plaintiffs' incorrect contention that exceptions to immunities that are defenses must be pled in this context.

### D.    CryoCath Properly Pled "Sham Litigation" in Count IV

CryoCath's counterclaims contain extensive allegations of how the plaintiffs' brought suit against CryoCath for infringement despite knowing that the claims of the '694 patent (if valid and enforceable) and the claims of the RE '049 patent (if valid and enforceable) do not read on CryoCath's accused devices. DI 10 at ¶¶ 40-45, 47, 48-53 and 55.

Although attempts to enforce patent rights are generally immune from the antitrust laws, "this immunity is hardly absolute." *Unitherm Food*, 375 F.3d at 1356. Patentees acting under the color of their patents may nevertheless be liable if the litigation is a sham. *Unitherm Food*, 375 F.3d at 1356. CryoCath's pleadings allege the plaintiffs' litigation is a sham, fulfilling the notice pleading requirement. Proving these improper activities requires discovery though significant detail *is* in the Amended Complaint. Since the immunity is not absolute and specific reasons for Count IV for Sham Litigation have been pled (though not required), the Court should deny Plaintiff's motion as to Count IV.

### E.    CryoCath Properly Pled Delaware Unfair Competition in Count XI

The plaintiffs argue Count XI does not state a claim for Delaware unfair competition. Br at 28-29. Nowhere do the plaintiffs identify what elements of an unfair competition claim the pleading fails to state (and they cannot for the first time do so in a Reply Brief). Failing to identify a missing element, plaintiffs' motion as to Count XI (Unfair Competition) should be denied.

The elements of the common law tort of unfair competition are: (1) that the plaintiff has a reasonable expectancy of entering a valid business relationship, (2) with which the defendant wrongfully interferes, (3) thereby defeating the plaintiff's legitimate expectancy, and (4) causing him harm. *Rypac Packaging Machinery Incorp. v. Coakley*, 2000 WL 567895 at *8 (Del. Ch. 2000) (citing *Int'l Business Machines Corp. v. Comdisco, Inc.*, 1993 WL 259102 (Del. Super. 1993)). *See also Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043, 1057 (Del. Super. 2001) (citing *Rypac, supra*). Also, a common law claim for unfair competition based on a patent holder's misrepresentation of its patent rights to the marketplace must include an allegation of bad faith. *Moore North America, Inc. v. Poser Business Forms, Inc.*, 2000 WL 1480992 at *7 (D. Del. 2000) (citing *Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318, 1336 (Fed. Cir. 1998), rev'd on other grounds, *Midwest Indus., Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356 (Fed. Cir. 1999)). *See also Allen v. Howmedica Lenbinger, Inc.*, 197 F. Supp. 2d 101, 111 (D. Del. 2002).

For (1), plaintiffs acknowledge that CryoCath engages in valid business relationships, with sales in the millions of dollars. Br. at 6. For (2), CyroCath alleges that plaintiff initiated this action to impose anticompetitive injury on CryoCath. DI 10 at ¶ 57. For (3) and (4), CryoCath alleges that plaintiffs conduct has anticompetitive effects and constitutes patent misuse

and has already and will continue to damage CryoCath with respect to at least its cost of suit to defend against the claim.  DI 10 at 59.  Additional damages, in an amount to be quantified through discovery and trial, will include costs of defending against meritless claims of patent infringement and costs in disrupted business and lost opportunities to pursue legitimate competition.  DI 10 at ¶ 59.

For bad faith, CryoCath alleges the plaintiffs brought suit against CryoCath for infringement despite knowing that the claims of the '694 patent and the claims of the RE '049 patent can not read on CryoCath's accused devices.  DI 10 at ¶¶ 40-45, 47, 48-53 and 55.  Thus, CryoCath's pleading recites all of the necessary elements.  The plaintiffs utter failure to identify missing elements as to Counts IV and XI should be fatal to their motion to dismiss those Counts for failing to state a claim under Rule 12(b)(6).

### F.    CryoCath Properly Alleges Sherman Act Violations in Count III

The plaintiffs acknowledge antitrust liability lies where "the accused infringer establishes:…the lawsuit is a sham."  Br at 3 (citing *Q-Pharma, Inc. v. Andrew Jergens Co.*, 360 F.3d 1295, 1304-05 (Fed. Cir. 2004)); 12 (citing *Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) and *Q-Pharma*).  CryoCath pled precisely that – sham litigation.  But CryoCath's pleading goes further, identifying specifically how the plaintiffs are asserting the Asserted Patents beyond their scope.  DI 10.

The Court should reject the plaintiffs' self-serving mischaracterization of CryoCath's antitrust claim as simple noninfringement positions.  Br. at 14.  That is not the basis.  Sham litigation is.  DI 10 at 9-11.  And the plaintiffs admit "specific intent to monopolize may be inferred from [such] anticompetitive conduct."  Br at 24.  That is, the plaintiffs essentially admit CryoCath pleads the elements of an antitrust counterclaim – sham litigation with specific intent.

Their own argument is self defeating and circular.[18]

### 1.    *Detailed Facts Need Not Be Pled, But They Are*

The plaintiffs argue CryoCath did not plead "*enough* facts to state a claim to relief." Br. at 1, 6 (emphasis added). Not so. CyroCath gave detailed factual bases for its antitrust Count III.

#### a.  *CryoCath Properly Alleges A Relevant Market, And Plaintiffs Brief Acknowledges And Identifies that Market*

In its search for evidence in the pleading, the plaintiffs argue for CryoCath to "identify a particular 'relevant market.'" Br at 4, 7. Yet the plaintiffs admit CryoCath defined a relevant market "in the United States for cryosurgical products to treat heart disorders." Br at 20. Despite that well-pled definition, or perhaps because of it, the plaintiffs attempt to impose a requirement for pleading "economic indicia of reasonable interchangeability." Br at 4, 19-21 (citing *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997)). But *Queen City Pizza* does not support this alleged requirement.

In *Queen City Pizza*, the Third Circuit provides guidance for defining the relevant market to include alleging a proposed relevant market that clearly encompasses all interchangeable substitute products. *Id.* at 436. That is, economic indicia of reasonable interchangeability need not be pled. The plaintiffs overextend this case.

CryoCath's proposed relevant market of cryosurgical products to treat heart disorders necessarily encompasses all interchangeable substitute products. DI 10 at ¶37. Furthermore,

---

[18] In fact, CryoCath did not include the '610 patent, which CryoCath also does not infringe, in its antitrust counterclaim. DI 10 at 37-62. CryoCath's legitimate and specific allegations that the '694 and RE '049 patents are asserted as a sham, together with the exclusion of the '610 patent from the counterclaims, demonstrates the detail with which CryoCath pled this counterclaim. That is not to say that the plaintiffs have a sound basis to assert the claims of the '610 patent. The '694 and RE '049 patents are simply asserted so far beyond their scope that the plaintiffs' assertion of those patents is, among other things, a sham.

CryoCath properly pleads the geographic market to include the United States. DI 10 at ¶37. Thus, the pleadings define a relevant market.

Even if other products can treat heart disorders (*e.g.* drug therapy and heat-based cardiac ablation products), CryoCor publicly states that these products are ***not*** interchangeable with cryosurgical products to treat heart disorders.[19]   In fact, the plaintiffs publicly allege that cryosurgical products to treat heart disorders *do not have any substitutes*.  Thus, by their own admission, the plaintiffs acknowledge the validity of CryoCath's pleading of a relevant market.

Under the circumstances, therefore, even if the Court adopted plaintiffs' misinterpretation, a failure to allege cross-elasticity or interchangeability cannot be fatal, since the plaintiffs suggest the cryosurgery products are unique and have no substitutes. *Mitel Corp. v. A&A Connections*, 1998 U.S. Dist. LEXIS 3576, No. Civ. A. 97-cv-4205, 1998 WL 136529, at *4 (E.D. Pa. Mar. 20, 1998); *see also Queen City Pizza*, 124 F.3d at 439.  (At a minimum, discovery will establish this law would not apply.)  Either way, CryoCath properly pled the relevant market and CryoCor's public admissions (that the Court may consider)[20] preclude requiring any additional detail in the pleading or merits allowing discovery to flesh out the interchangeability concern in Rule 12(b)(6) context.

### b.    *CryoCath Properly Alleges Anticompetitive Conduct And Antitrust Injury – Count III*

The Sherman Act applies "against conduct which unfairly tends to destroy competition itself." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993).  The plaintiffs indiscriminately argue CryoCath failed to plead the existence of anticompetitive conduct or a legally cognizable antitrust injury. Br at 4, 21-24.  These arguments lack merit.

---

[19] *Available at* http://www.cryocor.com/clinical/atrial_fib.htm (Ex. B).
[20] "[I]n deciding motions to dismiss pursuant to Rule 12(b)(6), courts consider the allegations in the complaint as well as 'exhibits such as public records and other indisputably authentic documents underlying the plaintiffs' claims." Sentinel Trust 316 F3d at 216 (cited at Br. at 10)

CryoCath agrees "an antitrust plaintiff must allege more than simply that the defendant's wrongful behavior directly damaged the plaintiff's business - the plaintiff must also allege that the accused behavior stifled competition." *Unitherm Food,* 375 F.3d at 1361. So CryoCath did just that, pleading the plaintiffs' wrongful sham litigation harms both CryoCath and consumers in the relevant market reducing competition. DI 10 at ¶59 and 60. But CryoCath did not stop there, since the plaintiffs' wrongful conduct doesn't.

CryoCath also pled the plaintiffs' illegal behavior harms consumers. DI 10 at ¶ 60. "The Third Circuit has recognized that, because the purpose of the antitrust laws is to protect competition, the court must examine the antitrust injury question from the viewpoint of the consumer." *Brotech Corp. v. White Eagle Int'l Techs. Group Inc.*, No. CIV. A.03-232, 2004 WL 1427136, at *15 (E.D. Pa June 21, 2004) (citing *Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 641 (3d Cir. 1996)). Either the harm to competition or to consumers would satisfy CryoCath's pleading requirements. The plaintiffs failed to address the consumer aspect of the pleading altogether. Failing to address this aspect of the pleading, the plaintiffs' argument must fail.

Furthermore, markets with limited competition warrant heightened antitrust concern. In these markets, elimination of one participant can adversely affect the entire market by discouraging other participants from competing in that market. *See Les Shockley Racing, Inc. v. National Hot Rod Assoc.*, 884 F.2d 504, 508-9 (9th Cir. 1989) ("Convergence of injury to a market competitor and injury to competition is possible when the relevant market is both narrow and discrete and the market participants few."). In this limited market for cryosurgical products to treat heart disorders (especially considering CryoCor's belief it has barriers to entry, Ex. B), eliminating competition would destroy the competitive dynamic. The resulting "antitrust injury in form of reduced competition rather than just an injury to a competitor" may be sufficient to

deny a Rule12(b)(6) motion to dismiss. *Syncsort Inc. v. Innovative Routines Int'l, Inc.*, No. CIV .04-3623(WHW), 2005 U.S. Dist. LEXIS 15432, at *30 (D.N.J. May 6, 2005).

Finally, plaintiff CryoCor publicly claims to hold "a formidable barrier to entry" in the market of cryosurgical devices to treat cardiac arrythmias.[21]  That barrier to entry as pled by CryoCath is not properly-asserted patents, and this sham litigation filed by the plaintiffs establishes what discovery will show – the CryoCor barrier to entry is an antitrust-sham litigation-unfair competition scheme designed to improperly compete by using this District's judicial resources.

### c.    *CryoCath Properly Alleges Monopolization – Count III*

CryoCath properly pled sham litigation.  CryoCath properly pled unfair competition. CryoCath properly pled Sherman Act violations.  In the Third Circuit, Sherman Act Section 2 pleading requires alleging "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from the growth or development as a consequence of a superior product, business acumen, or historic accident." *Queen City*, 124 F.3d at 437.

For (1), the plaintiffs argue CryoCath failed to allege market share or monopoly power. Br at 24-25.  Not so.  The plaintiffs admit CryoCath pleads "CryoCor 'has a monopoly…'" Br at 25.  Tellingly, plaintiffs omit the "certain uses" submarket language that follows their selective quotation. The plaintiffs complain they lack notice, but, as explained above, they know precisely what their FDA clearance is for and exactly what markets and submarkets CryoCath's pleading targets.  Their argument to the contrary is disingenuous.  Indeed, plaintiff CryoCor publicly admits possessing monopoly power in some market and claims to enjoy barriers to entry to it.

---

[21] See http://www.cryocor.com/corpprofile/intellectual.htm (Ex. C).

Even if the referred to barriers are patents - which is a question for discovery - the patents are improperly asserted.

For (2), the plaintiffs argue that "willful acquisition or maintenance of monopoly power" has generally been construed to mean some type of 'anticompetitive [or exclusionary] conduct.' *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407, 414 (2004) (emphasis removed)." Br at 18.  CryoCath alleged anticompetitive conduct as discussed above.

CyroCath's monopolization counterclaim is properly pled.  Thus, the plaintiffs' motion should be denied and discovery commenced.

### d.    *CryoCath Properly Alleges Attempted Monopolization – Count III*

In the Third Circuit, attempted monopolization claims under Sherman Act Section 2 require pleading that the plaintiffs: (1) engaged in predatory or anti-competitive conduct with (2) specific intent to monopolize and with (3) a dangerous probability of achieving monopoly power. For (1), CryoCath properly alleged anti-competitive conduct.  See infra, Section 2b.  For (2), the plaintiffs admit "specific intent to monopolize may be inferred from anticompetitive conduct. *See, e.g., Advo, Inc. v. Philadelphia Newspapers*, 51 F.3d 1191, 1199 (3d Cir. 1995)."  Br. at 24; see also DI 10 at ¶58 (pleading specific intent).  Thus, applying the plaintiffs' own argument compels a finding that CryoCath's pleading satisfies the first two elements of the Third Circuit's attempted monopolization test.

For (3), the plaintiffs admit CryoCath "does allege that 'on information and belief' CyroCor 'has a monopoly…' (D.I. 10 at ¶10)."  Br. at 25.[22]    That admission taken with or without plaintiffs' own public and FDA clearance – either of which support CryoCath's pleading

---

[22] Monopoly power is well defined in law as "the power to control prices or exclude competition." *United States v. Grinnell Corp., 384 U.S. 563, 571, 86 S. Ct. 1698, 16 L. Ed. 2d 778 (1966)* (quoting *United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 391, 76 S. Ct. 994, 100 L. Ed. 1264 (1956)*).  CryoCath did not need to do more than use the word. The plaintiffs do not appear to argue otherwise.

provides *evidence* that the plaintiffs have a dangerous probability of achieving monopoly power. The third element is also satisfied.

While "barrier to entry" *evidence* is not required at the pleading stage, *Chip-Mender, Inc. v. The Sherwin-Williams, Co.*, No. C 05-3465 PJH, 2006 U.S. Dist. LEXIS 2176, at *12,13 (N.D. Cal, Jan. 3, 2006), CryoCath provides this *evidence* in rebuttal to plaintiffs challenge that "defendant will not be able to offer" evidence that plaintiffs have a dangerous probability of achieving monopoly power.   Br at 25.   This conflicting evidence demonstrates not only satisfactory pleadings, but also the need for discovery to resolve CyroCath's antitrust claims.

Also for (3), the plaintiffs misstate that CryoCath failed to "allege a dangerous probability of Plaintiffs' gaining monopoly power without winning this suit."  Br at 4, 7.  But a review of the pleadings reveals that CryoCath alleges a "dangerous probability of [the plaintiffs'] success in monopolizing this market or related submarkets...." DI 10 at ¶ 56.

CyroCath properly pled all three elements of its attempted monopolization counterclaim. The plaintiffs have notice of this antitrust claim for monopolization and attempted monopolization.[23]  The Court should deny the motion as to Count III and commence discovery.

### G.    Timing Is Irrelevant to the Instant Determination

The plaintiffs argue that "now is the time" to dismiss the antitrust counterclaim because they implicate "expensive, wide-ranging discovery."  Br at 1, 25.  Whether or not this is true, timing cannot and should not justify granting their motion.[24]  And nowhere do the plaintiffs

---

[23] The plaintiffs point to CryoCath's pleading that one of the plaintiffs may not have standing to assert the Asserted Patents. *E.g.*, Br at 9, 22 n.9. At the time CryoCath filed its counterclaims, the plaintiffs refused to provide a copy of their alleged patent license. That license has now been provided to CryoCath's counsel on an outside-counsel-only basis. For the purposes of this motion, CryoCath does not address the allegation since the license is confidential and constitutes evidence not properly at issue in a motion to dismiss under Rule 12(b)(6) – or in an opposition, though <u>evidence</u> does contradict the plaintiffs arguments. Notably, the plaintiffs do not argue they both have standing.

[24] The plaintiffs' statement that no Rule 26(f) conference has been held is no longer accurate. The parties are conducting the conference and have agreed to commence discovery.

identify what discovery they think will be so intrusive. Consequently, this red herring cannot justify dismissing the antitrust claims.

### H.    Patent Misuse

As part of its labyrinthine motion to dismiss, the plaintiffs try to create in Count III a separate cause of action for patent misuse. Br at 26-28. There is no counterclaim for patent misuse. This is a straw man argument that can be disregarded

### I.    Plaintiffs Failed to Carry their Burden to Justify A Stay or Bifurcation

The plaintiffs must show "a clear case of hardship or inequity" before the Court can enter a stay order. *Cognex Corp. v. Nat'l Instruments Corp.*, C.A. 00-442-JJF, 2001 U.S. Dist. LEXIS 25555, at *4 (D. Del. June 29, 2001). And plaintiffs have failed to even try to make such a showing. Br. at 29-31. Failing that, their motion for a stay should be denied and has no legitimate basis in law or fact because it did not address the factors the Court must consider to enter a stay.

Those factors are "(1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party; (2) whether a stay would simplify issues in question and trial of the case; and (3) whether discovery is complete and whether a trial date has been set." *Pegasus Dev. Corp. v. DIRECTV, Inc.*, No. C.A. 00-1020-GMS, 2003 U.S. Dist. LEXIS 8052, at *3-4 (D. Del. May 14, 2003). The plaintiffs cannot argue those elements for the first time in their Reply Brief, and since they are not disjunctive, the failure to argue even one in their opening papers is fatal to their motion.

### a.    *The Facts of this Case Counsel In Favor of Not Staying or Birfurcating*

The plaintiffs argue without support that "bifurcating and staying discovery on Defendant CryoCath's antitrust and unfair competition counterclaims will promote judicial economy." Br.

at 30. They rely on an incorrect and self-serving theory that "defendant's antitrust and unfair competition counterclaims are premised entirely on its non-infringement position" Br. at 30. To the contrary, as discussed above, CryoCath's antitrust and unfair competition claims are at least based on: (1) plaintiffs actions to stifle competition; (2) plaintiffs actions to harm consumers; (3) plaintiffs actions to reduce competition in a narrow and discrete market with few competitors; (4) plaintiffs public admission of having a barrier to entry, and (5) plaintiffs' misuse of their patents. Failing to address these aspects of CryoCath's claims, the plaintiffs' stay and bifurcation motions should be denied.

### b.    *A Stay Would Prejudice CryoCath*

Staying discovery would unduly prejudice CryoCath and present discovery and settlement disadvantages. For example, staying discovery would enable the plaintiffs' anticompetitive actions to remain unresolved for years. The plaintiffs clearly plan to use expensive and time-consuming litigation to weaken CryoCath. They requested interference proceedings with the U.S. Patent and Trademark Office and a Section 337 investigation with the International Trade Commission (ITC).[25]

To delay this case during the interference proceeding and the ITC investigation would reinforce plaintiffs' anticompetitive strategy (and therefore CryoCath's pleading – but again, this is evidence). Staying would not simplify issues in question and trial of the case. Rather, in the plaintiffs' multinational anticompetitive strategy, they are more likely to use a stay to not produce the very evidence they argue is central to CryoCath's patent infringement claims. The plaintiffs cannot argue that patent infringement is the only basis for the antitrust claims and also

---

[25] The ITC proceeding is 337-TA-642. See www.usitc.gov. The Interference is styled Lalonde v. Li, USPTO B.P.A.I., Patent Interference No. 105,607. See www.uspto.gov. They also filed suit in Canada on foreign counterparts to the U.S. patents at issue in this case. *CryoCor, Inc. and AMS Research Corp. v. CryoCath Technologies, Inc.* Ct. No. T-66-08 (Canadian Federal Court). In that case, they have twice amended their complaint in an attempt to plead their case with particularity as required in Canada.

that discovery will be broader. Their argument defeats their motion to stay as it does their motion to dismiss.

> ### c. Bifurcation Of Discovery Would Provide No Efficiencies And Is Likely To Cause Discovery Problems Or Interfere With Prospects For Settlement

A court in this District held "[t]he decision to bifurcate *vel non* is a matter to be decided on a case-by-case basis and must be subject to an informed discretion by the trial judge in each instance." *Lis v. Robert Packer Hosp.,* 579 F.2d 819, 824 (3d Cir. 1978) quoting *Synopsys, Inc. v. Magma Design Automation,* 2006 U.S. Dist. LEXIS 33751; 64 Fed. R. Serv. 3d (Callaghan) 847 (D. Del. 2006). The plaintiffs did not argue case specific facts and their request to bifurcate discovery would save no time or effort.

The discovery relevant to CryoCath's antitrust claims goes only slightly beyond that which will be needed for standard patent damages. Also, to split discovery now would make settlement impossible or difficult to obtain. For example, without developing all the claims in the current litigation, settlement discussions could proceed on an informed basis and with the attention to risk that facilitates a negotiated resolution.

Splitting discovery would waste the Court's resources resolving disputes that will undoubtedly arise, for example, based on the plaintiffs' conflicting positions. They argued discovery will be extensive and at the same time merely duplicative of infringement. Br at 6, 31. Which is it? Discovery for the patent, antitrust and unfair competition claims will overlap the Asserted Patents and accused products. Additional antitrust discovery should not be significant – that is surely why the plaintiff did not give examples.

For at least the foregoing reasons, the Court should deny plaintiffs request to bifurcate issues for trial and stay discovery.

## CONCLUSION

At this pleading stage, the sole question is whether CryoCath's allegations set forth the requisite elements and provide CryoCor with notice of the nature of the claims. There is no legitimate dispute that they do. The plaintiffs unfairly and illegally brought this action on two patents they know CryoCath does not infringe and they should be made to answer for that wrongful conduct. Therefore, CryoCath respectfully requests the Court deny the plaintiffs' motions to dismiss Counts III, IV and XI and their request to stay or bifurcate those issues.

ASHBY & GEDDES

/s/ *Lauren E. Maguire*

John G. Day (I.D. # 2403)
Lauren E. Maguire (I.D. #4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888

*Attorneys for Plaintiff*
CryoCath Technologies Inc.

*Of Counsel:*

Jason R. Buratti
Jeffery L. Kamenetsky
Christopher & Weisberg
200 East Las Olas Boulevard
Suite 2040
Fort Lauderdale, Florida 33301
(954) 828-1488
(fax-(954) 828-9122)

Dated: April 16, 2008

# EXHIBIT A



FDA Home Page | CDRH Home Page | Search | A-Z Index          Questions?

510 (k)    |   Registration & Listing   |   Adverse Events   |   PMA | Classification | CLIA

CFR Title 21   |   Advisory Committees   |   Assembler | Recalls | Guidance | Standards



New Search                                    Back To Search Results

## 510(k) Premarket Notification Database

| | |
|---|---|
| **Device Classification Name** | Catheter, Steerable |
| **510(K) Number** | K070357 |
| **Device Name** | FLEXCATH STEERABLE SHEATH & DILATOR |
| **Applicant** | CRYOCATH TECHNOLOGIES, INC.<br>10 B Tano Road<br>Santa Fe, NM 87506 |
| **Contact** | Fred Milder |
| **Regulation Number** | 870.1280 |
| **Classification Product Code** | DRA |
| **Date Received** | 02/07/2007 |
| **Decision Date** | 12/28/2007 |
| **Decision** | Substantially Equivalent (SE) |
| **Classification Advisory Committee** | Cardiovascular |
| **Review Advisory Committee** | Cardiovascular |
| **Statement/Summary/Purged Status** | Summary Only |
| **Summary** | Summary |
| **Type** | Traditional |
| **Reviewed By Third Party** | No |
| **Expedited Review** | No |

Database Updated 04/08/2008

---

CDRH Home Page | CDRH A-Z Index | Contact CDRH | Accessibility | Disclaimer
FDA Home Page | Search FDA Site | FDA A-Z Index | Contact FDA | HHS Home Page

Center for Devices and Radiological Health / CDRH

http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpmn/pmn.cfm?ID=24017          4/16/2008



**CENTER FOR DEVICES AND RADIOLOGICAL HEALTH**

FDA Home Page | CDRH Home Page | Search | A-Z Index                    Questions?



| | | | | |
|---|---|---|---|---|
| 510 (k) | Registration & Listing | Adverse Events | PMA | Classification | CLIA |
| CFR Title 21 | Advisory Committees | Assembler | Recalls | Guidance | Standards |

New Search                                    Back To Search Results

## 510(k) Premarket Notification Database

| | |
|---|---|
| **Device Classification Name** | Unit, Cryosurgical, Accessories |
| **510(K) Number** | K030303 |
| **Device Name** | FREEZOR XTRA SURGICAL CARDIAC CRYOABLATION DEVICE |
| **Applicant** | CRYOCATH TECHNOLOGIES, INC. 16771 Chemin Ste Marie Kirkland,  CA  H9H 5 H3 |
| **Contact** | Jean-Pierre Desmara |
| **Regulation Number** | 878.4350 |
| **Classification Product Code** | GEH |
| **Date Received** | 01/29/2003 |
| **Decision Date** | 04/29/2003 |
| **Decision** | Substantially Equivalent (SE) |
| **Classification Advisory Committee** | General & Plastic Surgery |
| **Review Advisory Committee** | General & Plastic Surgery |
| **Statement/Summary/Purged Status** | Summary Only |
| **Summary** | Summary |
| **Type** | Traditional |
| **Reviewed By Third Party** | No |
| **Expedited Review** | No |

Database Updated 04/08/2008

CDRH Home Page | CDRH A-Z Index | Contact CDRH | Accessibility | Disclaimer
FDA Home Page | Search FDA Site | FDA A-Z Index | Contact FDA | HHS Home Page

Center for Devices and Radiological Health / CDRH

http://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpmn/pmn.cfm?ID=10758        4/16/2008

# EXHIBIT B



| Corporate Profile | Products | Clinical Trials | Our Team | Investors | Careers | Contact | Home |



CLINICAL TRIALS

**Overview**

**Atrial Fibrillation**

**Atrial Flutter**

Home > Clinical Trials > Atrial Fibrillation



**Atrial Fibrillation**

Atrial fibrillation is by far the most commonly occurring cardiac arrhythmia affecting over 5.6 million individuals in the U.S. annually. Atrial fibrillation causes the upper chambers of the heart (atria) to beat at an irregular rate and in an irregular rhythm. This chaotic activity interrupts normal blood flow, predisposes the heart to the formation of blood clots and results in a 6x increase in stroke and a 2x increase in mortality. Over 80,000 strokes annually are caused by atrial fibrillation. Each year atrial fibrillation strikes more individuals than Parkinson's disease, epilepsy, and Alzheimer's' Disease combined.

Patients with atrial fibrillation report symptoms such as heart palpitations (a racing heart), fatigue, weakness, shortness of breath, chest pain, and light-headedness. The current standard of care in the treatment of atrial fibrillation is life-long drug therapy — typically agents used in the attempt to restore the heart to its normal rate and rhythm, and blood thinners to prevent blood clot formation. Unfortunately these drugs do not cure atrial fibrillation and they have sometimes severe side effects which include arrhythmias, blindness, depression, impotence, lung toxicity (pulmonary fibrosis), skin discoloration, hemorrhage, liver damage, thyroid damage, and even death.

Since episodes of atrial fibrillation are unpredictable, patients will often avoid travel, stop exercise, and shun visits with family and friends. This loss of quality of life affects not only atrial fibrillation patients, but their family and friends as well.

As an alternative to these ineffective medications, some clinicians use heat-based radiofrequency (RF) ablation devices to treat atrial fibrillation even though these devices are not approved for this use in the United States. Patient complications reported in literature from the use of RF ablation devices to treat atrial fibrillation have at times resulted in severe loss of health and even death. These complications include the narrowing of blood vessels between the lungs and the left atrium (pulmonary vein stenosis), the creation of stroke producing clots (emboli), and the creation of life-threatening openings between the heart and the esophagus (atrial esophageal fistulas). These complications of RF ablation have limited its use to treat atrial fibrillation in some settings.

CryoCor cryoablation has been used to treat over 1,800 individuals worldwide for atrial flutter, atrial fibrillation and other cardiac arrhythmias. Unlike RF ablation, no pulmonary vein stenosis has been noted to date in cryoablation clinical studies or commercial use, nor have there been reports of atrial esophageal fistulas. As a result, CryoCor believes its Cardiac Cryoablation System may provide clinicians with treatment success at least equivalent to that now achieved in treating atrial fibrillation with either drugs or RF ablation but with fewer patient complications.

[ back to top ]

Home | Corporate Profile | Products | Clinical Trials | Our Team | Investors | Careers | Contact
Privacy Policy | Site Map
© 2005 CryoCor, Inc.

# EXHIBIT C





| Corporate Profile | Products | Clinical Trials | Our Team | Investors | Careers | Contact | Home |

**Business Opportunity**

**Problem – Solution**

**Procedure**

**Intellectual Property**

Home > Corporate Profile > Intellectual Property

**INTELLECTUAL PROPERTY**

CryoCor has built a portfolio of proprietary technologies in the design, function and performance of its System allowing for protected pursuit of its business strategy in successfully treating various cardiac arrhythmias, for which patents will be assigned to the Company. CryoCor's comprehensive intellectual property (IP) portfolio provides a formidable barrier of entry due to its proprietary position in the application of cryothermy to achieve and maintain sufficiently low temperatures to safely and effectively treat atrial fibrillation, atrial flutter and other cardiac arrhythmias.

Currently, CryoCor owns or licenses 39 issued United States patents and a number of pending United States patent applications covering various aspects of our products and technology. The Company also owns or licenses 24 patents issued outside of the United States and has a number of pending patent applications outside the United States.

Home | Corporate Profile | Products | Clinical Trials | Our Team | Investors | Careers | Contact
Privacy Policy | Site Map
© 2005 CryoCor, Inc.

# EXHIBIT D

**Quote, Chart, News**
Snapshot
Company Report
Quotes
Charts
Key Developments
Recent News
**Research**
SEC Filings
Advisor FYI
CAPS
StockScouter
Earnings Estimates
Analyst Ratings
Financial Results
Insider Trading
Ownership
Message Board
**Guided Research**
Research Wizard
**Find Stocks**
Stock Screener
Stock Power Searches
Top-Rated Stocks
**Related Links**
Quote Watchlist
Expert Picks
E-mail & Alerts
IPO Center
Message Boards
Capital Gains Analysis

## Boston Scientific and CryoCor Announce Signing of Definitive Merger Agreement

April 16, 2008 8:30 AM ET


All PR newswire news

NATICK, Mass. and SAN DIEGO, Calif., April 16 /PRNewswire-FirstCall/ -- Boston Scientific Corporation BSX and CryoCor, Inc. CRYO today announced the signing of a definitive merger agreement, under which Boston Scientific will pay a cash purchase price of $1.35 per share of CryoCor, or approximately $17.6 million. This acquisition follows a development agreement, in place since June 2007, to pursue therapeutic solutions for atrial fibrillation, or "Afib." Afib is the most common cardiac arrhythmia and affects millions of patients.

The existing development agreement involves the development of a console to deliver cryo energy to Boston Scientific's proprietary cryo balloon catheter. Boston Scientific's cryo balloon is being developed to provide a safe, standardized and broadly applicable method to isolate the electrical activity originating from the pulmonary veins, which are believed to be a source for the initiation and propagation of Afib.

"In the current development project, CryoCor's console demonstrated its ability to efficiently deliver nitrous oxide to our proprietary cryo balloon catheter," said Fred Colen, Executive Vice President, Operations and Technology, Boston Scientific Cardiac Rhythm Management. "This acquisition will allow us to further refine this base console technology, and gaining exclusive rights to CryoCor's family of intellectual property will provide us a key strategic advantage. This is a good example of our Cardiac Rhythm Management and Electrophysiology teams working together to advance our most promising technologies and to potentially make new Afib solutions a reality for electrophysiologists and their patients."

"We are pleased to see our cryoablation system and our intellectual property assets partnered with one of the world's leading electrophysiology companies," said Ed Brennan, Chief Executive Officer of CryoCor.

The acquisition, which has been approved by the Board of Directors of CryoCor, is structured as a cash tender offer. The parties have agreed to commence the tender offer within the next 10 business days, followed by a second-step merger in which any untendered CryoCor shares would be converted into the right to receive the same cash price per share as shareholders who tendered in the tender offer. Both the tender offer and the merger are subject to terms and conditions detailed in the merger agreement. The merger is expected to close this quarter.

About Boston Scientific Corporation

advertisement





**10 Stocks Share One Trait...**

Hansen Natural, Asta Funding, Celgene, Apple, Comtech, Daktronics, Green Mountain Coffee, Clean Harbors, Innodata Isogen, Immucor.

How many of these stocks do you own? They returned up to 19,449%. Ten years ago they were small caps. Discover 2 more breakout stocks for 2008.

These are just two of 10 top stock ideas revealed in a new Investor Kit from The Motley Fool. FREE for a limited time.

▶ **Click here to claim your report... It's FREE!**

**Article tools**

E-mail this article

Print-friendly version

Discuss this article

**Stocks mentioned in this article**
Boston Scientific Corp (BSX) Stock Quote, Chart, News, Add to Watchlist
CryoCor Inc (CRYO) Stock Quote, Chart, News, Add to Watchlist

**Related news**

Premarket Movers: Wachovia Corp. falls

Stocks end lower amid earnings concerns

S&P 500 Leaders & Laggards: FHN HES

Midday Leaders & Laggards: S&P 500

Gas prices could pass $3.50 in weeks

Boston Scientific is a worldwide developer, manufacturer and marketer of medical devices whose products are used in a broad range of interventional medical specialties. For more information, please visit: www.bostonscientific.com.

Boston Scientific's Electrophysiology business is a leader in cardiac ablation products designed to treat common cardiac arrhythmias. Its line of Blazer(TM), Blazer XP(TM) and Chilli II(TM) products are used to treat arrhythmias such as Atrial Flutter and Ventricular Tachycardia. The Electrophysiology business also supplies a complete line of multi-electrode diagnostic catheters, ultrasound (ICE) catheters and accessories. The cryo balloon catheter is currently under development and not approved for sale.

About CryoCor, Inc.

CryoCor is a medical technology company that has developed and manufactures a disposable catheter system based on its proprietary cryoablation technology for the minimally invasive treatment of cardiac arrhythmias. The Company's product, the CryoCor Cardiac Cryoablation System, or the Cryoablation System, is designed to treat cardiac arrhythmias through the use of cryoenergy, or extreme cold, to destroy targeted cardiac tissue. The Cryoablation System has been approved in Europe for the treatment of atrial fibrillation, and atrial flutter, the two most common and difficult to treat arrhythmias, since 2002. In the United States, CryoCor is conducting a pivotal trial to evaluate the safety and efficacy of the Cryoablation System for the treatment of atrial fibrillation and the Cryoablation System has been approved for the treatment of right atrial flutter. For more information please visit the Company's website at http://www.cryocor.com.

Cautionary Statement Regarding Forward-Looking Statements

This press release contains forward-looking statements within the meaning of Section 21E of the Securities Exchange Act of 1934. Forward-looking statements may be identified by words like "anticipate," "expect," "project," "believe," "plan," "estimate," "intend" and similar words. These forward- looking statements are based on our beliefs, assumptions and estimates using information available to us at the time and are not intended to be guarantees of future events or performance. These forward-looking statements include, among other things, statements regarding new product development and performance, acquisitions and integration of acquired companies, development plans and expenditures, and our growth strategy. If our underlying assumptions turn out to be incorrect, or if certain risks or uncertainties materialize, actual results could vary materially from the expectations and projections expressed or implied by our forward-looking statements. These factors, in some cases, have affected and in the future (together with other factors) could affect our ability to implement our business strategy and may cause actual results to differ materially from those contemplated by the statements expressed in this press release. As a result, readers are cautioned not to place undue reliance on any of our forward-looking statements.

Factors that may cause such differences include, among other things: future economic, competitive, reimbursement and regulatory conditions; new product introductions; demographic trends; intellectual property; litigation; financial market conditions; and, future business decisions made by us and our competitors. All of these factors are difficult or impossible to predict accurately and many of them are beyond our control. For a further list and description of these and other important risks and uncertainties that may affect our future operations, see Part I, Item 1A- Risk Factors in our most recent Annual Report on Form 10-K filed with the Securities and Exchange Commission, which we may update in Part II, Item 1A - Risk Factors in Quarterly Reports on Form 10-Q we have filed or will file thereafter. We disclaim any intention or obligation to publicly update or revise any forward- looking statements to reflect any change in our expectations or in events, conditions, or circumstances on which those expectations may be based, or that may affect the likelihood that actual results will differ from those contained in the forward-looking statements. This cautionary statement is applicable to all forward-looking statements contained in this document.

Additional Information

The tender offer described in this press release has not yet commenced, and this press release is neither an offer to purchase nor a solicitation of an offer to sell CryoCor common stock. Investors and security holders are urged to read both the tender offer statement and the solicitation/recommendation statement regarding the tender offer described in this press release when they become available because they will contain important information, including the terms and conditions to the tender offer. The tender offer statement will be filed by Padres Acquisition Corp., an indirect wholly-owned subsidiary of Boston Scientific, with the Securities and Exchange Commission ("SEC") and the solicitation/recommendation statement will be filed by CryoCor with the SEC. Investors and security holders may obtain a free copy of these statements (when available) and other documents filed by Boston Scientific and CryoCor with the SEC at the website maintained by the SEC at www.sec.gov. The tender offer statement and related materials, solicitation/recommendation statement, and such other documents may be obtained for free by directing such requests to Investor Relations of CryoCor, Inc.

```
CONTACTS FOR BOSTON SCIENTIFIC: Paul Donovan
                                508-650-8541 (office)
                                508-667-5165 (mobile)
                                Media Relations
                                Boston Scientific Corporation

                                Larry Neumann
                                508-650-8696 (office)
                                Investor Relations
                                Boston Scientific Corporation

CONTACTS FOR CRYOCOR:           Gregory J. Tibbitts
                                Chief Financial Officer
                                CryoCor, Inc.
                                (858) 909-2200
                                gtibbitts@cryocor.com

                                Stephanie Carrington / Zack Kubow
                                The Ruth Group
                                (646) 536-7017 / 7036
                                scarrington@theruthgroup.com
                                zkubow@theruthgroup.com
```

Copyright 2008 PR Newswire

Back to Recent News

advertisement

Sponsored Links

**Diamonds Chicago**
Wholesale Diamond Dealer in Chicago will sell Directly to the Public
www.diamonds-chicago.com

**Two Stocks to Buy Now**
Get David & Tom Gardner's 2 top-rated stocks free!
http://www.fool.com

**Fed Cuts Rates Again**
$180,000 Mortgage under $699/mo. See Rates - No Credit Check Required
www.MortgageRatesExperts.com

**Press Release Services**
Press Release Distribution, Writing, Wire Services. 888-546-NEWS
www.eworldwire.com

**MSN Money**
Search MSN Money | Message Boards | Site Status

**Data providers**
Copyright © 2008 Reuters. Click for Restrictions.
Quotes supplied by ComStock, an Interactive Data company.